**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
PENSKE MEDIA CORPORATION,         :

                                         :

                                         :     No. 1:20-CV-04583 (MKV)

                      Plaintiff,    :

                                         :

                                         :     **[PROPOSED PARTIALLY**

                                       :     **SEALED] AMENDED**

                    v.             :     **COMPLAINT**

                                         :

SHUTTERSTOCK, INC.               :

                                         :

                    Defendant.   :
-------------------------------------------------------------x

## COMPLAINT

      Plaintiff Penske Media Corporation ("PMC"), by its attorneys, for its Complaint against Defendant Shutterstock, Inc., respectfully alleges as follows:

## NATURE OF THE ACTION

      1.     Penske Media Corporation brings this action to remedy Defendant Shutterstock, Inc.'s cynical and pretextual invocation of the COVID-19 pandemic to re-write and terminate an agreement that Shutterstock has successfully used to transform itself – on PMC's back – from a provider of low value "stock" photographs to a purveyor of prestigious news and editorial content.  In addition to its wrongful termination of the parties' agreement, Shutterstock breached the contract by refusing to send photographers to cover and photograph various PMC-hosted events on PMC's behalf, which Shutterstock was obligated to do under the agreement to generate additional editorial content that PMC would own. Shutterstock also violated the covenant of good faith and fair dealing inherent in the parties' agreement by capturing photographs at various third party events for itself and not for PMC to own, as contemplated by the agreement, and

thereby diverting value away from PMC's photograph collection. PMC also brings this action for copyright infringement based on Shutterstock's continued exploitation of PMC's photographs even after Shutterstock wrongfully terminated the agreement from which Shutterstock's exploitation rights emanate. PMC, finally, brings this action to remedy Shutterstock's practice of using on its website and transmitting to others false copyright information identifying itself as the copyright owner of at least 2,300 photographs owned by PMC—in rampant violation of Section 1202 of the United States Copyright Act.

2.      In June 2015, the parties entered into an Archive & Event Hosting and Licensing Agreement. The agreement provided Shutterstock exclusive worldwide rights to license millions of photographic images from a trove of important media publications owned by PMC, including the legendary Hollywood publication *Variety* and the fashion bible *Women's Wear Daily* (and PMC also gave Shutterstock access to images from the subsequently added music icon *Rolling Stone*). The agreement also allowed Shutterstock to leverage PMC's insider access to fashion runways, exclusive celebrity parties, and Hollywood events like the Golden Globe and Academy Awards, as well as events, galas, summits, and conferences produced by PMC and its subsidiaries annually, in order to capture additional images to license to the world's media.

3.      Shutterstock has no valid basis to exploit the COVID-19 pandemic to walk away from its contractual obligations. Shutterstock contends that PMC has been unable to "perform" under the parties' agreement because the COVID-19 pandemic has resulted in the cancellation of events, which Shutterstock intended to attend and photograph (for PMC), and to license the resulting photographs (on PMC's behalf). But PMC has no

contractual obligation to ensure that any such events are held or occur.  Rather, PMC is obligated only to ensure that Shutterstock photographers are given access to attend and photograph those events on PMC's behalf, when and if those events are held.

4.     Shutterstock also contends that the pandemic purportedly rendered "worthless" its agreement with PMC because live, in person events that Shutterstock intended to photograph under the deal have been cancelled or postponed.  But in making this contention, Shutterstock ignores that, even with the impacts of COVID-19, which are likely temporary, it has earned tremendous benefits under the parties' agreement for the past five years, and that, absent Shutterstock's wrongful termination, Shutterstock would have continued to enjoy many of the key benefits under that deal, including the unrestricted right to license the millions of photographs in the PMC collection and to attend and photograph other events that continue to be scheduled within the parameters of COVID-19.

5.     Indeed, Shutterstock itself trumpeted the deal in a 2015 press release as giving it needed "credibility" to break out of the "stock" photo space, thus recognizing that the deal put Shutterstock "on the map" in the United States market as a source of high-quality and prestigious fashion and celebrity photographs, all of which allowed Shutterstock to attract new partners and content and build its business in the news and editorial space.  Shutterstock, moreover, already has benefitted from millions of images contained in PMC's photograph collection, including photographs contained in PMC's historic archive plus the hundreds of thousands more taken by both PMC and Shutterstock during the past five years. Shutterstock continuously exploited and licensed these photographs throughout the period, including after COVID-19 restrictions were

implemented and could have continued to exploit and license under the terms of the parties' deal had it not wrongfully terminated the Archive & Event Agreement.

6.      Having successfully extracted these invaluable benefits from its agreement with PMC, Shutterstock decided to jettison the deal as part of a recently announced cost-cutting plan, having nothing to do with the virus. Simply put, Shutterstock wrongfully terminated the agreement to avoid paying PMC ████████████████████ ████████████████████████████████████████ ████████ and therefore to help reduce Shutterstock's expenses and shore up its revenues so that this public company may continue to pay healthy dividends to its shareholders.

7.      PMC believes that anyone truly harmed by COVID-19 – individuals and businesses alike – deserves all the assistance that governments, courts, and private individuals and institutions can provide.  Like other businesses, the virus has impacted PMC's operations, as well as the lives of PMC's employees, and PMC has not hesitated to bring valuable assistance to those in need, including through Hail the Heroes, a PMC-lead initiative to raise funds for Team Rubicon and its #NeighborsHelpingNeighbors efforts around the COVID-19 crisis.

8.      Shutterstock, however, is not among those genuinely aggrieved by COVID-19.  Indeed, Shutterstock announced at the end of April, and approximately two weeks before serving PMC with its termination notice, that it was well positioned financially with $296 million in cash and no debt and expects to produce significant earnings and free cash flow in 2020, in no small part due to the groundbreaking deal with PMC that Shutterstock admits allowed it to "accelerate [its] progress in editorial imagery."

4

9.      Having reaped benefits under the parties' agreement for half a decade, Shutterstock shamelessly seeks to capitalize on a national tragedy to avoid paying PMC the upcoming annual advance to which PMC is entitled under the parties' deal.  PMC brings this action to remedy that and the other wrongs addressed below.

## THE PARTIES

10.      Plaintiff PMC is a digital media, publishing, and information services company.  It publishes more than 20 digital and print brands covering the entertainment and fashion industries, including *Women's Wear Daily* ("*WWD*"), *Variety*, *Deadline Hollywood*, *Rolling Stone*, and others.  It owns and controls a vast, and constantly growing photograph collection related to these publications, including images from its legendary, 100-years-old publications *Variety* and *WWD*.

11.      Defendant Shutterstock, Inc. is a company that owns and operates a website that historically has licensed commercial digital imagery to third parties on behalf of photographers and other content owners.  Commercial digital imagery consists of photographs, known as "stock" photographs, as well as illustrations and videos that companies use in their visual communications, such as websites, digital and print marketing materials, corporate communications, and publications.

## JURISDICTION AND VENUE

12.      This Court has subject jurisdiction over PMC's claims of copyright infringement and violations of the Digital Millennium Copyright Act under 17 U.S.C. §§ 1331 and 1338(a).  This Court has subject matter jurisdiction over PMC's contract claims under 28 U.S.C. § 1367 because these claims are so related to the claims in the

action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     The Court has personal jurisdiction over Shutterstock because Shutterstock's principal place of business is located within the State of New York and because Shutterstock consented in the agreement at issue to the exclusive jurisdiction of the federal and state courts located in New York.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and 1400(a), because Shutterstock's principal place of business is located, and thus Shutterstock resides in this District, and because Shutterstock waived in the agreement at issue any and all objections to venue in the federal and state courts located in New York.

## FACTUAL ALLEGATIONS

15.     In June 2015, PMC and Shutterstock entered into the Archive & Event Image Hosting and Licensing Agreement (the "Archive & Event Agreement"), effective as of July 1, 2015.

16.     As evidenced by the document's very title, the Archive & Event Agreement provides Shutterstock with two distinct benefits.  On the "Archive" side of the deal, Shutterstock obtained exclusive worldwide rights to license photographs contained in PMC's massive photograph collection, which includes fashion, celebrity and event images, created over the last 100+ years, from PMC's publications, including the legendary *Variety* and *WWD* publications (and PMC also gave Shutterstock access to *Rolling Stone*), and which has grown since the contract's inception in 2015 and continues to grow on a daily basis as new images are created.

17.     On the "Event" side, Shutterstock obtained from PMC the rights to (a) leverage PMC's insider access to various high profile Hollywood and fashion events, such as the Academy Awards, the Toronto Film Festival, and the Golden Globes, and to attend and exclusively photograph those events for PMC using PMC credentials; and (b) attend and photograph PMC-hosted events, again for PMC and to the extent such events were held, and to license the resulting photographs to Shutterstock customers.

<u>Shutterstock's Strategic Need to Partner with PMC</u>

18.     Before Shutterstock's entry into the Archive & Event Agreement, Shutterstock was primarily a "stock" photo outlet.  Stock photographs are low value photographs, often used for commercial purposes such as providing decorative elements to personal and commercial websites.  As *The Atlantic* reported in 2012, Shutterstock's stock photograph website focused "heavily on sit-comic poses, colorful cartoons, plates of food, ponderous abstractions, and cats."

19.     Although Shutterstock had hoped to expand its licensing business beyond such cat photos and into the more prestigious and higher revenue news and editorial space – especially in the fields of entertainment and fashion – Shutterstock had been stalled in its ability to expand into these markets, which had long been dominated by its main competitor, Getty Images.

20.      In 2015, Shutterstock embarked on an ambitious two-pronged business plan to move beyond the stock photography business and into the more lucrative and prestigious news and editorial markets.  First, Shutterstock acquired Rex Features, Europe's largest independent photo press agency, in January 2015.  Second, Shutterstock looked for a similarly big opportunity within the United States with the goal of

establishing credibility and gaining a foothold in the news and editorial arenas to compete with Getty and others in these markets.

21.     Shutterstock identified PMC as the ideal partner in the United States to accomplish its broader strategic goals.  Shutterstock and PMC engaged in lengthy negotiations, and ultimately entered into the Archive & Event Agreement, effective July 1, 2015.  In press announcements, interviews with the press, and even in its own filings with the Securities and Exchange Commission, Shutterstock trumpeted the role that the PMC relationship played within Shutterstock's larger strategic goals.  Shutterstock issued a press release stating that it had formed a "strategic . . . partnership" with PMC that would allow the company to "accelerate our progress in editorial imagery."  A Shutterstock executive told the business publication *Crain's Business New York* that the "deal brings us strength in entertainment and fashion in the U.S."  And Shutterstock disclosed in its Form 10-K Annual Report for 2015 that the deal gave Shutterstock "credibility in the market for editorial content that will allow us to further grow our product offerings."  As *Crain's* recognized, Shutterstock's entry into its landmark deal with PMC enabled the then-"provider of stock imagery" to finally "step[]into the world of red carpets and fashion runways—and tak[e] a key provider of fashion and entertainment photos and video away from archrival Getty Images."

22.     Given the critical importance of the Archive & Event Agreement to the company's strategic plans, Shutterstock agreed to provide PMC with significant compensation to induce PMC to enter the deal.  Among other things, Shutterstock agreed to pay PMC a generous royalty for Shutterstock's licensing of PMC's content as well as a

███████████   ████████████████████████████████████████████

████████████████████████████████████████████████████████

Third, Shutterstock agreed to provide PMC with a digital asset management tool, allowing PMC to store significant terabytes of digital content at no cost to PMC. Shutterstock further agreed that PMC would be the copyright owner of *all* photographs that Shutterstock shot at both PMC-hosted events and at third-party events to which Shutterstock was given access by PMC, and that Shutterstock shot using PMC credentials.

<u>Shutterstock Reaped Incalculable Benefits Under the Deal</u>

23.   For the past five years, Shutterstock has reaped tremendous benefits under the Archive & Event Agreement:

24.   Shutterstock has attained all the "credibility" it sought to gain from the deal.  That credibility gave Shutterstock an immediate foothold in the editorial and news licensing market within the United States and opened the door for Shutterstock to add editorial and news partners and content to its offerings.

25.   Indeed, before Shutterstock entered into the Archive & Event Agreement, it was rarely given credentials to allow photographers inside the highest profile events in the fashion and entertainment industry, and only occasionally given "behind the line" credentials to stand outside these events on the red carpet.  Pursuant to the Archive & Event Licensing Agreement, when a PMC publication was given access to one of these events, it gave its credential to Shutterstock, and Shutterstock would send its own photographer to cover the event.  As a result of Shutterstock's use of PMC's credentials, Shutterstock was finally able to "crack the barriers" and gain access through PMC that

industry expert Paul Melcher coined Shutterstock's "golden pass."  Shutterstock is now regularly granted its own credentials to many of the events for which PMC previously provided Shutterstock access.

26.     Shutterstock also has received rights to license images from PMC's photograph collection.  This collection includes photographs contained in PMC's historic archive plus the tens of thousands of photographs taken during the past five years by PMC's own staff and freelance photographers, as well as Shutterstock's photographers shooting for PMC under the Archive & Event Agreement, which photographs Shutterstock has continuously exploited and licensed under PMC's authority.  PMC's photograph collection includes decades of images featuring famous moments in fashion, entertainment, rock and roll, and other historic events, including Truman Capote's Black and White Ball.  The collection also includes images that PMC's staff and freelance photographers shoot almost every day ranging from movie premieres and concerts and other "red carpet" events to, just recently, images of protestors on the streets of Los Angeles.

Shutterstock's Pretextual Termination

27.     As part of Shutterstock's new strategy to shore up the company by reducing expenses, and despite the significant benefits that Shutterstock has received and would have continued to receive going forward under the deal, Shutterstock notified PMC of its termination of the Archive & Event Agreement via a written "Notice of termination for cause" dated May 18, 2020. Shutterstock contends that this letter provided PMC with a 45 day "notice and cure" period.  However, Shutterstock's May 18, 2020 letter did not provide PMC with such notice.  Shutterstock sent PMC a second letter

on July 2, 2020, notifying PMC that Shutterstock was again terminating the agreement, this time as of July 17, 2020.

28.     Shutterstock justified its termination on the untenable theory that, as result of in person events being cancelled as a result of the global COVID-19 pandemic, PMC cannot "perform" under the Archive & Event Agreement; and accordingly, the purpose of that contract has been "entirely frustrated" and the agreement rendered "worthless." Shutterstock also notified PMC, both in that termination letter and in other communications, that Shutterstock is excused from paying, and would not commit to pay, ███████████████████████████████ that is due and payable to PMC under the Archive & Event Agreement on or before July 1, 2020.  As set forth below, Shutterstock seeks to re-write the Archive & Event Agreement to falsely contend that PMC is obligated to deliver it events to shoot.  Shutterstock has no grounds to purport to terminate the agreement on this basis, much less to contend that the agreement has been rendered worthless.

29.     Shutterstock has no valid basis to rely on COVID-19 to terminate the Archive & Event Agreement, but is instead exploiting the pandemic to cynically and illegitimately renege on its contractual obligations:  specifically, Shutterstock seeks to avoid paying PMC █████████████ that was due and owing as of July 1, 2020.  In addition, Shutterstock wishes to avoid its obligation to offer PMC ████████ ████████████████████████████████████████ ██████, and other benefits owed to PMC during the remainder of the agreement.  This is not due to any failure by PMC to perform, or any "frustration" or "impossibility" of, the

Archive & Event Agreement due to COVID-19, but instead is based on Shutterstock's desire to implement a new business model to lower its costs across the board.

30.     Shutterstock cannot legitimately contend that PMC has failed, or will in the future fail, to "perform" under the Archive & Event Agreement based on the cancellation or non-occurrence of live, in-person events that Shutterstock planned to photograph.  PMC has no contractual obligation to ensure that any live, in-person events are held for Shutterstock to attend and photograph.  Rather, the Archive & Event Agreement plainly states that PMC is obligated only to ensure that Shutterstock photographers are given access to PMC events, and given credentials for third-party operated events to which PMC is given access: "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally," and "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access. . . ." PMC has never denied, Shutterstock access to any applicable PMC or third party-operated live event, and PMC, therefore, did not fail, to perform any of its live event obligations under the Archive & Event Agreement.

31.     Further, Shutterstock cannot legitimately rely upon the "frustration of purpose" doctrine to terminate the Archive & Event Agreement.  That doctrine can be invoked only where the contract at issue has been rendered "virtually worthless." Regardless of the temporary pause in Shutterstock's ability to access live events due to the COVID-19 pandemic, Shutterstock already has reaped tremendous benefits under the contract and, absent its unlawful termination, stood to reap many more through the

remainder of the term of the Agreement (which would have continued through June 31, 2021).

32.     As set forth above, for the past five years, Shutterstock already has received an array of benefits under the Archive & Event Agreement, including (a) obtaining the incalculable "credibility" that it eagerly sought to expand its business lines and enhance its reputation; (b) attending PMC hosted events and using PMC's credentials to capture five years-worth of photographs at high-profile events hosted by third parties, all of which have been exclusively licensed by Shutterstock; and (c) exclusively licensing images from the legendary PMC photograph collection, which is updated virtually daily with images taken by PMC's own photographers.  Given this five-year long stream of benefits that Shutterstock already enjoyed under the Archive & Event Agreement, and the opportunity to continue to receive substantial benefits under the Agreement through the remainder of its term, it is impossible for COVID-19 to have rendered the contract virtually worthless to Shutterstock.

33.     Notably, Shutterstock continued to license images from PMC's photograph collection to third-parties after various COVID-19 restrictions were implemented in the United States starting in mid-March 2020. For example, on or about July 27, 2020, *Us Weekly* magazine published a cover story about the untimely and tragic death of Kelly Preston. The cover image illustrating the story was an image from PMC's photograph collection that Shutterstock licensed to the magazine.

34.     While Shutterstock now disingenuously brushes aside the benefits it received from its licensing of millions of PMC photographs, including those shot by PMC photographers during the past five years, as well as those Shutterstock shot at PMC

and third party-operated events, Shutterstock has consistently touted its access to the PMC photograph collection as a key benefit of the deal.  Shutterstock's press release announcing the deal in 2015 included the headline "**Alliance to create leading global image library anchored by PMC's WWD and Variety**," and Shutterstock highlighted in the same release that "Shutterstock will have an exclusive worldwide right and license to PMC's archive, including images from its legendary, 100-year-old publications Variety and WWD."  Shutterstock again highlighted the value of the photograph collection in its Form 10-K report for 2015, stating that the Archive & Event Agreement provides Shutterstock with "exclusive worldwide rights to license PMC's extensive archive that includes Variety and Women's Wear Daily publications."

35.     Even if one were to focus myopically on only the live events that Shutterstock had planned to photograph over the past few months, it was premature for Shutterstock to contend in May and again in July, 2020 that the Archive & Event Agreement had been rendered "virtually worthless" for the remainder of the contract (which, as noted,  was scheduled to expire on June 30, 2021) based on COVID-19, given that the current pause in live, in-person entertainment events may soon end.  Indeed, each of the times that Shutterstock purported to terminate the Agreement, Shutterstock had no way of knowing which or how many of these events would not occur during the 2020–2021 contract period and even today Shutterstock still cannot know that information for the majority of these events (none of the marquee events identified in the Archive & Event Agreement were scheduled before September 2020, and most were originally scheduled to be held between December 2020 and June 2021).  By way of example, The Venice Film Festival was never postponed. It commenced as a live, in-person event on

September 2, 2020, as originally scheduled and it includes several red-carpet events which photographers are attending and photographing.  The Golden Globe and Academy Awards have been rescheduled but remain planned for 2021.

36.    As the above demonstrates, Shutterstock's purported termination of the Archive & Event Agreement based on COVID-19 is entirely pretextual.  Far from being genuinely aggrieved by the effects of COVID-19, Shutterstock is exploiting the grave COVID-19 pandemic to help it further a new, greedy cost cutting business model, recently introduced by new senior management, that it seeks to implement for reasons having nothing to do with the virus.  Instead, Shutterstock's surprising decision to unilaterally terminate the contract is part and parcel of a broader strategy by new management to reduce Shutterstock costs due to challenges to its business model.

37.    On February 13, 2020, Shutterstock announced that its founder and then CEO, would step down and be replaced by a new CEO.  This announcement coincided with the release of Shutterstock's Q4 and 2019 financial results, which showed that although overall revenue increased year by year, net income dropped 63% and net income per share declined by nearly 22 percent.

38.    Following this announcement, Shutterstock immediately embarked on a program to reduce its expenses and shore up its revenues.  On May 26, 2020, just six weeks after the management change, Shutterstock announced that to cut costs and increase profits,  the company would dramatically reduce, effective as of June 1, 2020,the royalty rates paid to its contributors (*i.e.*, the photographers and other content owners whose images Shutterstock licenses).  In addition to lowering overall rates paid to its contributors, this new royalty structure will allow Shutterstock to retain for itself a

significant portion of subscription fees that its customers pay to Shutterstock and which Shutterstock previously shared with its contributors.

39.     Shutterstock's business challenges appear to be the result of regrettable management failures.  Despite the many opportunities provided by PMC under the Archive & Event Agreement, Shutterstock has failed to fully exploit its relationship with PMC.  Shutterstock has undergone frequent management turnover since 2015, including the dismissal and/or departure of most of the Rex Features staff familiar with the news and editorial photography licensing business and three General Manager turnovers in the past five years.  Shutterstock has further failed to implement necessary technological measures to ensure that the PMC photographic images, including those in the PMC photograph collection, were fully exploited.  By way of example, since 2015, Shutterstock has repeatedly promised PMC that it would build a "call for image" system that would allow the parties to syndicate the extremely valuable and high profile cover photographs and other celebrity-driven studio photographs taken by *Variety*, *Rolling Stone*, *Deadline* and other PMC publications, and which require prior approval of talent before syndication can take place (*i.e.* permission is required to be obtained from the talent appearing within the photographs, often A-list Hollywood celebrities and world-class musicians), prior to licensing.  "Call for image" is a key feature of the Getty Images, Magnum, Trunk Archive and other high-end photograph licensing and syndication businesses.

40.     Shutterstock, moreover, made these moves and cynically terminated its Archive & Event Agreement with PMC in an effort to avoid paying it the monies due thereunder, even though Shutterstock had announced on April 28, 2020 that it is well

positioned financially with $296 million in cash and no debt and expects to produce

significant earnings and free cash flow in 2020, allowing it to continue to pay a quarterly

dividend to its shareholders

<u>Shutterstock's Other Contract Breaches</u>

41.     In addition to its wrongful termination of the Archive & Event Agreement,

Shutterstock has breached the contract, and the covenant of good faith and fair dealing

inherent in it, in other ways as well.

<u>Shutterstock's Additional Breach of Contract</u>

42.     Shutterstock is obligated under the Archive & Event Agreement to

"provide editorial photographic event coverage, at Shutterstock's expense, for all PMC

Events" (which events include events, galas, conferences, summits, and other event

functions to which third parties are invited generally).  Yet, Shutterstock refused in 2019

to send its photographers to cover and photograph various PMC-hosted events and made

clear that it would not cover in 2020 anything that it considered a "smaller" PMC event.

The 2019 events that Shutterstock specifically refused to cover, included:

- *The Cave* Screening & Reception – 10/29/2019

- *SPC Maiden* Screening & Panel – 10/24/2019

- Doc Series- Bellingcat – 10/22/2019

- Composer Panel – 10/22/2019

- Netflix Atlantics Screening – 10/21/2019

- *Ford v Ferrari* Screening – 10/17/2019

- *Honey Boy* Screening – 10/14/2019

- *Made in Boise* Screening – 10/10/2019

- *Life Below Zero* Screening – 8/26/2019

- HBO Panels – 8/18/2019

- *Free Solo* Screening, Panel & Reception – 8/12/2019

- Gold Derby Meet The Experts Event, The Landmark West LA – 5/28/2019

- Meet The Experts at The Landmark West LA – 5/30/2019

- Meet The Experts at The Landmark West LA – 6/4/2019

- Gold Derby Meet The Experts at The Landmark West LA – 6/6/2019

Shutterstock's Breach of the Implied Covenant

43.     As explained above, the Archive & Event Agreement required PMC to give Shutterstock PMC's credentials to photograph third-party events to which PMC had access and Shutterstock, historically, had no access.  PMC was barred under the terms of the Archive & Event Agreement from providing these credentials to any third party other than Shutterstock.  In exchange, the Archive & Event Agreement provided that PMC would own all photographs shot by Shutterstock using these credentials.

44.     When the parties negotiated the Archive & Event Agreement, the parties contemplated, and PMC reasonably and justifiably understood, that Shutterstock would use PMC's credentials to take photographs at these third party events, to the extent PMC offered such credentials to Shutterstock for, and Shutterstock wished to photograph, these events, especially given that PMC was obligated to give its credentials exclusively to Shutterstock.

45.     Shutterstock nevertheless aggressively leveraged its use of PMC's exclusive access to various third-party events to establish its own relationships with the producers/promoters of these events and to obtain its own credentials for Shutterstock photographers to access these events independent of PMC.

46.     On various occasions, Shutterstock declined to use the credentials for third party events that PMC was required to provide exclusively to Shutterstock under the Archive & Event Agreement's terms and which PMC either provided or was ready, willing, and able to provide to Shutterstock, and Shutterstock instead attended these events using credentials that Shutterstock obtained for itself off PMC's back.  On these occasions, Shutterstock has claimed ownership of the resulting photographs and has exploited the images for itself even though the Archive & Event Agreement contemplates that Shutterstock would photograph these events, if at all, using PMC's credentials. Shutterstock's attempt to do an end-run around the Archive & Event Agreement by rejecting the use of PMC's credentials unfairly interferes with PMC's right to receive the benefits it expected to receive under the contract (the copyright in photographs at any third-party event that Shutterstock photographed and to which PMC tendered its credentials to Shutterstock), unfairly competes with PMC, and violates Shutterstock's duty of good faith and fair dealing by diminishing the value of PMC's photograph collection by reducing the number of photographs PMC owns and adds to that collection and can commercially exploit.

<u>Shutterstock's Copyright Violations</u>

47.     PMC is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et seq.*) (the "Copyright Act") to, *inter alia*, reproduce, distribute, display, or license the reproduction, distribution, and/or display, among other images, the approximately 2,300 photographs listed in <u>Exhibit 1</u> attached hereto (the "2,300 Photographs").

19

48.     The 2,300 Photographs include images from various "red carpet" events which Shutterstock photographed on PMC's behalf and using PMC's credentials under the Archive & Event Agreement, as well as images shot by one of PMC's renowned staff photographers.

49.     Under the Archive & Event Agreement, PMC granted Shutterstock an exclusive worldwide license for the duration of the agreement's term to exploit the 2,300 Photographs.

50.     Shutterstock's license to exploit the 2,300 Photographs (or any of PMC's photographs) ended when Shutterstock wrongfully terminated the Archive & Event Agreement no later than July 17, 2020.  Shutterstock nevertheless continued to reproduce, distribute, and display the 2,300 Photographs on its website after July 17, 2020.

51.     Continuing after Shutterstock's purported termination of the Archive & Event Agreement, Shutterstock has misrepresented itself as the copyright owner of the 2,300 Photographs in connection with its reproduction, distribution, and/or display of those works on RexFeatures.com and Shutterstock.com, and in metadata attached to the images which Shutterstock distributes to its customers and licensees.

52.     Shutterstock knew that PMC—not Shutterstock—owned the copyright in the 2,300 Photographs. Shutterstock nevertheless credited itself (sometimes along with the applicable photographers) as the owner of these works and afforded no ownership credit to PMC.  Shutterstock has therefore falsified copyright management information related to such works.  Shutterstock's falsification of copyright management information was without PMC's authorization.

53.     Shutterstock's falsification of copyright management information allows Shutterstock to conceal the fact that Shutterstock does not have authority to reproduce, distribute, or display the 2,300 Photographs, nor to license others to do so and that its exploitation of the works is infringing.

54.     Moreover, on information and belief, Shutterstock has granted licenses to third parties to reproduce, distribute, and/or display certain of the 2,300 Photographs after July 17, 2020, thereby further distributing false copyright management information that causes Shutterstock's customers and licensees to misattribute the copyright ownership information in connection with their own uses of the licensed images.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

55.     PMC repeats and realleges, as if fully set forth herein, each of the allegations set forth in paragraphs 1 through 54 above.

56.     The Archive & Event Agreement is a valid and binding contract, and PMC has performed its obligations under it.

57.     Shutterstock has improperly purported to terminate the Archive & Event Agreement as of no later than July 17, 2020.  Shutterstock had no valid basis to terminate the Archive & Event Agreement, such that its purported termination is a material breach of the Archive & Event Agreement.

58.     Shutterstock also breached the Archive & Event Agreement by failing to ████████████████████████████████ due and owing prior to July 17, 2020.

59.     Shutterstock has also breached the Archive & Event Agreement by refusing to attend and photograph events hosted by PMC.

60.     As a result of Shutterstock's actions, PMC has been damaged in an amount to be determined at trial, and which exceed $5 million, ███████████████ ██████████████ and additional damages resulting from the loss by PMC of the other benefits due and owing to PMC under the Archive & Event Agreement, including, without limitation, ████████████████████████ ████████████████████ and the value of the photographs that Shutterstock was obligated, but refused, to shoot.

## SECOND CLAIM FOR RELIEF

### (For Breach of the Implied Covenant of Good Faith and Fair Dealing)

61.     PMC repeats and realleges, as if fully set forth herein, each of the allegations set forth in paragraphs 1 through 60 above.

62.     The Archive & Event Agreement contains a covenant of good faith and fair dealing inherent in every contract.

63.     In declining to use the credentials for third party events that PMC was required to provide exclusively to Shutterstock under the Archive & Event Agreement's terms, attending these events using credentials that Shutterstock obtained for itself, and thereafter claiming ownership of the resulting photographs, Shutterstock has unfairly interfered with PMC's right to receive its expected benefits under the contract and has violated the covenant of good faith and fair dealing.

64.     As a result of this violation, PMC has been damaged in an amount to be proven at trial, including but not limited to the value of the estimated thousands photographs and the ability to earn royalties from the commercial exploitation of these works during the term of the Archive & Event Agreement and thereafter, that

Shutterstock took at the approximately 30 events at which it declined to use PMC's credentials and thus diverted from PMC.

### THIRD CLAIM FOR RELIEF

#### (Digital Millennium Copyright Act)

65.     PMC repeats and realleges, as if fully set forth herein, each of the allegations set forth in paragraphs 1 through 64 above.

66.     PMC is the exclusive owner of the copyrights in the 2,300 Photographs.

67.     When Shutterstock reproduced, distributed, and displayed the 2,300 Photographs on RexFeatures.com and Shutterstock.com, the 2,300 Photographs contained copyright management information protected under 17 U.S.C. § 1202.

68.     Upon information and belief, Shutterstock intentionally and knowingly provided false copyright management information in connection with the 2,300 Photographs by crediting itself, and not PMC.

69.     This conduct of Shutterstock violates 17 U.S.C. § 1202.

70.     Shutterstock's falsification of the copyright management information was made without PMC's authorization.

71.     Upon information and belief, Shutterstock intentionally and knowingly provided copyright management information falsely identifying Shutterstock as the owner of the copyrights in the 2,300 Misattributed Photographs and not PMC, to induce, enable, facilitate, or conceal the infringement of PMC's exclusive rights in the 2,300 Photographs, including Shutterstock's own infringement.  Shutterstock also knew, or should have known, that such falsification of copyright management information would

induce, enable, facilitate, or conceal the infringement of PMC's exclusive rights in the 2,300 Photographs.

72.     As a result of the wrongful conduct of Shutterstock as alleged herein, PMC is entitled to recover from Shutterstock the damages that it sustained and will sustain, and any gains, profits and advantages obtained by Defendant because of its violations of 17 U.S.C. § 1202.

73.     Alternatively, Plaintiff may elect to recover from Defendant statutory damages pursuant to 17 U.S.C. § 1203(c)(3) in a sum of at least $2,500 up to $25,000 for each violation of 17 U.S.C. § 1202, which would range from approximately $5,750,000 to $57,500,000  in the aggregate.

74.     PMC would be further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 1203.

## FOURTH CLAIM FOR RELIEF

### (Copyright Infringement)

75.     PMC repeats and realleges, as if fully set forth herein, each of the allegations set forth in paragraphs 1 through 74 above.

76.     As the owner of the copyrights in the 2,300 Photographs, PMC owns the exclusive rights to reproduce, distribute, and/or display the 2,300 Photographs.

77.     Shutterstock has, within the United States, reproduced, distributed, and/or displayed the 2,300 Photographs on and after July 17, 2020.

78.     Shutterstock had no authorization to reproduce, distribute, and/or display the 2,300 Photographs on or after July 17, 2020.

79.     As a direct and proximate result of Shutterstock's infringement of PMC's exclusive rights under copyright, PMC is entitled to damages in an amount to be established at trial and Shutterstock's profits pursuant to 17 U.S.C. § 504(b) for each individual act of infringement.

WHEREFORE, PMC demands judgment and relief against Shutterstock as follows:

A.     A judgment in PMC's favor on PMC's Claims for Relief.

B.     Damages in an amount to be proven at trial;

C.     Pre-judgment and post-judgment interest to the extent permitted by law from the date of breach or wrongful act, until payment is made;

D.     The costs of this action;

E.     Attorneys' fees and costs; and

F.     Such other relief as the Court may deem just and proper.

Dated: New York, New York
      September 11, 2020

SHAPIRO ARATO BACH LLP

By:  /s/ Cynthia S. Arato
     Cynthia S. Arato
     Lauren M. Capaccio

500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone: (212) 257-4882
Facsimile: (212) 202-6417
carato@shapiroarato.com

*Attorneys for Plaintiff Penske Media Corporation*