UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

      Plaintiff-Counterclaim Defendant,

      -against-

SHUTTERSTOCK, INC.,

      Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

## SHUTTERSTOCK, INC.'S COUNTERSTATEMENT TO PENSKE MEDIA CORPORATION'S ANTICIPATED RULE 56.1 STATEMENT OF FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York and Paragraph 4(A)(i) of this Court's Individual Rules of Practice in Civil Cases, defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock"), by and through its undersigned counsel, respectfully submits the following counterstatement to plaintiff-counterclaim defendant Penske Media Corporation's ("PMC") anticipated Rule 56.1 statement of facts (Dkt. No. 112-1):[1]

    1.     Plaintiff PMC is a digital media, publishing, and information services company. It publishes more than 20 digital and print brands covering the entertainment and fashion industries, including Women's Wear Daily ("WWD"), Variety, Deadline Hollywood, Rolling Stone, and others. (Anticipated Declaration of Karl Walter ("Walter Decl.") ¶ __; Defendant Shutterstock Inc.'s Counterclaims, Dkt. No. 77 ("Counterclaims") ¶ 13).

    **Shutterstock's Response:**  Undisputed in part but incomplete for failure to reference live events.  Transcript of Deposition of Jay Penske ("Penske Tr."), 21:16-20 (███████████████████

████████████████████████████████████████████████████████████████████

---

[1] PMC's anticipated Rule 56.1 statement contains headings before Paragraphs 1, 6, 28, 35, 41, 52, 59, 81, 89, 114, 123, and 141, many of which contain statements of purported fact and/or arguments.  Shutterstock disputes such headings and objects to same on the ground that they are not supported by admissible evidence.



*id.*, 37:13-16 ███████████████████████████████████

████████ ); *id.*, 68:6-10 █████████████████████████████

███████████████████████████████████████████ *see also id.*,

68:19-21 (███████████████████████████████████████████

████████████████████████████

    2.    PMC owns a large and ever-growing photographic collection with millions of images related to its publications. (Walter Decl., ¶ ___).

**Shutterstock's Response:**  Disputed and immaterial to the extent that the "photographic collection" was not available for license via Shutterstock.  The vast majority of PMC's primarily physical photographs received as part of its then-recent purchases of Fairchild Fashion Media, Variety, and others was never digitized or made available to Shutterstock, and many were not available for license due to rights issues.  Accordingly, a major part—if not the majority—of PMC's copies of images never became Archive Content available to Shutterstock under the parties' Archive & Event Image Hosting and Licensing Agreement (the "Agreement").  *See* Transcript of Deposition of Karl Walter ("Walter Tr."), 385:23-386: 16, 387:9-388:5, 391:9-392:6; Transcript of Deposition of Judy Margolin ("Margolin Tr."), 192:1-13, Ex. 18 (SSTK030767-74) ████████████████████████████████████████); Expert Report of Eric Rachlis ("Rachlis Report"), ¶¶ 20, 25, 30, 33; Penske Tr., 138:20 (█████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████); *id.*, 162:5-6 ████████ ███████████████████████████████.

    3.    PMC's photographic collection includes historic fashion, celebrity, and event images, created over the last 100+ years, from the various PMC-owned publications (the "Historic

Archive"). (Expert Report of Eric Rachlis, dated Dec. 16, 2021 ("Rachlis Report") ¶¶ 10-12, 27, 29, 30).

**Shutterstock's Response:**  Disputed and immaterial to the extent that the "photographic collection" was not available for license via Shutterstock.  The vast majority of PMC's photographs received as part of its then-recent purchases of Fairchild Fashion Media, Variety, and others were never digitized or made available to Shutterstock, and many were not available for license due to rights issues.  Accordingly, a major part—if not the majority—of PMC's copies of images never became Archive Content available to Shutterstock under the Agreement.  *See* Walter Tr., 385:23-386:16, 387:9-388:5, 391:9-392:6; Margolin Tr., 188:24-25; 192:1-13, Ex. 16 (PMC_00019959-62); Rachlis Report ¶¶ 20, 25, 30, 33.  Further, "Historic Archive" is not defined in the Agreement.  "Archive Content" is.  *See* Agreement, ¶ 3(a)(i).  Archive Content does not include third-party or PMC event content.  *See id.*; *see also* Penske Tr., 176:9-17.

4.      Defendant Shutterstock, Inc. ("Shutterstock") is a company that owns and operates website platforms that license photographs to third parties for use on third party websites, publications, marketing materials, and corporate communications. (*See* Form 10-K, dated Feb. 24, 2016, PMC_0022218-345 at 22220; *see also* Counterclaims ¶¶ 11-12, 15).

**Shutterstock's Response:**  Disputed.  PMC cites a Form 10-K from over eight years ago. Shutterstock is a leading global creative platform offering full-service solutions, high-quality content, and creative workflow solutions for brands, businesses and media companies.  Its platform brings together content creators and a vast network of contributors by providing readily-searchable content that Shutterstock's customers pay to license and by compensating contributors as their content is licensed.  Shutterstock's offerings include over 400 million images and more than 24 million footage clips, as well as footage, music, and more, which has enabled Shutterstock to attract a global and diverse base of over two million customers in 2021 alone, representing businesses of all sizes and from all major industries, including global and local media and

broadcast companies that are reliant on fresh, newsworthy images to attract their own customers. *See* Anticipated Declaration of Stan Pavlovsky ("Pavlovsky Decl."), ¶ __.

5.     Until 2015, Shutterstock was known primarily for its "stock" photographs, but it desired to enter the more prestigious realm of editorial imagery, including fashion and entertainment photography. (Deposition Transcript of Ben Pfeifer ("Pfeifer Tr.") 54:20-25, 162:16-18, 164:17-23; Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Deposition Transcript of Stan Pavlovsky ("Pavlovsky Tr.") 59:11-60:10; *see also* Counterclaims ¶ 12).

**Shutterstock's Response:**  Undisputed as to its general brand at the time, but disputed as to editorial imagery.  Shutterstock always offered editorial imagery.  *See* Deposition Transcript of Jon Oringer ("Oringer Tr."), 63:15-24 ████████████████████████████████████████

However, ███████████████████████████████████████████████████████████

████████████████████  Shutterstock desired to launch an editorial *product* (called Shutterstock Editorial, now also encompassed in the product called Shutterstock Premier) to attract more customers in the media industry, and such product would include images not just from fashion and entertainment, but from politics, sports, and other current events from around the world.  *See* Pfeifer Tr., 167:17-168:4; 170:9-15; 207:15-21; Anticipated Declaration of Ben Pfeifer ("Pfeifer Decl."), ¶¶ __; Oringer Tr., 97:21-98:12; 100:24-101:2; 301:22-302:12 (████████████ ███████████████████████████████████████████████████).

6.     PMC and Shutterstock entered into an agreement, named the Archive & Event Image Hosting and Licensing Agreement (the "Archive & Event Agreement" or "Agreement"), as of July 1, 2015. (Archive & Event Agreement, SSTK092808-29).

**Shutterstock's Response:**  Undisputed.

7.     The Archive & Event Agreement provided for an initial six-year term that was to expire on June 30, 2021. (Archive & Event Agreement § 1).

**Shutterstock's Response:**  Undisputed.

8.     The Archive & Event Agreement provided Shutterstock with exclusive rights to license PMC's then-existing and ever-growing photographic collection, subject to limited exceptions. (Counterclaim ¶ 13; Archive & Event Agreement § 3(a)).

**<u>Shutterstock's Response:</u>**     Disputed.     PMC's claim that the Agreement provided Shutterstock access to an "ever-growing photographic collection" is imprecise, if not inaccurate. In fact, the Agreement explicitly excludes "Acquisition Content," i.e., "any content, events or rights to cover third party events acquired by PMC pursuant to any acquisition transaction that occurs outside the ordinary course of business during the License Period."  Agreement, ¶ 3(a)(iv); *see also* Walter Tr. 385:23-386:13; 387:9-388:5.  Thus, PMC's "ever-growing" characterization of PMC's photographic is misleading, unless it is referring to the photographs Shutterstock would shoot at live entertainment and fashion events using access granted by PMC—the core consideration provided by PMC in the Agreement.  In any event, the terms of the Agreement that govern the rights granted to and withheld from Shutterstock speak for themselves.

9.     The Agreement provided Shutterstock with these benefits in two main ways. (Archive & Event Agreement § 3; Counterclaims ¶ 13).

**<u>Shutterstock's Response:</u>**  Disputed, as to PMC's characterization "two main ways."  As set forth in Shutterstock's Additional Material Facts, there was one "main way" Shutterstock benefitted from the Agreement—access to photograph live events produced by PMC and third parties (like the Academy Awards and the Sundance Film Festival) to create content it could use to advance its comprehensive editorial photography product.  *See* Transcript of Deposition of Todd Greene ("Greene Tr."), 97:18-99:13 ███████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████); *id.*, 104:11-24; 114:25-115:20; Transcript of Deposition of George Grobar ("Grobar Tr."), 44:23-45:14 (████████████████████████████████████ *id.*, 134:8-135:4 ██████████████████████████████████████████████

██████ ); PMC_0002131-42 (talking points).  During the first 14 months of the Agreement, PMC did not provide any Archive Content at all.  *See* Anticipated Declaration of Candice Murray ("Murray Decl."), ¶¶ __, Ex. __ (SSTK168721).

10.    First, Shutterstock received exclusive rights to license to third parties what the Agreement defined as PMC's "Archive Content"— namely, images "owned or created by PMC" or those "to which PMC has the contractual right to syndicate and/or license." (Counterclaim ¶ 12; Archive & Event Agreement §§ 3(a)(i), 4; Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).

**Shutterstock's Response:**    Disputed, as to PMC's incomplete characterization of the Agreement and recitation of the definition of "Archive Content," and its suggestion, based on the prior paragraph, that the right to license Archive Content was a "main" benefit to Shutterstock of the Agreement (it was not—*see* Response ¶ 9, *supra*).  The cited portions of the Agreement do not merely grant Shutterstock a license; they require PMC to "work together" with Shutterstock "in good faith in the creation, management, hosting, distribution and syndication of image, footage and/or audio content (i) currently owned or created by PMC, (ii) to which PMC has the contractual right to syndicate and/or license, as of the date of this Agreement, and (iii) created by PMC, or to which PMC acquires the contractual right to syndicate and/or license, during the License Period (collectively, the 'Archive Content')."    Moreover, PMC omits that Shutterstock's rights are "[s]ubject to the Getty Agreement Restrictions."    *See* Agreement, ¶ 3(a)(i).  Section 4 of the Agreement merely reflects that Shutterstock gave PMC a requested budget to help PMC achieve its goal of trying to monetize the old physical copies of photographs that were in the storage files of Fairchild Fashion Media and the owner of *Variety*, which PMC had acquired in 2014 and 2012, and that PMC was obligated to deliver all such images in "SSTK Compliant" format with specific metadata.  Accordingly, it does not support the statement.  *See* Agreement, ¶ 4.

11.     PMC's Archive Content included PMC's Historic Archive. (Counterclaim ¶ 12; Archive & Event Agreement § 3(a)(i); Shutterstock Press Release, dated June 22, 2015, PMC_0022535-537, at 0022535).

**Shutterstock's Response:**  Disputed, as "Historic Archive" is not a defined term in the Agreement and the evidence PMC cites for this proposition does not support it. The Agreement itself identifies the scope of Archive Content, which does not include Event Content, but makes no reference to some distinct "historic archive."  *See* Agreement, ¶ 3(a)(1); *see also* Penske Tr., 175:13-176:18 ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████.

12.     Second, PMC agreed to provide Shutterstock with available access to select events—hosted by PMC or by third parties—at which new photographic images could be created for Shutterstock to license. (Counterclaims ¶¶ 13 and 15; Archive & Event Agreement § 3(a)(ii)-(iii)).

**Shutterstock's Response:**  Disputed, as to PMC's characterization of the express terms of the Agreement.  Paragraph 3(a)(ii) of the Agreement states:  "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')."  Paragraph 3(a)(iii) of the Agreement states: "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (the 'Third Party Events')."  The term Third Party Events expressly includes (but is not limited to) the events cataloged on Schedule D to the Agreement, such as the Academy Awards and the Sundance Film Festival.  Agreement, ¶¶ 3(a)(ii), 3(a)(iii).  PMC's phrase "available access" is not used in Paragraph 3(a), or anywhere else in the Agreement.

The Agreement does not say "if PMC has access" or "to the extent that PMC has access." The Agreement is not conditional or limiting at all, but instead is presumptive. The significant event access is what got Shutterstock to enter into the Agreement with PMC and assumes PMC already has access. Moreover, the language "to which PMC has access" refers to the list on Schedule D, at the very least, and reflects the array of significant annual events that the parties understood the events to be. In other words, the definition reflects the significant events that PMC has access to, as understood at the time of entry into the Agreement. Agreement, § 3(a)(iii) ("PMC will provide to Shutterstock defined credentials, passes, VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . . These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D."); Pfeifer Decl. ¶¶ __.

13. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

**Shutterstock's Response:** Disputed, as this recitation of a key term of the Agreement is incomplete. Paragraph 3(a)(ii) of the Agreement states: "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')." Paragraph 3(a)(iii) of the Agreement states: "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (the 'Third Party Events')." The latter is without regard to whether third parties are invited. The scope of pre-defined Third Party Events expressly includes (but is not limited to) the events cataloged on Schedule D to the Agreement, such as the Academy Awards and the Sundance Film Festival, as well as the Tony Awards and the Cannes

Film Festival, to which PMC did not provide access in 2020.  Moreover, PMC was obligated to "work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content."  Agreement, ¶¶ 3(a)(ii), 3(a)(iii).

14.    Shutterstock entered into the Archive & Event Agreement as part of a strategic effort to expand its licensing business into the news and editorial space. (Deposition of Benjamin Pfeifer ("Pfeifer Tr.") 25:11-17; 33:17-23; 54:20-25, 182:16-183:5; SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418; Shutterstock Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23; Shutterstock Press Release, dated June 22, 2015, PMC_0022535-537, at 0022535; Counterclaim ¶ 13; Pfeifer Tr., 12:12-17; 17:4-9; 19:20-22 (the images that Shutterstock obtained under the Agreement were considered "editorial" and not commercial "stock" images)).

**Shutterstock's Response:**  Disputed, to the extent this statement implies that Shutterstock had no editorial photography offering as of the execution of the Agreement.  Prior to executing the Agreement, Shutterstock offered editorial photographs, but desired to expand its editorial offering to include timely photographs from news, sports, entertainment, fashion, and other cultural and current events from around the world under its Shutterstock Editorial brand.  *See* Oringer Tr., 63:15-63:16 ███████████████████████████████████ Pfeifer Tr., 15:14-17:3 ████████████████████████████████████

15.    A number of Shutterstock's staff photographers, who were newly hired in 2015 to launch Shutterstock's editorial division (Shutterstock Press Release, dated Sept. 9, 2015, PMC_0022538-39; Pfeifer Tr., 166:4-20) have explained that "[p]rior to…2015," Shutterstock "didn't have an editorial division developed." (Deposition Transcript of Chelsea Lauren ("Lauren /Jones Tr.") 13:11-13; *accord* Lauren/Jones Tr., 28:8-10 (entertainment was "brand new" to Shutterstock in 2015); Deposition Transcript of Rob Latour ("Latour Tr.") 12:9-11 ("having an editorial department" was still a "dream[]" of Shutterstock as of 2015)).

**Shutterstock's Response:**  Disputed, to the extent this fact is offered to prove more than merely that the cherry-picked statements were said at deposition, including the deposition of two photographers that did not touch the business strategy or execution of the editorial product

offering.  Prior to executing the Agreement, Shutterstock did offer editorial photographs for license.  *See* Oringer Tr., 63:15-63:16 ████████████████████████████████████ Pfeifer Tr., 15:14-17:3 ████████████████████████████████████

Further, Shutterstock had already acquired Rex Features, Europe's largest independent photography agency, which gave it access to timely and newsworthy photography opportunities. *See* PMC_0022533 (January 15, 2015 press release, "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery"); Melvin Tr., 74:4-8.  The evidence PMC cites in support of the statement in Paragraph 15 is inadmissible, as it failed to establish that any of the witnesses it relies on have personal knowledge sufficient to support their testimony.  Undisputed that to support its broad editorial product, Shutterstock hired four leading photographers in 2015, all of whom are still on staff with Shutterstock despite the termination of the Agreement with PMC.  *See* Anticipated Declaration of Ben Melvin ("Melvin Decl."), ¶ __.

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████

**Shutterstock's Response:**    Disputed, as this is an incomplete and inaccurately contextualized recitation of the cited testimony.  PMC's counsel inquired whether Shutterstock was interested in the access provided by the Agreement "because it helped it compete with Getty," to which Mr. Pfeifer responded: ████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████  Pfeifer Tr., 53:9-54:25.

17.     Accordingly, in 2015, Shutterstock embarked on a two-pronged business plan to move beyond the stock photography business and into the editorial market. First, in January 2015, Shutterstock acquired Rex Features, Europe's largest independent photo press agency, which "mark[ed] Shutterstock's substantive entry in editorial imagery." (Pfeifer Tr., 164:17-23; Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Pavlovsky Tr., 59:11-60:10).

**Shutterstock's Response:** Disputed, as to the characterization, without relevant citation, to Shutterstock's business plan as "two-pronged."  Undisputed that Shutterstock purchased Rex Features in January 2015.  If there were other "prongs" to the approach, there were several, including ████████████████████████████████████████████████

████████████████████████████████████████ as well as acquiring and partnering with technology solutions designed to help support the overall editorial product's functionality and service delivery.  Murray Decl., ¶¶ __.

18.     ████████████████████████████████████████████████

████████████████████████████████████████████████

**Shutterstock's Response:** Disputed, as to the referenced timing.  Mr. Pfeifer did testify that PMC was Shutterstock's ████████████████████████████████████

████     Pfeifer Tr., 162:16-18.  But Shutterstock acquired Rex Features prior to engaging in contract negotiations with PMC, not "[a]t around that same time," and PMC knew that Shutterstock had already acquired Rex Features during those negotiations.  *See* PMC_0022533 (January 15, 2015 press release, "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery"); Penske Tr., 60:11-61:5 (████████████████████████████████

████████████████████████████████████████████████

████████; *id.*, 63:2-14 (same); Transcript of Deposition of Todd Greene ("Greene Tr."), 26:8-19, 114:25-115:20, 223:2-224:9.

19.     In announcing the deal, Shutterstock characterized PMC as a "trailblazing company" whose "strategic alliance" with Shutterstock would "accelerate [Shutterstock's] progress in editorial imagery." (Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535; Deposition Transcript of Jon Oringer ("Oringer Tr.") 212:23-213:20).

**Shutterstock's Response:** Undisputed that press and publicity materials included laudatory language, including as PMC asked Shutterstock to include (*see* Agreement, ¶ 7 (obligating Shutterstock to identify PMC as a "launch partner" for Shutterstock's editorial product)), but inaccurate and therefore disputed.  The press release was issued by both parties following drafting by their press departments, and the quoted language refers to PMC as "another trailblazing company" that Shutterstock teamed up with as part of building its editorial product. *See* PMC_022535 ("We are thrilled to team up with another trailblazing company . . . ."). However, immaterial.

20.     Shutterstock explained in securities filings that PMC gave Shutterstock "credibility in the market for editorial content that will allow us to further grow our product offerings." (Form 10-K, dated Feb. 24, 2016, PMC_0022218, at 0022222-23; Oringer Tr., 222:21-224:23).

**Shutterstock's Response:**  Undisputed that the money paid annually under the Agreement was designed in large part to buy credibility in the editorial market over each year of the Agreement, but incomplete as the cited pages preface the editorial overview in the 2016 10-K with the acquisition of Rex Features five months earlier, and refers to the six-year Agreement with PMC as giving, among other things, credibility in the market.  PMC_002222-23; Oringer Tr., 75:24-76:6.



**Shutterstock's Response:**  Disputed as incomplete and therefore misleading.  The cited page is misquoted and refers only to ███████████████████████████████████

█████████████████████████████████████████████████

████████████████████████   *See* SSTK092418; *see also* SSTK092410 ("Editorial Launched

Partnerships with Associated Press and European Press Agency.").

22.     Shutterstock agreed to provide PMC with significant compensation. (Archive &

Event Agreement).

**Shutterstock's Response:**  To the extent this fact refers to a promise to provide PMC with

significant compensation pursuant to the terms of, and compliance with, the letter and spirit of the

Agreement, undisputed.



[PMC SUF ¶ 23, n.2]: ████████████████████████████████████

███████████████████████████████████████████████

**Shutterstock's Response:**  Disputed, including the footnote, as PMC has mischaracterized

the plain terms of the Agreement.  Shutterstock agreed to pay PMC "an annual fully recoupable

advance against royalties (the 'Royalty Advances')."  Agreement, ¶ 6.  The acronym "MRG" does

not appear in Paragraph 6.  *Id.*  Paragraph 6—the subject of this purported fact—uses the defined

term "Royalty Advance," as quoted above.  *Id.*  The Agreement goes on to clarify that each

"Royalty Advance" was "recoupable by Shutterstock solely from all PMC Royalties . . . otherwise

payable to PMC during the twelve month period of the License Period to which such Royalty

Advance relates (i.e., the July 1 to June 30 period following payment)."  *Id.*  Indeed, Mr. Pfeifer,

the Shutterstock witness PMC cites for this supposed fact, specifically rejected PMC's counsel's

characterization of the payments as "minimum revenue guarantees" as opposed to "Royalty

Advances"—the term that is used in the Agreement.  *See, e.g.,* Pfeifer Tr., 68:15-69:3 █████████

███████████████████████████████████████████ *id.*, 72:2-22 █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Penske Tr., 182:23-183:5 ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████



███████████████████████████████████

**Shutterstock's Response:**  Disputed, as PMC has mischaracterized the plain terms of the

Agreement.  Shutterstock agreed to pay PMC, subject to the terms of the Agreement, "an annual

fully recoupable advance against royalties (the 'Royalty Advances')."   Agreement, ¶ 6.  The

acronym "MRG" does not appear in Paragraph 6.  *Id.*  Paragraph 6—the subject of this purported

fact—uses the defined term "Royalty Advance," as quoted above.  *Id.*  The Agreement goes on to

clarify that each "Royalty Advance" was "recoupable by Shutterstock solely from all PMC Royalties . . . otherwise payable to PMC during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment)." *Id.* While some other Shutterstock agreements do have "minimum revenue guarantees," this one did not. Indeed, Mr. Pfeifer, the Shutterstock witness PMC cites for this supposed fact, specifically rejected PMC's counsel's characterization of the payments as "minimum revenue guarantees" as opposed to "Royalty Advances"—the term that is used in the Agreement. *See, e.g.*, Pfeifer Tr., 68:15-69:3 ███████████████████████████████████████████████████████ *id.*, 72:2-22 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Penske Tr., 182:23-183:5 █████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

25. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed, but incomplete in that referenced "license to use images from Shutterstock's own image library" and █████████████ applied only "throughout the License Period" as such term is defined in the Agreement. *See* Agreement, ¶ 2(a), 1.

26.     Shutterstock also agreed to provide photographers, at its expense, to attend and shoot images at both PMC Events and Third Party Events and that PMC would own the copyrights to those images. (Archive & Event Agreement §§ 3(a)(ii)-(iii); Counterclaims ¶ 16).

**Shutterstock's Response:**  Disputed, as PMC has mischaracterized the plain terms of the Agreement.  Paragraph 3(a)(ii) states, in part, "Shutterstock will provide editorial photographic

event coverage, at Shutterstock's expense, for all PMC Events." Agreement, ¶ 3(a)(ii).  Paragraph

3(a)(iii), which addresses Third Party Events, contains no such language, and does not require

Shutterstock to provide photographers to cover Third Party Events.  *Id.*, ¶ 3(a)(iii).   Further

disputed that PMC would own the copyrights to images not shot under a PMC credential.  *See id.*

27.  ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

**Shutterstock's Response:**  Undisputed, but incomplete in its use of the term "editorial

images."  Over the life of the Agreement, the revenue generated by photographs taken at live

events (PMC Events and Third Party Events), *i.e.*, "editorial images," accounted for approximately

███ of the overall revenue generated pursuant to the Agreement.  *See* Murray Decl., ¶ __, Ex. __.

28.  █████████████████████████████████████████████████
███████████████████████████

**Shutterstock's Response:**  Undisputed.

29.  ████████████████████████████████████████████████
█████████████████████

**Shutterstock's Response:**  Undisputed that as part of the rounds of negotiations, each side

proposed sets of terms, and that in one set of terms that Shutterstock proposed, an ████████████

██████████  *See* Pfeifer Tr., 113:4-116:13.  Immaterial in that the term was never in the final

Agreement, which contains an integration clause.  *See* Agreement, ¶ 16.

30.  ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████

**Shutterstock's Response:**   Disputed, as PMC has mischaracterized the terms of the proposed clause, which did not refer to a "drop" or consequence "if revenues fell." The proposed term—which was among many that were not ultimately incorporated into the Agreement—

███████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████." *See* PMC 21297. Undisputed that Shutterstock paid the Royalty Advance in full in 2015, 2016, 2017, 2018, and 2019 despite PMC's deficiencies in cooperation through the years. *See* Response ¶ 29, *supra*; *see also* Walter Tr., 202:7-20.

31. ████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, as incomplete. As Mr. Pfeifer testified, this proposal was part of the overall "give-and-take" inherent in all contract negotiations, and thus cannot be analyzed in isolation. *See* Pfeifer Tr., 113:4-116:13. Indeed, it was one of many on both sides that were not ultimately incorporated into the Agreement, and the final Agreement did include other provisions designed to maximize Shutterstock's ability to recoup the Royalty Advances, including, without limitation, the requirement that PMC provide Shutterstock with access to the specific high-profile third party events listed on Schedule D of the Agreement, and that PMC "work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content," as well as PMC's language regarding

the ability to terminate for failure to correct, cure, or otherwise resolve any claimed breach in 45 days.  Agreement, ¶¶ 3(a)(iii), 8.  Notably, despite negotiating for a cure provision in the Agreement, Mr. Penske appeared to believe the cure provision was useless when asked about it during his deposition.  *See* Penske Tr. 361:7-363:13 ██████████████████████████

████████████████████████████████████████████

32.   ████████████████████████████████████████
████

**Shutterstock's Response:**  Disputed, to the extent that PMC has mischaracterized Mr. Pfeifer's testimony.  In response to the question "would you have proposed [royalty advance] amounts . . . based on projections that could show a loss to the extent there were other benefits that were important to obtain under the deal," Mr. Pfeifer testified: ████████████████████

████████████████████████████████████████████

████████████████████   Pfeifer Tr., 109:22-110:9.  Undisputed that Shutterstock was paying a vendor for a service and was amenable to not recouping the value of that service off of royalties given the primary purpose and benefit of the Agreement of giving Shutterstock an edge in the building and marketing of its editorial product.  Pfeifer Decl., ¶¶ __.

33.   ████████████████████████████████████████
████████████████████

**Shutterstock's Response:**  Undisputed.

34.   ████████████████████████████████████████
███████████████████████████

**Shutterstock's Response:**  Disputed, as an incomplete characterization of Shutterstock's purpose in entering into the Agreement.  For example, PMC's statement omits that Shutterstock believed having exclusive access to entertainment and fashion industry live events would help it

to jump ahead of competitors and therefore increase its market share of the editorial space, particularly in combination with its offerings from Rex Features and other major news and lifestyle content providers.  Pfeifer Tr., 183:15-21 

Pavlovsky Tr., 93:19-94:7 ("

Greene Tr., 115:13-15

35.    Shutterstock benefited from PMC's cachet in the fashion and entertainment world, which helped propel Shutterstock from a supplier of ordinary stock photos to an influential name in editorial imagery. (Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23; SSTK Company Overview, Sept. 2017, SSTK092400-41, at 092418).

**Shutterstock's Response:**  Disputed in part.  The cited documents do not support the statement.  The collection of acquisitions and partnerships as part of the overall editorial offering (including news, sports, and more) helped build Shutterstock's customer base for editorial imagery.  Shutterstock's acquisition of Rex Features built its ability to offer high-demand entertainment and fashion content, such as from awards events such as BAFTA.  Murray Decl., ¶ __; Melvin Decl., ¶ __.  The niche that PMC filled was live event and other fresh content from the worlds of entertainment and fashion in the United States.  Murray Decl., ¶ __.  Undisputed that PMC's cachet in the fashion and entertainment world was a benefit that Shutterstock bargained for under a six-year term.

36.

███████████████████████████████████████████████████████████████

███████████

**Shutterstock's Response:**   Immaterial but disputed in part.   Undisputed that PMC was instrumental in giving access as contemplated by the significant up-front payment under the Agreement.   Disputed as to credentials generally.   *See id.* (referring to PMC events growing in number).   Disputed that reputation in industry was due solely to PMC.   Melvin Decl., ¶ __ (discussing importance and impact of Rex acquisition).   In September 2019, after the cited email, Shutterstock identified that the fashion access and credentials and entertainment events were still important.   *See* Murray Tr., 107:15-108:19 ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████ ).

37.   ████████████████████████████████████████████████████████

██████████████████████████████████████████████ Deposition Transcript of Benjamin Melvin ("Melvin Tr.") 12:11-14:11, 17:14-18:20, 22:25-25:1, 74:9-75:16; *see also, e.g.*, ███████████████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, and immaterial and misleading because the stated "227 events" include third party events where (i) Shutterstock declined PMC's invitation but did not attend the event using its own (or anyone else's) credentials; and/or (ii) Shutterstock used its own credentials but such credentials were not offered by PMC.   These are not the basis for PMC's claim.   *See, e.g.*, Am. Compl. ¶ 63 ("In ***declining to use the credentials for third party events that PMC was required to provide*** exclusively to Shutterstock under the Archive & Event Agreement's terms, ***attending these events using credentials that Shutterstock obtained for itself***, and thereafter claiming ownership of the resulting photographs, Shutterstock has unfairly interfered

with PMC's right to receive its expected benefits under the contract and has violated the covenant of good faith and fair dealing.") (emphasis added).    Rather, PMC's claim is based on the "approximately 30 events" at which "Shutterstock took [photographs using its own credentials after] it declined to use PMC's credentials."  Am. Compl., ¶ 64 (alleging claim is based on the photographs that "Shutterstock took at the approximately 30 events at which it declined to use PMC's credentials"); *see also* Melvin Decl., ¶ __.  Notably, however, PMC's point-person on the day-to-day performance of the Agreement and PMC's Rule 30(b)(6) designee testified that he did not understand the Agreement to prohibit Shutterstock from doing so.  *See* Walter Tr., 227:24-228:5 ███████████████████████████████████████████████████████████████

████████████████████████████████ *see also* Melvin Decl., ¶ __.

38.    By early 2020, Shutterstock no longer needed PMC to obtain access to various premier events, like the Oscars, Grammys, Golden Globes and Emmys and rejected the credentials PMC offered to Shutterstock. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

**Shutterstock's Response:** Disputed.  Mr. Melvin—Shutterstock's Rule 30(b)(6) designee on "Shutterstock's obtaining and/or use of its own credentials to shoot images at Third Party Events for which it could have obtained credentials from PMC"—testified that Shutterstock "[a]bsolutely" needed PMC's help to obtain certain access to premier entertainment events. Melvin Tr., 63:9-11 █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ *id.,* 46:14-23, 63:24-66:9 (███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Moreover, Shutterstock used PMC's credentials at many of these events in 2019 and 2020.  *See*

Melvin Decl., ¶ __, Ex. __ (SSTK168725) ██████████████████████████████

████████████████████████████████████████ *id.*, Ex. __ (SSTK168726

at "SAGs" and "Globes" Sheets) ██████████████████████████████

████████████████████████████████); *accord* Murray Tr., 683:23-

684:13 ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

    39. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**Shutterstock's Response:**   Disputed, as Shutterstock's relationships with the event

organizers predated the Agreement through its acquisition of Rex Features.  *See* Melvin Decl., ¶

__; Melvin Tr., 9:4-13, 59:17-25 ("████████████████████████████████

███████████████████████████████████████████████████████████

████████████); *id.*, 74:4-8 ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████   Shutterstock also used many PMC credentials for the early 2020 awards season events.

*See* Melvin Decl., Ex. __ (SSTK168726) (██████████████████████████████

████████████████████████████████████████████).

40.   ████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, and not supported by the cited evidence, which includes a private email from Mr. Melvin to his wife related to his year-end self-evaluation. Melvin Decl., ¶ __.   Mr. Melvin merely stated that it would be ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████.   SSTK065530-32, at 065530.

41.   As of March 2020, Shutterstock had received approximately 2.5 million images under the Archive & Event Agreement, all of which were owned by PMC. (Tabulation of PMC Images Delivered to SSTK, SSTK161815; ████████████████████████████████████

████████████████████

**Shutterstock's Response:**   Disputed, as the approximately images that Shutterstock received pursuant to the Agreement included Archive Content, at least some of which PMC did not own.   *See* Rachlis Report, ¶¶ 25, 31; *see also* Margolin Depo., Ex. 18 (SSTK030768) (November 18, 2018 email chain regarding copyright infringement claim); *id.*, Ex. 19 (PMC_0021693) (February 4, 2020 email chain regarding copyright infringement claim).

42.   ████████████████████████████████████████████████

████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, to the extent that this statement implies that any PMC-coded images "remained up on Shutterstock's website" and/or "were ready available to Shutterstock's customers" after the termination of the Agreement on July 17, 2020.  That is false.

Shutterstock permanently removed all PMC-coded images from its website at 9:00 a.m. on the date that the Agreement effectively terminated (July 17, 2020).  Murray Decl., ¶ __, Ex. __ (SSTK169700-05) (identifying PMC Content taken down as of July 17, 2020); Sammut Decl., ¶ __.

43.    Between March and July 2020, Shutterstock identified PMC content and PMC brands on its websites as "world class content" from "industry leaders" and as "featured parties," and identified PMC's archive as a "highlight[] of our editorial collection." (Shutterstock Webpage, Main Editorial Page, dated as of Apr. 29, 2020, PMC_0022838-41, at 0022839; ██████████████████████████████████████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed, as this statement misquotes and mischaracterizes the cited page of Shutterstock's website, which speaks for itself, and is not supported by any of the other cited evidence.  Shutterstock included multiple brands' logos—only two of which were PMC's—at the bottom of the editorial page of its website as illustrative examples of the "industry leaders" whose content is among the "[w]orld-class content" in "[Shutterstock's] editorial collection."  PMC_0022838-41 (logos for Rex, European Press Photo Agency, APA, Variety, WWD); *see also* Murray Decl., ¶ __; Sammut Tr., 39:20-41:11.  Even in the purported "business pitch" that PMC cites, the reference to "PMC collections" is merely an example of content included in Shutterstock's editorial offering.  *See* Sammut Decl., ¶ __, Ex. __ (SSTK107719-22) (██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████  Moreover, Shutterstock's website identified Shutterstock's "Archival Collections"—**not** "PMC's archive"—as a "[h]ighlight[] of [Shutterstock's] editorial collection," among eight other categories of images (*e.g.*, "Coronavirus Outbreak Coverage" and "Editors' Picks").  Murray Decl., ¶ __, Ex. __ (PMC_0022838-41); *see also* Sammut Tr., 39:10-19, 102:8-

21 

**Shutterstock's Response:**   Disputed, to the extent this statement implies that PMC's brands were uniquely featured on Shutterstock's website (they were not—*see supra* Response ¶ 43), and misleading, as it consists of cherry-picked statements in response to deposition questioning about a printout of Shutterstock's website which did not include PMC's logos or content.  *See* Sammut Tr., 33:15-22, 37:20-41:11, 102:8-103:7, Ex. 1 (December 3, 2021 printout of editorial page of Shutterstock's website).



**Shutterstock's Response:**   Disputed, and misleading, as PMC's counsel—not Mr. Sammut—stated the quoted language.  *See* Sammut Tr., 84:9-13

*See* Murray Decl., ¶ __.

███████████████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed, and misleading, as the quoted statements are taken from an article about **Condé Nast's** archival content, and PMC cites no evidence attributing them to **PMC's** Archive Content or otherwise establishing that PMC's Archive Content—which PMC concedes did not bring in significant revenue during the Agreement (Murray Decl., ¶ __; Walter. Tr., 392:8-14)—would have become an important revenue stream for Shutterstock during the pandemic.  *See* PMC_0021227 (article about Condé Nast archival content); Murray Tr., 262:9-264:15 (██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ Moreover, many publishers—including PMC—used studio and corporate handouts, rather than license images from content licensing companies like Shutterstock.  *See* Rachlis Decl., ¶ __.

   47.   ████████████████████████████████████████████████████████
████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed.  The cited deposition testimony is inadmissible hearsay and, at most, establishes that ████████████████████████████████
███████████████████████████████ (Pfeifer Tr., 36:2-16)—██████████████
███████████████████████████████████████████████████ *Id.*, Ex. 3 (SSTK031177) (February 3, 2015 email from Keren Sachs).  To this extent this can even be characterized as "diligence," it is the only diligence that Shutterstock did on the Archive Content prior to entering into the Agreement (Pfeifer Tr., 39:7-21; Pfeifer Decl., ¶ __), and it has since become clear that PMC's Archive Content is not impressive.  *See* Rachlis Report ¶¶ 22-27; Murray

Decl., ¶ __, Ex. __ (█████████████████████████); Walter Tr., 392:8-9 ███████████████████████████

48. ████████████████████████████████
████████

**Shutterstock's Response:**  Disputed, and misleading to the extent this statement suggests that Shutterstock did "internal diligence" on PMC's Archive Content (*see supra* Response ¶ 47). Mr. Pfeifer merely testified that ████████████████████████████
████████████████████████████████████████████████████
███████████████████████ Pfeifer Tr., 39:18-22 (emphasis added). The fact that Shutterstock took no additional steps to examine PMC's Archive Content prior to entering into the Agreement is commensurate with its value vis-à-vis the other benefits that Shutterstock stood to gain.  *See* Pfeifer Decl., ¶ __.  Simply put, the Archive Content was not important to Shutterstock.

49. In announcing the deal, Shutterstock characterized "PMC's archive," including the "100-year old publications Variety and WWD," as "legendary." (Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).

**Shutterstock's Response:**  Disputed.  The cited press release was jointly drafted and issued by PMC and Shutterstock.  *See* Pfeifer Decl., ¶¶ __; Gullion Tr., 30:23-32:12 & Ex. 6
████████████████████████████████████████████████████
███████████████████████ Moreover, PMC used the exact same language in a document that it prepared and shared with Shutterstock before the press release was issued.  *See* Gullion Depo. Ex. 16 (PMC_0002131-42) (█████████████████
████████████████████████████████████████████████████



50.     Shutterstock's expert witness concedes that PMC's historic archive had "materially viable content" and "some nice material." (Rachlis Tr., 79:21-80:9; Rachlis Report ¶ 27, 29-30).

**Shutterstock's Response:**  Disputed.  Mr. Rachlis opined that eleven out of twelve of the archives identified in the Agreement as comprising PMC's Archive Content contain no materially viable content.  *See* Agreement, ¶ 3(a)(i) (defining PMC's "Archive Content" as "including, but not [being] limited to," twelve content libraries); Rachlis Report ¶ 27 (with one exception, the "archives listed in the Agreement . . . do not have known viable imagery").  According to Mr. Rachlis, the one exception is the WWD archive, which, despite having "some nice material" (Rachlis Tr., 79:21-25; *see also* Rachlis Report ¶¶ 28-29), has "limited [ ] licensing viability" because it is a "very niche subject matter archive" and its event and celebrity images are "not unique or exclusive" (*id.*, ¶ 32; *see also* ¶¶ 30-31).  *Accord* Rachlis Tr., 80:10-12 (agreeing that "WWD is the only PMC brand that has viable archival content"); *see also* Murray Decl., ¶ __ (only value in WWD archive is as a complement to its live content).

**Shutterstock's Response:**  Disputed, and misleading, as it misquote and mischaracterizes Ms. Murray's statement in an internal message.  Ms. Murray stated she ███████████████ ███████████████████████████████.  *See* SSTK114607-10, at 114608 ██████████ ███████████████████████████████████████████████████████████████ ██████████████ Murray Tr., 253:18-25 ████████████████████████████ ███████████████████████████████████████████████████████████████



SSTK114607-10, at 114608; *see also* Murray Tr., 254:2-9; Murray Decl., ¶ __ (

). Ms. Murray did not use the term "Historic

Archive" and such term is not defined in the Agreement. *See* Agreement, ¶ 3(a)(i).

52.

**Shutterstock's Response:** Disputed, as it mischaracterizes the nature of PMC's "coordination" with Shutterstock on the delivery of images. Shutterstock disputes this statement to the extent it implicates that the "new photographs" and/or content, generally, that PMC delivered to Shutterstock was of the same quality and demand that PMC's content previously brought.

53.

**Shutterstock's Response:** Disputed, as the referenced document (PMC_001353-65) is taken out of context. Ben Melvin replied

which would have been its duty in any event.

54.     Shutterstock terminated the Agreement as of July 16, 2020. (Counterclaims ¶¶ 31, 38).

**Shutterstock's Response:**  Undisputed.



**Shutterstock's Response:**  Undisputed, but immaterial and misleading, as many of the images delivered during this period were taken prior to the pandemic.  *See, e.g.*, Murray Decl., Ex. __.  Moreover, PMC's delivery of ███ images between mid-March and July 16, 2020 is a far cry from the "████████████████████████████████████████████████ ████████████████████████████████████ (PMC_0020975), and also pales in comparison to the number of images that PMC delivered to Shutterstock during the same period in prior years.  *See* SSTK16872.  This number is especially immaterial considering, as set forth in Shutterstock's Additional Material Facts, that AP delivers ████ images ***per day***.

56.     ████████████████████████████████████████████████████████

**Shutterstock's Response:**  Shutterstock cannot (and need not) respond to this statement because it presents a hypothetical question, rather than a statement of material fact.  Shutterstock undisputedly terminated the Agreement effective as of July 16, 2020 (*see* Response ¶ 54, *supra*) and, were this not the case, the Agreement would have either "expire[d] on June 30, 2021, or earlier if terminated pursuant to Section 8 . . . ."  Agreement, ¶ 1; *id.*, ¶ 8 (providing terms on which "[e]ither Party may terminate the Agreement at any time for cause . . . ").

57.     Vaccines became widely available in March 2021. *See, e.g.,* NY Times, *See How Vaccinations Are Going in Your County and State* (updated Mar. 21, 2022), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (noting "vaccine rollout began in December 2020, with a focus on some of the most vulnerable populations" and "every state had made all adults eligible for the shots by April 2021") and, as a result, certain live

events resumed around March 2021, at which PMC photographers shot new images. (Walter Decl., ¶ __; Deposition Transcript of Michael Buckner ("Buckner Tr.") 122:23-123:7).

**Shutterstock's Response:** Disputed, to the extent that it suggests that live events resumed around March 2021 in the same nature and to the same extent as prior to the pandemic. In April 2021, only the first dose was available for all adults in particular places, and the availability of vaccinations has nothing to do with whether entertainment and fashion events returned, much less in a manner that would allow for exclusive Shutterstock access via a PMC credential. *See* Lackman Decl., Ex. __ (https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/11/fact-sheet-president-biden-to-announce-all-americans-to-be-eligible-for-vaccinations-by-may-1-puts-the-nation-on-a-path-to-get-closer-to-normal-by-july-4th/). Further, PMC's definition of "live events" is far too broad: the portion of Mr. Buckner's transcript quoted by PMC encompasses public events such as rallies and protests, which do not require credentials, into the definition of "live events." Buckner Tr., 123:17-23 ████████████████████████ ████████████████████████████████████████████████ ████████████████████ Moreover, the Agreement was for exclusive entertainment and celebrity content, not health news, which was already being covered by other Shutterstock partners. *See* Agreement, ¶ 3(a)(ii) (*see* "PMC events" definition); *id.*, ¶ 3(a)(iii) (*see* "Third Party Events" definition and Schedule D); *see also id.*, ¶ 3(e) (regarding Fashion Events) ; Murray Decl., ¶ _.

58.    Had Shutterstock not terminated the Agreement, it would have benefitted from obtaining images over four months of live events (March through June 2021). ██████████ ████████████████████████████████████████████████ ████████████████; Lightbox storing thousands of photographs of live events shot by PMC, access provided to Shutterstock's counsel on Dec. 28, 2021).

**Shutterstock's Response:**  Disputed.  Shutterstock terminated the Agreement effective as of July 16, 2020 (*see* evidence cited in Response ¶ 54, *supra*) and, therefore, this statement presents a hypothetical rather than a statement of fact.  Moreover, Shutterstock cannot know whether it would have obtained images from live events if the Agreement remained in effect during this period, as PMC admitted that it withheld live event credentials from Shutterstock (Walter Tr., 202:7-20), and may not have sent images taken by its own photographers to Shutterstock.  *See* Murray Tr., 586:10-589:10 ███████████████████████████

██████████████████████████ (emphasis added).  In any event, due to the pandemic's impact on live events, any "benefit[]" that Shutterstock would have received would be substantially smaller than it received in prior  years, resulting in an even greater net loss of revenue.  *See* Murray Decl., ¶ __ .

59. ████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed to the extent that the term "revenues" means gross revenues from the distribution of PMC Content, but immaterial and misleading because, by definition, such amount does not account for the expenses that Shutterstock incurred over the same period, including, for example, the amount of the royalty advance paid to PMC.  *See* Murray Decl., ¶ __ ; Pavlovsky Decl. ¶ __ .

60. ████████████████████████████████████████████

**Shutterstock's Response:**  Disputed,  to  the  extent  that  this  statement  suggests  that ████████████████████████████████████████████

███████████████████████████████████████████ *See* SSTK025324-025333, at SSTK025327.  Ms. Murray's testimony refers to gross revenues from the license of PMC Content during the pandemic period, which, by definition, do not account for the costs and deductions that Shutterstock incurred over the same period, *e.g.*, the Royalty Advance paid to PMC.  *See* Murray Decl., ¶ __.  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ *See* Pavlovsky Decl., ¶ __; *see also* Murray Decl., ¶ __, Ex. __ (SSTK025324-025333, at SSTK025327) (████████████████████████

███).

61.    Using that figure and even assuming that the pandemic period started on March 1, 2020 and continued through the July 16, 2020 termination date, Shutterstock's average monthly revenues earned from the licensing of PMC content would be approximately ████████████ (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed, as PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  To the extent that the ████ figure is premised on Ms. Murray's testimony (Murray Tr., at 379:3-5), Shutterstock disputes this statement as immaterial and misleading for the same reasons (and based upon the same evidence) set forth *supra* Response ¶ 60.  ████████████

███████████████████████████████████████████

███████████████████████████████████

62.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

**Shutterstock's Response:**  Undisputed, but immaterial and misleading to the value of the Agreement to Shutterstock.  Ms. Murray's calculation only accounted for revenues from the license of PMC Content and did not account for the value of other benefits that Shutterstock received under the Agreement such as the value of access to live events.  *See* SSTK025324-025333, at SSTK025327 (reporting "Gross Distribution Revenues earned by SSTK");  Murray Tr., 177:14-19 ("Gross Distribution Revenues Earned by SSTK" reflects "[t]he revenue that [Shutterstock] generated against PMC content.");  Penske Tr., 49:15-17; Pavlovsky Tr., 93:19-94:7.

63. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

**Shutterstock's Response:**  Undisputed, but immaterial and misleading to the value of the Agreement to Shutterstock.  Ms. Murray's calculation only accounted for revenues from the license of PMC Content and did not account for the value of other benefits that Shutterstock received under the Agreement (*e.g.*, the value of access to live events) or for Shutterstock's deductions and costs (*e.g.*, royalty payments to PMC, photographer and editor salaries and fees, content processing expenses).  *See* SSTK025324-025333, at SSTK025327 (reporting "Gross Distribution Revenues earned by SSTK");  Murray Tr., 177:14-19 ("Gross Distribution Revenues Earned by SSTK" reflects "[t]he revenue that [Shutterstock] generated against PMC content.");  Penske Tr., 49:15-17; Pavlovsky Tr., 93:19-94:7.

64. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████

**Shutterstock's Response:**  Disputed, and misleading, as these figures merely include the amount that Shutterstock spent to supply photographers and editors, and do not account for various other amounts that Shutterstock incurred under the Agreement during the relevant time period (*e.g.*, advertising expenses, content processing expenses).  *See* Murray Decl., ¶ __; SSTK025324-025333, at  SSTK025327



*see also* Walter Expert Tr., 51:6-25

).

65.

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  To the extent that                                        are premised on the Murray Proposal, this statement is undisputed, but immaterial and misleading for the reasons set forth in Paragraphs 63-64 above.

66.



**Shutterstock's Response:**  Undisputed, but immaterial and misleading.

67.

██████████████████████████████████████████████████
████████████████████████

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  To the extent that the ████████████████ are premised on the Murray Proposal, Shutterstock further disputes this statement because it fails to properly account for timing.   As admitted by PMC's Rule 30(b)(6) designee and purported "expert" on Shutterstock's revenues and costs, Shutterstock does not necessarily incur the freelance expenses associated with the production of content in the same month as it earns revenue for the license of that content.  *See* Walter Expert Tr., 55:16-57:6 (████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████

████████      ██████████████████████████████████████
██████████████████████████████████

**Shutterstock's Response:**   Disputed because this statement is not supported by any evidence whatsoever, let alone evidence which would be admissible under Rule 56(c) and, accordingly, violates Local Rule 56.1(d).  In any event, this statement is immaterial and does not require a response because it is too vague and ambiguous (*e.g.*, "using other methods") to constitute a material fact.

69.   ██████████████████████████████████
██████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed, and misleading, as Shutterstock represented that the cited spreadsheet "sufficient to answer [PMC's] Interrogatory [Nos. 8-14]" as stated, which are premised on a contortion of the term "gross revenues."  Lackman Decl., Ex. __ (Shutterstock's Response to PMC's Interrogatories dated Jan. 28, 2022 (objecting to Interrogatory Nos. 8-14 seeking identification of so-called "gross revenue"—"irrespective of when Shutterstock received any such revenues, and irrespective of whether Shutterstock paid or recouped any Royalty Advance related to such revenues"—because, *inter alia*, they "def[y] general accounting principles, and [are] premised on a contortion of the term 'gross revenue,' which necessarily depends on 'when Shutterstock received any such revenues'").  The cited spreadsheet does not report whether Shutterstock actually received payment of the license fees for numerous licenses. *See* SSTK168954 ███████████████████████████████████████

70.    That spreadsheet shows that after March 15, 2020, Shutterstock customers reported using ███████████████ yielding listed gross revenues of approximately ███████████ ███████████████████████████████

**Shutterstock's Response:**  Shutterstock does not dispute that the spreadsheet Bates-numbered SSTK168954 shows that, ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████    However, Shutterstock disputes that this is an accurate calculation of the gross revenues Shutterstock earned after March 15, 2020 because, *inter alia*, (a) Shutterstock may receive the license fee before the corresponding usage date (Murray Decl., ¶ __, Ex. __ (SSTK168954 at "Invoices" Sheet, Row 60807) (███████████████████████ ███████████████████████████████; (b) PMC cites no evidence that Shutterstock actually received numerous license fees (*see supra* Response ¶ 69); and (c) a significant portion of the license fees included in PMC's calculation are attributable to usages reported by PMC and its

brands, which were never paid to Shutterstock and instead applied against the ███████ afforded

to PMC under the Agreement.  Further, it fails to account the fees against the Royalty Advance

against fees that Shutterstock paid.  *See* Agreement, ¶ 2(a), 1; Walter Expert Tr., 40:5-42:19 (PMC

did not pay these fees to Shutterstock).

71.    This listed post-pandemic revenue figure understates the revenue yielded by
Shutterstock's licensing of PMC images during the pandemic and before Shutterstock terminated
the Agreement. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████

**Shutterstock's Response:**  Shutterstock does not dispute that the "usage date" is blank for

numerous images in the spreadsheet Bates-numbered SSTK168954.  Shutterstock disputes the

remainder of this statement because PMC has not identified Ms. Arato as a witness in this case

and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c)

and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).

PMC has not identified Ms. Arato as a witness in this case and cites no evidence from which it

may be reasonably inferred, that ██████████████████████████████████████

████████████████████████████████████████████████████

72.    In any event, the reported revenue figure during the pandemic period ████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a

witness in this case and, therefore, this statement is not supported by admissible evidence as

required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial

and Expert Disclosures).

73. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

**Shutterstock's Response:**   Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).

74.   Under this method, as reported on SSTK168954, Shutterstock earned approximately ██████ in gross revenues under the Archive & Event Agreement based on usage dates listed during the pandemic period beginning in mid-March 2020, for average monthly gross revenues of approximately ██████. (Arato Decl., ¶__).

**Shutterstock's Response:**   Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this is an accurate calculation of the gross revenues that Shutterstock earned under the Agreement after March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response ¶ 70 *supra*.

75.   By comparison, as reported on SSTK168954, Shutterstock earned approximately ██████ in average monthly gross revenues under the Archive & Event Agreement listed for usage dates occurring during the pre-pandemic years of 2015 to mid-March 2020 plus all listings with no usage date. (Arato Dec. ¶__).

**Shutterstock's Response:**   Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this is an accurate calculation of the average monthly gross revenues that Shutterstock earned under the Agreement

prior to March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response to SUF ¶ 70 *supra*.

76.     Deducting the average monthly freelance costs of about ███████ from the average monthly pre-pandemic gross revenues of about ██████ demonstrates that Shutterstock earned average monthly revenues less freelance costs of ██████ from its licensing of PMC content before the pandemic. (Arato Decl., ¶___).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).   In any event, Shutterstock further disputes that this is an accurate calculation of the "average monthly revenue less freelance costs" that Shutterstock earned under the Agreement prior to March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response to SUF ¶¶ 63, 70 *supra*.

77.     Shutterstock's average monthly net earnings during the pandemic were, accordingly, approximately ████ of Shutterstock's average monthly net earnings before the pandemic. (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this "approximately ███" figure is accurate for the same reasons (and based upon the same evidence) set forth *supra* Response ¶¶ 64, 74-75.

78.     ████████████████████████████████████████████████████████████████████████████;
email from Shutterstock counsel dated Jan. 4, 2022).

**Shutterstock's Response:**  Undisputed.

79.    In advance of Karl Walter's deposition, Shutterstock produced a modified spreadsheet bates stamped SSTK168955 removing certain highly confidential information from SSTK168954. (*See* Communication from counsel, dated Feb. 28, 2022).

**Shutterstock's Response:**  Undisputed.

80.

**Shutterstock's Response:**  Shutterstock does not dispute the first sentence.  However, Shutterstock disputes the ▮▮▮▮▮▮ figure for the same reasons (and based upon the same evidence) set forth *supra* Response ¶¶ 64, 74-75.

81.

**Shutterstock's Response:**  Disputed, but immaterial.  During a very short period of time, Shutterstock and PMC discussed modifications to the Agreement to address certain ambiguities and practical issues to "rejigger" the terms to give both sides more of what they wanted, but this discussions ended absolutely on November 6, 2019.  *See* PMC_0020956.

82.

**Shutterstock's Response:**  Undisputed except as to the citation to the Oringer transcript, but misleading.  Both witnesses testified that the Agreement was drafted to require the parties to operate in good faith under the deal that was "unique" for both parties, and Oringer was speaking to the fact that PMC was not cooperative in negotiating for new Acquisition Content or otherwise acting in good faith.  *See* Oringer Tr., 248:8-10 (▮▮▮▮▮▮▮▮▮▮▮▮▮



*see also* Pfeifer Tr., 55:21-56:3

83.

**Shutterstock's Response:** Disputed but immaterial. As indicated in the other documents regarding PMC's theory that internal discussions that terminated well before the pandemic matter,

. *See* Murray Decl., ¶ __; Murray Tr., 113:20 -114:20("                              *id.* 116:15-17

84.

**Shutterstock's Response:** Undisputed but immaterial. PMC ultimately agreed that PMC sponsored events were not covered under the Agreement and agreed to a rate card to cover the costs that Shutterstock would incur in photographing sponsor-supported PMC events that

Shutterstock could not monetize due to restrictions or other low value (such as non-celebrities speaking on a panel about the film business).  *See* Murray Decl., ¶¶ __.

85. ████████████████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed.  The cited page shows an accounting table using the standard terms "gain" and "loss."  The table identifies financial losses in the context of the Royalty Advance only, as a basis to calibrate the expected continued "losses" to the fact that Shutterstock was not receiving the benefit that induced it to pay the Royalty Advances under the Agreement.  *See* SSTK023527-29 (████████████████████████████████████ ████████████████████████████ Murray Decl., ¶¶ __.

86. ████████████████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed but immaterial.  The testimony is that the head of tax would be looking at the accounting numbers only, and not the overall economic or business benefit to the business (*e.g.*, the competitive advantage, brand-building and marketing advantage, etc.), and therefore would describe it as a "value proposition loser" where Shutterstock itself would not.  *See* Murray Tr., 116:25-117:8 (████████████████████████████████████ ████████████████████████████████████████████████████████████████

87. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

**Shutterstock's Response:** Disputed but immaterial. The referenced proposals related to adding compensation for sponsored events that were not within the scope of the Agreement. Specifically, the cited document shows that Shutterstock inquired whether PMC was complying with its promises to not provide non-sponsored PMC Event access or content to third parties, proposed a right of first refusal for non-editorial (i.e., sponsored) PMC Events that did not result in the creation of content suitable for the editorial platform, and revised the Agreement to add *Rolling Stone* (which PMC refused to negotiate for as required under the Agreement). *See* SSTK024498-499.

88.  ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

**Shutterstock's Response:** Disputed but immaterial.  The cited evidence does not refer to "again."  The cited evidence refers to efforts to get PMC to comply with its obligation to ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████.  Further, immaterial given that mental state or motivation has nothing to do with the legal tests at issue here, and in that after Donna Granato left Shutterstock, the new head of editorial indicated that she did not want to renegotiate the Agreement.  *See* PMC_0020956; Walter Tr., 649:20-653:2.  Undisputed that PMC had been pushing for coverage of events that did not provide editorial, licensable content, and Shutterstock was looking for a win-win solution. Murray Decl., ¶¶ __.

89.    Shutterstock's chief of Editorial ████████████████████████
████████████ Accordingly, shortly after the pandemic hit the United States, ████████████████

████████████████████████████████████████████

**Shutterstock's Response:**  Immaterial given that negotiations or goals have nothing to do with the question of whether Shutterstock is excused from performance or any other legal tests pertaining to the claims and counterclaims relating to the Agreement.  Undisputed that Shutterstock did not want to lose PMC as a business partner even though PMC was not delivering services.  PMC had been providing value in terms of access to hundreds of events per year, and Shutterstock had negotiated for a full six years of service, but the pandemic had resulted in this vendor delivering essentially nothing and absolutely nothing with respect to the primary purpose of the Agreement.  Murray Decl., ¶¶ __. ███████████████████████

███████████  In the very early days of the pandemic, before it was clear that some of the major events would not proceed and the pandemic would likely result in the cancellation of events for over a year, Shutterstock looked to create a business solution that would take the effects of the pandemic out of the picture while still giving PMC its full ███████████████████

████████████████████████████████████████████

████████████████████  *See* SSTK025339.

90.    Shutterstock decided to use the pandemic to negotiate a new and better deal with PMC no later than March 24, 2020, just days after the pandemic hit. At that time, Shutterstock's then current CEO and Chairman, Jon Oringer, and Ms. Murray ███████████████████

█████████████████████████████

**Shutterstock's Response:**    Disputed but immaterial.   Mental state or motivation, particularly less than two weeks into the pandemic-related shutdowns, has nothing to do with the question of whether Shutterstock is entitled to relief or recovery.  Ms. Murray (not Mr. Oringer) said the quoted words in the context of Ms. Murray's concern that a contract where Shutterstock paid ███████████████████████  and got none was, indeed, not a good

contract.  Murray Decl., ¶¶ ___. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████  Murray Decl., ¶¶__.  In that sense, the contract was not

good in that PMC took an adversarial rather than a collaborative, "good faith" approach on issues

because they had the leverage of live events.  *See id.*

91. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**Shutterstock's Response:**  Disputed.  There was no "decision."  Despite being reflected

in a casual chat format, the context makes clear that there was an opportunity to negotiate with

PMC regarding the Agreement globally given that there were no live events and to develop a fair

deal rather than simply end it.  As Ms. Murray testified at her deposition████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Murray

Tr., 134:22-136:5; 220:16-21; 223:24-224:3; 224:16-18.   Further, at this very stressful and

challenging time, none of the events in Schedule D of the Agreement had been cancelled, nor was

it clear that PMC was not going to take steps to resolve the matter.  *Id.*  Murray Decl., ¶¶ __.

Immaterial in that a non-lawyer's uncorrected view on the law, in the context of a global pandemic

that put everyone under stress, is not binding on this Court, and motivation is irrelevant.

Shutterstock was legally entitled to "walk away" from the Agreement for multiple reasons as

explained in the accompanying Memorandum of Law.

92. ████████████████████████████████████████████

**Shutterstock's Response:**  Disputed but immaterial.  There was no "decision."  Despite being reflected in a casual chat format, the context makes clear that there was an opportunity to negotiate with PMC regarding the Agreement globally given that there were no live events ████ ████████████████████████████  *see* SSTK 100705) and to develop a fair deal rather than simply end it.  In the context of receiving no live event access and PMC declining to cooperate – failing to cover fashion events, taking the position that Shutterstock had to take photographs that could not be syndicated, refusing to negotiate in good faith for additional access to high-profile events – it was certainly not a good contract.  *See* Response to ¶ 91.  Further, the statement reflects the belief of someone who did not negotiate the language of the Agreement.  The Agreement was not intended to be one-sided but in some ways had turned out to be that way due to PMC's non-compliance with the obligation to act in good faith at times, something Jay Penske was evidently aware of due to his avoidance of the issue.  *See* SSTK 100706 ███████████████████ ████████████████████████████████  Pfeifer Decl., ¶¶ __.

93.

**Shutterstock's Response:**  Disputed.  The cited document uses accounting terms (e.g., "gain" or "loss") but the document reflects the outlay for the services that PMC had delivered and was supposed to deliver as a springboard for offering an up-front payment under which Shutterstock would still "lose" money – i.e., continue to pay for the delivery of services it had contracted for, namely, receive event access and support the creation of content.  *Id.* at

SSTK025327-29. Murray Decl., ¶¶ __.  Immaterial in that Shutterstock's payments have nothing to do with whether Shutterstock is excused from performance under the law or any other claim or counterclaim in this case.

94.    Stan Pavlovsky, previously COO of Shutterstock, took over as CEO in April 2020 (Pavlovsky Tr., 49:10-15).

**Shutterstock's Response:**  Undisputed.

95.    ███████████████████████████████████████

**Shutterstock's Response:**  Disputed to the extent that the quoted testimony refers to the PMC relationship, as it does not, and immaterial to the extent that PMC is suggesting that mental state or motivation has anything to do with whether there was a breach or whether Shutterstock is otherwise excused from performance. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████    Pavlovsky Tr., 64:3-64:9.

96.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed but immaterial legally (for reasons stated above) and in that PMC proposed some form of relief, albeit a delayed payment at a cost of an extra █ ████████, given the undisputed fact that PMC could not deliver on the services Shutterstock had contracted for.  *See* Penske Tr., 339:11-16; Pavlovsky Tr., 177:5-178:12.

97. ███████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████

**Shutterstock's Response:**  Disputed, to the extent it characterizes the ██████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████  Immaterial as the terms of a proposed resolution two weeks into the pandemic have no legal relevance to whether Shutterstock is entitled to prevail on its claims or defenses pertaining to the Agreement.

98. ███████████████████████████████████████████████████
█████████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed that a proposal made 18 days into the pandemic shut-down speculated that live events might resume in six months, but immaterial.

99. 

**Shutterstock's Response:**  Immaterial for the reasons stated above, and disputed.  The primary goal in making the proposal was to work out a temporary measure to deal as best as possible with a global pandemic that was wreaking havoc on the world, in a way that would not allow the pandemic to torpedo the relationship entirely.  Murray Decl., ¶ __. The quoted statement is taken from a Shutterstock employee who admittedly did not have a major say in the ultimate disposition of a potential new deal. ▮▮▮▮▮▮▮ (Murray Tr., 161:4-161:4). ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ Murray Decl., ¶¶ __; *see also* Pavlovsky Tr. 180:6-181:5; 193:16-194:5.

100. ▮▮▮▮▮▮▮

**Shutterstock's Response:**  Immaterial for the reasons stated above, but disputed. ▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

101.

**Shutterstock's Response:**  Immaterial for reasons stated above, including that motivation

is irrelevant, and disputed.

102.

**Shutterstock's Response:**  Undisputed that not paying money for services not rendered would inherently result in savings of expense but loss of benefit.  Disputed, to the extent this statement characterizes Shutterstock's motives during the pandemic renegotiation as unequivocally ███████████████ and immaterial in that alleged motives in a negotiation are irrelevant to whether Shutterstock is excused or otherwise entitled to relief.  Indeed, Mr. Pavlovsky testified to his intent at the time: ██████████████████

████████████████ (Pavlovsky Tr., 194:15-195:23).  Shutterstock further avers that its reason for rejecting this proposal was clear given the uncertainty surrounding the pandemic, and issue which was not addressed by PMC's proposal: ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (Pavlovsky Tr., 180:9-181:5).

103.   ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

**Shutterstock's Response:**  Disputed and immaterial.  "Historic Content" is not a term under the Agreement and is not mentioned in the proposal. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████  *See* SSTK161780.

Undisputed that the proposal appears to omit a credit but PMC never responded to the proposal, so it is an irrelevant point.

104.  ████████████████████████████████████
████████████████

**Shutterstock's Response:**  Undisputed.  As Mr. Pavlvosky testified, committing to any sort of advance when the pandemic was so uncertain made no sense.  Pavlovsky Tr., 180:4-181:5. Further, PMC never countered this proposal apart from reasserting its ██████████████ which was objectively unacceptable.  *See* Response to Paragraph 101.

105.  ████████████████████████████████████
████████████████████████████████████
████████████████████████████████

**Shutterstock's Response:**  Disputed as mischaracterized. ██████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████ PMC_0020989;

ECF Doc. No. 1.

106. ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

**Shutterstock's Response:**  Disputed but immaterial. PMC's referenced transcripts are

mischaracterized. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████. Such a breach obviates the

need for a detailed financial analysis.

107. ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

**Shutterstock's Response:**  Undisputed, but Shutterstock avers that it did its analysis for

the "entire editorial business," (Murray Tr., 287:287:12-13), not just for PMC's contribution to its

editorial business, and the editorial business evolved in ways that PMC has failed to distinguish. Immaterial to the questions at issue in the lawsuit.

108. 

**Shutterstock's Response:**  Undisputed. At the time, PMC had delivered, in the prior two months, far less than the Associated Press delivered to Shutterstock *each day*.  Murray Decl., ¶¶ __.

109.

**Shutterstock's Response:**  Disputed.  Mr. Pavlovsky says nothing about any "Historic Archive."

Murray Decl., ¶¶ __.  Immaterial to the issues in this dispute, which is about a 2015 Agreement, not a prospective 2020 agreement that PMC refused to engage on.

110.

**Shutterstock's Response:**   Disputed, as PMC has mischaracterized Mr. Pfeifer's testimony.  Mr. Pfeifer testified that, *inter alia,* █████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Pfeifer

Tr., 98:11-99:7 (emphasis added).  Mr. Pfeifer's full testimony conveys the true understanding of the parties at the time: "to which PMC has access" was a descriptive phrase, not a conditional one. It meant that PMC was obligated to provide Shutterstock access to the events that it had access to, i.e., those high-profile events identified on Schedule D to the Agreement (e.g., The Academy Awards, The Grammys, The Sundance Film Festival, etc.) and all others "to which PMC has access."  It certainly did not memorialize any unspoken escape-hatch for PMC in the event it had no access whatsoever to any third party events, or shift onto Shutterstock the unforeseeable risk that a once-in-a-century global pandemic would wipe out all of the live events that PMC promised Shutterstock to induce it to enter into the Agreement in the first place. ███████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████   Grobar Tr., 134:8-135:4.

111.   ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, as PMC has again mischaracterized this portion of Mr. Pfeifer's testimony.  See response to Paragraph 110.  In fact, the cited portion of Mr. Pfeifer's testimony contradicts the point PMC cites it for, i.e., that Mr. Pfeifer supposedly "admitted" that

███████████████████████████████████████ Mr. Pfeifer

said nothing of the sort.   When PMC's counsel pressed him on his understanding of the

Agreement's terms, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*,

100:10-23.  Far from the admission PMC claims, Mr. Pfeifer's testimony is consistent with an

obvious assumption of the contracting parties—that PMC could not simply elect not to hold any

PMC Events and remain in compliance with its obligation to provide live event access under the

Agreement.  ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Grobar Tr., 134:8-135:4.

112.    Shutterstock has alleged in its Counterclaims that, to the extent PMC did not
provide access to PMC Events or Third Party Events, it was because those events had to be
cancelled "as a direct result of the pandemic" and Covid-19 related "restrictions."
(Counterclaims ¶¶ 1, 3, 20-24). Shutterstock has also alleged that it was because of the pandemic
that "these events ceased to exist in any meaningful way" (*id.* ¶ 3) because "without a red carpet,"
Shutterstock could not create licensable images (*id.* ¶ 1).

**Shutterstock's Response:**    Undisputed  generally  but  avers  that  the  Counterclaims

themselves are more accurate than PMC's selective quotation of them.  Multiple PMC witnesses

claimed that the reason they could not provide event access was due to the COVID-19 pandemic.

*See* Penske Tr., 323:16-325:3 (██████████████████████); Margolin Tr.,

73:17-74:8; 102:11-16 (similar).

113.  █████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

██████████████████████████████████████████████████████

**Shutterstock's Response:**  Disputed.  The confusing, compound, and speculative question

posed caused ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████

114.    Shutterstock purported to terminate the parties' relationship as of July 17, 2020. (Counterclaims ¶¶ 31, 38).

**Shutterstock's Response:**  Undisputed, but misleading to the extent the word "purported"

suggests that the termination was ineffective.  Shutterstock effectively terminated the Agreement

as of July 17, 2020.  *See supra* Response ¶ 54.

115.    Shutterstock continued to display PMC content past the July 16, 2020 cutoff. Specifically, as relevant to PMC's copyright infringement claim, Shutterstock failed to take down three images from the LA USD School Closure and 66 images from the 92nd Annual Academy Awards.

**Shutterstock's Response:**   Disputed in part.   Shutterstock does not dispute that it continued to display thumbnail/watermarked informational versions of the three images from the LAUSD School Closure and 66 images from the 92nd Annual Academy Awards on its website after July 16, 2020.   However, it was not until PMC filed its Amended Complaint, on or about September 11, 2020, that Shutterstock first became aware that it had inadvertently failed to take them down due to a metadata discrepancy, and Shutterstock expeditiously took them down thereafter.   *See* Murray Decl., ¶ __, Ex. __ (SSTK168956) (report showing images removed on September 17 and 18, 2020); Sammut Decl., ¶ __.   Shutterstock removed nearly all other PMC Content from its websites on July 17, 2020 and did not display such content in any form at any time thereafter.   *See* Murray Decl., ¶ __, Ex. __ (SSTK169700-05) (identifying PMC Content taken down as of July 17, 2020).

116.    Michael Buckner shot the images from the LA USD School Closure on December 15, 2015. (Image Metadata Screen Shots, PMC_0024915-17). At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Buckner Tr., 13, 38; Walter Decl., ¶ __).

**Shutterstock's Response:**  Undisputed.

117.    Michael Buckner shot the images from the 92nd Academy Awards on February 29, 2020. At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Buckner Tr., 13, 38; Walter Decl., ¶ __).

**Shutterstock's Response:**  Undisputed.

118.    PMC owns and has a copyright registration for the LA USD School Closure images. (PMC Copyright Registration Collection 9, PMC_0024911-12 (VA2-215-216); Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 3 of the images listed in the registration.")).

**Shutterstock's Response:**  Undisputed.

119.    PMC owns and has a copyright registration for the images shot at the 92nd Annual Academy Awards. (PMC Copyright Registration Collection 4, PMC_0024889-90 (VA2-213-153); Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 66 of the images listed in the registration.")).

**Shutterstock's Response:**  Undisputed.

120.    The images from the LAUSD School Closure were displayed on Shutterstock's website ███████████████████ (Shutterstock Website Screen Shots, PMC_0004424-27; ██████████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that it inadvertently continued to display thumbnail/watermarked informational versions of the images from the LAUSD School Closure on its website after July 17, 2020 due to a metadata discrepancy and quickly removed them after it became aware of same.  *See* Murray Decl., ¶ __; Sammut Decl., ¶ __.

121.    The images from the 92nd Academy Awards were displayed on Shutterstock's website ███████████████████ (Shutterstock Website Screen Shots, PMC_0004379-82; ██████████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that it inadvertently continued to display thumbnail/watermarked informational versions of the images from the 92nd Academy Awards on its website after July 17, 2020 due to a metadata discrepancy and quickly removed them after it became aware of same.  *See* Murray Decl., ¶ __; Sammut Decl., ¶ __.

122.    Shutterstock's counsel has represented that, after the Agreement was terminated, Shutterstock also granted so-called "renewal" licenses to exploit certain of the above noted images shot by Michael Buckner. (Arato Decl., ¶__).

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that the only licenses of any kind that Shutterstock issued on or after July 17, 2020 for the exploitation of any of the above-noted images shot by Michael Buckner are two "renewal" licenses for one such image, resulting in approximately ████████████.  *See* Murray Decl., ¶ __ (renewal licenses are not new licenses and common in the industry to allow renewal licenses post-termination), Ex. __ (SSTK168956); *see also id.*, ¶ __; Lackman Decl., ¶ __, Ex. __ (July 2, 2020 Letter, PMC_0020986-89, at 0020989) ("As is consistent with commercial practice in the industry, and

61

while [Shutterstock] will take the aforementioned steps, Shutterstock cannot guarantee that a party who obtained PMC content before July 17, 2020 will not use the content after the effective date of termination.").

123. ███████████████████████████████████████
███████████████████████

**Shutterstock's Response:**  Undisputed, but this statement is incomplete and misleading.

124. ███████████████████████████████████████
██████████████████████

**Shutterstock's Response:**     Undisputed, but misleading.  Following termination of the Agreement, PMC continued to use one such account (*i.e.*, the "RollingStonePMCTemp" account, which is part of the "MPenske" organization of accounts) to access Shutterstock's images without permission.  *See* Sammut Decl. ¶ __, Ex. __ (SSTK00001) (identifying "RollingStonePMCTemp" among   PMC's   accounts);   *id.*,   Ex.   __   (SSTK00002-5)   (listing   downloads   by "RollingStonePMCTemp" account after July 17, 2020); McDonald Tr., 11:16-12:16; 38:8-12.

125. ███████████████████████████████████████
████████████████████████████████████████

**Shutterstock's Response:**     Disputed, as this statement misrepresents the contents Shutterstock's July 2, 2020 termination letter, which speaks for itself.  Shutterstock said nothing about disabling PMC's accounts in its July 2, 2020 termination letter, but merely stated that in the event of termination, ████████████████████████████████████████████████
████████████████████████████████████████████

126.

██████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed.

127.

██████████████████████████████████████████████████

**Shutterstock's Response:**   Disputed, to the extent that this statement implies that Shutterstock was required to shut down PMC's Shutterstock accounts upon termination of the Agreement.  The Agreement contains no such requirement.  *See* Agreement, ¶ 8.

128.

██████████████████████████████████████████████████

**Shutterstock's Response:**  Undisputed, but immaterial.

129.

██████████████████████████████████████████████████ Deposition Transcript of Kimberly McDonald ("McDonald Tr.") 11:16-12:16; 38:8-12).

**Shutterstock's Response:**  Disputed, as Ms. ████████████████████

████████████████████████████████████████████████

████████████████     *See* McDonald Tr., 44:6-45:15.

130.    On July 14, 2020, Ms. McDonald received an email addressed to "ALL RS Edit Staff," labeled "URGENT, MUST READ." (Email from Lotz, dated July 14, 2020, PMC_0020002-05; McDonald Tr., 19:6-20:18).

**Shutterstock's Response:**  Undisputed, but immaterial.

131.    At the time, Ms. McDonald was a member of the "RS Edit Staff" listserv. (McDonald Tr., 18:21-22:7).

**Shutterstock's Response:**  Undisputed, but immaterial.

132.    The email advised the RS Edit Staff to discontinue use of Shutterstock accounts but Ms. McDonald did not review the email. (McDonald Tr., 20:8-18).

**Shutterstock's Response:**  Undisputed, but immaterial.


133.    Ms. McDonald did not read the email because it would have been sent "when we were doing remote production during the pandemic, meaning that I would have been responsible for between 10 to 15 videos within a week. It's very easy to have emails get buried when you're working at that frequency." (McDonald Tr., 45:24-46:3).

**Shutterstock's Response:**  Disputed, as this is an incomplete and misleading recitation of the cited testimony (*see* McDonald Tr., 45:16-47:2), but in any event, immaterial.


134.    ███████████████████████████████████████████
███████████████

**Shutterstock's Response:**  Undisputed, but immaterial.


135.    Had Ms. McDonald reviewed the email, she would not have downloaded the images. (McDonald Tr., 25:11-17, 43:14-17).

**Shutterstock's Response:**  Undisputed that Ms. McDonald testified as much at her deposition, but immaterial.


136.    Shutterstock has no evidence of an injury arising from McDonald's downloading of the 20 images. ███████████████████████████████████████
████████████████████████████████████████████
████████████████

**Shutterstock's Response:**  Disputed.  PMC downloaded more than twenty images post-termination without permission and, like PMC, Shutterstock claims injury from the unauthorized use of images.  *See* Sammut Decl., ¶ __, Ex. __ (SSTK00002-5) (identifying post-termination downloads and open-market license fees); Pavlovsky Tr., 328:15-329:14 ████████████
████████████████████████████████████████████████
████████████████████████████████████

137.



**Shutterstock's Response:**  Disputed, to the extent that this statement implies that

. *See* Sammut Decl., ¶ __.

138.    Shutterstock has produced no documentary evidence demonstrated that it suffered at least $5,000 in damages as a result of these activities. (Arato Decl., ¶__).

**Shutterstock's Response:**    Disputed, to the extent that this statement implies that Shutterstock has not suffered at least $5,000 in damages as a result of the unauthorized use of the "RollingStonePMCTemp" account following termination of the Agreement.  *See* Pavlovsky Tr., 323:14-325:6; *see also* Murray Decl., ¶ __ (discussing open-market license fees).

139.    The only terms of use that Shutterstock produced are dated November 29, 2021. (Terms of Use, SSTK111629-35).

**Shutterstock's Response:**    Disputed, to the extent that this statement misleadingly suggests that November 29, 2021 is the effective date of the Terms of Use.  It is not—the "11/29/2021" date printed on the referenced copy of the Terms of Use indicates the date on which Shutterstock's counsel printed the Terms of Use from Shutterstock's website in preparation for McDonald's deposition the next day.  *See* Lackman Decl., ¶ __, Ex. __ (Terms of Use introduced as an exhibit at McDonald's deposition on November 30, 2021).  The cited Terms of Use were in

effect at the time of PMC's post-termination downloads.  *See* Sammut Decl., Ex. __ (Terms of use via Wayback Machine).

140. ███████████████████████████████████████████████████████
███████████████████████████████████

**Shutterstock's Response:**      Disputed, to the extent this statement implies that a PMC employee like ██████████████████████████████████████████████████████

████████████████████████████████████ was not bound by the Terms of Use  *See* SSTK111629-

35 (any person "accessing or using [the] website [https://www.shutterstock.com/] . . . agree[s] to

and [is] bound by the terms and conditions set forth [therein] . . . .").  Indeed, when asked whether

PMC employees would see Shutterstock's terms when they logged on to the website, Mr. Sammut

██████████████████████████████████████████████████████████

███████████████████████████████████████████████ McDonald Tr., 37:11-20.

141.    Shutterstock alleges that it was entitled to receive, and expected, a certain number of Historic Archive images "per month" between January and April 2020. (Counterclaims ¶ 28).

**Shutterstock's Response:**      Disputed.   *See* Countercl. ¶ 28 (alleging, *inter alia*, that

"Shutterstock received just 119 archival images for the four-month period from January through

April 2020 . . . . In 2019, Shutterstock received, on average, 437 archival submissions *per month*

resulting in a year-over-year drop of *93%* as compared to expectations for archival content.")

(emphasis in original).  PMC was required to "work . . . in good faith in the . . . distribution and

syndication of . . . Archive Content [images]."  Agreement, ¶ 3(a)(i).  In 2018 and 2019, PMC's

good-faith efforts resulted in the delivery of, on average, thousands of Archive Content images per

month.  *See* Murray Decl., ¶ __, Ex. __ (SSTK168721).  Shutterstock expected PMC to use the

same good-faith efforts between January and April 2020.  *Id.* ¶ __.

142.    Shutterstock alleges that "in 2019, Shutterstock received, on average, 437 archival submissions per month," whereas "Shutterstock received just 119 archival images for the four-month period from January through April 2020." (Counterclaims ¶ 28).

**Shutterstock's Response:**  Undisputed.



143.

**Shutterstock's Response:**  Disputed.  Shutterstock's records pertaining to PMC's delivery of Archive Content show that PMC received a substantial number of Archive Content images during the first quarter of 2018 and 2019.  *See* Murray Decl., ¶ __, Ex. __

144.

**Shutterstock's Response:**  Disputed.  Shutterstock expected PMC to "work . . . in good faith in the . . . distribution and syndication of . . . Archive Content" (Agreement, ¶ 3(a)(i)), particularly during the early pandemic months when its delivery of live event content necessarily came to a halt.  *See* Murray Decl., ¶ __.  In fact, Mr. Walter—PMC's Rule 30(b)(6) designee on the topic of "[t]he frequency and volume of delivery to Shutterstock of . . . Archive Content" (Lackman Decl., Ex. __)—expected PMC to digitize and deliver ▇▇▇▇ Archive Content images to Shutterstock in 2020, but it never did.  *See* Walter Tr., 385:4-386:13, Ex. 38 (PMC_0014957-62).

145.    Shutterstock produced a spreadsheet in this action documenting the timing of PMC's delivery of Historic Archive images. (Arato Decl., __; SSTK00006).

**Shutterstock's Response:**  Disputed, as Shutterstock's counsel has informed PMC's counsel that such spreadsheet (SSTK000006) does not completely and accurately document PMC's delivery of archival images, and because "Historic Archive" is not a defined term in the Agreement.  *See* Lackman Decl., ¶ __.  Shutterstock has produced multiple spreadsheets documenting PMC's delivery of Archive Content images, including, but not limited to, the spreadsheets Bates-numbered SSTK161815, SSTK161816, SSTK161817, and SSTK168721. *See* Lackman Decl., ¶ __

146.    ████████████████████████████████████████████
████████████████████████████████

**Shutterstock's Response:**  Disputed, as "Historic Archive" is not a defined term in the Agreement.  Shutterstock used the codes PMCAR and PMCEL to identify PMC's Archive Content for internal purposes.  *See* Murray Decl., ¶ __, Ex. __ (SSTK161818) ("PMCAR" and "PMCEL" codes refer to "PMC Archive").

147.    According to Shutterstock's tracking, ████████████████████
████████████

| | ██ | ██ | ██ | ██ | ██ | ██ |
|---|---|---|---|---|---|---|
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | █ | ██ | █ |
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | █ | █ | █ |



| | | | | | | |
|---|---|---|---|---|---|---|
| ███ | █ | █ | █ | ███ | █ | |
| ███ | █ | █ | █ | █████ | █ | |
| ███ | █ | ████ | █ | █ | █████ | |
| ███ | █ | ████ | █ | █ | █████ | |
| ███ | █ | █ | █ | █ | █████ | |
| ███ | █ | █ | █ | █ | █ | |

( ████████████████████

**Shutterstock's Response:**  Disputed, as the numbers in the chart above conflict with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images.  *See* Murray Decl., ¶ __; *see, e.g.*, *id.*, Ex. __ (SSTK168721) ████████████
████████████████████████████████████████████████████████████
███ .

148. ████████████████████████████████████████████
████████████████████

| | ██ | ██ | ██ | ██ | ██ | ██ |
|---|---|---|---|---|---|---|
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | ██ | █ | █ |
| ██ | | █ | █ | █ | █ | █ |
| ██ | | █ | █ | █ | █ | ██ |
| ██ | | █ | █ | █ | ██ | █ |
| ██ | | █ | █ | █ | ██ | |
| ██ | █ | █ | █ | █ | ██ | |
| ██ | █ | █ | █ | ██ | █ | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██ | | █ | █ | █ | ██ | █ | |
| ██ | | █ | █ | █ | ██ | █ | |
| ██ | | █ | ███ | █ | ███ | █ | |
| ██ | | █ | █ | █ | █ | █ | |

(████████████████████████████

**Shutterstock's Response:** Disputed, as the numbers in the chart above conflict with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images. *See* Murray Decl., ¶ __; *see, e.g.*, *id.*, Ex. __ (SSTK168721) ████████████ ████████████████████████████████████████████████████ ███.

149. ████████████████████████████████████████████ ████████████████████████████████

**Shutterstock's Response:** Disputed, as it conflicts with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images (Murray Decl., ¶ __, Ex. __ (SSTK1687210) (███████████████████████████████████ ████████████ and because "Historic Archive" is not a defined term in the Agreement.

150. Shutterstock never articulated any injury resulting from the purported withholding of archival images between January and April 2020, ██████████████████████████ ████████████████

**Shutterstock's Response:** Disputed, as PMC's withholding of archival images between January and April 2020 necessarily resulted in less Archive Content for Shutterstock to offer for license to third parties pursuant to the Agreement. Moreover, this is immaterial in the overall context of the Agreement, which was entered into for special access for events, for which PMC was to provide access. *See* Agreement, ¶ 3(a)(ii)-(iii).

## STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH IT IS CONTENDED THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED

151.    The "editorial" use of photographic imagery is the use of imagery as part of the timely editorial coverage of people, events, and other subject matter.  *See* Greene Tr., 38:25-39:15; PMC_21282; Murray Decl., ¶ __.

152.    Interest in celebrities and fashion is consistently high among consumers, thus the success and popularity of media brands that offer editorial coverage of the same, such as E! Entertainment, PopSugar, and Entertainment Weekly.  *See* Rachlis Report, ¶¶ 12-13; Murray Decl., ¶ __

153.    The demand for photography documenting current entertainment and fashion industry events (such as movie premieres, award shows, and high-profile parties and fashion shows) for use by such media brands in their editorial offerings is correspondingly high and ongoing, especially given the constantly updating 24-hour news cycle.  *See* Rachlis Report, ¶ 13; Murray Decl., ¶ __.

154.    Archival photographic imagery is typically older imagery that is not illustrative of timely, current events.  *See* Rachlis Report, ¶ 14; Murray Decl., ¶ __.

155.    As such, archival photographic imagery is used for different purposes than live event imagery in media.  For example, an archival image might be licensed for use in a CNN program on a historical event, or in a retrospective of a deceased celebrity.  *See* Rachlis Report, ¶ 15; Murray Decl., ¶ __.

156.    The number of consumers interested in current entertainment and fashion industry news is larger than the consumer population interested in the editorial pieces that typically utilize archival imagery.  As a result, the demand for live event imagery among producers of editorial

content in these industries is significantly higher than that for archival imagery.  *See* Rachlis Report, ¶¶ 16-17; Murray Decl., ¶ __.

157.    Prior to the June 2015 execution of the Agreement, Shutterstock decided to launch a comprehensive editorial photography product.  *See* Pfeifer Tr., 167:17-168:4; 170:9-15; 207:15-21; Oringer Tr., 97:21-98:12; 100:24-101:2; 301:22-302:12; Murray Decl., ¶ __.

158.    As part of this endeavor to build a comprehensive editorial product, Shutterstock sought to ensure that it had the ability to capture images at entertainment and fashion industry events as they were occurring so that they could provide them to their clients who would be creating editorial coverage about those events.  *See* Pfeifer Decl., ¶ __; Greene Tr., 104:11-24.

159.    In January 2015, at the start of the effort to build the editorial offering, Shutterstock acquired Rex Features, the largest independently-owned photographic press agency in Europe, thereby gaining access to a large number of significant entertainment and fashion industry events in the United Kingdom and Europe primarily.  *See* Melvin Decl., ¶ __, Ex. __ (PMC_0022533) (January 15, 2015 press release).

160.    Shutterstock also invested in technology to help support the editorial product offering and hired four leading photographers in 2015 to help support its editorial service.  Murray Delc., ¶ __; Melvin Decl., ¶ __; PMC_0022538-39.

161.    Over the course of the next two or so years, Shutterstock secured exclusive, multi-year agreements with the Associated Press (AP), The Football Association (the governing body of English Football), european pressphoto agency, b.v. (epa) (one of the leading news photography agencies in the world), the World Surf League, SilverHub Media (which owns one of the leading press photography agencies in Germany), and others that offer photographs that are of value to global media companies.  *See* Murray Decl., ¶ __.

162.    Shutterstock's deal with AP, entered into in early 2016 and which was recently renewed, gives Shutterstock customers access to approximately 3,000 images daily, from breaking news to red carpets to live sporting events, and its deal with epa gave it access to more than 1,500 press photos daily.  *See* Murray Decl., ¶ __.

163.    Shutterstock viewed a deal with PMC as a way to obtain the same kind of entertainment and fashion industry event access in the United States as it obtained from Rex Features in Europe.  Pfeifer Tr., 162:16-18; *see also id.*, 53:9-54:25, 98:11-99:7.

164.    Prior to the negotiations over the Agreement, PMC knew that Shutterstock was in the midst of launching its comprehensive editorial photography product and that ███████ ████████████████████████████████████████████████████████ Greene Tr., 97:18-99:13; 104:11-24; 114:25-115:20.

165.    With knowledge of Shutterstock's goal, PMC used its "insider access" to high-profile live entertainment and fashion industry events—including by offering to provide access to specific events like The Academy Awards, The Grammy Awards, and The Sundance Film Festival—to induce Shutterstock to enter into the Agreement (a fact that PMC's Rule 30(b)(6) designee on the negotiation of the Agreement did not deny).  Pfeifer Tr., 183:15-21; PMC_022851-22859; PMC_22553-37; Greene Tr., 11:16-12:2, 14:12-19; 114:1-13; 115:22-116:25; 117:8-23. *See also* Penske Tr., 100:3-103:07, Ex. 4 (SSTK111575-582) ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ).

166.    CEO Jay Penske hyped up the competitive value of the agreement by leaning into the importance of access and noted that in response to the Shutterstock deal, Getty Images reached out to the Hollywood Reporter (not owned by PMC at the time and a competitor to Variety) to get

access and credentials.  *See* Penske Tr., 258:4-259:10 & Ex. 20 (SSTK111587) (███████

█████████████████████████████████████████   *see also* Penske Tr., 73:13-24; 74:15-

75:18; 231:17-232:9 (███████████████████████████████████████████████████████

███); 274:3-6; 406:13; 430:18-431:3 & Ex. 43 (PMC 22929).

167.    Access to live entertainment and fashion industry events was the primary reason

Shutterstock entered into the Agreement, and PMC knew and understood this at the time of its

execution.  Pfeifer Decl., ¶ __; Greene Tr., 158:23-159:15; 173:24-174:22; 196:12-197:12; 235:7-

20, Ex. 25; Grobar Tr., 44:23-45:14 (████████████████████████████████████████

134:8-135:4 (███████████████████████████████████████████████████████████

██████

168.    Indeed, in its Amended Complaint, PMC notes that "industry expert" Paul Melcher

referred to PMC's live event access as a "golden pass" (Dkt. No. 30, ¶ 25), and the "talking points"

PMC developed to ensure that all personnel were on message when discussing the Shutterstock

Agreement both internally and externally emphasized "PMC's insider access and event

exclusivity."  Under the heading, "How does this deal work?", Shutterstock's live event access

was front-and-center:



████████████████████████████████████
████████████████████████████████████

PMC_002137-2142.

169.  The parties touted PMC's "insider access and event exclusivity" in contemporaneous press releases as well.  *See* SSTK111626-27 ("Shutterstock is teaming up with Penske Media Corporation to create and license images and videos ***of the biggest events in entertainment and fashion***, the companies will announce Monday.  The alliance combines the technology of one of the biggest stock-image providers in the world ***with PMC's insider access and event exclusivity***, establishing an innovative way of offering editorial images to media, publishing and creative business.") (emphasis added).

170.  The Agreement contemplated that PMC had access to significant events around the world, and it defined Third Party Events to encompass those events "to which PMC has access," including but not limited to the events listed on Schedule D.  Agreement, ¶ 3(a)(iii) ("PMC will provide to Shutterstock defined credentials, passes, VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . . These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D.").  The language of the Agreement confirms the parties' understanding that PMC did have access and always would provide it.  *See* CSUF ¶¶ 110-11.  PMC's failure to draft the Agreement to say "if PMC has access" or "to the extent that PMC has access" inherently confirms that providing access was not conditional or that the scope of access was limited to situations where PMC had access. *See* Agreement, ¶ 3(a)(iii).

171.  PMC's primary goal in the Agreement was to make money.  *See* Deposition Transcript of Gerry Byrne, 52:17-51:9 ██████████████████████ Walter Tr., 45:2-5 ████████████████████████████████████████████████

███████████████████████████████ PMC 0021285 (Email dated April 16, 2015 from

Jay Penske to PMC business team ███████████████████████████████████

Penske Tr., 409:22-410:2 ███████████████████████████████████

As to Shutterstock, however, PMC never seriously envisioned that it would recoup on the

Advance. Penske Tr., 424:19-425:3. A minor goal for PMC was for Shutterstock to help PMC

manage and onboard its acquired physical image collection, which it had not previously offered

for license. *See* Penske Tr., 263:6-14; 275:5-7; 423:24-25; 429:2-5; 439:21-440:3.

172.    PMC and Shutterstock entered into the Agreement effective as of July 1, 2015. See

Dkt. No. 30 (Amended Complaint), Ex. A; accord Greene Tr., 71:3-72:19 & Ex. 4. It provides,

*inter alia*:

   a.    "PMC will provide Shutterstock access to its events, galas, conferences,
         summits, and other event functions to which third parties are invited generally
         ('PMC Events'). All image, footage and/or audio content recorded at such
         PMC Events are referred to herein as 'PMC Event Content'."

   b.    "PMC will provide to Shutterstock defined credentials, passes, and VIP
         access to significant events around the world to which PMC has access as
         defined herein ('Third Party Events'). All image, footage and/or audio
         content created hereunder at the Third Party Events is referred to herein as
         'Third Party Event Content'. Subject to the Getty Agreement Restrictions,
         PMC hereby grants to Shutterstock the right to be the sole third party to
         leverage and utilize PMC's credentials and access to capture Third Party
         Event Content at Third Party Events. These Third Party Events shall initially
         include, but not be limited to, those events listed on Schedule 'D'. PMC shall
         work with Shutterstock in good faith to create additional access at third party
         events that will enable the Parties to further monetize the Third Party Event
         Content."

173.    The Agreement obligated PMC to act in good faith to maximize the events and

licensable content available to Shutterstock under the Agreement, including with respect to new

credentials, passes, or access obtained by PMC. *See* Agreement, ¶¶ 3(a)(i), 3(a)(iii), 3(a)(iv), 3(e).

174.    Under the Agreement, Shutterstock and PMC shared the revenue earned on the

exploitation of photographs taken by Shutterstock at live entertainment and fashion industry events

(i.e., PMC Events Content and Third Party Event Content), and PMC's archival imagery ("Archive Content").  Agreement, ¶ 6.

175.    Specifically, the Agreement provides that Shutterstock pay PMC a royalty in the amount of ████ of the revenue received pursuant to the exploitation of Archive Content, PMC Event Content, and Third Party Event Content.  Agreement, ¶ 6.

176.    Shutterstock also agreed to pay PMC "an annual fully recoupable advance" against these royalties (the "Royalty Advances").  Agreement, ¶ 6.

177.    From PMC's original three-year proposal, the Agreement entered into was divided into six separate "License Periods," and a Royalty Advance was due at the beginning of each, as follows:

   c.    Year 1: ████████ due on or before September 1, 2015

   d.    Year 2: ████████ due on or before July 1, 2016

   e.    Year 3: ████████ due on or before July 1, 2017

   f.    Year 4: ████████ due on or before July 1, 2018

   g.    Year 5: ████████ due on or before July 1, 2019

   h.    Year 6: ████████ due on or before July 1, 2020

Agreement, ¶ 6.

178.    Each Royalty Advance was recoupable by Shutterstock **"solely"** from the royalties otherwise due to PMC **"during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment)."**  Agreement, ¶ 6.

179.    So, for example, if revenue reached ████████ in License Period 5, Shutterstock would fully recoup its ████████ Royalty Advance for that year (PMC is entitled to ████ of the revenue, and ████████████████ Shutterstock would then remit to PMC ████ of

any additional revenue above ███████ mark received during that License Period.  Shutterstock could **not** keep any such additional revenue to recoup against the next License Period's Royalty Advance, or the prior License Period's Royalty Advance if Shutterstock did not fully recoup it. Each License Period stood on its own.  Agreement, ¶ 6; Greene Tr., 160:3-164:3.

180.     During the negotiations, PMC revised the Agreement to make clear that, when it came to recouping a Royalty Advance, each License Period was insulated from the rest, *i.e.*, that Shutterstock could not use one License Period's revenue to recoup against another License Year's advance.  Greene Tr., 160:3-164:3, 178:4-24, 230:23-232:3 ███████████████████████████████████████████████████████████████████████████████████████████ ███████████████

181.     The Royalty Advance █████████████████ License Period 2, with the ███████ ███████ in License Period 6, because the parties anticipated that revenues would increase over time as more consumers of editorial photography recognized Shutterstock as a reliable source for current entertainment and fashion photography, and higher revenues in the later License Periods would ████████████████████████ Royalty Advances.  Pfeifer Decl., ¶ __.  Indeed, PMC hoped its share of the revenue would exceed the ██████ Royalty Advances in the later License Periods.  Penske Tr., 182:11-183:5.

182.     Beginning in early 2020 (License Period 5, after Shutterstock had already paid that License Period's Royalty Advance) and continuing through License Period 6, the COVID-19 pandemic resulted in the cancellation of nearly all PMC Events and Third Party Events.  Those events that did occur were either delayed or modified significantly in a manner that resulted in substantially reduced opportunities for live photography.  *See* Walter Tr., 249:18-250:6 ("To my recollection, there were no events [between mid-March, 2020, and July 16, 2020] that happened

in person."); *id.*, 253:25-254:15 ("there's not really credentials to be had for virtual events").  As a result, PMC was not able to provide Shutterstock with access to generate live event content as required by the Agreement.

183.    Shutterstock would not have agreed to pay the License Period 6 Royalty Advance, or any other Royalty Advance, if it knew that it would not have access to PMC Events or Third Party Events during that particular License Year, especially because Shutterstock could recoup against a Royalty Advance with ***only*** the revenues earned during that particular License Period. Pfeifer Decl., ¶ __.

184.    Indeed, PMC did not even provide any of its Archive Content to Shutterstock until ***14 months*** into the Agreement—by that time, Shutterstock had already paid ***two*** Royalty Advances.  Murray Decl., ¶¶ __ & Ex. __ (SSTK168721).

185.    The parties did not expect Archive Content to generate sufficient revenue to justify the amount of any Royalty Advance.  Pfeifer Decl.; Pfeifer Tr., 53:9-54:8.  Indeed, PMC has never had anyone pay an advance against royalties for archive material alone.  Penske Tr., 200:6-14. Consistent with the foregoing, there was little to no negotiation or discussion regarding the archive images; the overwhelming majority of the time in the negotiation and subsequent meetings was spent on matters pertaining to live events.  Pfeifer Decl., ¶ __.

186.    Over the entire course of the Agreement, Archive Content accounted for approximately ██ of the overall revenue generated by the parties' exploitation of content created pursuant to the Agreement, and live event content (i.e., PMC Event Content and Third Party Event Content) accounted for approximately ██  See Murray Decl., ¶ __, Ex. __.

187.    On average, Shutterstock sent photographers to approximately ***800 live events per year*** pursuant to the access PMC provided under the Agreement.  Melvin Decl., ¶ __.

188.    Neither party expected nor reasonably could have expected that a global pandemic would occur during the term of the Agreement that would cause nearly all live events to be cancelled.  Pfeifer Decl., ¶ ___; Greene Tr., 321:9-14.

189.    From early March 2020 onward, PMC did not offer credentials, passes, or VIP access to significant events or any other third party events – not to any of the events that had occurred in the prior four years, nor any other events where Shutterstock would enjoy exclusive access.  Walter Tr., 202:7-20; Margolin Tr., 134:10-134:23.

190.    For example, PMC did not provide access to the 2020 Cannes Film Festival (scheduled for May 12-23, 2020), the 2020 Tony Awards (scheduled for June 7, 2020), the 2020 Toronto Film Festival (scheduled for September 10-19, 2020), or the 2020 Emmy Awards (scheduled for September 20, 2020).  The former two, which were scheduled to occur before the effective date of termination, were cancelled.  Penske Tr., 323:16-19.

191.    In March 2020, PMC also inexplicably stopped providing meaningful Archive Content to Shutterstock.  PMC on average provided, on average, approximately 61,575 archival images to Shutterstock per month in the two years prior to the pandemic (2018-2019), but during the last four months of the parties' relationship, PMC provided Shutterstock with only a token amount, just 119 archival images *in total*. Murray Decl., ¶¶ __, Ex. __ (SSTK168721).

192.    And just prior to the pandemic, PMC planned to digitize ████████ physical images, but it instead decided to ship the images to another location where they sat in storage. PMC made no efforts to make these images available to Shutterstock.  *See* Walter Tr., 385:4-386:13, Ex. 38 (PMC_0014957-62).

193.    Recognizing that the pandemic eliminated the reason why Shutterstock entered into the agreement (namely, to obtain exclusive VIP access, credentials, and passes to entertainment

and fashion events), PMC agreed that the contract should be amended in some way in response to the unforeseen pandemic, which had instantly obliterated the very services Shutterstock contracted for.   Penske Tr., 214:14-18 ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ *id.* at 339-13 ████████████████████████

███████████████████████████████████████████ PMC 15928-29.  *See also* Penske Tr., 316:9-12; 336:10-12 ████████████████████████

██████████████   Nonetheless, as discussed below, PMC's cash-driven proposal—indeed its sole proposal and sole position—failed to appreciate the fact that it was unclear if or how live events would come back, as well as the fact that live events were cancelled only eight months into the prior term of the Agreement.   Further, after events specifically named in the Agreement were cancelled, PMC indisputably was in breach.  *See* Agreement, § 3(a)(iii) & Schedule D.

194.    As a result of the impact on live events, PMC was able to negotiate mutually acceptable relief from venues and other vendors who allow PMC to put on its more than 100 annual summits, conferences, and talent-driven events.   *See* Penske Tr., 385:8-386:5 ██████████

███████████████████████████████████████████████████████

███████████████████   PMC vigorously opposed providing documentation regarding this relief, necessitating a motion to the Court.  *See* Dkt. No. 94.

195.    Indeed, PMC's Chief Operating Office testified that he would expect where live events were cancelled due to the pandemic, PMC or its subsidiary brands took the position that they were owed money back from the venue slated to host the event (*e.g.*, a refund of a security deposit); but Mr. Grobar claimed to not know "definitively."  Grobar Tr., 93:3-17.

196.    Two weeks after the pandemic closed offices and shut the country down, Shutterstock approached PMC regarding the issue, but even despite the matter escalating to Shutterstock's CEO and PMC's COO in mid-April, the parties seemed to be talking past each other: PMC demanding that Shutterstock commit to paying the ███████ advance either on July 1 or split into an extended term, and Shutterstock asking to speak about the overall picture, bearing in mind the possibility that live events requiring credentials, passes or VIP access may not return for a year or more.  Pavlovsky Tr., 180:20-181:5.

197.    Shutterstock's CEO noted to PMC's COO on their phone call in mid-April that Shutterstock had already paid a full year's advance-a sizeable amount of money-through June 30, 2020 and was no longer receiving live event access as of March 2020.   Therefore, in Mr. Pavlovsky's view it did not make sense to open a dialog by talking about how much more money would be advanced to PMC-much less talking about a ███████ royalty advance for the coming year.  *See* Pavlovsky Tr., 193:16-194:5; 204:2-15; 247:15-248:3; 263:15-23.

198.    PMC saw an opportunity to have its cake and eat it, too, as a result of the pandemic, working internally to get the royalty advance and then immediately go to market without any intention to deliver services against that royalty advance.  PMC_008848-50 ████████████████████ ██); PMC_010175; PMC_015971-72 ██████████████████████████████ ████████

199.    On May 4, 2020 at the latest, PMC claimed it had already ████████████ ████████████████████████████ PMC_0020975-20976.  According to PMC, the plan was to "████████████████████████████████ ████████  *Id.*; *see also* Grobar Tr., 174:6-11, 183:24-184:24.  PMC included these points in an email from COO George Grobar to CEO Jay Penske, which Mr. Penske then forwarded to Jon

Oringer in an effort at leverage.  Mr. Grobar revealed at his deposition, PMC intended to forward the ostensibly internal email from the beginning, and it was drafted not by Mr. Grobar alone, but by a team of PMC personnel, including attorneys.  Indeed, Mr. Grobar testified that he did not write various portions of the email.  *See* Grobar Tr., 152:19-197:16, 200:9-210:20.

200.    From that time onward, PMC did not offer to create additional access at third party events for Shutterstock.  See Margolin Tr., 102:4-16.

201.    Four days later, Shutterstock's CEO reached out to PMC's CEO with a cordial note and invited a discussion, with the goal of finding a good faith effort to see if there was a way to rectify the fact that Shutterstock was not receiving the contracted services.  PMC_0016287-288. *See also* Pavlovsky Tr., 53:6-19; 110:19-111:2.  On the call, PMC's CEO was angry about Shutterstock's refusal to commit to a promise some fixed sum of money as a condition to having an overall discussion about what to do regarding the uncertain pandemic that was causing the elimination of all events (not to mention the overall uncertainty and human casualties).  Pavlovsky Tr., 249:14-23.

202.    When Mr. Pavlovsky declined to commit to any specific amount of money, as Mr. Penske demanded he do, Mr. Penske hung up on Mr. Pavlovsky after saying a few profanities. Pavlovsky Tr., 249:14-23, 250:14 █████████████████████████████████████ ████████████████████████████████████

203.    Shutterstock decided that in light of the response and threats, it would be best to not involve Mr. Pavlovsky or Mr. Oringer, and instead turn the matter over to the legal team.  But apart from a single phone call, PMC's counsel did not respond to the efforts of Shutterstock's legal team.  *See* Pavlovsky Tr., 254:14-23; Garfield Tr., 16:25-17:3; 34:2-5; 37:18-22; 45:3-11; 59;25-60:10; PMC 22819-20.

204.    Section 8 of the Agreement provides: "Either Party may terminate the Agreement at any time for cause by giving the other Party written notice and providing for a forty-five (45) day period ("Cure Period") during which the other must correct, cure or otherwise resolve the alleged cause for termination."  If the alleged cause is not cured, the party was obligated to give notice of termination to the other.  Agreement, ¶ 8; Penske Tr., 210:11-211:10 ███████████████

████████████████████████████████████████████████████████████████████

███████████████████████

205.    Given the radio silence from PMC coupled with the apparent lack of interest in addressing the matter, Shutterstock prepared a letter pursuant to Section 8 of the Agreement. Garfield Tr., 35:14-21; 54:18-55:8; 58:5-7; 59:25-60:10 Ex. 6 (PMC 0020980-83).  In the letter, Shutterstock identified the fact that PMC had cancelled PMC Events, was unable to provide access to Third Party Events, including those in Schedule D, and offered no assurances that PMC could offer any access to any such events in the foreseeable future.  *Id.*

206.    In response to the letter, Jay Penske sent a note to Jon Oringer saying: ████████████

████████████████████████████████████████████████████████████████████

████████████    PMC 21820.  Mr. Oringer responded: ███████████████████████████

████████████████████████████████████████    *Id.*  Shutterstock's GC also wrote to Ms. Margolin to invite PMC to discuss.  Garfield Tr., Ex. 7 (PMC 22822-23).

207.    Apart from the response from Mr. Penske on May 18, 2020, nobody from PMC responded to either communication in the 45-day window, much less took any steps to correct, cure or otherwise resolve the alleged cause for termination.  Penske Tr., 360:11-365:12; Margolin Tr., 112:5-113:11; 128:12-19.  The only thing Shutterstock heard from PMC came 30 days later: that PMC had filed an unnoticed lawsuit against Shutterstock.  Dkt. No. 1.

208.     Indeed, when asked at deposition, Jay Penske acknowledged the breach but confirmed that PMC did not take any steps to correct, cure, or otherwise resolve it.  He took the misguided position that the pre-notice offer to "blend and extend" (*i.e.*, force Shutterstock into another year in an unpredictable time, and give PMC another ████████ in credit for the privilege of paying part of the advance later) was sufficient, and no effort to do anything at all post-notice was required.  Penske Tr., 360:11-365:12 ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Margolin Tr., 102:4-16; 112:5-25.

209.     Given that filing a lawsuit was not a correction, cure, or otherwise a resolution of the alleged cause for termination, Shutterstock sent a written notice of termination on July 2, 2020, pursuant to the provisions of Section 8 of the Agreement.  Garfield Tr., Ex. 8 (SSTK111589-111590).

210.     The Agreement contains a severability clause which states: "If any provision of this Agreement or any application thereof is determined to be illegal, invalid or unenforceable, the remainder of this Agreement and any other application of such provision shall not be affected thereby, and such illegal, invalid or unenforceable provision shall be reworded, if possible, so as to make it legal, valid and enforceable."  Agreement, ¶ 19.

211.     PMC agreed to be bound by Shutterstock's website Terms of Use.  *See* Agreement, Schedule A § 2 ("Customer [PMC] agrees to be bound by . . . Shutterstock's Website Terms of Use . . . in existence as of the date hereof"); *see also* SSTK111629-35 (any person "accessing or

using [the] website [https://www.shutterstock.com/] . . . agree[s] to and [is] bound by the terms and conditions set forth [therein] . . . .").

212.    PMC and Shutterstock had no license agreement in effect (separate from the Terms of Use) between July 17, 2020 and November 2020.  *See* Murray Decl., ¶ __.

Dated: New York, New York
        March 28, 2022

MITCHELL SILBERBERG & KNUPP LLP

By:   /s/Eleanor M. Lackman
        Eleanor M. Lackman
        Marissa B. Lewis
        437 Madison Avenue, 25th Floor
        New York, New York 10022
        Tel.: (212) 509-3900
        Fax: (212) 509-7239
        eml@msk.com
        mbl@msk.com

*Attorneys for Defendant-Counterclaim Plaintiff Shutterstock, Inc.*