

**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Eleanor M. Lackman
Partner
(212) 878-4890 Phone
(917) 546-7675 Fax
eml@msk.com

March 28, 2022

**VIA CM/ECF**
The Honorable Mary Kay Vyskocil, U.S.D.J.
United States District Court, Southern District of New York
500 Pearl Street, Room 2230
New York, NY 10007

Re:     <u>Penske Media Corp. v. Shutterstock, Inc., 20-cv-4538 (MKV)</u>

Dear Judge Vyskocil:

Penske Media Corporation ("PMC") contends there are ***150*** material facts at issue in this case. Shutterstock, Inc. ("Shutterstock") disputes the vast majority.  That alone is enough to doom PMC's proffered summary judgment motion.  But it is not the only reason PMC's motion would be fruitless.  As its sprawling Rule 56.1 statement reveals, PMC misses the ultimate question that must be adjudicated given the parties' respective contract claims and defenses:  Was Shutterstock obligated to pay PMC an advance against royalties, even though PMC failed to deliver the access to live events that it promised it would deliver in exchange for the advance, or was Shutterstock's obligation to pay the advance excused?  PMC never squarely addressed (or even presented) this question, opting instead to set up a strawman, i.e., should the Court "simply rip up" the contract due to the COVID-19 pandemic.  Dkt. No. 112, p.2.  As to the real question, Shutterstock's obligation to pay the advances corresponding to License Periods 5 and 6 was excused given PMC's express breaches, the clear intent of the parties, and the original purpose of the Agreement.

**Factual Background.**  In late 2014, having established itself in the stock image industry, Shutterstock set out to develop an "editorial" product, i.e., an offering of photographic imagery relevant to current events and trends in the entertainment and fashion industries that media outlets (such as E! Entertainment and Entertainment Weekly) could license to use in their publications and programming.  To compete with the likes of Getty Images, which was already established in the editorial space, Shutterstock needed to photograph the live industry events that consumers of celebrity news and the latest fashion trends want to read about.  And to do that, Shutterstock needed access to the events themselves.

So Shutterstock acquired Rex Features, Europe's largest independent photo press agency, and entered into multiyear distribution agreements with some of the leading news and sports agencies in the world.  But while Rex had access to European events, it did not have broad access to red-carpet and fashion industry events based in the United States.  PMC, which owns well-known industry brands like Variety and Women's Wear Daily, had that access—special access, in fact.

PMC knew Shutterstock needed it to create and sell its budding editorial product.  So PMC used its access to events like The Academy Awards, The Grammys, and The Sundance Film Festival to induce Shutterstock to enter the Agreement—a fact that PMC's Rule 30(b)(6) designee on the



The Honorable Mary Kay Vyskocil, U.S.D.J.
March 28, 2022
Page 2

negotiations did not deny.  Indeed, the record is replete with evidence that Shutterstock would not have even begun contract negotiations if PMC's live event access was not part of the deal.

The parties eventually executed the "Archive & Event Image Hosting and Licensing Agreement" (the "Agreement") that is the subject of this litigation.  In it, PMC promised to provide Shutterstock (i) access to photograph PMC-owned live events, (ii) exclusive credentials and VIP access to photograph high-profile events produced by third parties, and (iii) archival photography amassed by PMC's trade magazines over the years.  The parties agreed to split the royalty revenue earned on Shutterstock's exploitation of live event and archival content during six separate "License Periods."  In addition, Shutterstock agreed to pay PMC a "fully recoupable advance" against the royalties PMC was entitled to, called a "Royalty Advance,"[1] at the start of each License Period.  The Agreement provided that Shutterstock would recoup the advance using the royalties otherwise due *during that License Period*; Shutterstock was not permitted to use revenue earned during one License Period to recoup the Royalty Advance paid in another.  Shutterstock was willing to pay these advances in exchange for PMC's access, not its archive.  Indeed, Shutterstock paid the advances in License Periods 1 and 2 before receiving *any* archival content from PMC.

When the COVID-19 pandemic arrived in March 2020, PMC's pace of delivering roughly 800 live events per year plummeted to *zero*, and the consideration supporting the Royalty Advance for License Period 5 (which Shutterstock had already paid) and the upcoming advance for License Period 6 vanished.  After pre-defined events under Section 3(a)(iii) of the Agreement were cancelled and PMC refused to offer any proposal but a brief delay in payment in exchange for an additional $1 million in free images, Shutterstock served a demand that PMC cure its failure to perform pursuant to the terms of the Agreement.  PMC did not respond in good faith, as was its obligation under the Agreement, or even at all.  Instead of working with Shutterstock toward a solution as PMC acknowledged the Agreement required, it initiated this litigation.  When PMC failed to address the alleged cause and refused to do anything to resolve the matter in the 45-day resolution window, Shutterstock served notice of termination as the Agreement required.

**Argument.**  PMC focuses its letter brief on the frustration of purpose defense, but completely ignores other fatal defects in its claim.  Chief among these is PMC's failure to perform its obligation to provide Shutterstock access to live events in License Periods 5 and 6, including the 2020 Tony Awards and the 2020 Cannes Film Festival, both of which were specifically promised by PMC but were cancelled due to the COVID-19 pandemic.  That breach of the express terms of the Agreement excused Shutterstock's reciprocal performance, i.e., payment of the advances corresponding to License Periods 5 and 6.  *See, e.g., County of Jefferson v. Onondaga Development, LLC*, 151 A.D. 3d 1793 (4th Dep't 2017) ("one of the essential elements of a cause of action for breach of contract is the performance of its obligations by the party asserting the cause of action for breach").  *See also City of New York v. Long Island Airports Limousine Serv. Corp.*, 96 A.D.2d 998, 999 (1983), *aff'd*, 62 N.Y.2d 846 (1984) (courts excuse performance of contractual obligations where failure of consideration renders such performance "vastly different from what

---

[1] PMC uses the term "minimum guaranteed revenue payment," but the Agreement defines the payment at issue as "an annual fully recoupable advance against royalties" and uses the term "Royalty Advance."



The Honorable Mary Kay Vyskocil, U.S.D.J.
March 28, 2022
Page 3

could reasonably have been within the contemplation of the parties when the contract was made."). Since PMC made sure that each License Period stood on its own—i.e., that Shutterstock could recoup a Royalty Advance "solely" with revenue earned during the corresponding License Period—and the Agreement contains a severability clause, the Court may excuse the obligations in License Periods 5 and 6 without disturbing the License Periods that were not affected by the pandemic. *See* Agreement, ¶ 19.

PMC now clings to the phrase "to which PMC has access" in Paragraph 3 of the Agreement, implying that it is a limitation on PMC's obligation to provide Shutterstock live event access. In other words, according to PMC, it agreed to provide access to specifically identified events (*see* Schedule D), but *only to the extent that* PMC had access to those events. There is no room in the record for this "gotcha" interpretation. Events "to which PMC has access" is a descriptive phrase, not a conditional one. It meant that PMC was obligated to provide Shutterstock access to the events *that it had access to*, i.e., "those events listed on Schedule 'D'" (e.g., The Academy Awards, The Grammys, The Sundance Film Festival, etc.) and all others "to which PMC has access." It certainly did not memorialize any unspoken "out" for PMC in the event it had *no access whatsoever* to *any* third party events, or shift onto Shutterstock the unforeseeable risk that a once-in-a-century global pandemic would wipe out all of the live events that PMC promised Shutterstock to induce it to enter into the Agreement in the first place. As George Grobar, PMC's Chief Operating Officer, put it, the Agreement was "built" on the concept that Shutterstock "could leverage the access to these events." Grobar Tr., 134:8-135:4.

Independently, PMC's inability to provide access to live events in License Periods 5 and 6 due to the COVID-19 pandemic plainly frustrated the core purpose of the Agreement, excusing Shutterstock's obligation to pay the advances corresponding to those periods. *See, e.g., Matter of Fontana D'Oro Foods, Inc.*, 122 Misc.2d 1091, 1098 (Richmond Cnty. 1983) ("frustration of purpose refers to a situation where an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract.").[2]

PMC's other claims are not amenable to summary judgment either. PMC's copyright claims are limited to Shutterstock's unknowing display on its website of informational (i.e., fair use) thumbnails of a mere 69 miscoded images (as compared to the "2300 Photographs" claimed in the operative Complaint), and the renewal of just two licenses of one such image (for a total of less than $20), prior to receiving notice of PMC's claim to own such images in September 2020. Meanwhile, it is undisputed that PMC continued to access a Shutterstock account that it had no right to access, and through which it downloaded images (at no charge), until the offense was detected in November 2020. An issue remains as to whether the employee(s) who downloaded the images knew they lacked permission to do so.

---

[2] In another overreach, PMC claimed Jon Oringer testified that Shutterstock would not have walked away from the Agreement even if it had known it "wouldn't be getting live images from PMC." A reading of the transcript shows that he said nothing of the sort. Oringer Tr., 234:22-235:11; Proposed Counterstatement of Facts, ¶ 113.



The Honorable Mary Kay Vyskocil, U.S.D.J.
March 28, 2022
Page 4

Respectfully submitted,

*s/ Eleanor M. Lackman*

Eleanor M. Lackman