**TO BE FILED UNDER SEAL/REDACTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Yellow Highlight = Confidential or AEO/Highly Confidential

PENSKE MEDIA CORPORATION,

      Plaintiff-Counterclaim Defendant,

      -against-

SHUTTERSTOCK, INC.,

      Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

## SHUTTERSTOCK, INC.'S COUNTERSTATEMENT TO PENSKE MEDIA CORPORATION'S ANTICIPATED RULE 56.1 STATEMENT OF FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York and Paragraph 4(A)(i) of this Court's Individual Rules of Practice in Civil Cases, defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock"), by and through its undersigned counsel, respectfully submits the following counterstatement to plaintiff-counterclaim defendant Penske Media Corporation's ("PMC") anticipated Rule 56.1 statement of facts (Dkt. No. 112-1):[1]

    1.    Plaintiff PMC is a digital media, publishing, and information services company. It publishes more than 20 digital and print brands covering the entertainment and fashion industries, including Women's Wear Daily ("WWD"), Variety, Deadline Hollywood, Rolling Stone, and others. (Anticipated Declaration of Karl Walter ("Walter Decl.") ¶ __; Defendant Shutterstock Inc.'s Counterclaims, Dkt. No. 77 ("Counterclaims") ¶ 13).

    **Shutterstock's Response:**  Undisputed in part but incomplete for failure to reference live events.  Transcript of Deposition of Jay Penske ("Penske Tr."), 21:16-20 (PMC is a "[p]ublishing digital media company" with "an element of live events and some information services or data.");

---

[1] PMC's anticipated Rule 56.1 statement contains headings before Paragraphs 1, 6, 28, 35, 41, 52, 59, 81, 89, 114, 123, and 141, many of which contain statements of purported fact and/or arguments.  Shutterstock disputes such headings and objects to same on the ground that they are not supported by admissible evidence.

*id.*, 37:13-16 ("Q. Are live events core to the business?  A. Certainly. Certainly part of the core business."); *id.*, 68:6-10 ("[A] digital media business that has live events, that has an information services business as, as well as some data licensing. That's our current business."); *see also id.*, 68:19-21 (At the time of the parties' discussions about a potential agreement, PMC was "not in the business of selling stock photography or editorial photography.").

2.      PMC owns a large and ever-growing photographic collection with millions of images related to its publications. (Walter Decl., ¶ __).

**Shutterstock's Response:**  Disputed and immaterial to the extent that the "photographic collection" was not available for license via Shutterstock.  The vast majority of PMC's primarily physical photographs received as part of its then-recent purchases of Fairchild Fashion Media, Variety, and others was never digitized or made available to Shutterstock, and many were not available for license due to rights issues.  Accordingly, a major part—if not the majority—of PMC's copies of images never became Archive Content available to Shutterstock under the parties' Archive & Event Image Hosting and Licensing Agreement (the "Agreement").  *See* Transcript of Deposition of Karl Walter ("Walter Tr."), 385:23-386: 16, 387:9-388:5, 391:9-392:6; Transcript of Deposition of Judy Margolin ("Margolin Tr."), 192:1-13, Ex. 18 (SSTK030767-74) (claim against over 950 images from the Fairchild Fashion Media collection); Expert Report of Eric Rachlis ("Rachlis Report"), ¶¶ 20, 25, 30, 33; Penske Tr., 138:20 (describing the "complications of actually getting archives material approvals from photographers" and the use of some of the money from the Shutterstock deal to work on the "extremely complex and laborious challenge" of understanding the rights and permissions of the archives); *id.*, 162:5-6 ("there were some challenges with rights and permissions").

3.      PMC's photographic collection includes historic fashion, celebrity, and event images, created over the last 100+ years, from the various PMC-owned publications (the "Historic

Archive"). (Expert Report of Eric Rachlis, dated Dec. 16, 2021 ("Rachlis Report") ¶¶ 10-12, 27, 29, 30).

**Shutterstock's Response:** Disputed and immaterial to the extent that the "photographic collection" was not available for license via Shutterstock. The vast majority of PMC's photographs received as part of its then-recent purchases of Fairchild Fashion Media, Variety, and others were never digitized or made available to Shutterstock, and many were not available for license due to rights issues. Accordingly, a major part—if not the majority—of PMC's copies of images never became Archive Content available to Shutterstock under the Agreement. *See* Walter Tr., 385:23-386:16, 387:9-388:5, 391:9-392:6; Margolin Tr., 188:24-25; 192:1-13, Ex. 16 (PMC_00019959-62); Rachlis Report ¶¶ 20, 25, 30, 33. Further, "Historic Archive" is not defined in the Agreement. "Archive Content" is. *See* Agreement, ¶ 3(a)(i). Archive Content does not include third-party or PMC event content. *See id.*; *see also* Penske Tr., 176:9-17.

4.       Defendant Shutterstock, Inc. ("Shutterstock") is a company that owns and operates website platforms that license photographs to third parties for use on third party websites, publications, marketing materials, and corporate communications. (*See* Form 10-K, dated Feb. 24, 2016, PMC_0022218-345 at 22220; *see also* Counterclaims ¶¶ 11-12, 15).

**Shutterstock's Response:** Disputed. PMC cites a Form 10-K from over eight years ago. Shutterstock is a leading global creative platform offering full-service solutions, high-quality content, and creative workflow solutions for brands, businesses and media companies. Its platform brings together content creators and a vast network of contributors by providing readily-searchable content that Shutterstock's customers pay to license and by compensating contributors as their content is licensed. Shutterstock's offerings include over 400 million images and more than 24 million footage clips, as well as footage, music, and more, which has enabled Shutterstock to attract a global and diverse base of over two million customers in 2021 alone, representing businesses of all sizes and from all major industries, including global and local media and

broadcast companies that are reliant on fresh, newsworthy images to attract their own customers. *See* Anticipated Declaration of Stan Pavlovsky ("Pavlovsky Decl."), ¶ __.

5.      Until 2015, Shutterstock was known primarily for its "stock" photographs, but it desired to enter the more prestigious realm of editorial imagery, including fashion and entertainment photography. (Deposition Transcript of Ben Pfeifer ("Pfeifer Tr.") 54:20-25, 162:16-18, 164:17-23; Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Deposition Transcript of Stan Pavlovsky ("Pavlovsky Tr.") 59:11-60:10; *see also* Counterclaims ¶ 12).

**Shutterstock's Response:**  Undisputed as to its general brand at the time, but disputed as to editorial imagery.  Shutterstock always offered editorial imagery.  *See* Deposition Transcript of Jon Oringer ("Oringer Tr."), 63:15-24 ("[W]e've been selling editorial images since about 2006"). However, in around late 2014, to help earn market share away from its biggest competitor in stock content, Getty Images, Shutterstock desired to launch an editorial *product* (called Shutterstock Editorial, now also encompassed in the product called Shutterstock Premier) to attract more customers in the media industry, and such product would include images not just from fashion and entertainment, but from politics, sports, and other current events from around the world.  *See* Pfeifer Tr., 167:17-168:4; 170:9-15; 207:15-21; Anticipated Declaration of Ben Pfeifer ("Pfeifer Decl."), ¶¶ __; Oringer Tr., 97:21-98:12; 100:24-101:2; 301:22-302:12 (Penske and Oringer agreed on the goal to help Shutterstock get a competitive advantage over Getty Images).

6.      PMC and Shutterstock entered into an agreement, named the Archive & Event Image Hosting and Licensing Agreement (the "Archive & Event Agreement" or "Agreement"), as of July 1, 2015. (Archive & Event Agreement, SSTK092808-29).

**Shutterstock's Response:**  Undisputed.

7.      The Archive & Event Agreement provided for an initial six-year term that was to expire on June 30, 2021. (Archive & Event Agreement § 1).

**Shutterstock's Response:**  Undisputed.

8.      The Archive & Event Agreement provided Shutterstock with exclusive rights to license PMC's then-existing and ever-growing photographic collection, subject to limited exceptions. (Counterclaim ¶ 13; Archive & Event Agreement § 3(a)).

**Shutterstock's Response:**      Disputed.   PMC's claim that the Agreement provided Shutterstock access to an "ever-growing photographic collection" is imprecise, if not inaccurate. In fact, the Agreement explicitly excludes "Acquisition Content," i.e., "any content, events or rights to cover third party events acquired by PMC pursuant to any acquisition transaction that occurs outside the ordinary course of business during the License Period."  Agreement, ¶ 3(a)(iv); *see also* Walter Tr. 385:23-386:13; 387:9-388:5.  Thus, PMC's "ever-growing" characterization of PMC's photographic is misleading, unless it is referring to the photographs Shutterstock would shoot at live entertainment and fashion events using access granted by PMC—the core consideration provided by PMC in the Agreement.  In any event, the terms of the Agreement that govern the rights granted to and withheld from Shutterstock speak for themselves.

9.      The Agreement provided Shutterstock with these benefits in two main ways. (Archive & Event Agreement § 3; Counterclaims ¶ 13).

**Shutterstock's Response:**  Disputed, as to PMC's characterization "two main ways."  As set forth in Shutterstock's Additional Material Facts, there was one "main way" Shutterstock benefitted from the Agreement—access to photograph live events produced by PMC and third parties (like the Academy Awards and the Sundance Film Festival) to create content it could use to advance its comprehensive editorial photography product.  *See* Transcript of Deposition of Todd Greene ("Greene Tr."), 97:18-99:13 ("it was important to [Shutterstock] that they enter into an agreement with somebody like PMC that could give them access to be captured for use in [ ] their editorial products"); *id.*, 104:11-24; 114:25-115:20; Transcript of Deposition of George Grobar ("Grobar Tr."), 44:23-45:14 (access to events "was a significant part of the partnership"); *id.*, 134:8-135:4 (the Agreement "was built on the concept of they could leverage the access to these

events"); PMC_0002131-42 (talking points).  During the first 14 months of the Agreement, PMC did not provide any Archive Content at all.  *See* Anticipated Declaration of Candice Murray ("Murray Decl."), ¶¶ __, Ex. __ (SSTK168721).

10.     First, Shutterstock received exclusive rights to license to third parties what the Agreement defined as PMC's "Archive Content"— namely, images "owned or created by PMC" or those "to which PMC has the contractual right to syndicate and/or license." (Counterclaim ¶ 12; Archive & Event Agreement §§ 3(a)(i), 4; Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).

**Shutterstock's Response:**   Disputed, as to PMC's incomplete characterization of the Agreement and recitation of the definition of "Archive Content," and its suggestion, based on the prior paragraph, that the right to license Archive Content was a "main" benefit to Shutterstock of the Agreement (it was not—*see* Response ¶ 9, *supra*).  The cited portions of the Agreement do not merely grant Shutterstock a license; they require PMC to "work together" with Shutterstock "in good faith in the creation, management, hosting, distribution and syndication of image, footage and/or audio content (i) currently owned or created by PMC, (ii) to which PMC has the contractual right to syndicate and/or license, as of the date of this Agreement, and (iii) created by PMC, or to which PMC acquires the contractual right to syndicate and/or license, during the License Period (collectively, the 'Archive Content')."   Moreover, PMC omits that Shutterstock's rights are "[s]ubject to the Getty Agreement Restrictions."   *See* Agreement, ¶ 3(a)(i).  Section 4 of the Agreement merely reflects that Shutterstock gave PMC a requested budget to help PMC achieve its goal of trying to monetize the old physical copies of photographs that were in the storage files of Fairchild Fashion Media and the owner of *Variety*, which PMC had acquired in 2014 and 2012, and that PMC was obligated to deliver all such images in "SSTK Compliant" format with specific metadata.  Accordingly, it does not support the statement.  *See* Agreement, ¶ 4.

11.     PMC's Archive Content included PMC's Historic Archive. (Counterclaim ¶ 12; Archive & Event Agreement § 3(a)(i); Shutterstock Press Release, dated June 22, 2015, PMC_0022535-537, at 0022535).

**Shutterstock's Response:**  Disputed, as "Historic Archive" is not a defined term in the Agreement and the evidence PMC cites for this proposition does not support it. The Agreement itself identifies the scope of Archive Content, which does not include Event Content, but makes no reference to some distinct "historic archive."  *See* Agreement, ¶ 3(a)(1); *see also* Penske Tr., 175:13-176:18 ("Q. Looking at this definition [of "Archive Content"], does this…include content that is created at third-party events? […] A. Yeah, it says third-party event access and third-party event content […] so my, my instinct would be it doesn't.  It's just a sub-bullet of PMC content, archive content.").

12.     Second, PMC agreed to provide Shutterstock with available access to select events—hosted by PMC or by third parties—at which new photographic images could be created for Shutterstock to license. (Counterclaims ¶¶ 13 and 15; Archive & Event Agreement § 3(a)(ii)-(iii)).

**Shutterstock's Response:**  Disputed, as to PMC's characterization of the express terms of the Agreement.  Paragraph 3(a)(ii) of the Agreement states:  "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')."  Paragraph 3(a)(iii) of the Agreement states: "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (the 'Third Party Events')."  The term Third Party Events expressly includes (but is not limited to) the events cataloged on Schedule D to the Agreement, such as the Academy Awards and the Sundance Film Festival.  Agreement, ¶¶ 3(a)(ii), 3(a)(iii).  PMC's phrase "available access" is not used in Paragraph 3(a), or anywhere else in the Agreement.

The Agreement does not say "if PMC has access" or "to the extent that PMC has access." The Agreement is not conditional or limiting at all, but instead is presumptive. The significant event access is what got Shutterstock to enter into the Agreement with PMC and assumes PMC already has access. Moreover, the language "to which PMC has access" refers to the list on Schedule D, at the very least, and reflects the array of significant annual events that the parties understood the events to be. In other words, the definition reflects the significant events that PMC has access to, as understood at the time of entry into the Agreement. Agreement, § 3(a)(iii) ("PMC will provide to Shutterstock defined credentials, passes, VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . . These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D."); Pfeifer Decl. ¶¶ __.

13.    Specifically, PMC agreed to provide Shutterstock with "access to [PMC's] event functions to which third parties are invited generally" (the "PMC Events") and to "provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access," like the Oscars and the Grammys (the "Third Party Events"). (Archive & Event Agreement § 3(a)(ii)-(iii)).

**Shutterstock's Response:** Disputed, as this recitation of a key term of the Agreement is incomplete. Paragraph 3(a)(ii) of the Agreement states: "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')." Paragraph 3(a)(iii) of the Agreement states: "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (the 'Third Party Events')." The latter is without regard to whether third parties are invited. The scope of pre-defined Third Party Events expressly includes (but is not limited to) the events cataloged on Schedule D to the Agreement, such as the Academy Awards and the Sundance Film Festival, as well as the Tony Awards and the Cannes

Film Festival, to which PMC did not provide access in 2020.  Moreover, PMC was obligated to

"work with Shutterstock in good faith to create additional access at third party events that will

enable the Parties to further monetize the Third Party Event Content."  Agreement, ¶¶ 3(a)(ii),

3(a)(iii).

14.     Shutterstock entered into the Archive & Event Agreement as part of a strategic
effort to expand its licensing business into the news and editorial space. (Deposition of Benjamin
Pfeifer ("Pfeifer Tr.") 25:11-17; 33:17-23; 54:20-25, 182:16-183:5; SSTK Company Overview,
dated Sept. 2017, SSTK092400-41, at 092418; Shutterstock Form 10-K, dated Feb. 24, 2016,
PMC_0022218-345, at 0022222-23; Shutterstock Press Release, dated June 22, 2015,
PMC_0022535-537, at 0022535; Counterclaim ¶ 13; Pfeifer Tr., 12:12-17; 17:4-9; 19:20-22 (the
images that Shutterstock obtained under the Agreement were considered "editorial" and not
commercial "stock" images)).

**Shutterstock's Response:**  Disputed, to the extent this statement implies that Shutterstock

had no editorial photography offering as of the execution of the Agreement.  Prior to executing the

Agreement, Shutterstock offered editorial photographs, but desired to expand its editorial offering

to include timely photographs from news, sports, entertainment, fashion, and other cultural and

current events from around the world under its Shutterstock Editorial brand.  *See* Oringer Tr.,

63:15-63:16 ("[W]e've been selling editorial images since about 2006"); Pfeifer Tr., 15:14-17:3

("there was always editorial content on the Shutterstock platform").

15.     A number of Shutterstock's staff photographers, who were newly hired in 2015 to
launch Shutterstock's editorial division (Shutterstock Press Release, dated Sept. 9, 2015,
PMC_0022538-39; Pfeifer Tr., 166:4-20) have explained that "[p]rior to…2015," Shutterstock
"didn't have an editorial division developed." (Deposition Transcript of Chelsea Lauren ("Lauren
/Jones Tr.") 13:11-13; *accord* Lauren/Jones Tr., 28:8-10 (entertainment was "brand new" to
Shutterstock in 2015); Deposition Transcript of Rob Latour ("Latour Tr.") 12:9-11 ("having an
editorial department" was still a "dream[]" of Shutterstock as of 2015)).

**Shutterstock's Response:**  Disputed, to the extent this fact is offered to prove more than

merely that the cherry-picked statements were said at deposition, including the deposition of two

photographers that did not touch the business strategy or execution of the editorial product

offering.  Prior to executing the Agreement, Shutterstock did offer editorial photographs for license.  *See* Oringer Tr., 63:15-63:16 ("we've been selling editorial images since about 2006"); Pfeifer Tr., 15:14-17:3 ("there was always editorial content on the Shutterstock platform"). Further, Shutterstock had already acquired Rex Features, Europe's largest independent photography agency, which gave it access to timely and newsworthy photography opportunities. *See* PMC_0022533 (January 15, 2015 press release, "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery"); Melvin Tr., 74:4-8.  The evidence PMC cites in support of the statement in Paragraph 15 is inadmissible, as it failed to establish that any of the witnesses it relies on have personal knowledge sufficient to support their testimony.  Undisputed that to support its broad editorial product, Shutterstock hired four leading photographers in 2015, all of whom are still on staff with Shutterstock despite the termination of the Agreement with PMC.  *See* Anticipated Declaration of Ben Melvin ("Melvin Decl."), ¶ __.

16.    Shutterstock's lead negotiator for the Agreement in 2015 and head of Shutterstock's business development in 2015 (Pfeifer Tr., 10:15-22, 11:3-9, 21:24, 29:25-30:1) has testified that prior to 2015, Shutterstock previously had been "known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, [or] anyone in the entertainment and fashion world" (Pfeifer Tr., 54:20-25).

**Shutterstock's Response:**    Disputed, as this is an incomplete and inaccurately contextualized recitation of the cited testimony.  PMC's counsel inquired whether Shutterstock was interested in the access provided by the Agreement "because it helped it compete with Getty," to which Mr. Pfeifer responded: "[W]e talked about competing with Getty every day, but Shutterstock's issue is that it was known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, anyone in the entertainment and fashion world.  So having a Variety credential helped get access."  Pfeifer Tr., 53:9-54:25.

10

17.     Accordingly, in 2015, Shutterstock embarked on a two-pronged business plan to move beyond the stock photography business and into the editorial market. First, in January 2015, Shutterstock acquired Rex Features, Europe's largest independent photo press agency, which "mark[ed] Shutterstock's substantive entry in editorial imagery." (Pfeifer Tr., 164:17-23; Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Pavlovsky Tr., 59:11-60:10).

**Shutterstock's Response:**  Disputed, as to the characterization, without relevant citation, to Shutterstock's business plan as "two-pronged."  Undisputed that Shutterstock purchased Rex Features in January 2015.  If there were other "prongs" to the approach, there were several, including entering into licensing deals with major entities in news, sports, and more (including PMC, the AP, epa, The Football Association, and others), as well as acquiring and partnering with technology solutions designed to help support the overall editorial product's functionality and service delivery.  Murray Decl., ¶¶ __.

18.     At around that same time, Shutterstock identified PMC as its "solution for U.S. entertainment and fashion access and archive content." (Pfeifer Tr., 162:16-18).

**Shutterstock's Response:**  Disputed, as to the referenced timing.  Mr. Pfeifer did testify that PMC was Shutterstock's "solution for U.S. entertainment and fashion access and archive content."  Pfeifer Tr., 162:16-18.  But Shutterstock acquired Rex Features prior to engaging in contract negotiations with PMC, not "[a]t around that same time," and PMC knew that Shutterstock had already acquired Rex Features during those negotiations.  *See* PMC_0022533 (January 15, 2015 press release, "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery"); Penske Tr., 60:11-61:5 (Shutterstock "had just acquired Rex" during Mr. Penske's initial discussions with Shutterstock's CEO, Jon Oringer, regarding the potential agreement); *id.*, 63:2-14 (same); Transcript of Deposition of Todd Greene ("Greene Tr."), 26:8-19, 114:25-115:20, 223:2-224:9.

19.    In announcing the deal, Shutterstock characterized PMC as a "trailblazing company" whose "strategic alliance" with Shutterstock would "accelerate [Shutterstock's] progress in editorial imagery." (Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535; Deposition Transcript of Jon Oringer ("Oringer Tr.") 212:23-213:20).

**Shutterstock's Response:**  Undisputed that press and publicity materials included laudatory language, including as PMC asked Shutterstock to include (*see* Agreement, ¶ 7 (obligating Shutterstock to identify PMC as a "launch partner" for Shutterstock's editorial product)), but inaccurate and therefore disputed.  The press release was issued by both parties following drafting by their press departments, and the quoted language refers to PMC as "another trailblazing company" that Shutterstock teamed up with as part of building its editorial product. *See* PMC_022535 ("We are thrilled to team up with another trailblazing company . . . ."). However, immaterial.

20.    Shutterstock explained in securities filings that PMC gave Shutterstock "credibility in the market for editorial content that will allow us to further grow our product offerings." (Form 10-K, dated Feb. 24, 2016, PMC_0022218, at 0022222-23; Oringer Tr., 222:21-224:23).

**Shutterstock's Response:**  Undisputed that the money paid annually under the Agreement was designed in large part to buy credibility in the editorial market over each year of the Agreement, but incomplete as the cited pages preface the editorial overview in the 2016 10-K with the acquisition of Rex Features five months earlier, and refers to the six-year Agreement with PMC as giving, among other things, credibility in the market.  PMC_002222-23; Oringer Tr., 75:24-76:6.

21.    Shutterstock explained in a 2017 Company Overview that "partnering with PMC" was a future "growth driver" in the "editorial" space. (SSTK Company Overview, Sept. 2017, SSTK092401, 092418).

**Shutterstock's Response:**  Disputed as incomplete and therefore misleading.  The cited page is misquoted and refers only to *investments* in "additional" growth drivers for the editorial

product, among which the partnership with PMC was one of seven "additional future growth drivers" Shutterstock invested in. *See* SSTK092418; *see also* SSTK092410 ("Editorial Launched Partnerships with Associated Press and European Press Agency.").

22.     Shutterstock agreed to provide PMC with significant compensation. (Archive & Event Agreement).

**Shutterstock's Response:**  To the extent this fact refers to a promise to provide PMC with significant compensation pursuant to the terms of, and compliance with, the letter and spirit of the Agreement, undisputed.

23.     First, Shutterstock agreed to pay PMC so-called guaranteed minimum revenue payments ("MRGs") as a non-refundable advance against royalties otherwise due and payable to PMC for Shutterstock's licensing of PMC content. (Archive & Event Agreement § 6; Deposition Transcript of Candice Murray ("Murray Tr.") 84:21-25; Pfeifer Tr., 68:15-69:17 (Agreement's royalty advance is a guaranteed revenue; "minimum revenue guarantee is an accepted, common—common term")).

[PMC SUF ¶ 23, n.2]:  The Agreement provides that Shutterstock will retain 70% of the fees it earns for licensing PMC content to Shutterstock's customers and that Shutterstock will remit 30% of those fees as a royalty to PMC (subject to Shutterstock recouping the minimum revenue guarantees). (Archive & Event Agreement § 6).

**Shutterstock's Response:**  Disputed, including the footnote, as PMC has mischaracterized the plain terms of the Agreement.  Shutterstock agreed to pay PMC "an annual fully recoupable advance against royalties (the 'Royalty Advances')."  Agreement, ¶ 6.  The acronym "MRG" does not appear in Paragraph 6.  *Id.*  Paragraph 6—the subject of this purported fact—uses the defined term "Royalty Advance," as quoted above.  *Id.*  The Agreement goes on to clarify that each "Royalty Advance" was "recoupable by Shutterstock solely from all PMC Royalties . . . otherwise payable to PMC during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment)."  *Id.*  Indeed, Mr. Pfeifer, the Shutterstock witness PMC cites for this supposed fact, specifically rejected PMC's counsel's

characterization of the payments as "minimum revenue guarantees" as opposed to "Royalty Advances"—the term that is used in the Agreement. *See, e.g.,* Pfeifer Tr., 68:15-69:3 ("I wouldn't call it a guarantee. I would call it an advance of royalty income."); *id.*, 72:2-22 ("Q. And that's why it's called a minimum revenue guarantee, correct? . . . A. That's why it's called a royalty advance. . . . This agreement talks about 'royalty advances,' . . . not a 'revenue guarantee'"); Penske Tr., 182:23-183:5 ("Q. I see the term 'royalty advances,' not minimum guarantee. Is there some other provision that you're looking at? Is that your terminology for royalty advance? A. It is, yes, […] I stand corrected.").

24.    Shutterstock agreed to pay PMC annual MRGs as follows:

| CONTRACT YEAR | PAYMENT DEADLINE | AMOUNT |
|---|---|---|
| Year 1 | 9/1/2015 | $1.5 million |
| Year 2 | 7/1/2016 | $1.5 million |
| Year 3 | 7/1/2017 | $2 million |
| Year 4 | 7/1/2018 | $2.5 million |
| Year 5 | 7/1/2019 | $3 million |
| Year 6 | 7/1/2020 | $3.5 million |

(Archive & Event Agreement § 6).

**Shutterstock's Response:** Disputed, as PMC has mischaracterized the plain terms of the Agreement. Shutterstock agreed to pay PMC, subject to the terms of the Agreement, "an annual fully recoupable advance against royalties (the 'Royalty Advances')." Agreement, ¶ 6. The acronym "MRG" does not appear in Paragraph 6. *Id.* Paragraph 6—the subject of this purported fact—uses the defined term "Royalty Advance," as quoted above. *Id.* The Agreement goes on to

clarify that each "Royalty Advance" was "recoupable by Shutterstock solely from all PMC Royalties . . . otherwise payable to PMC during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment)." *Id.* While some other Shutterstock agreements do have "minimum revenue guarantees," this one did not. Indeed, Mr. Pfeifer, the Shutterstock witness PMC cites for this supposed fact, specifically rejected PMC's counsel's characterization of the payments as "minimum revenue guarantees" as opposed to "Royalty Advances"—the term that is used in the Agreement. *See, e.g.*, Pfeifer Tr., 68:15-69:3 ("I wouldn't call it a guarantee. I would call it an advance of royalty income."); *id.*, 72:2-22 ("Q. And that's why it's called a minimum revenue guarantee, correct? . . . A. That's why it's called a royalty advance. . . . This agreement talks about 'royalty advances,' . . . not a 'revenue guarantee'"); Penske Tr., 182:23-183:5 ("Q. I see the term 'royalty advances,' not minimum guarantee. Is there some other provision that you're looking at? Is that your terminology for royalty advance? A. It is, yes, […] I stand corrected.").

25.    Shutterstock also granted PMC a license to use images from Shutterstock's own image library, in exchange for specified fees, except that Shutterstock "waiv[ed] the first US $1,000,000 of fees payable." (Archive & Event Agreement § 2(a)). This provided PMC with a $1 million credit for PMC to use to license Shutterstock images. (*Id.*).

**Shutterstock's Response:**  Undisputed, but incomplete in that referenced "license to use images from Shutterstock's own image library" and "$1 million credit" applied only "throughout the License Period" as such term is defined in the Agreement. *See* Agreement, ¶ 2(a), 1.

26.    Shutterstock also agreed to provide photographers, at its expense, to attend and shoot images at both PMC Events and Third Party Events and that PMC would own the copyrights to those images. (Archive & Event Agreement §§ 3(a)(ii)-(iii); Counterclaims ¶ 16).

**Shutterstock's Response:**  Disputed, as PMC has mischaracterized the plain terms of the Agreement. Paragraph 3(a)(ii) states, in part, "Shutterstock will provide editorial photographic

event coverage, at Shutterstock's expense, for all PMC Events." Agreement, ¶ 3(a)(ii). Paragraph 3(a)(iii), which addresses Third Party Events, contains no such language, and does not require Shutterstock to provide photographers to cover Third Party Events. *Id.*, ¶ 3(a)(iii). Further disputed that PMC would own the copyrights to images not shot under a PMC credential. *See id.*

27.     The Archive & Event Agreement ultimately allowed Shutterstock to obtain and post millions of editorial images on Shutterstock's websites for Shutterstock's customers to license for a fee. (*See, e.g.*, Tabulation of PMC Images Delivered to SSTK, SSTK161815; Murray Tr., 177:7-78:20).

**Shutterstock's Response:**  Undisputed, but incomplete in its use of the term "editorial images."  Over the life of the Agreement, the revenue generated by photographs taken at live events (PMC Events and Third Party Events), *i.e.*, "editorial images," accounted for approximately 90% of the overall revenue generated pursuant to the Agreement. *See* Murray Decl., ¶ __, Ex. __.

28.     Prior to signing the Archive & Event Agreement, the parties negotiated a term sheet. (Signed Term Sheet, May 6, 2015, PMC_0019609).

**Shutterstock's Response:**  Undisputed.

29.     During that negotiation, Shutterstock proposed a provision that it titled "Shutterstock Opt-Out." (Draft Term Sheet, Apr. 28, 2015, PMC_0021292-301, at 0021297; Pfeifer Tr., 174:10-11, 112:23-113:11).

**Shutterstock's Response:**  Undisputed that as part of the rounds of negotiations, each side proposed sets of terms, and that in one set of terms that Shutterstock proposed, an "Opt-Out" term was proposed. *See* Pfeifer Tr., 113:4-116:13.  Immaterial in that the term was never in the final Agreement, which contains an integration clause. *See* Agreement, ¶ 16.

30.     The "Shutterstock Opt-Out" proposed giving "Shutterstock the right to terminate the deal if there's a drop in the royalties that Shutterstock earns under the deal." (Oringer Tr., 172:21-24; *accord* Draft Term Sheet, dated Apr. 28, 2015, PMC_0021292-301, at 0021297 (draft opt-out giving Shutterstock "the right to terminate" starting in 2018, if "PMC Royalties equal less than 50% of the Royalty Advance"); Oringer Tr., 174:10-11 (under the draft provisions "Shutterstock would be able to cancel the agreement" if revenues fell); Pfeifer Tr., 112:23-113:11

(describing provision as "a clause in Shutterstock's favor that gives Shutterstock an option to pull out of or terminate the agreement if revenue generated from the licensing of this content doesn't meet minimum levels.").

**Shutterstock's Response:**   Disputed, as PMC has mischaracterized the terms of the proposed clause, which did not refer to a "drop" or consequence "if revenues fell." The proposed term—which was among many that were not ultimately incorporated into the Agreement— included a right to terminate "if in the immediately preceding year PMC Royalties equal less than 50% of the Royalty Advance paid for such year." *See* PMC 21297. Undisputed that Shutterstock paid the Royalty Advance in full in 2015, 2016, 2017, 2018, and 2019 despite PMC's deficiencies in cooperation through the years. *See* Response ¶ 29, *supra*; *see also* Walter Tr., 202:7-20.

31.   PMC rejected Shutterstock's proposed Opt-Out provision and Shutterstock accepted PMC's rejection of the provision. (Draft Term Sheet, Apr. 28, 2015, Pfeifer Ex. 10 at 0022605 (redline of redline showing Shutterstock accepting PMC's striking of the proposed "Opt-Out" provision), id. at p.16 (print out of redline changes showing that Todd Greene, then General Counsel of PMC (Greene Tr., 64:4-5; 65:12-13), deleted "Opt-Out" provision); PMC_0019609 (final Term Sheet containing no "Opt-Out" provision); SSTK092808-28 (final Archive & Event Agreement containing no "Opt-Out provision); Pfeifer Tr., 126:22-127:6 and 128:24-129:14 ("I think I agree with what you are saying. The conditional opt-out was stricken . . . Shutterstock signed the final term sheet.").

**Shutterstock's Response:**   Disputed, as incomplete. As Mr. Pfeifer testified, this proposal was part of the overall "give-and-take" inherent in all contract negotiations, and thus cannot be analyzed in isolation. *See* Pfeifer Tr., 113:4-116:13. Indeed, it was one of many on both sides that were not ultimately incorporated into the Agreement, and the final Agreement did include other provisions designed to maximize Shutterstock's ability to recoup the Royalty Advances, including, without limitation, the requirement that PMC provide Shutterstock with access to the specific high-profile third party events listed on Schedule D of the Agreement, and that PMC "work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content," as well as PMC's language regarding

17

the ability to terminate for failure to correct, cure, or otherwise resolve any claimed breach in 45 days.  Agreement, ¶¶ 3(a)(iii), 8.  Notably, despite negotiating for a cure provision in the Agreement, Mr. Penske appeared to believe the cure provision was useless when asked about it during his deposition.  *See* Penske Tr. 361:7-363:13 ("You're saying in 45 days I could create – start creating live events in order to remove our company from a breach?").

   32. Shutterstock was willing to run its new businesses "at a loss." (Pfeifer Tr., 109:22-110:9).

  **Shutterstock's Response:**  Disputed, to the extent that PMC has mischaracterized Mr. Pfeifer's testimony.  In response to the question "would you have proposed [royalty advance] amounts . . . based on projections that could show a loss to the extent there were other benefits that were important to obtain under the deal," Mr. Pfeifer testified: "Potentially, yes.  I mean, all new businesses, at least at Shutterstock, we typically ran businesses or were willing to run businesses at a loss for some period of time."  Pfeifer Tr., 109:22-110:9.  Undisputed that Shutterstock was paying a vendor for a service and was amenable to not recouping the value of that service off of royalties given the primary purpose and benefit of the Agreement of giving Shutterstock an edge in the building and marketing of its editorial product.  Pfeifer Decl., ¶¶ __.

   33. Shutterstock viewed its Agreement with PMC as "an investment in the long-term growth of Shutterstock." (Pfeifer Tr., 234:23-235:17).

  **Shutterstock's Response:**  Undisputed.

   34. Shutterstock believed its deal with PMC would add to Shutterstock's reputation in the editorial space, open up new business opportunities, and improve the overall relationship between Shutterstock and its customers. (Pfeifer Tr., 182:16-183:21).

  **Shutterstock's Response:**  Disputed, as an incomplete characterization of Shutterstock's purpose in entering into the Agreement.  For example, PMC's statement omits that Shutterstock believed having exclusive access to entertainment and fashion industry live events would help it

to jump ahead of competitors and therefore increase its market share of the editorial space, particularly in combination with its offerings from Rex Features and other major news and lifestyle content providers.  Pfeifer Tr., 183:15-21 ("We had conversations about how [the Agreement] would open doors with different kinds of customers […] [W]e felt there was meaningful business impact to having access to [live and archival] content we wouldn't otherwise have."); Pavlovsky Tr., 93:19-94:7 ("We have lots of images already. The difference with the live events is that allowed us to have exclusive content that competitors like Getty could not have, so there's value to that content that doesn't exist with other forms of con[tent] at the present time."); Greene Tr., 115:13-15 ("[Shutterstock] wanted to enter into the editorial imagery business and to specifically take on Getty in the market.").

35.     Shutterstock benefited from PMC's cachet in the fashion and entertainment world, which helped propel Shutterstock from a supplier of ordinary stock photos to an influential name in editorial imagery. (Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23; SSTK Company Overview, Sept. 2017, SSTK092400-41, at 092418).

**Shutterstock's Response:**  Disputed in part.  The cited documents do not support the statement.  The collection of acquisitions and partnerships as part of the overall editorial offering (including news, sports, and more) helped build Shutterstock's customer base for editorial imagery.  Shutterstock's acquisition of Rex Features built its ability to offer high-demand entertainment and fashion content, such as from awards events such as BAFTA.  Murray Decl., ¶ __; Melvin Decl., ¶ __.  The niche that PMC filled was live event and other fresh content from the worlds of entertainment and fashion in the United States.  Murray Decl., ¶ __.  Undisputed that PMC's cachet in the fashion and entertainment world was a benefit that Shutterstock bargained for under a six-year term.

36.     Internally, Shutterstock conceded that "PMC was instrumental in gaining access to events for SSTK in the early years of the deal. As SSTK has established its brand in the market,

we are increasingly securing our own editorial credentials to events." This "resulted in less of a need for leaning on PMC to provide." (Email from Granato to Oringer, dated Mar. 18, 2019, SSTK161819-21, at 161821).

**Shutterstock's Response:**   Immaterial but disputed in part.  Undisputed that PMC was instrumental in giving access as contemplated by the significant up-front payment under the Agreement.  Disputed as to credentials generally.  *See id.* (referring to PMC events growing in number).  Disputed that reputation in industry was due solely to PMC.  Melvin Decl., ¶ __ (discussing importance and impact of Rex acquisition).  In September 2019, after the cited email, Shutterstock identified that the fashion access and credentials and entertainment events were still important.  *See* Murray Tr., 107:15-108:19 (describing importance of fashion weeks around the world. "Q.  I asked you if there was anything of than the access and live events that you valued in September of 2019? [Objection] A. Again, it was really the live events. Q. So nothing else? [Objection] A. No.").

37.   In 2018 and 2019, there were at least 227 events in New York and Los Angeles where Shutterstock either declined PMC's invitation to attend or used its own credentials. (2019 PMC Credentials, PMC_0019418; 2018 PMC Credentials, PMC_0019400; Deposition Transcript of Benjamin Melvin ("Melvin Tr.") 12:11-14:11, 17:14-18:20, 22:25-25:1, 74:9-75:16; *see also, e.g.*, Melvin Google Docs notification, dated Nov. 13, 2018, SSTK065144).

**Shutterstock's Response:**   Disputed, and immaterial and misleading because the stated "227 events" include third party events where (i) Shutterstock declined PMC's invitation but did not attend the event using its own (or anyone else's) credentials; and/or (ii) Shutterstock used its own credentials but such credentials were not offered by PMC.  These are not the basis for PMC's claim.  *See, e.g.*, Am. Compl. ¶ 63 ("In *declining to use the credentials for third party events that PMC was required to provide* exclusively to Shutterstock under the Archive & Event Agreement's terms, *attending these events using credentials that Shutterstock obtained for itself*, and thereafter claiming ownership of the resulting photographs, Shutterstock has unfairly interfered

with PMC's right to receive its expected benefits under the contract and has violated the covenant of good faith and fair dealing.") (emphasis added).    Rather, PMC's claim is based on the "approximately 30 events" at which "Shutterstock took [photographs using its own credentials after] it declined to use PMC's credentials."  Am. Compl., ¶ 64 (alleging claim is based on the photographs that "Shutterstock took at the approximately 30 events at which it declined to use PMC's credentials"); *see also* Melvin Decl., ¶ __.  Notably, however, PMC's point-person on the day-to-day performance of the Agreement and PMC's Rule 30(b)(6) designee testified that he did not understand the Agreement to prohibit Shutterstock from doing so.  *See* Walter Tr., 227:24-228:5 ("Q.  Was Shutterstock prohibited from using its own credentials for third-party events? . . . A.  I don't know why they would be."); s*ee also* Melvin Decl., ¶ __.

38.    By early 2020, Shutterstock no longer needed PMC to obtain access to various premier events, like the Oscars, Grammys, Golden Globes and Emmys and rejected the credentials PMC offered to Shutterstock. (Email from Walter dated Jan. 31, 2020, SSTK108869-71, at 108869 ("The pattern definitely has been that team SSTK isn't interested in [PMC] credentials from major events, like the Globes and Oscars, even though these credentials are increasingly rare."); Email from Granato dated Aug. 13, 2018, SSTK052379-81, at 052379 ("we are getting a lot of the same credentials that they are now"); Murray Tr., 66:18-67:7, 69:2-7 (agreeing with statement in 2018 that Shutterstock is "getting a lot of the same credentials that [PMC is] now"); 2019 Shutterstock Spreadsheet of Editorial Event Coverage SSTK168725; Murray Tr., 683:23-686:8 (By 2019, Shutterstock had its own credentials for each of the events listed on Schedule D to the Agreement)).

**Shutterstock's Response:**  Disputed.  Mr. Melvin—Shutterstock's Rule 30(b)(6) designee on "Shutterstock's obtaining and/or use of its own credentials to shoot images at Third Party Events for which it could have obtained credentials from PMC"—testified that Shutterstock "[a]bsolutely" needed PMC's help to obtain certain access to premier entertainment events. Melvin Tr., 63:9-11 ("[T]he majority of the access that [Shutterstock] received was arrivals.  So one of the things that PMC . . . afforded us, was access, outside of behind the line . . . ."); *id.*, 46:14-23, 63:24-66:9 (confirming that "there are different credentials for different aspects of the event" and "Shutterstock could not get [certain credentials] on its own" and relied on PMC,

including, for example, "executive arrivals" credentials to the Oscars and the Golden Globes). Moreover, Shutterstock used PMC's credentials at many of these events in 2019 and 2020. *See* Melvin Decl., ¶ __, Ex. __ (SSTK168725) (showing Shutterstock used multiple PMC credentials (*i.e.*, "VAR" and "WWD") for the Oscars and Golden Globes in 2019); *id.*, Ex. __ (SSTK168726 at "SAGs" and "Globes" Sheets) (showing Shutterstock used multiple PMC credentials (*i.e.*, "VAR") for the Screen Actors Guild awards and Golden Globes); *accord* Murray Tr., 683:23-684:13 ("Shutterstock also worked with PMC [ ] to use their credentials" in 2019 for the events listed on Schedule D because they "are giant events, where you would take all the credentials you could and put as many photographers there as you could.").

39.    Shutterstock, on its own, received "near-perfect placement" for its photographers "for every single event this [early 2020 awards] season," based upon "the relationships Shutterstock ha[d] built with all the event organi[z]ers" during the PMC partnership. (Email from Barrett, dated Feb. 5, 2020, SSTK109975-77, at 109976).

**Shutterstock's Response:**    Disputed, as Shutterstock's relationships with the event organizers predated the Agreement through its acquisition of Rex Features. *See* Melvin Decl., ¶ __; Melvin Tr., 9:4-13, 59:17-25 ("going back to the early 2000s, I received credentials, invites, tip sheets, to almost every event in Los Angeles," including while employed by Rex Features prior to the acquisition); *id.*, 74:4-8 ("Again, with the Oscars, we had a pre-existing relationship that dates back to the early mid-2000s, where we had covered the Academy Awards every year since then. So, again, this wasn't a new relationship. . . . [Rex Features] had photographers based in LA that were shooting under the Rex credential [at] the Academy Awards, the Golden Globes, and almost every other event that too place in LA, prior to 2009, going back to May 2000 – early 2000s."). Shutterstock also used many PMC credentials for the early 2020 awards season events. *See* Melvin Decl., Ex. __ (SSTK168726) (showing Shutterstock used multiple PMC credentials (*i.e.*, "VAR" and "WWD") for various early 2020 awards season events).

40.    Internally, Shutterstock thought it was "stupendous" when its staff photographers tried to "get [credentials] on [their own] without having to go through" PMC. (Email from B. Melvin, Oct. 16, 2017, SSTK065530-32, at 065530; *accord, e.g.*, Email from B. Melvin, dated Jan. 26, 2018, SSTK168958; Email from Gerber, dated Nov. 29, 2019, SSTK065168-69, at 065168 (Shutterstock avoided "overlap" with PMC in photographing events)).

**Shutterstock's Response:**    Disputed, and not supported by the cited evidence, which includes a private email from Mr. Melvin to his wife related to his year-end self-evaluation. Melvin Decl., ¶ __.  Mr. Melvin merely stated that it would be "stupendous" if Chelsea Lauren (one of Shutterstock's staff photographers) "check[ed] what [she] can get on [her] own" for the "KROQ Almost Acoustic Christmas" concert in 2017, which she would "normally be shooting" anyway.  SSTK065530-32, at 065530.

41.    As of March 2020, Shutterstock had received approximately 2.5 million images under the Archive & Event Agreement, all of which were owned by PMC. (Tabulation of PMC Images Delivered to SSTK, SSTK161815; Murray Tr., 681:9-13; Google Sheets comment from Marquis to Murray, dated May 11, 2020, SSTK100528 ("we have 2.5m PMC images on our site today.").

**Shutterstock's Response:**    Disputed, as the approximately images that Shutterstock received pursuant to the Agreement included Archive Content, at least some of which PMC did not own.  *See* Rachlis Report, ¶¶ 25, 31; *see also* Margolin Depo., Ex. 18 (SSTK030768) (November 18, 2018 email chain regarding copyright infringement claim); *id.*, Ex. 19 (PMC_0021693) (February 4, 2020 email chain regarding copyright infringement claim).

42.    These images remained "up on Shutterstock's website through at least July 16, 2020" (when Shutterstock purported to terminate the Agreement (Murray Tr., 681:14-682:7)), where they were "readily available" to Shutterstock's customers (Deposition Transcript of Steve Sammut ("Sammut Tr.") 95:23-96:2).

**Shutterstock's Response:**    Disputed, to the extent that this statement implies that any PMC-coded images "remained up on Shutterstock's website" and/or "were ready available to Shutterstock's customers" after the termination of the Agreement on July 17, 2020.  That is false.

Shutterstock permanently removed all PMC-coded images from its website at 9:00 a.m. on the date that the Agreement effectively terminated (July 17, 2020).  Murray Decl., ¶ __, Ex. __ (SSTK169700-05) (identifying PMC Content taken down as of July 17, 2020); Sammut Decl., ¶ __.

43.    Between March and July 2020, Shutterstock identified PMC content and PMC brands on its websites as "world class content" from "industry leaders" and as "featured parties," and identified PMC's archive as a "highlight[] of our editorial collection." (Shutterstock Webpage, Main Editorial Page, dated as of Apr. 29, 2020, PMC_0022838-41, at 0022839; Murray Tr., 267:2-10 and 272:15-21; Sammut 102:22-103:24; Email from Sammut, dated May 18, 2020, SSTK107719-22, at 107719 (touting "PMC collections" in a May 18, 2020 business pitch)).

**Shutterstock's Response:**  Disputed, as this statement misquotes and mischaracterizes the cited page of Shutterstock's website, which speaks for itself, and is not supported by any of the other cited evidence.  Shutterstock included multiple brands' logos—only two of which were PMC's—at the bottom of the editorial page of its website as illustrative examples of the "industry leaders" whose content is among the "[w]orld-class content" in "[Shutterstock's] editorial collection."  PMC_0022838-41 (logos for Rex, European Press Photo Agency, APA, Variety, WWD); *see also* Murray Decl., ¶ __; Sammut Tr., 39:20-41:11.  Even in the purported "business pitch" that PMC cites, the reference to "PMC collections" is merely an example of content included in Shutterstock's editorial offering.  *See* Sammut Decl., ¶ __, Ex. __ (SSTK107719-22) (Shutterstock's editorial offering include "the Rex collection, Shutterstock Editorial's staff photographers['] content, other wholly owned content, as well as collections that are available globally whether exclusive or otherwise that are not wholly owned, e.g. PMC collections like WWD or Variety").  Moreover, Shutterstock's website identified Shutterstock's "Archival Collections"—***not*** "PMC's archive"—as a "[h]ighlight[] of [Shutterstock's] editorial collection," among eight other categories of images (*e.g.*, "Coronavirus Outbreak Coverage" and "Editors' Picks").  Murray Decl., ¶ __, Ex. __ (PMC_0022838-41); *see also* Sammut Tr., 39:10-19, 102:8-

21 (explaining the reference to "Archival Collections" on Shutterstock's website refers to "any asset [in Shutterstock's collection] pre the year 2000").

44.     These representations were intended to "drive revenue to the business," because the "high profile" brands Shutterstock featured on its website were "what our customers want to see in terms of content." (Sammut Tr., 38:2-39:5, 102:14-103:7). These were the brands, in other words, that would "entice…customers to license with" Shutterstock. (Sammut Tr., 41:4-11, 102:22-103:7).

**Shutterstock's Response:**   Disputed, to the extent this statement implies that PMC's brands were uniquely featured on Shutterstock's website (they were not—*see supra* Response ¶ 43), and misleading, as it consists of cherry-picked statements in response to deposition questioning about a printout of Shutterstock's website which did not include PMC's logos or content. *See* Sammut Tr., 33:15-22, 37:20-41:11, 102:8-103:7, Ex. 1 (December 3, 2021 printout of editorial page of Shutterstock's website).

45.     "[A]fter the onset of the pandemic" and regardless of whether Shutterstock was able to add new images from new live events to its websites, "there continued to be a demand among Shutterstock's customers for entertainment pictures." (Sammut Tr., 84:9-13).

**Shutterstock's Response:**   Disputed, and misleading, as PMC's counsel—not Mr. Sammut—stated the quoted language. *See* Sammut Tr., 84:9-13 ("Q:  So after the onset of the pandemic, did you observe that there continued to be a demand among Shutterstock's customers for entertainment pictures?   A:  Yes, but not in the same capacity. . . . If you take away the occurrence of these [entertainment] events . . . , the interest in them has to change. . . . I was definitely aware that there was a shift in what [content] was being published . . . ."). There was a drop in demand for live entertainment content among Shutterstock's customers during the pandemic, particularly during the early pandemic months. *See* Murray Decl., ¶ __.

46.     As the Chief of Shutterstock's Editorial division conceded, because "[t]here were no live events," customers "were creating stories with archival content." (Yahoo Article, June 29,

2021, PMC_0021227-33, at 021228; Murray Tr., 262:9-264:15, 7:4-7). Archival content thus became "an increasingly important revenue stream" for the company. (Murray Tr., 262:9-264:15).

**Shutterstock's Response:**  Disputed, and misleading, as the quoted statements are taken from an article about ***Condé Nast's*** archival content, and PMC cites no evidence attributing them to ***PMC's*** Archive Content or otherwise establishing that PMC's Archive Content—which PMC concedes did not bring in significant revenue during the Agreement (Murray Decl., ¶ __; Walter. Tr., 392:8-14)—would have become an important revenue stream for Shutterstock during the pandemic.  *See* PMC_0021227 (article about Condé Nast archival content); Murray Tr., 262:9-264:15 (confirming statements made in the article about Condé Nast archival content and, even with regard to archival content in general, testifying that only "[s]ome" customers were using more archival content in the absence of live events, whereas others focused on news).  Moreover, many publishers—including PMC—used studio and corporate handouts, rather than license images from content licensing companies like Shutterstock.  *See* Rachlis Decl., ¶ __.

47.    Prior to entering the deal, Shutterstock did internal diligence on the Historic Archive and concluded that it was "impressive." (Pfeifer Tr., 40:25-41:14).

**Shutterstock's Response:**  Disputed.  The cited deposition testimony is inadmissible hearsay and, at most, establishes that Keren Sachs—a former Shutterstock employee whose duties did not include managing or acquiring archival content (Pfeifer Tr., 36:2-16)—stated in an email to Mr. Pfeifer that she "review[ed] [PMC's] archive" and "[i]t's impressive."  *Id.*, Ex. 3 (SSTK031177) (February 3, 2015 email from Keren Sachs).  To this extent this can even be characterized as "diligence," it is the only diligence that Shutterstock did on the Archive Content prior to entering into the Agreement (Pfeifer Tr., 39:7-21; Pfeifer Decl., ¶ __), and it has since become clear that PMC's Archive Content is not impressive.  *See* Rachlis Report ¶¶ 22-27; Murray

Decl., ¶ __, Ex. __ (sale of Archive Content accounted for less than 10% of revenue); Walter Tr.,

392:8-9 ("Q: . . . did the licensing of archived content bring in significant revenue?  A:  No.").

48.    The internal diligence was a "typical step for [Shutterstock] for any content deal"
to determine if the archive material "aligned with [Shutterstock's] expectations." (Pfeifer Tr.,
39:13-22).

**Shutterstock's Response:**  Disputed, and misleading to the extent this statement suggests

that Shutterstock did "internal diligence" on PMC's Archive Content (*see supra* Response ¶ 47).

Mr. Pfeifer merely testified that *"**looking at some of the content**,"* as it did in the case of PMC's

Archive Content, "would be a typical step for [Shutterstock] for any content deal . . . to determine

if [the content] aligned with [Shutterstock's] expectation." Pfeifer Tr., 39:18-22 (emphasis added).

The fact that Shutterstock took no additional steps to examine PMC's Archive Content prior to

entering into the Agreement is commensurate with its value vis-à-vis the other benefits that

Shutterstock stood to gain.  *See* Pfeifer Decl., ¶ __.  Simply put, the Archive Content was not

important to Shutterstock.

49.    In announcing the deal, Shutterstock characterized "PMC's archive," including the
"100-year old publications Variety and WWD," as "legendary." (Shutterstock Press Release, dated
June 22, 2015, PMC_0022535-37, at 0022535).

**Shutterstock's Response:**  Disputed.  The cited press release was jointly drafted and

issued by PMC and Shutterstock.  *See* Pfeifer Decl., ¶¶ __; Gullion Tr., 30:23-32:12 & Ex. 6

(agreeing that "[she was] responsible for drafting this press release [ ] with respect to PMC's side"

and describing the "very collaborative process with Shutterstock").  Moreover, PMC used the exact

same language in a document that it prepared and shared with Shutterstock before the press release

was issued.  *See* Gullion Depo. Ex. 16 (PMC_0002131-42) (June 18, 2015 Gullion to various PMC

employees attaching "our finalized talking points, reviewed and approved by SSTK," which refer

to "PMC's archive" as "including images from its legendary 100-year-old publications Variety and WWD").

50.    Shutterstock's expert witness concedes that PMC's historic archive had "materially viable content" and "some nice material." (Rachlis Tr., 79:21-80:9; Rachlis Report ¶ 27, 29-30).

**Shutterstock's Response:**  Disputed.  Mr. Rachlis opined that eleven out of twelve of the archives identified in the Agreement as comprising PMC's Archive Content contain no materially viable content.  *See* Agreement, ¶ 3(a)(i) (defining PMC's "Archive Content" as "including, but not [being] limited to," twelve content libraries); Rachlis Report ¶ 27 (with one exception, the "archives listed in the Agreement . . . do not have known viable imagery").  According to Mr. Rachlis, the one exception is the WWD archive, which, despite having "some nice material" (Rachlis Tr., 79:21-25; *see also* Rachlis Report ¶¶ 28-29), has "limited [ ] licensing viability" because it is a "very niche subject matter archive" and its event and celebrity images are "not unique or exclusive" (*id.*, ¶ 32; *see also* ¶¶ 30-31).  *Accord* Rachlis Tr., 80:10-12 (agreeing that "WWD is the only PMC brand that has viable archival content"); *see also* Murray Decl., ¶ __ (only value in WWD archive is as a complement to its live content).

51.    After the pandemic's onset, Shutterstock's editorial chief admitted internally that she "honestly d[idn't] want to lose" the PMC images, and one of her two "biggest concern[s]" was "loss of [the Historic] Archive." (Chat, dated Apr. 28, 2020, SSTK114607-10, at 114608).

**Shutterstock's Response:**  Disputed, and misleading, as it misquote and mischaracterizes Ms. Murray's statement in an internal message.  Ms. Murray stated she "honestly d[idn't] want to lose" the PMC relationship, not the PMC images.  *See* SSTK114607-10, at 114608 (in a discussion about "the deal," Ms. Murray said, "I honestly don't want to lose it but we are so far away from establishing terms . . . "); Murray Tr., 253:18-25 ("Q: . . . [Y]ou did not want to lose the PMC relationship?  A:  Yea, I said I honestly don't want to lose it[.]").  Further, in response to a question

from Mr. Melvin asking if her "biggest concern [was] the loss of [PMC's] archive or the access to events moving forward," Ms. Murray responded "WWD live and archiv[e]" and "nothing else." SSTK114607-10, at 114608; *see also* Murray Tr., 254:2-9; Murray Decl., ¶ __ (only value in WWD archive is as a complement to its live content). Ms. Murray did not use the term "Historic Archive" and such term is not defined in the Agreement. *See* Agreement, ¶ 3(a)(i).

52.     During the pandemic and before Shutterstock terminated the Agreement, PMC created and delivered new photographs to Shutterstock (Images delivered to Shutterstock, SSTK0006), and coordinated with Shutterstock. (Email from Melvin, dated May 15, 2020, PMC_0016319 ("Rob is going to head to Santa Monica to try to find a decent position."); Email from Buckner, dated June 12, 2020, PMC_0016848 ("There should be some good names coming today."); Email from Buckner, dated June 14, 2020, PMC_0016856; Email from Buckner, dated June 18, 2020, PMC_0016860-62, at 0016860; Email from Melvin, dated June 24, 2020, PMC_0001353-55, at 0001355).

**Shutterstock's Response:**     Disputed, as it mischaracterizes the nature of PMC's "coordination" with Shutterstock on the delivery of images. Shutterstock disputes this statement to the extent it implicates that the "new photographs" and/or content, generally, that PMC delivered to Shutterstock was of the same quality and demand that PMC's content previously brought.

53.     For example, after PMC invited Shutterstock to a "Garth Brooks Drive Thru Concert," Shutterstock responded, "I am all in for this content" and "I will also be in attendance." (Email chain, dated June 26, 2020, PMC_0016885). Shutterstock indicated at the time that it "much appreciated" the efforts PMC was making to include Shutterstock in event coverage during the pandemic. (Email from Melvin, dated June 25, 2020, PMC_0001363-65, at 0001363).

**Shutterstock's Response:**     Disputed, as the referenced document (PMC_001353-65) is taken out of context. Ben Melvin replied "much appreciated" to a Variety employee's informing Mr. Melvin that the show in question was fully virtual. Mr. Melvin's comment in no way indicates a sentiment by Shutterstock that it generally appreciated PMC's purported efforts to "include Shutterstock in event coverage during the pandemic," which would have been its duty in any event.

54.     Shutterstock terminated the Agreement as of July 16, 2020. (Counterclaims ¶¶ 31, 38).

**Shutterstock's Response:**  Undisputed.

55.     Between mid-March and Shutterstock's July 16 2020 termination date, PMC delivered 2,238 images to Shutterstock. (Images delivered to Shutterstock, SSTK00006; Murray Tr., 567:3-569:25 (2,238 images delivered between March 10 and July 2020)).

**Shutterstock's Response:**  Undisputed, but immaterial and misleading, as many of the images delivered during this period were taken prior to the pandemic.  *See, e.g.*, Murray Decl., Ex. __.  Moreover, PMC's delivery of 2,238 images between mid-March and July 16, 2020 is a far cry from the "more than a million recently digital files of Archive Content" that PMC claimed to be "in the process of transferring" to Shutterstock on March 4, 2020 (PMC_0020975), and also pales in comparison to the number of images that PMC delivered to Shutterstock during the same period in prior years.  *See* SSTK16872.  This number is especially immaterial considering, as set forth in Shutterstock's Additional Material Facts, that AP delivers 3,000 images *per day*.

56.     Had Shutterstock not terminated the Archive & Event Agreement, the Agreement's term would have extended through June 30, 2021. (Archive & Event Agreement § 1).

**Shutterstock's Response:**  Shutterstock cannot (and need not) respond to this statement because it presents a hypothetical question, rather than a statement of material fact.  Shutterstock undisputedly terminated the Agreement effective as of July 16, 2020 (*see* Response ¶ 54, *supra*) and, were this not the case, the Agreement would have either "expire[d] on June 30, 2021, or earlier if terminated pursuant to Section 8 . . . ." Agreement, ¶ 1; *id.*, ¶ 8 (providing terms on which "[e]ither Party may terminate the Agreement at any time for cause . . . ").

57.     Vaccines became widely available in March 2021. *See, e.g.,* NY Times, *See How Vaccinations Are Going in Your County and State* (updated Mar. 21, 2022), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html  (noting  "vaccine rollout began in December 2020, with a focus on some of the most vulnerable populations" and "every state had made all adults eligible for the shots by April 2021") and, as a result, certain live

events resumed around March 2021, at which PMC photographers shot new images. (Walter Decl., ¶ __; Deposition Transcript of Michael Buckner ("Buckner Tr.") 122:23-123:7).

> **Shutterstock's Response:**  Disputed, to the extent that it suggests that live events resumed around March 2021 in the same nature and to the same extent as prior to the pandemic. In April 2021, only the first dose was available for all adults in particular places, and the availability of vaccinations has nothing to do with whether entertainment and fashion events returned, much less in a manner that would allow for exclusive Shutterstock access via a PMC credential. *See* Lackman Decl., Ex. __ (https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/11/fact-sheet-president-biden-to-announce-all-americans-to-be-eligible-for-vaccinations-by-may-1-puts-the-nation-on-a-path-to-get-closer-to-normal-by-july-4th/).  Further, PMC's definition of "live events" is far too broad: the portion of Mr. Buckner's transcript quoted by PMC encompasses public events such as rallies and protests, which do not require credentials, into the definition of "live events."  Buckner Tr., 123:17-23 ("Q. You talked a little bit about protests and rallies; would you consider those to be live events? A. Yes. Q. Would you consider them to be live entertainment events? A.   Everything that I cover tends to have an entertainment angle.").   Moreover, the Agreement was for exclusive entertainment and celebrity content, not health news, which was already being covered by other Shutterstock partners.  *See* Agreement, ¶ 3(a)(ii) (*see* "PMC events" definition); *id.*, ¶ 3(a)(iii) (*see* "Third Party Events" definition and Schedule D); *see also* *id.*, ¶ 3(e) (regarding Fashion Events) ; Murray Decl., ¶ _.

58.    Had Shutterstock not terminated the Agreement, it would have benefitted from obtaining images over four months of live events (March through June 2021). (Murray Tr., 586:10-595:19 (identifying examples of PMC images taken at live events prior to June 30, 2021 and admitting that Shutterstock would have put those images on its website if the Archive & Event Agreement had not been terminated); Lightbox storing thousands of photographs of live events shot by PMC, access provided to Shutterstock's counsel on Dec. 28, 2021).

**Shutterstock's Response:**  Disputed.  Shutterstock terminated the Agreement effective as of July 16, 2020 (*see* evidence cited in Response ¶ 54, *supra*) and, therefore, this statement presents a hypothetical rather than a statement of fact.  Moreover, Shutterstock cannot know whether it would have obtained images from live events if the Agreement remained in effect during this period, as PMC admitted that it withheld live event credentials from Shutterstock (Walter Tr., 202:7-20), and may not have sent images taken by its own photographers to Shutterstock.  *See* Murray Tr., 586:10-589:10 (agreeing Shutterstock would have ingested certain images "[*i*]*f they were sent to* [*Shutterstock*] by PMC under an active contract") (emphasis added).  In any event, due to the pandemic's impact on live events, any "benefit[]" that Shutterstock would have received would be substantially smaller than it received in prior  years, resulting in an even greater net loss of revenue.  *See* Murray Decl., ¶ __.

59.     After the onset of the pandemic in March 2020, Shutterstock continued to license thousands of PMC images to its customers, yielding thousands of dollars in monthly revenue to Shutterstock. (Murray Tr., 379:3-5; Spreadsheet of Licensing Revenue, SSTK168954).

**Shutterstock's Response:**  Undisputed to the extent that the term "revenues" means gross revenues from the distribution of PMC Content, but immaterial and misleading because, by definition, such amount does not account for the expenses that Shutterstock incurred over the same period, including, for example, the amount of the royalty advance paid to PMC.  *See* Murray Decl., ¶ __; Pavlovsky Decl. ¶ __.

60.     Shutterstock's corporate designee and chief of its Editorial division, Candice Murray, testified that "the dollar value of the revenues that Shutterstock earned for licensing activity during the pandemic period…was just under a hundred thousand dollars." (Murray Tr., at 379:3-5).

**Shutterstock's Response:**  Disputed, to the extent that this statement suggests that Shutterstock did not lose money under the Agreement during the pandemic period.  It did (and, in

fact, it lost money throughout the entire term of the Agreement.  *See* SSTK025324-025333, at

SSTK025327.  Ms. Murray's testimony refers to gross revenues from the license of PMC Content

during the pandemic period, which, by definition, do not account for the costs and deductions that

Shutterstock incurred over the same period, *e.g.*, the Royalty Advance paid to PMC.  *See* Murray

Decl., ¶ __.  When the Royalty Advance that Shutterstock paid to PMC for the relevant period

($3M) is amortized over the roughly four-month pandemic period ($1M), and subtracted from the

"just under a hundred thousand dollars" in gross revenues during this period, the result is a severe

net loss to Shutterstock (*negative* $900K).  *See* Pavlovsky Decl., ¶ __; *see also* Murray Decl., ¶

__, Ex. __ (SSTK025324-025333, at SSTK025327) (projecting a significant loss for the year

2020).

61.    Using that figure and even assuming that the pandemic period started on March 1,
2020 and continued through the July 16, 2020 termination date, Shutterstock's average monthly
revenues earned from the licensing of PMC content would be approximately $22,000 (just under
$100,000 divided by approximately 4.5 months). (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed, as PMC has not identified Ms. Arato as a witness in

this case and, therefore, this statement is not supported by admissible evidence as required by Rule

56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert

Disclosures).  To the extent that the "22,000" figure is premised on Ms. Murray's testimony

(Murray Tr., at 379:3-5), Shutterstock disputes this statement as immaterial and misleading for the

same reasons (and based upon the same evidence) set forth *supra* Response ¶ 60.  Using simple

math, the calculations result in a **loss** of $1,025,000 for a 4.5-month period, or a loss of $227,777.78

in total because of the outflow of the royalty advance for the year.

62.    Ms. Murray testified that she calculated and presented to PMC in March 2020 a
summary of the gross revenues which Shutterstock had earned from its licensing activity of PMC
Content for each year from the second half of 2015 through 2019. (Murray Tr., at 177:7-178:20;
Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327).

**Shutterstock's Response:**  Undisputed, but immaterial and misleading to the value of the Agreement to Shutterstock.  Ms. Murray's calculation only accounted for revenues from the license of PMC Content and did not account for the value of other benefits that Shutterstock received under the Agreement such as the value of access to live events.  *See* SSTK025324-025333, at SSTK025327 (reporting "Gross Distribution Revenues earned by SSTK");  Murray Tr., 177:14-19 ("Gross Distribution Revenues Earned by SSTK" reflects "[t]he revenue that [Shutterstock] generated against PMC content.");  Penske Tr., 49:15-17; Pavlovsky Tr., 93:19-94:7.

63.    Ms. Murray calculated that Shutterstock earned gross revenues of $2,831,014 during that four and one-half-year period (Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327), or an average of $52,426 per month (Arato Decl., ¶___).

**Shutterstock's Response:**  Undisputed, but immaterial and misleading to the value of the Agreement to Shutterstock.  Ms. Murray's calculation only accounted for revenues from the license of PMC Content and did not account for the value of other benefits that Shutterstock received under the Agreement (*e.g.*, the value of access to live events) or for Shutterstock's deductions and costs (*e.g.*, royalty payments to PMC, photographer and editor salaries and fees, content processing expenses).  *See* SSTK025324-025333, at SSTK025327 (reporting "Gross Distribution Revenues earned by SSTK");  Murray Tr., 177:14-19 ("Gross Distribution Revenues Earned by SSTK" reflects "[t]he revenue that [Shutterstock] generated against PMC content.");  Penske Tr., 49:15-17; Pavlovsky Tr., 93:19-94:7.

64.    Starting in 2016, Shutterstock, spent between approximately $200,000 and $300,000 per year under the Agreement to supply photographers and photo editors to attend live events and capture content for PMC. (Murray Tr., at 184:7-20; Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327). Between 2016 and 2019, Shutterstock incurred freelance related expenses of approximately $1,100,000 to generate content under the Agreement (Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327) or just under approximately $23,000 per month (Arato Decl., ¶___).

**Shutterstock's Response:**  Disputed, and misleading, as these figures merely include the amount that Shutterstock spent to supply photographers and editors, and do not account for various other amounts that Shutterstock incurred under the Agreement during the relevant time period (*e.g.*, advertising expenses, content processing expenses).  *See* Murray Decl., ¶ __; SSTK025324-025333, at SSTK025327 (reporting "PMC Event Coverage (est.) – Freelance Fees" and "separately reporting, *inter alia*, "Ad Spend" and "Content Processing Expense Reimbursement"); *see also* Walter Expert Tr., 51:6-25 (admitting calculation of $23,000 per month does not include all of Shutterstock's costs).

65.   Deducting Shutterstock's average monthly freelance expenses of about $23,000 from Shutterstock's average monthly gross revenues of about $52,000 results in average monthly revenues less freelance costs of just under $30,000 from Shutterstock's licensing of PMC content between 2015 and 2019, before the pandemic. (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  To the extent that the "23,000" and "52,000" figures are premised on the Murray Proposal, this statement is undisputed, but immaterial and misleading for the reasons set forth in Paragraphs 63-64 above.

66.   Shutterstock did not incur any freelance related expenses when it exploited PMC content between mid-March 2020 through the July 2020 termination date, because, in the absence of live events, Shutterstock was not sending photographers and editors to live events during that time. (Murray Tr., 185:12-23; 186:11-22; 193:23-194:23).

**Shutterstock's Response:**  Undisputed, but immaterial and misleading.

67.   Accordingly, Shutterstock's average monthly revenues earned during the pandemic period (which total just under $22,000) less freelance expenses incurred  during the pandemic period (which total 0) are approximately 76% of Shutterstock's average monthly revenues earned

pre-pandemic less freelance expenses incurred during that pre- pre-pandemic period. (which total just under $30,000). (Arato Decl., ¶__).

**Shutterstock's Response:**   Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ __, Exs. __ (PMC's Initial and Expert Disclosures).  To the extent that the "22,000" and "30,000" figures are premised on the Murray Proposal, Shutterstock further disputes this statement because it fails to properly account for timing.   As admitted by PMC's Rule 30(b)(6) designee and purported "expert" on Shutterstock's revenues and costs, Shutterstock does not necessarily incur the freelance expenses associated with the production of content in the same month as it earns revenue for the license of that content.  *See* Walter Expert Tr., 55:16-57:6 (acknowledging Shutterstock incurred freelance costs in 2017 for image licensed in 2019; "Q:  So the revenue from licensing this photo and the corresponding costs wouldn't necessarily be recorded in the same year; right?  A:  Correct.").

68.    A comparison of Shutterstock's pre and post pandemic revenues less freelance expenses using other methods also demonstrates that Shutterstock's exploitation of PMC content during the pandemic yielded a substantial portion of what that content had previously earned.

**Shutterstock's Response:**   Disputed because this statement is not supported by any evidence whatsoever, let alone evidence which would be admissible under Rule 56(c) and, accordingly, violates Local Rule 56.1(d).  In any event, this statement is immaterial and does not require a response because it is too vague and ambiguous (*e.g.*, "using other methods") to constitute a material fact.

69.    Shutterstock produced a spreadsheet in this case bates stamped SSTK168954 which Shutterstock represented as "sufficient to answer" PMC's Interrogatories about gross revenues. Shutterstock's Response to PMC's Interrogatories, dated Jan. 28, 2022, at 4-12; Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed, and misleading, as Shutterstock represented that the cited spreadsheet "sufficient to answer [PMC's] Interrogatory [Nos. 8-14]" as stated, which are premised on a contortion of the term "gross revenues."  Lackman Decl., Ex. __ (Shutterstock's Response to PMC's Interrogatories dated Jan. 28, 2022 (objecting to Interrogatory Nos. 8-14 seeking identification of so-called "gross revenue"—"irrespective of when Shutterstock received any such revenues, and irrespective of whether Shutterstock paid or recouped any Royalty Advance related to such revenues"—because, *inter alia*, they "def[y] general accounting principles, and [are] premised on a contortion of the term 'gross revenue,' which necessarily depends on 'when Shutterstock received any such revenues'").  The cited spreadsheet does not report whether Shutterstock actually received payment of the license fees for numerous licenses. *See* SSTK168954 ("Invoice Payment Date" column is blank for numerous licenses).

70.    That spreadsheet shows that after March 15, 2020, Shutterstock customers reported using over 7,500 PMC images, yielding listed gross revenues of approximately $79,000, based on a "usage date" as listed on that spreadsheet. (SSTK168954; Arato Dec. ¶__).

**Shutterstock's Response:**  Shutterstock does not dispute that the spreadsheet Bates-numbered SSTK168954 shows that, after March 15, 2020, Shutterstock customers reported using over 7,500 PMC images and that the sum of the corresponding license fees (in the "Amount" column) is approximately $79,000.  However, Shutterstock disputes that this is an accurate calculation of the gross revenues Shutterstock earned after March 15, 2020 because, *inter alia*, (a) Shutterstock may receive the license fee before the corresponding usage date (Murray Decl., ¶ __, Ex. __ (SSTK168954 at "Invoices" Sheet, Row 60807) (showing customer paid the license fee on July 4, 2019 and used the image on March 21, 2020)); (b) PMC cites no evidence that Shutterstock actually received numerous license fees (*see supra* Response ¶ 69); and (c) a significant portion of the license fees included in PMC's calculation are attributable to usages reported by PMC and its

brands, which were never paid to Shutterstock and instead applied against the $1M credit afforded

to PMC under the Agreement.  Further, it fails to account the fees against the Royalty Advance

against fees that Shutterstock paid.  *See* Agreement, ¶ 2(a), 1; Walter Expert Tr., 40:5-42:19 (PMC

did not pay these fees to Shutterstock).

71.    This listed post-pandemic revenue figure understates the revenue yielded by
Shutterstock's licensing of PMC images during the pandemic and before Shutterstock terminated
the Agreement. This is because the spreadsheet leaves the "usage" date blank for thousands of
PMC images that may have been used or licensed during the pandemic; properly dating those
images would increase revenue yielded by PMC images during the pandemic. (SSTK168954;
Arato Decl., ¶__).

**Shutterstock's Response:**  Shutterstock does not dispute that the "usage date" is blank for

numerous images in the spreadsheet Bates-numbered SSTK168954.  Shutterstock disputes the

remainder of this statement because PMC has not identified Ms. Arato as a witness in this case

and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c)

and Local Rule 56.1(d).  *See* Lackman Decl., ¶__, Exs. __ (PMC's Initial and Expert Disclosures).

PMC has not identified Ms. Arato as a witness in this case and cites no evidence from which it

may be reasonably inferred, that "properly dating those images [without usage dates in the

spreadsheet] would increase revenue yielded by PMC during the pandemic."

72.    In any event, the reported revenue figure during the pandemic period based on
"usage dates" is 50% of the corresponding average figure during the period of March 15 to July
16 between 2016 and 2019, also based on "usage dates" listed during those periods (SSTK168954;
(Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a

witness in this case and, therefore, this statement is not supported by admissible evidence as

required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶__, Exs. __ (PMC's Initial

and Expert Disclosures).

73.    Alternatively, one can compare Shutterstock's reported pre and post pandemic revenues for all of Shutterstock's reported licensing activity (not just the licensing that includes a "usage date") as listed on SSTK168954 and that comparison also demonstrates that Shutterstock's exploitation of PMC Content during the pandemic yielded a substantial portion of what that content had previously earned. (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶__, Exs. __ (PMC's Initial and Expert Disclosures).

74.    Under this method, as reported on SSTK168954, Shutterstock earned approximately $79,700 in gross revenues under the Archive & Event Agreement based on usage dates listed during the pandemic period beginning in mid-March 2020, for average monthly gross revenues of approximately $20,000. (Arato Decl., ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶__, Exs. __ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this is an accurate calculation of the gross revenues that Shutterstock earned under the Agreement after March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response ¶ 70 *supra*.

75.    By comparison, as reported on SSTK168954, Shutterstock earned approximately $44,000. in average monthly gross revenues under the Archive & Event Agreement listed for usage dates occurring during the pre-pandemic years of 2015 to mid-March 2020 plus all listings with no usage date. (Arato Dec. ¶__).

**Shutterstock's Response:**  Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶__, Exs. __ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this is an accurate calculation of the average monthly gross revenues that Shutterstock earned under the Agreement

prior to March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response to SUF ¶ 70 *supra*.

76.    Deducting the average monthly freelance costs of about $23,000 from the average monthly pre-pandemic gross revenues of about $44,000 demonstrates that Shutterstock earned average monthly revenues less freelance costs of $21,000 from its licensing of PMC content before the pandemic. (Arato Decl., ¶___).

**Shutterstock's Response:**    Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ ___, Exs. ___ (PMC's Initial and Expert Disclosures).   In any event, Shutterstock further disputes that this is an accurate calculation of the "average monthly revenue less freelance costs" that Shutterstock earned under the Agreement prior to March 15, 2020 for the same reasons (and based upon the same evidence) set forth in Response to SUF ¶¶ 63, 70 *supra*.

77.    Shutterstock's average monthly net earnings during the pandemic were, accordingly, approximately 95% of Shutterstock's average monthly net earnings before the pandemic. (Arato Decl., ¶___).

**Shutterstock's Response:**    Disputed because PMC has not identified Ms. Arato as a witness in this case and, therefore, this statement is not supported by admissible evidence as required by Rule 56(c) and Local Rule 56.1(d).  *See* Lackman Decl., ¶ ___, Exs. ___ (PMC's Initial and Expert Disclosures).  In any event, Shutterstock further disputes that this "approximately 95%" figure is accurate for the same reasons (and based upon the same evidence) set forth *supra* Response ¶¶ 64, 74-75.

78.    Shutterstock's spreadsheet includes entries for PMC downloading its own PMC images from Shutterstock's website. While the spreadsheet includes a reported revenue figure for those downloads, Shutterstock did not earn those revenues from PMC. (Murray Tr., 695:21-25; email from Shutterstock counsel dated Jan. 4, 2022).

**Shutterstock's Response:** Undisputed.

79.     In advance of Karl Walter's deposition, Shutterstock produced a modified spreadsheet bates stamped SSTK168955 removing certain highly confidential information from SSTK168954. (*See* Communication from counsel, dated Feb. 28, 2022).

**Shutterstock's Response:** Undisputed.

80.     That spreadsheet shows that PMC brands account for approximately $750 of Shutterstock's revenue during the pandemic months. Deducting that amount from the pandemic earnings, PMC's average monthly net earnings during the pandemic was no less than 92% of Shutterstock's average monthly net earnings before the pandemic. (SSTK168954, Walter Decl., ¶__).

**Shutterstock's Response:** Shutterstock does not dispute the first sentence.  However, Shutterstock disputes the "no less than 92%" figure for the same reasons (and based upon the same evidence) set forth *supra* Response ¶¶ 64, 74-75.

81.     Starting at least as early as January of 2019, Shutterstock sought to renegotiate the Agreement. (Murray Tr., 105:4-7).

**Shutterstock's Response:** Disputed, but immaterial.  During a very short period of time, Shutterstock and PMC discussed modifications to the Agreement to address certain ambiguities and practical issues to "rejigger" the terms to give both sides more of what they wanted, but this discussions ended absolutely on November 6, 2019.  *See* PMC_0020956.

82.     At the time Shutterstock negotiated the Archive & Event Agreement in 2015, Shutterstock "didn't have enough experience providing event coverage to understand the economics." (Pfeifer Tr., 55:17-20; *see also* Oringer Tr., 247:5-10 (claiming "contract was put together when both parties didn't understand kind of how the editorial market would evolve.").

**Shutterstock's Response:** Undisputed except as to the citation to the Oringer transcript, but misleading.  Both witnesses testified that the Agreement was drafted to require the parties to operate in good faith under the deal that was "unique" for both parties, and Oringer was speaking to the fact that PMC was not cooperative in negotiating for new Acquisition Content or otherwise acting in good faith.  *See* Oringer Tr., 248:8-10 (describing discussions to encourage PMC to

operate in good faith and Penske "putting up the blocks"); *see also* Pfeifer Tr., 55:21-56:3 ("I know our intent was that we needed some wiggle room. We had to mutually agree to provide that level of coverage even for the PMC events, which is a small subset of the entertainment and fashion events that the deal is intended to get access to.").

83.     As of 2019, Shutterstock viewed its event coverage obligations under the Agreement as an "enormous distraction for our production teams" which "results in us spending more money to produce lots of content that they wind up owning" (Murray Tr., 113:2-11; Email from Granato, dated Sept. 28, 2019, SSTK052537-40, at 052537).

**Shutterstock's Response:** Disputed but immaterial. As indicated in the other documents regarding PMC's theory that internal discussions that terminated well before the pandemic matter, in the context of pre-paying the 2020 Royalty Advance six months early with a modest 5.7% discount, Donna Granato was referring materially to the issue with sponsored PMC Events that had no editorial or licensing value on Shutterstock's platform. These events were resulting in disproportionate cost issues until a rate card was adopted for sponsored, non-editorial events. *See* Murray Decl., ¶ __; Murray Tr., 113:20 -114:20("And at this point in time, were – was Shutterstock still providing photographers to shoot at PMC-sponsored events for free? Yes."); *id.* 116:15-17 ("I wouldn't call those [third-party events] a distraction. It was primarily the PMC [sponsored] events.").

84.     Shutterstock also believed that "[f]or the 'PMC' sponsored events we are basically their outsourced production house getting paid below market fees or no fees when there is no distribution value for us" (Murray Tr., 69:11-19; Email from Granato, dated Aug. 13, 2018, SSTK052379-81, at 052380).

**Shutterstock's Response:** Undisputed but immaterial. PMC ultimately agreed that PMC sponsored events were not covered under the Agreement and agreed to a rate card to cover the costs that Shutterstock would incur in photographing sponsor-supported PMC events that

Shutterstock could not monetize due to restrictions or other low value (such as non-celebrities speaking on a panel about the film business).  *See* Murray Decl., ¶¶ __.

85.    Based on revenue and expenses under the Agreement standing alone, Shutterstock calculated that was losing millions of dollars each year from 2015 to 2019 under the Agreement. (Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025327).

**Shutterstock's Response:**  Disputed.  The cited page shows an accounting table using the standard terms "gain" and "loss."  The table identifies financial losses in the context of the Royalty Advance only, as a basis to calibrate the expected continued "losses" to the fact that Shutterstock was not receiving the benefit that induced it to pay the Royalty Advances under the Agreement.  *See* SSTK023527-29 (proposing 50% reduction in year's royalty advance "due to no events for 6 months" as estimated on March 31, 2020); Murray Decl., ¶¶ __.

86.    Shutterstock believed that its minimum revenue guarantee payment obligation was a "value proposition loser for Shutterstock." (Murray Tr., 116:25-117:8; Email from Conte, dated Sept. 28, 2019, SSTK052537-40, at 052537).

**Shutterstock's Response:**  Disputed but immaterial.  The testimony is that the head of tax would be looking at the accounting numbers only, and not the overall economic or business benefit to the business (*e.g.*, the competitive advantage, brand-building and marketing advantage, etc.), and therefore would describe it as a "value proposition loser" where Shutterstock itself would not.  *See* Murray Tr., 116:25-117:8 (Responding to questions regarding an email from Shutterstock's former head of tax, Al Conte: "It lost money, which is how Al would have looked at it, so yes.").

87.    In late January 2019, Shutterstock proposed revising the Agreement to, among other things, modify its obligations for production and assignments. Shutterstock proposed that it be relieved of its obligation to provide photographers and editors at its expense to cover PMC Events and that, instead, Shutterstock be given a right of first refusal to cover these events at PMC's expense. (Email from D. Granato, dated Jan. 25, 2019, SSTK024498-500).

**Shutterstock's Response:**  Disputed but immaterial. The referenced proposals related to adding compensation for sponsored events that were not within the scope of the Agreement. Specifically, the cited document shows that Shutterstock inquired whether PMC was complying with its promises to not provide non-sponsored PMC Event access or content to third parties, proposed a right of first refusal for non-editorial (i.e., sponsored) PMC Events that did not result in the creation of content suitable for the editorial platform, and revised the Agreement to add *Rolling Stone* (which PMC refused to negotiate for as required under the Agreement).  *See* SSTK024498-499.

88.   In late September 2019, Shutterstock again sought to renegotiate the deal (in the form of an early termination of the Agreement and a new deal with lower costs) because of the above perceived burdens. (Email from D. Granato, dated Sept. 28, 2019, SSTK052739-41 (Shutterstock emailing proposal to PMC); Murray Tr., 105:4-7; 106:18-24 (Shutterstock was "looking to lower" "costs we were spending to produce the content")).

**Shutterstock's Response:**  Disputed but immaterial.  The cited evidence does not refer to "again."   The cited evidence refers to efforts to get PMC to comply with its obligation to renegotiate upon its acquisition of Rolling Stone credentials and/or content, and to set a rate card for PMC sponsored events that were outside of the Agreement and that PMC had demanded Shutterstock produce.  Further, immaterial given that mental state or motivation has nothing to do with the legal tests at issue here, and in that after Donna Granato left Shutterstock, the new head of editorial indicated that she did not want to renegotiate the Agreement.  *See* PMC_0020956; Walter Tr., 649:20-653:2.  Undisputed that PMC had been pushing for coverage of events that did not provide editorial, licensable content, and Shutterstock was looking for a win-win solution. Murray Decl., ¶¶ __.

89.   Shutterstock's chief of Editorial "honestly didn't want to lose PMC as a business partner" as a result of the pandemic. (Chat, dated Apr. 28, 2020, SSTK 114607-10, 114608). Accordingly, shortly after the pandemic hit the United States, Shutterstock endeavored to *keep*

PMC as a partner, albeit on economic terms that were more beneficial to Shutterstock. (Murray Proposal dated March 31, 2020, SSTK025324-33, at 02529-30).

**Shutterstock's Response:**  Immaterial given that negotiations or goals have nothing to do with the question of whether Shutterstock is excused from performance or any other legal tests pertaining to the claims and counterclaims relating to the Agreement.  Undisputed that Shutterstock did not want to lose PMC as a business partner even though PMC was not delivering services.  PMC had been providing value in terms of access to hundreds of events per year, and Shutterstock had negotiated for a full six years of service, but the pandemic had resulted in this vendor delivering essentially nothing and absolutely nothing with respect to the primary purpose of the Agreement.  Murray Decl., ¶¶ __.  Disputed that the economic terms were more beneficial to Shutterstock.  In the very early days of the pandemic, before it was clear that some of the major events would not proceed and the pandemic would likely result in the cancellation of events for over a year, Shutterstock looked to create a business solution that would take the effects of the pandemic out of the picture while still giving PMC its full $1 million credit, a seven-figure royalty advance to address the then-hope of a return of events in six months, and a limit on production costs for one quarter as events ramped back up.  *See* SSTK025339.

90.    Shutterstock decided to use the pandemic to negotiate a new and better deal with PMC no later than March 24, 2020, just days after the pandemic hit. At that time, Shutterstock's then current CEO and Chairman, Jon Oringer, and Ms. Murray concluded that "this [the pandemic] is a good opportunity to do a good deal with them." (Chat, dated Mar. 24, 2020, SSTK100705-08, at 100705; Murray Tr., 140:24-141:23).

**Shutterstock's Response:**  Disputed but immaterial.   Mental state or motivation, particularly less than two weeks into the pandemic-related shutdowns, has nothing to do with the question of whether Shutterstock is entitled to relief or recovery.  Ms. Murray (not Mr. Oringer) said the quoted words in the context of Ms. Murray's concern that a contract where Shutterstock paid millions of dollars to receive hundreds of events and got none was, indeed, not a good

contract.  Murray Decl., ¶¶ ___.  Further, PMC had taken the position that it did not have to negotiate with Shutterstock in good faith over new Acquisition Content and had further taken the position that Shutterstock had to provide costly coverage for sponsored events when the language in the agreement plainly said "editorial."  Murray Decl., ¶¶___.  In that sense, the contract was not good in that PMC took an adversarial rather than a collaborative, "good faith" approach on issues because they had the leverage of live events. *See id.*

91.     Mr. Oringer and Ms. Murray made this decision even though Ms. Murray reported to Mr. Oringer that Shutterstock had "no legal recourse" to exit the Agreement and had concluded that to simply "walk away" from PMC—as it ultimately did—would constitute a breach of the current agreement. (Chat, dated Mar. 24, 2020, SSTK 100705-08, at 100705, 07).

**Shutterstock's Response:**  Disputed.  There was no "decision."  Despite being reflected in a casual chat format, the context makes clear that there was an opportunity to negotiate with PMC regarding the Agreement globally given that there were no live events and to develop a fair deal rather than simply end it.  As Ms. Murray testified at her deposition, Mr. Oringer had asked her if there was a force majeure clause in the Agreement, and she was under the impression – before talking to counsel – that this determined whether there was entitlement to terminate.  Murray Tr., 134:22-136:5; 220:16-21; 223:24-224:3; 224:16-18.  Further, at this very stressful and challenging time, none of the events in Schedule D of the Agreement had been cancelled, nor was it clear that PMC was not going to take steps to resolve the matter.  *Id.*  Murray Decl., ¶¶ __.  Immaterial in that a non-lawyer's uncorrected view on the law, in the context of a global pandemic that put everyone under stress, is not binding on this Court, and motivation is irrelevant.  Shutterstock was legally entitled to "walk away" from the Agreement for multiple reasons as explained in the accompanying Memorandum of Law.

92.     Mr. Oringer and Ms. Murray made this decision because they had long believed that the Agreement "is not a good contract," "the economics don't work," and "this time the tables

have to turn." (Chat, dated Mar. 24, 2020, SSTK100705-708, at 100705, 100707; Murray Tr., 139:14-16; 146:14-147:5; Oringer Tr., 239:1-2 ("we know this contract is pretty one-sided towards PMC"; 239:21-240:1 ("Q: Is it also not a good contract because Shutterstock lost money on it every year?" A: I mean, that's—its one of the reasons."); 278:13-15 ("why would we continue with something like this if it was so one-sided").

**Shutterstock's Response:**  Disputed but immaterial.  There was no "decision."  Despite being reflected in a casual chat format, the context makes clear that there was an opportunity to negotiate with PMC regarding the Agreement globally given that there were no live events ("they can't be providing us anything," *see* SSTK 100705) and to develop a fair deal rather than simply end it.  In the context of receiving no live event access and PMC declining to cooperate – failing to cover fashion events, taking the position that Shutterstock had to take photographs that could not be syndicated, refusing to negotiate in good faith for additional access to high-profile events – it was certainly not a good contract.  *See* Response to ¶ 91.  Further, the statement reflects the belief of someone who did not negotiate the language of the Agreement.  The Agreement was not intended to be one-sided but in some ways had turned out to be that way due to PMC's non-compliance with the obligation to act in good faith at times, something Jay Penske was evidently aware of due to his avoidance of the issue.  *See* SSTK 100706 ("[I] saw Jay the other week... he doesn't mention anything biz related ever[.] we avoid the topic"); Pfeifer Decl., ¶¶ __.

93.  At or around that time, Shutterstock calculated that, before the pandemic, it had lost approximately $11 million dollars under the deal between 2015-2019. (Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025327).

**Shutterstock's Response:**  Disputed.  The cited document uses accounting terms (e.g., "gain" or "loss") but the document reflects the outlay for the services that PMC had delivered and was supposed to deliver as a springboard for offering an up-front payment under which Shutterstock would still "lose" money – i.e., continue to pay for the delivery of services it had contracted for, namely, receive event access and support the creation of content.  *Id.* at

SSTK025327-29. Murray Decl., ¶¶ __.  Immaterial in that Shutterstock's payments have nothing to do with whether Shutterstock is excused from performance under the law or any other claim or counterclaim in this case.

94.     Stan Pavlovsky, previously COO of Shutterstock, took over as CEO in April 2020 (Pavlovsky Tr., 49:10-15).

**Shutterstock's Response:**  Undisputed.

95.     Mr. Pavlovsky searched for "new ways" to "reduce costs" upon becoming CEO. (Pavlovsky Tr., 62:25-63:4).

**Shutterstock's Response:**  Disputed to the extent that the quoted testimony refers to the PMC relationship, as it does not, and immaterial to the extent that PMC is suggesting that mental state or motivation has anything to do with whether there was a breach or whether Shutterstock is otherwise excused from performance.  When asked whether he "identified new ways that Shutterstock could reduce costs" when he became CEO, he replied in the affirmative, noting that he observed the way Shutterstock was "deploying people resources" and that he looked at Shutterstock's technology.  *See* Pavlovsky Tr., 62:24-63:14. Indeed, Mr. Pavlovsky did not see his role as coming to Shutterstock to "reduce costs": "My role is not to finding cost reductions. My role is to find the most effective way to run the company.  So in many cases, that includes cost increases. So I never managed a business purely for cost reduction.  I think that is a very narrow focus for the company."  Pavlovsky Tr., 64:3-64:9.

96.     On or around March 31, 2020, Mr. Pavlosky learned that Shutterstock's editorial department was estimating that it would miss its earnings forecast for 2020 by millions of dollars and questioned Ms. Murray about the newly projected shortfall. (Chat, dated Mar. 31, 2020, SSTK100683 ("forecast for Editorial" was "7M off plan")). Ms. Murray told Mr. Pavlovsky that Shutterstock "need[ed] relief from PMC" in order to bridge this budgetary shortfall. (*Id.*; *see also* Chat, dated Mar. 31, 2020, SSTK114740 at 114743; Murray Tr., 201:15-202:19, 203:10-15) (explaining the need for relief from PMC "to help salvage the revenue numbers.").

**Shutterstock's Response:**  Undisputed but immaterial legally (for reasons stated above) and in that PMC proposed some form of relief, albeit a delayed payment at a cost of an extra $1 million in credit, given the undisputed fact that PMC could not deliver on the services Shutterstock had contracted for.  *See* Penske Tr., 339:11-16; Pavlovsky Tr., 177:5-178:12.

97.   The same day of her chat with Mr. Pavlovsky, Ms. Murray sent PMC a proposal for a revised deal which sought to maintain the relationship with PMC through June 30, 2021 (the end of the initial contractual term) and also proposed "renew[ing] the agreement through Dec [20]22," albeit on renegotiated financial terms that were far more favorable to Shutterstock than the terms contained in the original Agreement. (Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).

**Shutterstock's Response:**  Disputed, to the extent it characterizes the proposal to renew the agreement through December 2022 as "far more favorable to Shutterstock as the terms contained in the original Agreement."  In the same document cited by PMC, Ms. Murray states that no content of any type had been received for nearly two weeks, but that "[Shutterstock] value[s] our partnership and are hopeful that [PMC is] open to this discussion considering all that is going on in the world that is affecting business today."  SSTK025324-33, at 02524.  Indeed, the proposal was not "more favorable" to Shutterstock: Proposals #1 and #2 offered the same $1M credit to PMC for use of Shutterstock's photo library, and Proposal #1 only cut the Royalty Advance by 50% (from $3.5M to $1.75M) to account for the six months where, at the time, events were anticipated to not happen.  Immaterial as the terms of a proposed resolution two weeks into the pandemic have no legal relevance to whether Shutterstock is entitled to prevail on its claims or defenses pertaining to the Agreement.

98.   The proposal projected that live events would resume in six months from the end of March. (Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025328).

**Shutterstock's Response:**  Undisputed that a proposal made 18 days into the pandemic shut-down speculated that live events might resume in six months, but immaterial.

99.   Shutterstock's goals in making this proposal were to "waive the upcoming" minimum revenue guarantee payment that was due on July 1, 2020 and start a new deal on July 1 with more favorable payment and production terms. Murray Tr., 159:21-161:5 ("a WIN would be to waive the upcoming MRG and start a new deal on July 1ˢᵗ that is agreeable from an MRG and production standpoint."), 163:20-24.

**Shutterstock's Response:**   Immaterial for the reasons stated above, and disputed.  The primary goal in making the proposal was to work out a temporary measure to deal as best as possible with a global pandemic that was wreaking havoc on the world, in a way that would not allow the pandemic to torpedo the relationship entirely.  Murray Decl., ¶ __. The quoted statement is taken from a Shutterstock employee who admittedly did not have a major say in the ultimate disposition of a potential new deal.  In her own words, "it's not ultimately my call." (Murray Tr., 161:4-161:4).  However, Shutterstock does not dispute that a lower Royalty Advance was sensible for a re-negotiation of the agreement's terms at that juncture (March 2020), when no events – the undisputed primary consideration for the deal—were happening.  When it became clear that the pandemic could potentially last more than six months, Shutterstock reasonably concluded that putting any timeframe on event content—and therefore any up-front payment for the services of providing access—made no sense.  Murray Decl., ¶¶ __; *see also* Pavlovsky Tr. 180:6-181:5; 193:16-194:5.


100.   Shutterstock presented two options to PMC in Shutterstock's March 31, 2020 proposal, each of which allowed Shutterstock to maintain its existing rights under the Agreement through the end of the contractual term, including during the six month period Shutterstock projected that live events would be cancelled, but which reduced Shutterstock's MRG payment obligations and Shutterstock's obligation to provide event coverage for PMC at Shutterstock's expense. (Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).

**Shutterstock's Response:**   Immaterial for the reasons stated above, but disputed. Any proposal which projected that live events would be cancelled would <u>not</u> be a proposal that "allowed Shutterstock to maintain its existing rights under the Agreement," by nature, since its existing rights were premised on having access to live events. In that regard, reducing Shutterstock's

royalty advance payment obligations by six months accounted for the lack of access to live events for an estimated six months (further evidencing what the Royalty Advance was for: the events, not the archive, a point PMC did not dispute at the time). Additionally, the proposal removed "Shutterstock's obligation to provide event coverage for PMC at Shutterstock's expense" only because no live events were happening and addressed production costs in part due to some PMC brands' resistance to accept that PMC sponsored events were not within the Agreement and should be paid for. Murray Decl., ¶ __. PMC never provided any response to this proposal, apart from offering a delayed one-half of the payment of the Royalty Advance in exchange for at least $1 million in additional credit. *See* Penske Tr., 342:12-343:8 ("the intention was to blend the deal and extend over two years […] we're not going to [let] them […] walk away from the payment, […] [we are] willing to spread it over two years").

101.    PMC offered in response to extend the term of Archive & Event Agreement for no additional payment by Shutterstock and to defer payment of half of the upcoming Minimum Revenue Guarantee (which was otherwise due in full on July 1, 2020) until the following year. (Email from Penske, dated May 9, 2020, PMC_0016287-88, at 0016287).

**Shutterstock's Response:** Immaterial for reasons stated above, including that motivation is irrelevant, and disputed. The proposal referred to the upcoming Royalty Advance, not an upcoming "Minimum Revenue Guarantee," which Jay Penske conceded is not the term in the Agreement. PMC's absurd proposal was that Shutterstock absolutely pay the total amount despite the fact that PMC admittedly was delivering no services, but that Shutterstock could wait to pay $1.75 million of it until some months later so long as Shutterstock gave PMC a generous extra $1 million in credit. *See* Pavlovsky Tr., 180:6-181:5. This proposal – essentially a short-term loan with an "interest rate" of over 50% in the form of credit for images for which Shutterstock had to pay suppliers – failed to take into account anything about the pandemic, the terms of the deal, the fact that PMC had provided no content for weeks, that PMC had retained the entire Royalty

Advance from the entire year without performing from only eight months into the contract year, or the fact that PMC could not deliver on upcoming events of any type including pre-defined events in Schedule D.  *See* SSTK024717; Margolin Tr., 150:8-151:13.  It reflected PMC's admission that PMC's leadership did not understand the stock photography business.  *See* Penske Tr., 65:11-66:1; 66:13-20 ("[T]he selling of photographs, either stock or editorial, is not a business that PMC has been in or is currently in.").  PMC's proposal never changed and in fact was so rigid that when Shutterstock's CEO questioned why it should discuss up-front money when PMC was already in the hole, PMC's CEO—frustrated that he was not going to be able to execute on the plan to get the money and immediately look for another partner—responded with profanities and then hung up on Shutterstock's CEO.  Pavlovsky Tr., 249:12-250:14 ("Q. What did you and [Jay Penske] speak about? A. […] I just remember he threw a few profanities out and then that was pretty much the end of the conversation. […] I think he hung up on me.").

102.    While this dialogue ensued, Mr. Pavlosky advised Mr. Oringer that he was going to tell PMC that "we're not going to pay anything" (Chat, dated Apr. 14, SSTK160949; Pavlovsky Tr., 196:15-197:7) and anticipated that a new deal with PMC "would result in another huge savings for us" (Chat, dated Apr. 15, 2020, SSTK106659-60, at 106659).

**Shutterstock's Response:**  Undisputed that not paying money for services not rendered would inherently result in savings of expense but loss of benefit.  Disputed, to the extent this statement characterizes Shutterstock's motives during the pandemic renegotiation as unequivocally unwilling to pay "anything," and immaterial in that alleged motives in a negotiation are irrelevant to whether Shutterstock is excused or otherwise entitled to relief.  Indeed, Mr. Pavlovsky testified to his intent at the time: "From my perspective, if PMC was not going to be able to rectify or help us, work with us, you know, tell us, you know, a solution, we were not going to pay the last advance." (Pavlovsky Tr., 191:12-191:16). Moreover, Mr. Pavlovsky stated that unless there was some resolution, Shutterstock did not intend to pay $3.5 million for services it

was not receiving.  (Pavlovsky Tr., 194:15-195:23).  Shutterstock further avers that its reason for

rejecting this proposal was clear given the uncertainty surrounding the pandemic, and issue which

was not addressed by PMC's proposal: "The primary reason is that we would continue -- we would

be paying for a period of time when we're not receiving any services, no live events, etc., and so

just extending the remainder of the contract for another half or whatever it would be is not

something that I felt comfortable. Q. Even if that extension covered a period of time when live

events resumed? A. Correct. Q. Why was that not accepted? A. Because everything was so

uncertain at the time, that there was no way for me to think about an extension of an agreement in

the middle of a pandemic.  I had no idea how much longer this -- it could have been the case that

this thing had gone on for another, you know, year and we would have been yet again in the same

-- in the same position, we're getting no services, but paying." (Pavlovsky Tr., 180:9-181:5).

103.    On April 29, 2020, Mr. Pavlovsky sent PMC an updated proposal for a renegotiated
deal that would commence on July 1, 2020—during the pandemic. Under that proposal,
Shutterstock would continue to receive the same benefits that it held under the Archive & Event
Agreement (the right to license PMC content, including Historic Content and new images taken at
available live events), except that Shutterstock would no longer have to pay PMC any minimum
revenue guarantee; PMC would no longer get the $1 million credit towards its licensing of
Shutterstock images; and PMC would have to bear the expenses for Shutterstock to provide event
coverage. (Email from Pavlovsky, dated Apr. 29, 2020, SSTK161779-81 at 161780).

**Shutterstock's Response:**  Disputed and immaterial.  "Historic Content" is not a term

under the Agreement and is not mentioned in the proposal. Under the proposal, Shutterstock would

receive live events when they returned, but they did not exist at that time and were not expected to

return until after July 1, 2020, and for the reasons Mr. Pavlovsky explained, including the

uncertainty and PMC had retained one-third of a year's Royalty Advance while performing no

measurable services, Shutterstock was not comfortable with setting an advance.  Instead, PMC

would enjoy a much higher royalty rate than under the Agreement (40% instead of 30%), calibrated

against production costs for content that Shutterstock would create but which PMC would own

outright in just three or fewer years, and the parties would meet quarterly to help ensure that they were acting in good faith as business partners as the Agreement contemplated. *See* SSTK161780. Undisputed that the proposal appears to omit a credit but PMC never responded to the proposal, so it is an irrelevant point.

104.    On April 29, 2020, Mr. Pavlovsky confirmed to PMC that "we are not committing to any part of the minimum guarantee." (Email from Pavlovsky, dated Apr. 29, 2020, SSTK161779-81 at 161779).

**Shutterstock's Response:**  Undisputed.  As Mr. Pavlvosky testified, committing to any sort of advance when the pandemic was so uncertain made no sense.  Pavlovsky Tr., 180:4-181:5. Further, PMC never countered this proposal apart from reasserting its "blend and extend" proposal, which was objectively unacceptable. *See* Response to Paragraph 101.

105.    Shutterstock sent PMC notices of termination dated May 18 and July 2, 2020, which claimed its performance was excused and gave it the right to unilaterally "terminate" the Agreement. On this basis, Shutterstock withheld both payment of the final $3.5 million annual guaranteed payment and the $1 million credit for use of Shutterstock's imagery during the final contract year. (May 18, 2020 Letter, PMC_0020980-83; July 2, 2020 Letter, PMC_0020986-89).

**Shutterstock's Response:**  Disputed as mischaracterized. Shutterstock sent PMC a Notice to Cure per the Agreement's Section 8 on May 18, 2020 and indicated that the alleged cause for termination excused it from further performance.  Neither cited letter mentions the $3.5 million royalty advance (there was no "annual guaranteed payment") nor the $1 million credit; the letters do mention various portions of the Agreement under which PMC was not performing.  PMC continued to use up the credit from its prior year despite not rendering services from March 2020 onward, and continued to access its accounts to take content for free for over four months after the termination of the Agreement. McDonald Tr., 25:22-26:1; 44:6-14.  The July 2, 2020 letter further outlined steps Shutterstock would take for an acceptable wind-down, even though PMC by that

point had retaliated with a lawsuit laden with false and disparaging allegations.  PMC_0020989;

ECF Doc. No. 1.

106.    Before taking any of the above-noted actions and terminating the Agreement based on the pandemic's purported impact on the deal, Shutterstock did not take any steps to analyze the pandemic's actual financial impact on Shutterstock under the Agreement (factoring in Shutterstock's actual revenues and actual cost savings) before taking any of the above-noted actions and terminating the Agreement based on the pandemic's purported impact on the deal. (Murray Tr., 284:24-285:7, 286:25-287:13; 288:6-18; Pavlovskly Tr., 248:4-18).

**Shutterstock's Response:**  Disputed but immaterial. PMC's referenced transcripts are mischaracterized. When Mr. Pavlovsky was asked whether in May 2020, Shutterstock had quantified the lost value of the deal, Mr. Pavlovsky did not recall, but noted that part of how Shutterstock determined the lost value was "by virtue of the fact that we didn't have all the live event coverage within that period [one third of the prior year of the contract]."  When asked the same question, Ms. Murray also stated that "When I said 90 percent of the revenue we generated against PMC content was on live event content, we had however many years prior to 2020 to say this is what we saw from live event content."  Murray Tr., 284:11-284:15.  In any event, 106 there is no need to look at the financial impact because PMC was in breach and the services that Shutterstock was paying PMC to provide were not being delivered.  Such a breach obviates the need for a detailed financial analysis.

107.    During that same time-period, Shutterstock did that financial analysis for its Editorial business as a whole (Murray Tr., 286:25-287), and Shutterstock determined that its Editorial business did "better in 2020 versus 2019" on a net revenue basis (i.e. that "during the pandemic period, the cost savings that Shutterstock experienced were sufficient to have the net revenue number be a little better than in a comparable prepandemic period.") (Murray Tr., 287:14-288:11).

**Shutterstock's Response:**  Undisputed, but Shutterstock avers that it did its analysis for the "entire editorial business," (Murray Tr., 287:287:12-13), not just for PMC's contribution to its

editorial business, and the editorial business evolved in ways that PMC has failed to distinguish. Immaterial to the questions at issue in the lawsuit.

108.   In the May 18 letter, as well as in a May 8 email that Mr. Pavlosky sent to PMC, Shutterstock told PMC that "the piecemeal submission of Archival Content or outdated Event content does not remedy PMC's inability to fulfill the lion's share of its obligations." (May 18, 2020 Letter, PMC_0020980-83 at 0020982-83; Pavlovsky Email, May 8, 2020, SSTK103646-47 ("PMC's submission of archival content or outdated event content does not remedy failure by PMC to fulfill the entirety of its obligations.")).

**Shutterstock's Response:**  Undisputed. At the time, PMC had delivered, in the prior two months, far less than the Associated Press delivered to Shutterstock *each day*.  Murray Decl., ¶¶ __.

109.   Shutterstock told this to PMC even though Mr. Pavlosky recognized the value of the Historic Archive in his April 29, 2020 proposal, stating "Shutterstock and PMC to establish archive cadence and strategy on go to market for this valuable asset." (Pavlovsky Email, Apr. 29, 2020, SSTK161779-81 at 161780).

**Shutterstock's Response:**  Disputed.  Mr. Pavlovsky says nothing about any "Historic Archive."  However, his proposal contemplates a review and assessment of Archive Content – including the "millions" of images that Mr. Grobar had represented him (albeit falsely) were on their way to Shutterstock.  *See* PMC_0020975-76.  Without any live event content, both the pricing and focus of a new agreement would have to take a fresh look at what, if anything, PMC could still offer.  Murray Decl., ¶¶ __.  Immaterial to the issues in this dispute, which is about a 2015 Agreement, not a prospective 2020 agreement that PMC refused to engage on.

110.   Ben Pfeifer, Shutterstock's lead negotiator for the Agreement in 2015 admitted at his deposition that the Archive & Event Agreement did not impose an absolute obligation on PMC to provide access to events to which PMC did not, in fact, have access. As Mr. Pfeifer explained, the agreement's language "creat[es] wiggle room in the event that they're blocked out of an event . . . but we didn't contemplate that as a high risk" and "we did not perceive this as [a] business risk at the time." (Pfeifer Tr., 98:5-100:9).

**Shutterstock's Response:**    Disputed, as PMC has mischaracterized Mr. Pfeifer's testimony.  Mr. Pfeifer testified that, *inter alia*, "our motivation to get into this deal had a lot to do with the fact that we expected Variety to be able to get into *any event of significance*," and that he understood there to be wiggle room in the event that PMC is "blocked out of an event *because of some third-party, say Getty, causing a problem for Variety getting access to an event*."  Pfeifer Tr., 98:11-99:7 (emphasis added).  Mr. Pfeifer's full testimony conveys the true understanding of the parties at the time: "to which PMC has access" was a descriptive phrase, not a conditional one. It meant that PMC was obligated to provide Shutterstock access to the events that it had access to, i.e., those high-profile events identified on Schedule D to the Agreement (e.g., The Academy Awards, The Grammys, The Sundance Film Festival, etc.) and all others "to which PMC has access."  It certainly did not memorialize any unspoken escape-hatch for PMC in the event it had no access whatsoever to any third party events, or shift onto Shutterstock the unforeseeable risk that a once-in-a-century global pandemic would wipe out all of the live events that PMC promised Shutterstock to induce it to enter into the Agreement in the first place.  "PMC not having access to an event is like Ferrari not having access to Formula One.  They are the industry, in my mind." Pfeifer Tr., 99:13-16.  Pfeifer Decl.  As George Grobar, PMC's Chief Operting Officer, put it, the Agreement was "built" on the concept that Shutterstock "could leverage the access to these events."  Grobar Tr., 134:8-135:4.

111.    Shutterstock's lead negotiator also admitted that the Archive & Event Agreement did not impose an absolute obligation on PMC to hold PMC Events to which the public was invited generally. As Mr. Pfeifer explained, he understood that PMC was to act in good faith in inviting Shutterstock to shoot images at these events. (Pfeifer Tr., 100:5-101:20).

**Shutterstock's Response:**  Disputed, as PMC has again mischaracterized this portion of Mr. Pfeifer's testimony.  See response to Paragraph 110.  In fact, the cited portion of Mr. Pfeifer's testimony contradicts the point PMC cites it for, i.e., that Mr. Pfeifer supposedly "admitted" that

the Agreement "did not impose an absolute obligation on PMC to hold PMC Events."  Mr. Pfeifer

said nothing of the sort.   When PMC's counsel pressed him on his understanding of the

Agreement's terms, Mr. Pfeifer testified that, based on his conversations with Jay Penske, he

understood that some PMC events "were private, like industry leader events" (Pfeifer Tr., 101:21-

102:2), and that to the extent PMC called a particular event "private," such that Shutterstock

photographers would not be given access, he assumed PMC would be doing so in good faith.  *Id.*,

100:10-23.  Far from the admission PMC claims, Mr. Pfeifer's testimony is consistent with an

obvious assumption of the contracting parties—that PMC could not simply elect not to hold any

PMC Events and remain in compliance with its obligation to provide live event access under the

Agreement.  As Mr. Grobar testified, live events were "a significant part of the partnership"

(Grobar Tr., 44:23-45:3), and the Agreement was "built" on the concept that Shutterstock "could

leverage the access to these events."  Grobar Tr., 134:8-135:4.

112.   Shutterstock has alleged in its Counterclaims that, to the extent PMC did not
provide access to PMC Events or Third Party Events, it was because those events had to be
cancelled "as a direct result of the pandemic" and Covid-19 related "restrictions."
(Counterclaims ¶¶ 1, 3, 20-24). Shutterstock has also alleged that it was because of the pandemic
that "these events ceased to exist in any meaningful way" (*id.* ¶ 3) because "without a red carpet,"
Shutterstock could not create licensable images (*id.* ¶ 1).

**Shutterstock's Response:**   Undisputed generally but avers that the Counterclaims

themselves are more accurate than PMC's selective quotation of them.  Multiple PMC witnesses

claimed that the reason they could not provide event access was due to the COVID-19 pandemic.

*See* Penske Tr., 323:16-325:3 (discussing event cancellations due to the pandemic); Margolin Tr.,

73:17-74:8; 102:11-16 (similar).

113.   Shutterstock's Founder and Executive Chairman, Jon Oringer, testified that
Shutterstock would *not* have "walked away from…deal" in "2015" even if it had known
Shutterstock "wouldn't be getting live images from PMC during the period of time that the

pandemic lasted." (Oringer Tr., 234:22-235:11). In 2015, it was Oringer who had final decision-making authority regarding whether to enter the Agreement with PMC. (Pfiffer Tr., 22).

**Shutterstock's Response:** Disputed. The confusing, compound, and speculative question posed caused Mr. Oringer to answer a question of whether he expected whether he and Jay Penske could work out their issues during the pandemic that Mr. Oringer had already testified was unforeseeable and unforeseen at the time; he spoke to whether he thought in 2015 Jay Penske would be a collaborative partner if an issue came up. *See* Oringer Tr., 234:22-235:11 ("Q. Based on the expectations that you had for the deal when you entered into it in 2015, would you have walked away from the entire deal if you had known in 2015 that revenue generated during the pandemic -- or strike that. That you would get -- you wouldn't be getting live images from PMC during the period of time that the pandemic lasted? [Objections] A. No. I would have expected that -- actually, I thought Jay would have been a better person and worked with us through that period of time to help us figure out a way to generate value for both sides through the pandemic."); *id.* at 21:1-9 ("I was not thinking about a pandemic at the time of the agreement."). Undisputed that Oringer had final decision-making authority regarding whether to enter the Agreement with PMC.

114.    Shutterstock purported to terminate the parties' relationship as of July 17, 2020. (Counterclaims ¶¶ 31, 38).

**Shutterstock's Response:** Undisputed, but misleading to the extent the word "purported" suggests that the termination was ineffective. Shutterstock effectively terminated the Agreement as of July 17, 2020. *See supra* Response ¶ 54.

115.    Shutterstock continued to display PMC content past the July 16, 2020 cutoff. Specifically, as relevant to PMC's copyright infringement claim, Shutterstock failed to take down three images from the LA USD School Closure and 66 images from the 92nd Annual Academy Awards.

**Shutterstock's Response:** Disputed in part.  Shutterstock does not dispute that it continued to display thumbnail/watermarked informational versions of the three images from the LAUSD School Closure and 66 images from the 92nd Annual Academy Awards on its website after July 16, 2020.  However, it was not until PMC filed its Amended Complaint, on or about September 11, 2020, that Shutterstock first became aware that it had inadvertently failed to take them down due to a metadata discrepancy, and Shutterstock expeditiously took them down thereafter.  *See* Murray Decl., ¶ __, Ex. __ (SSTK168956) (report showing images removed on September 17 and 18, 2020); Sammut Decl., ¶ __.  Shutterstock removed nearly all other PMC Content from its websites on July 17, 2020 and did not display such content in any form at any time thereafter.  *See* Murray Decl., ¶ __, Ex. __ (SSTK169700-05) (identifying PMC Content taken down as of July 17, 2020).

116.   Michael Buckner shot the images from the LA USD School Closure on December 15, 2015. (Image Metadata Screen Shots, PMC_0024915-17). At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Buckner Tr., 13, 38; Walter Decl., ¶ __).

**Shutterstock's Response:** Undisputed.

117.   Michael Buckner shot the images from the 92nd Academy Awards on February 29, 2020. At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Buckner Tr., 13, 38; Walter Decl., ¶ __).

**Shutterstock's Response:** Undisputed.

118.   PMC owns and has a copyright registration for the LA USD School Closure images. (PMC Copyright Registration Collection 9, PMC_0024911-12 (VA2-215-216); Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 3 of the images listed in the registration.")).

**Shutterstock's Response:** Undisputed.

119.   PMC owns and has a copyright registration for the images shot at the 92nd Annual Academy Awards. (PMC Copyright Registration Collection 4, PMC_0024889-90 (VA2-213-153); Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 66 of the images listed in the registration.")).

**Shutterstock's Response:**  Undisputed.

120.    The images from the LAUSD School Closure were displayed on Shutterstock's website until September 18, 2020. (Shutterstock Website Screen Shots, PMC_0004424-27; Shutterstock's Image Removal Date Spreadsheet, SSTK168956).

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that it inadvertently continued to display thumbnail/watermarked informational versions of the images from the LAUSD School Closure on its website after July 17, 2020 due to a metadata discrepancy and quickly removed them after it became aware of same.  *See* Murray Decl., ¶ __; Sammut Decl., ¶ __.

121.    The images from the 92nd Academy Awards were displayed on Shutterstock's website until September 17, 2020. (Shutterstock Website Screen Shots, PMC_0004379-82; Shutterstock's Image Removal Date Spreadsheet, SSTK168956).

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that it inadvertently continued to display thumbnail/watermarked informational versions of the images from the 92nd Academy Awards on its website after July 17, 2020 due to a metadata discrepancy and quickly removed them after it became aware of same.  *See* Murray Decl., ¶ __; Sammut Decl., ¶ __.

122.    Shutterstock's counsel has represented that, after the Agreement was terminated, Shutterstock also granted so-called "renewal" licenses to exploit certain of the above noted images shot by Michael Buckner. (Arato Decl., ¶__).

**Shutterstock's Response:**  Undisputed.  Shutterstock further states that the only licenses of any kind that Shutterstock issued on or after July 17, 2020 for the exploitation of any of the above-noted images shot by Michael Buckner are two "renewal" licenses for one such image, resulting in approximately $10 in revenue.  *See* Murray Decl., ¶ __ (renewal licenses are not new licenses and common in the industry to allow renewal licenses post-termination), Ex. __ (SSTK168956); *see also id.*, ¶ __; Lackman Decl., ¶ __, Ex. __ (July 2, 2020 Letter, PMC_0020986-89, at 0020989) ("As is consistent with commercial practice in the industry, and

while [Shutterstock] will take the aforementioned steps, Shutterstock cannot guarantee that a party who obtained PMC content before July 17, 2020 will not use the content after the effective date of termination.").

123.   The Archive & Event Agreement granted PMC access to Shutterstock's image library and awarded PMC an annual $1 million credit toward the use of these images. (Archive & Event Agreement § 2(a)).

**Shutterstock's Response:**  Undisputed, but this statement is incomplete and misleading.

124.   Each PMC brand (like Variety or Rolling Stone) had its own Shutterstock accounts, and used those accounts to access the Shutterstock images during the Agreement's term. (Sammut Tr., 110:3-111:25, 141:2-12).

**Shutterstock's Response:**   Undisputed, but misleading.  Following termination of the Agreement, PMC continued to use one such account (*i.e.*, the "RollingStonePMCTemp" account, which is part of the "MPenske" organization of accounts) to access Shutterstock's images without permission.  *See* Sammut Decl. ¶ __, Ex. __ (SSTK00001) (identifying "RollingStonePMCTemp" among   PMC's   accounts);   *id.*,   Ex.   __   (SSTK00002-5)   (listing   downloads   by "RollingStonePMCTemp" account after July 17, 2020); McDonald Tr., 11:16-12:16; 38:8-12.

125.   Shutterstock represented to PMC in its July 2, 2020 termination letter that it would disable the accounts—*i.e.*, the logins and passwords—PMC used to access the Shutterstock website. (July 2, 2020 Letter, PMC_0020986-89, at 0020989).

**Shutterstock's Response:**   Disputed, as this statement misrepresents the contents Shutterstock's July 2, 2020 termination letter, which speaks for itself.  Shutterstock said nothing about disabling PMC's accounts in its July 2, 2020 termination letter, but merely stated that in the event of termination, "Shutterstock content will no longer be available to PMC as of [July 17, 2020], beyond how any third party might access such content in the marketplace."

126.    Shutterstock did not disable one of the accounts used by the Rolling Stone brand, titled "M.Penske," and that account remained active past the purported termination date. (Sammut Tr., 120:7-121, 132:6-22).

**Shutterstock's Response:**  Undisputed.

127.    Shutterstock concedes that it made a mistake in leaving the M.Penske account open. (Sammut Tr., 120:13-18 (Rolling Stone account "should…have been shut down in July 2020" but "was not shut down"); Murray Tr., 359:2-14 ("It was missed. Mistakes happen."); Email chain dated Nov. 3, 2020, SSTK161784-89).

**Shutterstock's Response:**  Disputed, to the extent that this statement implies that Shutterstock was required to shut down PMC's Shutterstock accounts upon termination of the Agreement.  The Agreement contains no such requirement.  *See* Agreement, ¶ 8.

128.    Had Shutterstock disabled the "MPenske" account, PMC would not have been able to use the account to access Shutterstock's website. (Sammut Tr., 118:13-22).

**Shutterstock's Response:**  Undisputed, but immaterial.

129.    In September and October 2020, a Rolling Stone employee (Kimberly McDonald) mistakenly downloaded select images from the Shutterstock website using this account. (Sammut Tr., 155:9-156:13; Image List, SSTK11637-638; Deposition Transcript of Kimberly McDonald ("McDonald Tr.") 11:16-12:16; 38:8-12).

**Shutterstock's Response:**  Disputed, as Ms. McDonald testified that she did not recall downloading at least one of the images downloaded using the "RollingStonePMCTemp" account after July 17, 2020.  *See* McDonald Tr., 44:6-45:15.

130.    On July 14, 2020, Ms. McDonald received an email addressed to "ALL RS Edit Staff," labeled "URGENT, MUST READ." (Email from Lotz, dated July 14, 2020, PMC_0020002-05; McDonald Tr., 19:6-20:18).

**Shutterstock's Response:**  Undisputed, but immaterial.

131.    At the time, Ms. McDonald was a member of the "RS Edit Staff" listserv. (McDonald Tr., 18:21-22:7).

**Shutterstock's Response:**  Undisputed, but immaterial.

132.     The email advised the RS Edit Staff to discontinue use of Shutterstock accounts but Ms. McDonald did not review the email. (McDonald Tr., 20:8-18).

**Shutterstock's Response:**  Undisputed, but immaterial.

133.     Ms. McDonald did not read the email because it would have been sent "when we were doing remote production during the pandemic, meaning that I would have been responsible for between 10 to 15 videos within a week. It's very easy to have emails get buried when you're working at that frequency." (McDonald Tr., 45:24-46:3).

**Shutterstock's Response:**  Disputed, as this is an incomplete and misleading recitation of the cited testimony (*see* McDonald Tr., 45:16-47:2), but in any event, immaterial.

134.     From her standpoint, the Shutterstock website Ms. McDonald accessed using the M.Penske account looked the same after July 16, 2020 as it had beforehand. (Sammut Tr., 144:15-25, 148:5-20).

**Shutterstock's Response:**  Undisputed, but immaterial.

135.     Had Ms. McDonald reviewed the email, she would not have downloaded the images. (McDonald Tr., 25:11-17, 43:14-17).

**Shutterstock's Response:**  Undisputed that Ms. McDonald testified as much at her deposition, but immaterial.

136.     Shutterstock has no evidence of an injury arising from McDonald's downloading of the 20 images. (Pavlovsky Tr., 323:14-325:6). Its 30(b)(6) witness claimed that the company owed licensing royalties to third parties based upon these downloads, and that these royalties exceeded the statutory minimum $5,000 damages, but he failed to substantiate this claim with any concrete proof. (*Id.*).

**Shutterstock's Response:**  Disputed.  PMC downloaded more than twenty images post-termination without permission and, like PMC, Shutterstock claims injury from the unauthorized use of images.  *See* Sammut Decl., ¶ __, Ex. __ (SSTK00002-5) (identifying post-termination downloads and open-market license fees); Pavlovsky Tr., 328:15-329:14 (testifying that Shutterstock was injured because PMC did not pay Shutterstock for the downloads and Shutterstock had to pay contributors royalties related to the downloads).

137.   Internal Shutterstock correspondence reflects that Ms. McDonald's downloads totaled only "$120 after the shutdown" of the PMC relationship in July 2020. (Email chain dated Nov. 3, 2020, SSTK161784-89, at 161787).

**Shutterstock's Response:**   Disputed, to the extent that this statement implies that Ms. McDonald made all post-termination downloads (*see supra* Response ¶ 129), and because the cited email chain does not establish $120 is the "total" amount.  *See* SSTK161784-89 (January 29, 2021 email, "The customer downloads $120 after the shutdown related to username: MPENSKE."). Moreover, PMC obtained discounted rates—to which it was not entitled—by using the "RollingStonePMCTemp" account post-termination, and the open-market rates for those images are substantially higher.  *See* Sammut Decl., ¶ __.

138.   Shutterstock has produced no documentary evidence demonstrated that it suffered at least $5,000 in damages as a result of these activities. (Arato Decl., ¶__).

**Shutterstock's Response:**   Disputed, to the extent that this statement implies that Shutterstock has not suffered at least $5,000 in damages as a result of the unauthorized use of the "RollingStonePMCTemp" account following termination of the Agreement.  *See* Pavlovsky Tr., 323:14-325:6; *see also* Murray Decl., ¶ __ (discussing open-market license fees).

139.   The only terms of use that Shutterstock produced are dated November 29, 2021. (Terms of Use, SSTK111629-35).

**Shutterstock's Response:**   Disputed, to the extent that this statement misleadingly suggests that November 29, 2021 is the effective date of the Terms of Use.  It is not—the "11/29/2021" date printed on the referenced copy of the Terms of Use indicates the date on which Shutterstock's counsel printed the Terms of Use from Shutterstock's website in preparation for McDonald's deposition the next day.  *See* Lackman Decl., ¶ __, Ex. __ (Terms of Use introduced as an exhibit at McDonald's deposition on November 30, 2021).  The cited Terms of Use were in

effect at the time of PMC's post-termination downloads.  *See* Sammut Decl., Ex. ___ (Terms of use via Wayback Machine).

140.   When a PMC employee like Ms. McDonald logged onto the Shutterstock website using the PMC accounts that Shutterstock set up for PMC under the Agreement, no Terms of Use would appear. (Sammut Tr., 159:10-160:20).

**Shutterstock's Response:**   Disputed, to the extent this statement implies that a PMC employee like Kimberly McDonald—who admittedly accessed and used Shutterstock's website (McDonald Tr., 11:16-12:16; 38:8-12)—was not bound by the Terms of Use  *See* SSTK111629-35 (any person "accessing or using [the] website [https://www.shutterstock.com/] . . . agree[s] to and [is] bound by the terms and conditions set forth [therein] . . . .").  Indeed, when asked whether PMC employees would see Shutterstock's terms when they logged on to the website, Mr. Sammut stated that "they had access to seeing the general terms." Sammut Tr., 159:13-14.  Moreover, Ms. McDonald understood that content is "protected in a number of ways."  McDonald Tr., 37:11-20.

141.   Shutterstock alleges that it was entitled to receive, and expected, a certain number of Historic Archive images "per month" between January and April 2020. (Counterclaims ¶ 28).

**Shutterstock's Response:**   Disputed.  *See* Countercl. ¶ 28 (alleging, *inter alia*, that "Shutterstock received just 119 archival images for the four-month period from January through April 2020 . . . . In 2019, Shutterstock received, on average, 437 archival submissions *per month* resulting in a year-over-year drop of *93%* as compared to expectations for archival content.") (emphasis in original).  PMC was required to "work . . . in good faith in the . . . distribution and syndication of . . . Archive Content [images]."  Agreement, ¶ 3(a)(i).  In 2018 and 2019, PMC's good-faith efforts resulted in the delivery of, on average, thousands of Archive Content images per month.  *See* Murray Decl., ¶ ___, Ex. ___ (SSTK168721).  Shutterstock expected PMC to use the same good-faith efforts between January and April 2020.  *Id.* ¶ ___.

66

142.     Shutterstock alleges that "in 2019, Shutterstock received, on average, 437 archival submissions per month," whereas "Shutterstock received just 119 archival images for the four-month period from January through April 2020." (Counterclaims ¶ 28).

**Shutterstock's Response:**  Undisputed.

143.     Shutterstock *never* received a substantial number of Historic Archive images during the first four months of a calendar year, and sometimes it received none. Rather, from the outset of the Agreement in 2016, if Shutterstock received archival images, it was *always* in large chunks later in the year. (Murray Tr., 420:21-421:23, 423:15-424:6).

**Shutterstock's Response:**  Disputed.  Shutterstock's records pertaining to PMC's delivery of Archive Content show that PMC received a substantial number of Archive Content images during the first quarter of 2018 and 2019.  *See* Murray Decl., ¶ __, Ex. __ (SSTK168721 at "Quarters" Sheet, Rows 8 and 9) (showing Shutterstock received 515 Archive Content images in the first quarter of 2018 and 4,135 Archive Content images in the first quarter of 2019).

144.     Shutterstock admits that the parties "never set up a regular cadence of delivery" (Murray Tr., 421:12) and, for this reason, Shutterstock never complained about the pace of delivery or archival images or asserted that PMC had breached the Agreement based on the pace of its delivery of Historic Archive images. (Pfeifer Tr., 224:8-17; Murray Tr., 350:21-352:14. Based on PMC's historic delivery cadence, Shutterstock was not expecting a delivery of additional historic archive images between January and April 2020. (Murray Tr., 423:15-424:6).

**Shutterstock's Response:**  Disputed.  Shutterstock expected PMC to "work . . . in good faith in the . . . distribution and syndication of . . . Archive Content" (Agreement, ¶ 3(a)(i)), particularly during the early pandemic months when its delivery of live event content necessarily came to a halt.  *See* Murray Decl., ¶ __.  In fact, Mr. Walter—PMC's Rule 30(b)(6) designee on the topic of "[t]he frequency and volume of delivery to Shutterstock of . . . Archive Content" (Lackman Decl., Ex. __)—expected PMC to digitize and deliver 1.9 million Archive Content images to Shutterstock in 2020, but it never did.  *See* Walter Tr., 385:4-386:13, Ex. 38 (PMC_0014957-62).

145.    Shutterstock produced a spreadsheet in this action documenting the timing of PMC's delivery of Historic Archive images. (Arato Decl., __; SSTK00006).

**Shutterstock's Response:**  Disputed, as Shutterstock's counsel has informed PMC's counsel that such spreadsheet (SSTK000006) does not completely and accurately document PMC's delivery of archival images, and because "Historic Archive" is not a defined term in the Agreement.  *See* Lackman Decl., ¶ __.  Shutterstock has produced multiple spreadsheets documenting PMC's delivery of Archive Content images, including, but not limited to, the spreadsheets Bates-numbered SSTK161815, SSTK161816, SSTK161817, and SSTK168721. *See* Lackman Decl., ¶ __

146.    Shutterstock tracked the delivery of Historic Archive images under the labels PMCAR and PMCEL. (Murray Tr., 304:21-23).

**Shutterstock's Response:**  Disputed, as "Historic Archive" is not a defined term in the Agreement.  Shutterstock used the codes PMCAR and PMCEL to identify PMC's Archive Content for internal purposes. *See* Murray Decl., ¶ __, Ex. __ (SSTK161818) ("PMCAR" and "PMCEL" codes refer to "PMC Archive").

147.    According to Shutterstock's tracking, PMC delivered archival images under the code PMCAR on the following schedule:

|     | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| --- | --- | --- | --- | --- | --- | --- |
| **Jan** |  | 0 | 0 | 0 | 0 | 0 |
| **Feb** |  | 0 | 0 | 0 | 0 | 0 |
| **Mar** |  | 0 | 0 | 0 | 0 | 0 |
| **Apr** |  | 0 | 0 | 0 | 64 | 0 |
| **May** |  | 0 | 0 | 0 | 0 | 0 |
| **Jun** |  | 0 | 0 | 0 | 0 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Jul** | 0 | 0 | 0 | 2,778 | 0 | |
| **Aug** | 0 | 0 | 0 | 129,155 | 0 | |
| **Sep** | 0 | 181,780 | 2 | 8 | 113,375 | |
| **Oct** | 0 | 549,001 | 4 | 0 | 335,514 | |
| **Nov** | 0 | 0 | 2 | 0 | 126,901 | |
| **Dec** | 0 | 0 | 0 | 2 | 0 | |

(SSTK00006; Murray Tr., 417:22-420:6).

**Shutterstock's Response:**  Disputed, as the numbers in the chart above conflict with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images.  *See* Murray Decl., ¶ __; *see, e.g.*, *id.*, Ex. __ (SSTK168721) (reporting archival images delivered by month for the code PMCAR, including, for example, 511 archival images in March 2019).

148.    According to Shutterstock's tracking, PMC delivered archival images under the code PMCEL on the following schedule:

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| **Jan** | | 0 | 0 | 0 | 0 | 0 |
| **Feb** | | 0 | 0 | 515 | 0 | 6 |
| **Mar** | | 0 | 0 | 0 | 0 | 0 |
| **Apr** | | 0 | 1 | 0 | 1 | 113 |
| **May** | | 0 | 0 | 0 | 213 | 1 |
| **Jun** | | 0 | 0 | 0 | 561 | 0 |
| **Jul** | 0 | 0 | 0 | 0 | 31 | |
| **Aug** | 0 | 0 | 0 | 57 | 0 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Sep** | 0 | 0 | 0 | 19 | 0 | |
| **Oct** | 0 | 0 | 2 | 53 | 4 | |
| **Nov** | 0 | 34,893 | 0 | 118 | 40 | |
| **Dec** | 0 | 0 | 0 | 0 | 0 | |

(SSTK00006; Murray Tr., 410:12-413:18).

**Shutterstock's Response:**  Disputed, as the numbers in the chart above conflict with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images.  *See* Murray Decl., ¶ __; *see, e.g., id.*, Ex. __ (SSTK168721) (reporting archival images delivered by month for the code PMCEL, including, for example, 2,119 archival images in March 2019).

149.   Based on Shutterstock's tracking, PMC delivered 65 Historic Archive images to Shutterstock between January and April 2019. (SSTK00006).

**Shutterstock's Response:**  Disputed, as it conflicts with the spreadsheet that Shutterstock produced for the purpose of tracking PMC's delivery of archival images (Murray Decl., ¶ __, Ex. __ (SSTK1687210) (showing PMC delivered 5,248 archival images to Shutterstock between January and April 2019)), and because  "Historic Archive" is not a defined term in the Agreement.

150.   Shutterstock never articulated any injury resulting from the purported withholding of archival images between January and April 2020, and now does not claim to have suffered any. (Pavlovsky Tr., 288:5-23).

**Shutterstock's Response:**  Disputed, as PMC's withholding of archival images between January and April 2020 necessarily resulted in less Archive Content for Shutterstock to offer for license to third parties pursuant to the Agreement.  Moreover, this is immaterial in the overall context of the Agreement, which was entered into for special access for events, for which PMC was to provide access. *See* Agreement, ¶ 3(a)(ii)-(iii).

**STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH IT IS
CONTENDED THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED**

151.    The "editorial" use of photographic imagery is the use of imagery as part of the timely editorial coverage of people, events, and other subject matter.  *See* Greene Tr., 38:25-39:15; PMC_21282; Murray Decl., ¶ __.

152.    Interest in celebrities and fashion is consistently high among consumers, thus the success and popularity of media brands that offer editorial coverage of the same, such as E! Entertainment, PopSugar, and Entertainment Weekly.  *See* Rachlis Report, ¶¶ 12-13; Murray Decl., ¶ __

153.    The demand for photography documenting current entertainment and fashion industry events (such as movie premieres, award shows, and high-profile parties and fashion shows) for use by such media brands in their editorial offerings is correspondingly high and ongoing, especially given the constantly updating 24-hour news cycle.  *See* Rachlis Report, ¶ 13; Murray Decl., ¶ __.

154.    Archival photographic imagery is typically older imagery that is not illustrative of timely, current events.  *See* Rachlis Report, ¶ 14; Murray Decl., ¶ __.

155.    As such, archival photographic imagery is used for different purposes than live event imagery in media.  For example, an archival image might be licensed for use in a CNN program on a historical event, or in a retrospective of a deceased celebrity.  *See* Rachlis Report, ¶ 15; Murray Decl., ¶ __.

156.    The number of consumers interested in current entertainment and fashion industry news is larger than the consumer population interested in the editorial pieces that typically utilize archival imagery.  As a result, the demand for live event imagery among producers of editorial

content in these industries is significantly higher than that for archival imagery.  *See* Rachlis Report, ¶¶ 16-17; Murray Decl., ¶ __.

157.    Prior to the June 2015 execution of the Agreement, Shutterstock decided to launch a comprehensive editorial photography product.  *See* Pfeifer Tr., 167:17-168:4; 170:9-15; 207:15-21; Oringer Tr., 97:21-98:12; 100:24-101:2; 301:22-302:12; Murray Decl., ¶ __.

158.    As part of this endeavor to build a comprehensive editorial product, Shutterstock sought to ensure that it had the ability to capture images at entertainment and fashion industry events as they were occurring so that they could provide them to their clients who would be creating editorial coverage about those events.  *See* Pfeifer Decl., ¶ __; Greene Tr., 104:11-24.

159.    In January 2015, at the start of the effort to build the editorial offering, Shutterstock acquired Rex Features, the largest independently-owned photographic press agency in Europe, thereby gaining access to a large number of significant entertainment and fashion industry events in the United Kingdom and Europe primarily.  *See* Melvin Decl., ¶ __, Ex. __ (PMC_0022533) (January 15, 2015 press release).

160.    Shutterstock also invested in technology to help support the editorial product offering and hired four leading photographers in 2015 to help support its editorial service.  Murray Delc., ¶ __; Melvin Decl., ¶ __; PMC_0022538-39.

161.    Over the course of the next two or so years, Shutterstock secured exclusive, multi-year agreements with the Associated Press (AP), The Football Association (the governing body of English Football), european pressphoto agency, b.v. (epa) (one of the leading news photography agencies in the world), the World Surf League, SilverHub Media (which owns one of the leading press photography agencies in Germany), and others that offer photographs that are of value to global media companies.  *See* Murray Decl., ¶ __.

162.    Shutterstock's deal with AP, entered into in early 2016 and which was recently renewed, gives Shutterstock customers access to approximately 3,000 images daily, from breaking news to red carpets to live sporting events, and its deal with epa gave it access to more than 1,500 press photos daily.  *See* Murray Decl., ¶ __.

163.    Shutterstock viewed a deal with PMC as a way to obtain the same kind of entertainment and fashion industry event access in the United States as it obtained from Rex Features in Europe.  Pfeifer Tr., 162:16-18; *see also id.*, 53:9-54:25, 98:11-99:7.

164.    Prior to the negotiations over the Agreement, PMC knew that Shutterstock was in the midst of launching its comprehensive editorial photography product and that Shutterstock intended "to specifically take on Getty" in the editorial photography market.  Greene Tr., 97:18-99:13; 104:11-24; 114:25-115:20.

165.    With knowledge of Shutterstock's goal, PMC used its "insider access" to high-profile live entertainment and fashion industry events—including by offering to provide access to specific events like The Academy Awards, The Grammy Awards, and The Sundance Film Festival—to induce Shutterstock to enter into the Agreement (a fact that PMC's Rule 30(b)(6) designee on the negotiation of the Agreement did not deny).  Pfeifer Tr., 183:15-21; PMC_022851-22859; PMC_22553-37; Greene Tr., 11:16-12:2, 14:12-19; 114:1-13; 115:22-116:25; 117:8-23.  *See also* Penske Tr., 100:3-103:07, Ex. 4 (SSTK111575-582) (emphasizing the importance to Getty Images, Shutterstock's competitor, of live event coverage and noting that a majority of the events Getty Images was promoting in its referenced marketing material were from PMC).

166.    CEO Jay Penske hyped up the competitive value of the agreement by leaning into the importance of access and noted that in response to the Shutterstock deal, Getty Images reached out to the Hollywood Reporter (not owned by PMC at the time and a competitor to Variety) to get

access and credentials.  *See* Penske Tr., 258:4-259:10 & Ex. 20 (SSTK111587) (quoting Jay Penske saying "Now I want to destroy Getty even more!"); *see also* Penske Tr., 73:13-24; 74:15-75:18; 231:17-232:9 (Shutterstock paying a lot of money to help pursue the "800-pound gorilla in Getty"); 274:3-6; 406:13; 430:18-431:3 & Ex. 43 (PMC 22929).

167.    Access to live entertainment and fashion industry events was the primary reason Shutterstock entered into the Agreement, and PMC knew and understood this at the time of its execution.  Pfeifer Decl., ¶ __; Greene Tr., 158:23-159:15; 173:24-174:22; 196:12-197:12; 235:7-20, Ex. 25; Grobar Tr., 44:23-45:14 (access to events "was a significant part of the partnership"); 134:8-135:4 (the Agreement "was built on the concept of they could leverage the access to these events").

168.    Indeed, in its Amended Complaint, PMC notes that "industry expert" Paul Melcher referred to PMC's live event access as a "golden pass" (Dkt. No. 30, ¶ 25), and the "talking points" PMC developed to ensure that all personnel were on message when discussing the Shutterstock Agreement both internally and externally emphasized "PMC's insider access and event exclusivity."  Under the heading, "How does this deal work?", Shutterstock's live event access was front-and-center:

> Shutterstock will expand its existing coverage of leading Hollywood events. Over the coming months, leading photographers will capture images from the latest fashion industry insider-events, including global runway coverage and exclusive parties.  Shutterstock will also document leading Hollywood events including the Golden Globe Awards and the Academy Awards. There are more than 60 events each month that we may choose to cover. This content will be available via Rex and Shutterstock Premier.

> Commencing in January 2016, Shutterstock will become the exclusive official photographer for all of PMC's more than 50 annual events, which includes Fairchild Summits, built upon the influential editorial content of WWD and Footwear News, as well as Variety's robust offerings similarly fueled by its thought-leading entertainment content and including opportunities such as intimate and unique conversations with today's top film and TV talent at film festivals and premiers around the world, red

carpet celebrations, award shows, and executive conferences. Also included are red carpet events for other PMC brands such as HollywoodLife, Deadline Hollywood and Variety Latino.

PMC_002137-2142.

169. The parties touted PMC's "insider access and event exclusivity" in contemporaneous press releases as well. *See* SSTK111626-27 ("Shutterstock is teaming up with Penske Media Corporation to create and license images and videos *of the biggest events in entertainment and fashion*, the companies will announce Monday. The alliance combines the technology of one of the biggest stock-image providers in the world *with PMC's insider access and event exclusivity*, establishing an innovative way of offering editorial images to media, publishing and creative business.") (emphasis added).

170. The Agreement contemplated that PMC had access to significant events around the world, and it defined Third Party Events to encompass those events "to which PMC has access," including but not limited to the events listed on Schedule D. Agreement, ¶ 3(a)(iii) ("PMC will provide to Shutterstock defined credentials, passes, VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . . These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D."). The language of the Agreement confirms the parties' understanding that PMC did have access and always would provide it. *See* CSUF ¶¶ 110-11. PMC's failure to draft the Agreement to say "if PMC has access" or "to the extent that PMC has access" inherently confirms that providing access was not conditional or that the scope of access was limited to situations where PMC had access. *See* Agreement, ¶ 3(a)(iii).

171. PMC's primary goal in the Agreement was to make money. *See* Deposition Transcript of Gerry Byrne, 52:17-51:9 ("[W]e're in business to make money."); Walter Tr., 45:2-5 ("Q: Do you have any understanding at all as to any goal that PMC had in its relationship with

Shutterstock?  A:  We wanted to make money.”); PMC 0021285 (Email dated April 16, 2015 from

Jay Penske to PMC business team: “CASHFLOW MY BOYS!!! $15million in 48months!”);

Penske Tr., 409:22-410:2 (“I’m not aware of another e-mail with all caps and exclamation points”).

As to Shutterstock, however, PMC never seriously envisioned that it would recoup on the

Advance.  Penske Tr., 424:19-425:3.  A minor goal for PMC was for Shutterstock to help PMC

manage and onboard its acquired physical image collection, which it had not previously offered

for license.  *See* Penske Tr., 263:6-14; 275:5-7; 423:24-25; 429:2-5; 439:21-440:3.

172.    PMC and Shutterstock entered into the Agreement effective as of July 1, 2015.  See

Dkt. No. 30 (Amended Complaint), Ex. A; accord Greene Tr., 71:3-72:19 & Ex. 4.  It provides,

*inter alia*:

    a.    “PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally (‘PMC Events’).  All image, footage and/or audio content recorded at such PMC Events are referred to herein as ‘PMC Event Content’.”

    b.    “PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (‘Third Party Events’).  All image, footage and/or audio content created hereunder at the Third Party Events is referred to herein as ‘Third Party Event Content’.  Subject to the Getty Agreement Restrictions, PMC hereby grants to Shutterstock the right to be the sole third party to leverage and utilize PMC’s credentials and access to capture Third Party Event Content at Third Party Events.  These Third Party Events shall initially include, but not be limited to, those events listed on Schedule ‘D’.  PMC shall work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content.”

173.    The Agreement obligated PMC to act in good faith to maximize the events and

licensable content available to Shutterstock under the Agreement, including with respect to new

credentials, passes, or access obtained by PMC.  *See* Agreement, ¶¶ 3(a)(i), 3(a)(iii), 3(a)(iv), 3(e).

174.    Under the Agreement, Shutterstock and PMC shared the revenue earned on the

exploitation of photographs taken by Shutterstock at live entertainment and fashion industry events

(i.e., PMC Events Content and Third Party Event Content), and PMC's archival imagery ("Archive Content"). Agreement, ¶ 6.

175.    Specifically, the Agreement provides that Shutterstock pay PMC a royalty in the amount of 30% of the revenue received pursuant to the exploitation of Archive Content, PMC Event Content, and Third Party Event Content. Agreement, ¶ 6.

176.    Shutterstock also agreed to pay PMC "an annual fully recoupable advance" against these royalties (the "Royalty Advances"). Agreement, ¶ 6.

177.    From PMC's original three-year proposal, the Agreement entered into was divided into six separate "License Periods," and a Royalty Advance was due at the beginning of each, as follows:

c.    Year 1: $1,500,000 due on or before September 1, 2015

d.    Year 2: $1,500,000 due on or before July 1, 2016

e.    Year 3: $2,000,000 due on or before July 1, 2017

f.    Year 4: $2,500,000 due on or before July 1, 2018

g.    Year 5: $3,000,000 due on or before July 1, 2019

h.    Year 6: $3,500,000 due on or before July 1, 2020

Agreement, ¶ 6.

178.    Each Royalty Advance was recoupable by Shutterstock **"solely"** from the royalties otherwise due to PMC **"during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment)."** Agreement, ¶ 6.

179.    So, for example, if revenue reached $10,000,000 in License Period 5, Shutterstock would fully recoup its $3,000,000 Royalty Advance for that year (PMC is entitled to 30% of the revenue, and 30% of $10,000,000 is $3,000,000). Shutterstock would then remit to PMC 30% of

any additional revenue above $10,000,000 mark received during that License Period.  Shutterstock could ***not*** keep any such additional revenue to recoup against the next License Period's Royalty Advance, or the prior License Period's Royalty Advance if Shutterstock did not fully recoup it. Each License Period stood on its own.  Agreement, ¶ 6; Greene Tr., 160:3-164:3.

180.    During the negotiations, PMC revised the Agreement to make clear that, when it came to recouping a Royalty Advance, each License Period was insulated from the rest, *i.e.*, that Shutterstock could not use one License Period's revenue to recoup against another License Year's advance.  Greene Tr., 160:3-164:3, 178:4-24, 230:23-232:3 ("the reason that we did this was to make sure that when Shutterstock was able to recoup royalties, it was only in relation to the 12-month period").

181.    The Royalty Advance amount increased after License Period 2, with the largest amount in License Period 6, because the parties anticipated that revenues would increase over time as more consumers of editorial photography recognized Shutterstock as a reliable source for current entertainment and fashion photography, and higher revenues in the later License Periods would justify larger corresponding recoupable Royalty Advances.  Pfeifer Decl., ¶ __.  Indeed, PMC hoped its share of the revenue would exceed the larger Royalty Advances in the later License Periods.  Penske Tr., 182:11-183:5.

182.    Beginning in early 2020 (License Period 5, after Shutterstock had already paid that License Period's Royalty Advance) and continuing through License Period 6, the COVID-19 pandemic resulted in the cancellation of nearly all PMC Events and Third Party Events.  Those events that did occur were either delayed or modified significantly in a manner that resulted in substantially reduced opportunities for live photography.  *See* Walter Tr., 249:18-250:6 ("To my recollection, there were no events [between mid-March, 2020, and July 16, 2020] that happened

in person."); *id.*, 253:25-254:15 ("there's not really credentials to be had for virtual events").  As a result, PMC was not able to provide Shutterstock with access to generate live event content as required by the Agreement.

183.    Shutterstock would not have agreed to pay the License Period 6 Royalty Advance, or any other Royalty Advance, if it knew that it would not have access to PMC Events or Third Party Events during that particular License Year, especially because Shutterstock could recoup against a Royalty Advance with *only* the revenues earned during that particular License Period. Pfeifer Decl., ¶ __.

184.    Indeed, PMC did not even provide any of its Archive Content to Shutterstock until *14 months* into the Agreement—by that time, Shutterstock had already paid *two* Royalty Advances.  Murray Decl., ¶¶ __ & Ex. __ (SSTK168721).

185.    The parties did not expect Archive Content to generate sufficient revenue to justify the amount of any Royalty Advance.  Pfeifer Decl.; Pfeifer Tr., 53:9-54:8.  Indeed, PMC has never had anyone pay an advance against royalties for archive material alone.  Penske Tr., 200:6-14. Consistent with the foregoing, there was little to no negotiation or discussion regarding the archive images; the overwhelming majority of the time in the negotiation and subsequent meetings was spent on matters pertaining to live events.  Pfeifer Decl., ¶ __.

186.    Over the entire course of the Agreement, Archive Content accounted for approximately 10% of the overall revenue generated by the parties' exploitation of content created pursuant to the Agreement, and live event content (i.e., PMC Event Content and Third Party Event Content) accounted for approximately 90%.  See Murray Decl., ¶ __, Ex. __.

187.    On average, Shutterstock sent photographers to approximately *800 live events per year* pursuant to the access PMC provided under the Agreement.  Melvin Decl., ¶ __.

188.     Neither party expected nor reasonably could have expected that a global pandemic would occur during the term of the Agreement that would cause nearly all live events to be cancelled.  Pfeifer Decl., ¶ ___; Greene Tr., 321:9-14.

189.     From early March 2020 onward, PMC did not offer credentials, passes, or VIP access to significant events or any other third party events – not to any of the events that had occurred in the prior four years, nor any other events where Shutterstock would enjoy exclusive access.  Walter Tr., 202:7-20; Margolin Tr., 134:10-134:23.

190.     For example, PMC did not provide access to the 2020 Cannes Film Festival (scheduled for May 12-23, 2020), the 2020 Tony Awards (scheduled for June 7, 2020), the 2020 Toronto Film Festival (scheduled for September 10-19, 2020), or the 2020 Emmy Awards (scheduled for September 20, 2020).  The former two, which were scheduled to occur before the effective date of termination, were cancelled.  Penske Tr., 323:16-19.

191.     In March 2020, PMC also inexplicably stopped providing meaningful Archive Content to Shutterstock.  PMC on average provided, on average, approximately 61,575 archival images to Shutterstock per month in the two years prior to the pandemic (2018-2019), but during the last four months of the parties' relationship, PMC provided Shutterstock with only a token amount, just 119 archival images *in total*. Murray Decl., ¶¶ __, Ex. __ (SSTK168721).

192.     And just prior to the pandemic, PMC planned to digitize 1.9 million physical images, but it instead decided to ship the images to another location where they sat in storage. PMC made no efforts to make these images available to Shutterstock.  *See* Walter Tr., 385:4-386:13, Ex. 38 (PMC_0014957-62).

193.     Recognizing that the pandemic eliminated the reason why Shutterstock entered into the agreement (namely, to obtain exclusive VIP access, credentials, and passes to entertainment

and fashion events), PMC agreed that the contract should be amended in some way in response to the unforeseen pandemic, which had instantly obliterated the very services Shutterstock contracted for.  Penske Tr., 214:14-18 ("I offered specifically to extend the agreement while there were challenges obviously with live events through the devastating effects of COVID"); *id.* at 215:2-5 ("I was very aware that these events were being impacted, and I offered to extend the agreement for a year and to bridge the payment."); *id.* at 339-13 ("Yeah, it means proffer them another, another year or extend the term so they can see some of the live events come back."); PMC 15928-29.  *See also* Penske Tr., 316:9-12; 336:10-12 ("[L]ive event revenue was, was down most significantly.").  Nonetheless, as discussed below, PMC's cash-driven proposal—indeed its sole proposal and sole position—failed to appreciate the fact that it was unclear if or how live events would come back, as well as the fact that live events were cancelled only eight months into the prior term of the Agreement.  Further, after events specifically named in the Agreement were cancelled, PMC indisputably was in breach.  *See* Agreement, § 3(a)(iii) & Schedule D.

194.   As a result of the impact on live events, PMC was able to negotiate mutually acceptable relief from venues and other vendors who allow PMC to put on its more than 100 annual summits, conferences, and talent-driven events.   *See* Penske Tr., 385:8-386:5 (describing agreements to postpone contracts for pre-pandemic booked space until PMC had visibility on when live events would return).  PMC vigorously opposed providing documentation regarding this relief, necessitating a motion to the Court.  *See* Dkt. No. 94.

195.   Indeed, PMC's Chief Operating Office testified that he would expect where live events were cancelled due to the pandemic, PMC or its subsidiary brands took the position that they were owed money back from the venue slated to host the event (*e.g.*, a refund of a security deposit); but Mr. Grobar claimed to not know "definitively."  Grobar Tr., 93:3-17.

196.    Two weeks after the pandemic closed offices and shut the country down, Shutterstock approached PMC regarding the issue, but even despite the matter escalating to Shutterstock's CEO and PMC's COO in mid-April, the parties seemed to be talking past each other: PMC demanding that Shutterstock commit to paying the $3.5 million advance either on July 1 or split into an extended term, and Shutterstock asking to speak about the overall picture, bearing in mind the possibility that live events requiring credentials, passes or VIP access may not return for a year or more.  Pavlovsky Tr., 180:20-181:5.

197.    Shutterstock's CEO noted to PMC's COO on their phone call in mid-April that Shutterstock had already paid a full year's advance-a sizeable amount of money-through June 30, 2020 and was no longer receiving live event access as of March 2020.  Therefore, in Mr. Pavlovsky's view it did not make sense to open a dialog by talking about how much more money would be advanced to PMC-much less talking about a $3.5 million royalty advance for the coming year.  *See* Pavlovsky Tr., 193:16-194:5; 204:2-15; 247:15-248:3; 263:15-23.

198.    PMC saw an opportunity to have its cake and eat it, too, as a result of the pandemic, working internally to get the royalty advance and then immediately go to market without any intention to deliver services against that royalty advance.  PMC_008848-50 ("final payment then out"); PMC_010175; PMC_015971-72 ("Let's hold it to them to make the payment" and then "go to market").

199.    On May 4, 2020 at the latest, PMC claimed it had already consulted with two outside firms and had "readied counsel to litigate."  PMC_0020975-20976.  According to PMC, the plan was to "hammer back in equal measure, and get paid, and then seek a [new] partner upon completion[.]"  *Id.*; *see also* Grobar Tr., 174:6-11, 183:24-184:24.  PMC included these points in an email from COO George Grobar to CEO Jay Penske, which Mr. Penske then forwarded to Jon

Oringer in an effort at leverage.  Mr. Grobar revealed at his deposition, PMC intended to forward the ostensibly internal email from the beginning, and it was drafted not by Mr. Grobar alone, but by a team of PMC personnel, including attorneys.  Indeed, Mr. Grobar testified that he did not write various portions of the email.  *See* Grobar Tr., 152:19-197:16, 200:9-210:20.

200.    From that time onward, PMC did not offer to create additional access at third party events for Shutterstock.  See Margolin Tr., 102:4-16.

201.    Four days later, Shutterstock's CEO reached out to PMC's CEO with a cordial note and invited a discussion, with the goal of finding a good faith effort to see if there was a way to rectify the fact that Shutterstock was not receiving the contracted services.  PMC_0016287-288. *See also* Pavlovsky Tr., 53:6-19; 110:19-111:2.  On the call, PMC's CEO was angry about Shutterstock's refusal to commit to a promise some fixed sum of money as a condition to having an overall discussion about what to do regarding the uncertain pandemic that was causing the elimination of all events (not to mention the overall uncertainty and human casualties).  Pavlovsky Tr., 249:14-23.

202.    When Mr. Pavlovsky declined to commit to any specific amount of money, as Mr. Penske demanded he do, Mr. Penske hung up on Mr. Pavlovsky after saying a few profanities. Pavlovsky Tr., 249:14-23, 250:14 ("I just remember he threw a few profanities out and then that was pretty much the end of the conversation.").

203.    Shutterstock decided that in light of the response and threats, it would be best to not involve Mr. Pavlovsky or Mr. Oringer, and instead turn the matter over to the legal team.  But apart from a single phone call, PMC's counsel did not respond to the efforts of Shutterstock's legal team.  *See* Pavlovsky Tr., 254:14-23; Garfield Tr., 16:25-17:3; 34:2-5; 37:18-22; 45:3-11; 59;25-60:10; PMC 22819-20.

204.    Section 8 of the Agreement provides: "Either Party may terminate the Agreement at any time for cause by giving the other Party written notice and providing for a forty-five (45) day period ("Cure Period") during which the other must correct, cure or otherwise resolve the alleged cause for termination."  If the alleged cause is not cured, the party was obligated to give notice of termination to the other.  Agreement, ¶ 8; Penske Tr., 210:11-211:10 (Section 8 of the Agreement is a "fairly boilerplate termination agreement if someone could not cure the alleged cause for termination.").

205.    Given the radio silence from PMC coupled with the apparent lack of interest in addressing the matter, Shutterstock prepared a letter pursuant to Section 8 of the Agreement. Garfield Tr., 35:14-21; 54:18-55:8; 58:5-7; 59:25-60:10 Ex. 6 (PMC 0020980-83).  In the letter, Shutterstock identified the fact that PMC had cancelled PMC Events, was unable to provide access to Third Party Events, including those in Schedule D, and offered no assurances that PMC could offer any access to any such events in the foreseeable future.  *Id.*

206.    In response to the letter, Jay Penske sent a note to Jon Oringer saying: "Wow Jon, I guess you/Stan made the call to throw rocks instead, it's going to cost SSTK much more. Such a waste of time."  PMC 21820.  Mr. Oringer responded: "We are happy to come to an agreement. The notice was based on the 45 day window in the contract."  *Id.*  Shutterstock's GC also wrote to Ms. Margolin to invite PMC to discuss.  Garfield Tr., Ex. 7 (PMC 22822-23).

207.    Apart from the response from Mr. Penske on May 18, 2020, nobody from PMC responded to either communication in the 45-day window, much less took any steps to correct, cure or otherwise resolve the alleged cause for termination.  Penske Tr., 360:11-365:12; Margolin Tr., 112:5-113:11; 128:12-19.  The only thing Shutterstock heard from PMC came 30 days later: that PMC had filed an unnoticed lawsuit against Shutterstock.  Dkt. No. 1.

208.    Indeed, when asked at deposition, Jay Penske acknowledged the breach but confirmed that PMC did not take any steps to correct, cure, or otherwise resolve it.  He took the misguided position that the pre-notice offer to "blend and extend" (*i.e.*, force Shutterstock into another year in an unpredictable time, and give PMC another $1 million in credit for the privilege of paying part of the advance later) was sufficient, and no effort to do anything at all post-notice was required.  Penske Tr., 360:11-365:12 ("Q. The alleged cause is the information provided in the letter, including the – A. You wanted us to start creating live events?  Is that what you're referring to? Q. How about – A. You're the one who was talking about this is such a global pandemic that we needed to all be so careful to changes – you're saying in 45 days I could create – start creating live events in order to remove our company from a breach?"); Margolin Tr., 102:4-16; 112:5-25.

209.    Given that filing a lawsuit was not a correction, cure, or otherwise a resolution of the alleged cause for termination, Shutterstock sent a written notice of termination on July 2, 2020, pursuant to the provisions of Section 8 of the Agreement.  Garfield Tr., Ex. 8 (SSTK111589-111590).

210.    The Agreement contains a severability clause which states: "If any provision of this Agreement or any application thereof is determined to be illegal, invalid or unenforceable, the remainder of this Agreement and any other application of such provision shall not be affected thereby, and such illegal, invalid or unenforceable provision shall be reworded, if possible, so as to make it legal, valid and enforceable."  Agreement, ¶ 19.

211.    PMC agreed to be bound by Shutterstock's website Terms of Use.  *See* Agreement, Schedule A § 2 ("Customer [PMC] agrees to be bound by . . . Shutterstock's Website Terms of Use . . . in existence as of the date hereof"); *see also* SSTK111629-35 (any person "accessing or

using [the] website [https://www.shutterstock.com/] . . . agree[s] to and [is] bound by the terms and conditions set forth [therein] . . . .").

212.    PMC and Shutterstock had no license agreement in effect (separate from the Terms of Use) between July 17, 2020 and November 2020.  *See* Murray Decl., ¶ __.

Dated: New York, New York
        March 28, 2022

MITCHELL SILBERBERG & KNUPP LLP

By:  /s/
        Eleanor M. Lackman
        Marissa B. Lewis
        437 Madison Avenue, 25th Floor
        New York, New York 10022
        Tel.: (212) 509-3900
        Fax: (212) 509-7239
        eml@msk.com
        mbl@msk.com

*Attorneys for Defendant-Counterclaim Plaintiff Shutterstock, Inc.*