UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

      Plaintiff-Counterclaim Defendant,

      -against-

SHUTTERSTOCK, INC.,

      Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

## PMC'S RESPONSE TO SHUTTERSTOCK'S

## DRAFT RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York and Paragraph 4(A)(i) of this Court's Individual Rules of Practice in Civil Cases, Plaintiff Penske Media Corporation ("PMC"), by and through its undersigned counsel, respectfully submits the following response to the draft statement of undisputed facts submitted by Defendant Shutterstock Inc. ("Shutterstock") in support of its anticipated Motion for Partial Summary Judgment:

1.      **Shutterstock's Contention**: Plaintiff-counterclaim defendant Penske Media Corporation ("PMC") and Shutterstock entered into the "Archive & Event Image Hosting and License Agreement" effective as of July 1, 2015 (the "Agreement").  *See* Dkt. No. 30 (Amended Complaint), Ex. A; *accord* Deposition of Todd Greene dated February 2, 2022 ("Greene Tr."), 71:3-72:19 & Ex. 4.

      **PMC's Response**: No dispute.

2.      **Shutterstock's Contention**: Paragraph 3(a)(iii) of the Agreement provides, in its entirety, as follows:

**TO BE FILED REDACTED/UNDER SEAL**

> PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events").  All image, footage and/or audio content created hereunder at the Third Party Events is referred to herein as "Third Party Event Content".  Subject to the Getty Agreement Restrictions, **PMC hereby grants to Shutterstock *the right to* be the sole third party to leverage and utilize PMC's credentials and access to capture Third Party Event Content at Third Party Events.**  These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D".  PMC shall work with Shutterstock in good faith to create additional access to third party events that will enable the Parties to further monetize the Third Party Event Content.

Agreement, ¶ 3(a)(iii) (emphasis added); *see also id.*, Schedule D (listing the following Third Party Events:  "The Golden Globes Awards and Nominee Press Conference," "The Sundance Film Festival," "The Grammy Awards," "The Academy Awards," "The Tony Awards," The Emmy Awards," "The Cannes Film Festival," "The Screen Actors Guild Awards," "The Directors Guild of America Awards," "The Venice Film Festival," "The Independent Spirit Awards," and "The Toronto Film Festival").

<u>**PMC's Response**</u>: No dispute.

3.    <u>**Shutterstock's Contention**</u>: The Agreement could have included, but did not include, an express requirement that Shutterstock had to provide photographic coverage of Third Party Events using PMC's credentials (and *only* PMC's credentials) if PMC offered to provide such credentials to Shutterstock.  *See* Agreement, ¶ 3(a)(iii).

<u>**PMC's Response**</u>: Partially disputed. The Agreement does not have an express provision requiring Shutterstock to use only PMC credentials at Third Party Events that Shutterstock choses to attend and when PMC offers Shutterstock those credentials, however, this is not material or relevant to PMC's *implied covenant* claim. PMC does not contend that the implied covenant required Shutterstock to attend all Third Party Events for which PMC made its

credentials available.  (Opinion and Order, Dkt. 71, at 8 n.3 ("an obligation **to attend** all Third

Party Events for which Penske makes its credentials available" is "simply is not the claim

asserted in the Amended Complaint")).

4.      **Shutterstock's Contention**: In contrast to Paragraph 3(a)(iii), Paragraph 3(a)(ii)

of the Agreement, which addresses "PMC Events," provides, in relevant part, as follows:

> PMC will provide Shutterstock access to its events, galas,
> conferences, summits, and other event functions to which third
> parties are invited generally ("PMC Events").  . . . During the
> License Period, **Shutterstock *will provide* editorial event
> coverage, at Shutterstock's expense, for all PMC Events.**  . . .

*Id.*, ¶ 3(a)(ii) (emphasis added).

**PMC's Response**: No dispute.

5.      **Shutterstock's Contention**: Further, Paragraph 3(e) of the Agreement provides

that "[t]he in-house staff photographers currently employed by PMC shall produce images . . .

that will be contributed to . . . Third Party Event Content."   *Id.*, ¶ 3(e); *see also See* Declaration

of Benjamin Melvin in Support of Motion for Partial Summary Judgment ("Melvin Decl.").

**PMC's Response**: Partially disputed as to materiality. There is no dispute that the quoted

language appears in ¶ 3(e) of the Agreement, however, that provision is not material or relevant

to PMC's implied covenant claim. (*See* Opinion at 10 ("the Court cannot find, as Shutterstock

urges, that…Penske's opportunities to take pictures itself preclude an implied obligation in the

Agreement for Shutterstock to diligently use the rights it was granted in the Agreement")).

6.      **Shutterstock's Contention**: PMC owns Variety, Inc. ("Variety").  *See* Transcript

of February 10, 2022 Deposition of George Grobar ("Grobar Tr.), 19:8-19.

**PMC's Response**: Disputed. Variety *Media, LLC* is an indirect subsidiary of PMC.

There is no entity "Variety, Inc." In deposition testimony that Shutterstock cites, George Grobar

testified: "I think of [PMC] as a tightly interwoven set of business units that are sort of symbiotic

with the corporate team that supports all of those business units….Variety, Women's Wear Daily. Those would be brands and business units there." Grobar Tr. 19:8-19.

7.    **Shutterstock's Contention**: In 2010, Variety and Getty Images (US), Inc. ("Getty Images") entered into a "Photographic Services and Reciprocal Image License Agreement" (the "Getty Agreement"), pursuant to which Variety agreed, *inter alia*, to provide to Getty Images its credentials to various third-party events.  *See* Greene Tr., 269:23-271:6 & Ex. 28, ¶ 4.

**PMC's Response**: No dispute.

8.    **Shutterstock's Contention**: Paragraph 4.2 of the Getty Agreement provides, in relevant part, as follows:

> During the Term, Getty Images ***will provide*** the following photographic event coverage ***using Variety's "Variety" credential***:
> . . .
>
> **Required Events.  *Getty Images will be obligated to provide coverage***, as requested by Variety, of the following events, free of charge . . . including, but not limited to:

Greene Tr., Ex. 28, ¶¶  4.2 & 4.2.1 (emphasis added); *see also, e.g., id.*, ¶ 4.2.1(b) (listing among the Required Events:  "The Golden Globes Awards and nominee press conference," "The Sundance Film Festival," "The Grammy Awards . . . ," "The Academy Awards . . . ," "The Tony Awards . . . ," The Emmy Awards . . . ," "The Cannes Film Festival," "The Screen Actors Guild Awards," "The Directors Guild of America Awards," "The Venice Film Festival," "The Independent Spirit Awards," and "The Toronto Film Festival").

**PMC's Response**: Partially disputed as to materiality. No dispute that the Getty Agreement contains this language, however neither the Getty Agreement, nor this language is material or relevant to PMC's implied covenant claim.

9.      **Shutterstock's Contention**: The Getty Agreement and the limitations it would place on PMC and Shutterstock's business relationship is addressed in the Agreement itself. *See* Agreement, ¶ 18.

**PMC's Response**: Partially disputed as to materiality. No dispute that PMC had an agreement with Getty, however, that agreement is not material or relevant to PMC's implied covenant claim. There is no dispute that the Agreement references the agreement with Getty in certain select ways, but that reference is not material or relevant to PMC's implied covenant claim.

10.     **Shutterstock's Contention**: PMC's Chief Legal Officer, Todd Greene, was the author of all of PMC's edits to the Agreement and was designated by PMC, pursuant to Rule 30(b)(6), to testify regarding the meaning of the Agreement and the Getty Agreement. *See* Greene Tr., 16:19-17:4, 64:12-14, 75:20-77:11.

**PMC's Response**: Partially disputed. In 2015 Todd Greene was not PMC's Chief Legal Officer, he was General Counsel and Senior Vice President of Human Resources. (Greene Tr. 65:11-13). In addition, Todd Greene was not the author of all of PMC's edits. (*See* Pfeifer Deposition Exhibit 8 at p.9-18 (list of mark ups from redline of term sheet draft dated Apr. 23, 2015, PMC_0007269, showing edits by Paul Woolnough); Pfeifer Deposition Exhibit 10, at p.16 (list of mark ups of term sheet draft dated May 4, 2015, PMC_0022600, showing edits by Jay Penske)). PMC designated Todd Greene to testify to the Getty Agreement in general, not specifically as to the agreement's "meaning." (*See* Shutterstock's 30(b)(6) Notice, Schedule A, at ¶ 13 ("Other agreements that PMC has entered, other than the Agreement, to exploit its archive content or live event content, including with Getty Images.")); December 22, 2021 email from C.

5

Arato to E. Lackman ("We will agree to provide a witness [Todd Greene] to discuss generally the terms of the Getty agreement.").

11.    **Shutterstock's Contention**: Mr. Greene could not explain why PMC did not include a term in the Agreement requiring Shutterstock to use PMC's credentials to photograph Third Party Events, similar to the one in the Getty Agreement.  *See* Greene Tr., 270:19-271:12 ("Q.  Do you have any understanding as to why you didn't include a similar term in the PMC Shutterstock agreement if the intent really was to require Shutterstock to use PMC's credentials if offered to third-party events?  A.  No, I don't."); *see also, id.*, 268:12-19 ("Q.  And remember, Mr. Greene, the question is, as the exclusive author of revisions to this agreement for PMC, why didn't you include a clause that required Shutterstock to use credentials to third-party events if offered by PMC and no other credentials?  A.  The answer to your question is I don't know.").

**PMC's Response**: Partially disputed. There is no dispute that Todd Greene answered "I don't know" in response to quoted questions about why there was no express provision requiring Shutterstock to cover Third Party Events if invited by PMC, however, this is not relevant or material to PMC's implied covenant claim. (*See supra* PMC Response to ¶¶ 3, 9; *see also* Greene Tr. 267:14-16, 268:12-13 (first asking "Why didn't you write into the agreement that obligation to use the third-party event credentials if they were proffered by PMC?" before repeating "And remember, Mr. Greene, the question is…"); Opinion and Order, Dkt. 71, at 8 n.3 ("an obligation ***to attend*** all Third Party Events for which Penske makes its credentials available" is "simply is not the claim asserted in the Amended Complaint")). Regardless, Greene's answer of 'I don't know" would not negate PMC's implied covenant claim. (*See supra* ¶ 3).

12. **Shutterstock's Contention**: On or about January 15, 2015, Shutterstock entered into an agreement to acquire Rex Features, the largest independently-owned photographic press agency in Europe. *See* Melvin Decl., ¶ __, Ex. __ (January 15, 2015 press release).

**PMC's Response**: No dispute.

13. **Shutterstock's Contention**: Shutterstock obtained credentials and access to significant third-party events around the world through its acquisition of Rex Features. *See* Melvin Decl., ¶ __.

**PMC's Response**: Partially disputed. There is no dispute that prior to the PMC-Shutterstock Agreement, Rex Features covered live events outside of the United States and Canada, however, Benjamin Pfeifer, Shutterstock's lead negotiator, testified that "Rex Features had a hard time getting credentials, in particular to U.S. fashion and entertainment events." (Deposition of Benjamin Pfeifer ("Pfeifer Tr.") 53:18-21). In contrast, "Variety could get into any entertainment event it wanted to up until the point that we did this deal." (*Id*. at 53:23-25). Therefore, Shutterstock identified PMC as its "solution for U.S. entertainment and fashion access" (Pfeifer Tr. 162:16-18; *see also* Schedule D (listing events in the United States and Canada); *infra* ¶ 25).

14. **Shutterstock's Contention**: At the time PMC and Shutterstock entered into the Agreement, PMC knew that Shutterstock had acquired Rex Features and that Shutterstock obtained credentials and access to various third-party events through such acquisition. *See* Transcript of January 18, 2022 Deposition of Karl Walter ("Walter Tr."), 130:23-133:6; Transcript of November 18, 2021 Deposition of Jay Penske ("Penske Tr."), 60:11-61:5 (Shutterstock "had just acquired Rex" during Mr. Penske's initial discussions with Shutterstock's CEO, Jon Oringer, regarding the potential agreement); *id.*, 63:2-14 (same);  Greene Tr., 26:8-19

(Shutterstock's CEO, Jon Oringer, told Jay Penske that "[Shutterstock] had [ ] acquired a business called Rex Features" during their initial discussions regarding the potential agreement); *id.*, 114:25-115:20 (same); *see also id.*, 223:2-224:9 ("[PMC] met with a number of employees from . . . Rex" prior to the execution of the Agreement, including "in relation to getting . . . access to or credentials to third-party events").

**PMC's Response**: Partially disputed. There is no dispute that PMC was aware of Shutterstock's Rex Features acquisition at the time of the PMC-Shutterstock Agreement, but the cited evidence does not establish that PMC knew what access and credentials Shutterstock obtained through Rex Features. (Walter Tr. 131:12-25 ("Rex was regional in its coverage….[T]hey didn't work with the Oscars. They didn't work with the Golden Globes. They didn't work with major events like that…their strength was regional, and that region was the U.K."); Penske Tr. 64:5-7 ("I would say [from] our perspective Rex was [] very UK-centric, not strong in the US"); Greene Tr. 115:15-18 ("they were looking for a media partner like us that could provide…access to events in different categories"); *see also supra* PMC Response to ¶ 3).

15.     **Shutterstock's Contention**: During the course of the Agreement, PMC and Shutterstock jointly maintained and referred to annual "shared production documents" to keep track of, *inter alia*, Third Party Events.  *See* Melvin Decl., ¶ __ & Exs. __ (PMC_0019397, PMC_0019401, PMC_0019400, PMC_0019418) (2016, 2017, 2018, 2019 shared production documents); *see also* Walter Tr., 140:4-7, 167:13-168:3, 187:20-188:21.

**PMC's Response**: No dispute.

16.     **Shutterstock's Contention**: On multiple occasions, and as early as 2016, Shutterstock expressly indicated in the shared production document that it was passing on PMC's credentials for a particular Third Party Event because Shutterstock already had its own

credentials for that event.  *See* Melvin Decl., ¶ __ ; *see also, e.g.*, *id.*, Ex. __ (PMC_0019397 at "LA" Sheet, Row 35) (declining Variety credential for Third Party Event in 2016 because "SSTK already covering"); *id.*, Ex. __ (PMC_0019401 at "LA" Sheet, Row 356, 466) (declining Variety credential for Third Party Events in 2017 because "Chelsea already shooting for SSTK"); *id.*, Ex. 3__ (PMC_0019400 at "Los Angeles" Sheet, Row 475) ("SSTK passing" on Variety credential for Third Party Event in 2018 because Shutterstock "already ha[d] arrivals & fixed show [credentials]"); *id.*, Ex. __ (PMC_0019418 at "LA" Sheet, Row 412) ("SSTK passing" on Variety credential for Third Party Event in 2019 because Shutterstock already "ha[d] arrivals cred[ential]").

        **PMC's Response**: No dispute.

        17.    **Shutterstock's Contention**: In some instances, Shutterstock also informed PMC by email that it was passing on PMC's credentials for a particular Third Party Event because Shutterstock already had its own credentials for that event.  *See, e.g.*, Melvin Decl., Ex. __ (PMC_0009489) (August 12, 2019 email from Ben Melvin to PMC passing on Variety's "fixed carpet" credential for Third Party Event because "[Shutterstock] already ha[d] [an] arrivals [credential]"); Declaration of Eleanor M. Lackman in Support of Motion for Partial Summary Judgment ("Lackman Decl."), Ex. __ (PMC_0015255) (February 4, 2020 email from Emily Taylor to PMC stating, "We won't be filling your credential [for the Third Party Event] as [Shutterstock has the] same access").

        **PMC's Response**: No dispute.

        18.    **Shutterstock's Contention**: In a presentation delivered to PMC in June 2016, Shutterstock indicated that Shutterstock used its own credentials to attend and photograph approximately 647 third party events held between January 2016 through May 2016.  *See* Penske

Tr., Ex. 50 (PMC_0022103-133) at PMC_0022103; *see also* Declaration of Candice Murray in Support of Motion for Partial Summary Judgment ("Murray Decl."), ¶ __.

     **PMC's Response**: Partially disputed as to materiality. There is no dispute that Shutterstock delivered this presentation, however, this is not material or relevant to PMC's implied covenant claim because the presentation does not evidence that PMC offered credentials to Shutterstock for the events that Shutterstock covered as documented in the presentation. For example, the majority of Shutterstock's credentials were in the United Kingdom. (PMC_0022104).

     19.    **Shutterstock's Contention**: During the term of the Agreement, PMC was aware that Shutterstock had passed on PMC's credentials and instead used its own credentials to attend and photograph multiple Third Party Events. *See* evidence cited in support of SUF ¶¶ 14-17, *supra*. *See also* Melvin Decl., ¶ __; Lackman Decl., Ex. __ (PMC_0010516) (September 12, 2019 email from PMC stating, "according to the doc SSTK was passing on sending photog[rapher] [to the Audi party because it] already had carpet & inside access . . ."); *id.* Ex. __ (PMC_0014096) (December 30, 2019 email from PMC stating, "I believe Shutterstock already has a photographer to cover the Disney/FX party on the carpet and inside (I believe via a partnership?) . . ."); *id.* Ex. __ (PMC_0015065) (January 22, 2020 email from third party to PMC, "We credentialed a Shutterstock photographer already [for the MusicCares event]").

     **PMC's Response**: No dispute.

     20.    **Shutterstock's Contention**: Nonetheless, prior to filing this lawsuit, PMC did not object to Shutterstock's use of its own credentials, rather than PMC's credentials, to attend and photograph Third Party Events. *See* Murray Decl., ¶ __; Greene Tr., 271:15-272:12, 294:18-295:16; Walter Tr. 218:23-220:6, 610:5-25.

**PMC's Response**: Disputed. PMC raised concerns to Shutterstock about Shutterstock's practice of using its own credentials instead of PMC's and "there was an ongoing back and forth." *See infra* ¶ 30.

21.   **Shutterstock's Contention**: Karl Water was PMC's point-person on the day-to-day performance of the Agreement and PMC's Rule 30(b)(6) designee on the topic of "Shutterstock's alleged violation of the covenant of good faith and fair dealing."  Walter Tr., 20:7-21:6; Murray Decl., ¶ __; Lackman Decl., Ex. __ (November 3, 2021 email from PMC's counsel).

**PMC's Response**: No dispute.

22.   **Shutterstock's Contention**: Mr. Walter testified that he did not understand the Agreement to prohibit Shutterstock from using its own credentials for Third Party Events.  *See* Walter Tr., 227:24-228:5 ("Q.  Was Shutterstock prohibited from using its own credentials for third-party events? . . . A.  I don't know why they would be.").

**PMC's Response**: Partially disputed. There is no dispute that Karl Walter gave this testimony, however, this is not material or relevant to PMC's implied covenant claim because PMC does not claim that Shutterstock could only cover events when PMC offered credentials and Mr. Walter was not asked in this question whether Shutterstock was prohibited from using its own credentials for third party events after it declined credentials provided by PMC. On that topic, Mr. Walter testified: "We believe that if they were shooting events and not using our credentials and using other credentials to attend those events, that it was a breach of the good faith agreement of the agreement." (Walter Tr. 598:8-12) (with typo for last word, which was transcribed as "argument," corrected in an errata).

11

23.   **Shutterstock's Contention**: In multiple instances, PMC not only acknowledged and did not object to Shutterstock's use of its own credentials, rather than PMC's credentials, to attend and photograph Third Party Events, but also opted to use the photographs Shutterstock took instead of sending its own photographer.  *See, e.g.*, Lackman Decl., Ex. __ (PMC_0014027) (December 12, 2019 email from PMC declining credential for a Third Party Event and stating, "Shutterstock already has [a photographer] covering so we'll use their photos versus sending a separate photog[rapher]"); *id.* Ex. __ (PMC_0015228) (February 3, 2020 email from PMC stating, "Shutterstock says they already have a photographer attending [the Third Party Event], so we'll use their photos!"); *see also* Murray Decl., ¶ __; Melvin Decl., ¶ __.

**PMC's Response**: Partially disputed. There is no dispute that PMC did not object in the two instances cited by Shutterstock, however Karl Walter testified that there was an ongoing dialogue about Shutterstock's use of Shutterstock credentials instead of PMC credentials. (*See supra* PMC's Response to ¶ 20; *infra* ¶ 30). PMC's use of Shutterstock's photographs instead of sending their own photographer is not material or relevant to PMC's implied covenant claim. PMC had limited photographers and sometimes covered multiple events in one night. (*See infra* ¶ 32). Even if PMC was able to use Shutterstock's photographs of an event, when Shutterstock used its credentials and not PMC's credentials, PMC lost ownership of photographs that Shutterstock took at the events; a percentage of licensing revenue earned from Shutterstock's exploitation of such works during the contract term; and the ability to exploit those images after the contract term ended. (*See infra* ¶ 25).

24.   **Shutterstock's Contention**: When asked which credentials Shutterstock declined, whether PMC had suffered any damages as a result, and if so, what those damages were, PMC's Rule 30(b)(6) designee on the topic of "Shutterstock's alleged breach of the

Agreement . . . and any alleged damages PMC suffered as a result thereof" refused to answer based on instructions from his counsel.  *See* Greene Tr., 261:12-24 ("Q. Mr. Greene, do you have any knowledge related in any way to the allegation that Shutterstock declined to use the credentials for third-party events, other than your conversation with [K]arl Walter, which you've refused to reveal, and your conversations with your outside counsel?  A. Other than my conversations with [K]arl Walter that were conducted under attorney-client privilege and my conversations with my outside counsel, which were conducted under attorney-client privilege, I do not have additional ways in which I can verify that statement."); *id.*, 263:24-264:12 ("Q. And do you have any idea whether or not PMC was damaged at all by Shutterstock's alleged declination of credentials for third-party events?  A. Any information I would have would have been through -- obtained through my conversations with [K]arl Walter under attorney-client privilege or my outside counsel through attorney-client privilege.  Q. Do you know whether or not PMC was damaged?· Yes or no.  MS. ARATO:  I instruct the witness not to answer based on his answer that he just gave you.").

**PMC's Response**: Partially disputed. There is no dispute about the quoted Todd Greene testimony, however, Karl Walter was the designee of the topics related to PMC's implied covenant claim, not Todd Greene. More specifically, Karl Walter was the designee to testify to "Any Third Party Events, as that term is defined in the Agreement, to which PMC offered credentials to Shutterstock, that Shutterstock attended and photographed using credentials other than those offered by PMC, and any alleged damages PMC suffered as a result thereof;" and "Shutterstock's alleged violation of the covenant of good faith and fair dealing, as alleged in PMC's amended complaint, and any alleged damages PMC suffered as a result thereof." (Shutterstock's 30(b)(6) Schedule A ¶¶ 22, 25). In addition, both Karl Walter and Todd Greene

were designated to testify to "Shutterstock's alleged breach of the Agreement, as alleged in

PMC's amended complaint, and any alleged damages PMC suffered as a result thereof." (*Id*. ¶

24).  Moreover, neither Mr. Walter nor Mr. Greene would be in a position to know all of the

benefits to Shutterstock from its use of its own credentials, including which photographs were

taken and the revenues those photographs yielded for Shutterstock.

### PMC'S ADDITIONAL RELEVANT FACTS

25.     At the time the parties entered into the Agreement, Shutterstock did not have its

own credentials to photograph the major Third Party Events and Shutterstock identified PMC as

its "solution for U.S. entertainment and fashion access." (Pfeifer Tr. 162:16-18; *see also* Pfeifer

Tr. 53:18-25 ("Rex Features had a hard time getting credentials, in particular to U.S. fashion and

entertainment events….Variety could get into any entertainment event it wanted to up until the

point that we did this deal.")).

26.     During the course of the agreement, Shutterstock "leverage[d] [its] PMC

partnership to strengthen and differentiate [its] entertainment offering." (Internal Shutterstock

Email from D. Segers, dated Sept. 1, 2016, SSTK114618-22, at 21 (describing 2016 coverage of

Toronto Film Festival); *see also* Email from M. Stueven, Rex Features to C. Mehta, Pr Dept.,

dated Sept. 4, 2015, SSTK018246-28, at 018246 ("Rob will also be covering for Variety, so

whatever great access you can give us would be appreciated"); Email chain between C. Iacullo,

Brandsway Creative and B. Melvin, Shutterstock, dated Mar. 29, 2016 SSTK069723-29, at

069726 (Melvin writes "Not sure if you're aware but we are the main suppliers of entertainment

content to Variety and all PMC titles. It would be great if could [*sic*] allow us access to the

cocktail party to shoot more original content on behalf of Variety." Iacullo responds: "we will

reserve a spot for Chelsea on the carpet and can also grant her access to the party so you can get more original content for Variety/PMC titles")).

27.     Internally, Shutterstock thought it was "stupendous" when its staff photographers tried to "get [credentials] on [their own] without having to go through" PMC. (Email from Melvin, Oct. 16, 2017, SSTK065530-32, at 065530; *accord, e.g.*, Email from Melvin, dated Jan. 26, 2018, SSTK168958; Email from Gerber, dated Nov. 29, 2019, SSTK065168-69, at 065168 (Shutterstock avoided "overlap" with PMC in photographing events)).

28.     Shutterstock elected to use its own credentials instead of PMC credentials for at least 80 events in New York between 2018 and 2020. (2018 PMC Credentials Spreadsheet, PMC_0019400 (31 events); 2019 Spreadsheet, PMC_0019418 (42 events); 2020 NY Spreadsheet, PMC_0019399 (9 events); this information was not preserved for LA events; *see also,* Deposition of Benjamin Melvin ("Melvin Tr.") 12:11-14:11, 17:14-18:20, 22:25-25:1, 74:9-75:16; *e.g.*, Melvin Google Docs notification, dated Nov. 13, 2018, SSTK065144; *see also supra* ¶¶ 16-17).

29.     By early 2020, Shutterstock stopped covering various Third Party Events using PMC credentials, like the events listed in Schedule D of the Agreement, and instead covered them with its own credentials. (Walter Tr. 217:10-13. ("At this point in the relationship, it was pretty clear that Shutterstock was no longer interested in fulfilling some of our most important credentials."); (Email from Walter dated Jan. 31, 2020, SSTK108869-71, at 108869 ("The pattern definitely has been that team SSTK isn't interested in [PMC] credentials from major events, like the Globes and Oscars, even though these credentials are increasingly rare.")); 2019 Shutterstock Spreadsheet of Editorial Event Coverage SSTK168725; Deposition of Candice Murray ("Murray Tr.") 683:23-686:8 (By 2019, Shutterstock had its own credentials for each of

the events listed on Schedule D to the Agreement)); Email from Granato dated Aug. 13, 2018, SSTK052379-81, at 052379 ("we are getting a lot of the same credentials that they are now"); Murray Tr. 66:18-67:7, 69:2-7 (agreeing with statement in 2018 that Shutterstock is "getting a lot of the same credentials that [PMC is] now"); Shutterstock, on its own, received "near-perfect placement" for its photographers "for every single event this [early 2020 awards] season," based upon "the relationships Shutterstock ha[d] built with all the event organi[z]ers" during the PMC partnership. (Email from Barrett, dated Feb. 5, 2020, SSTK109975-77, at 109976).

30.    PMC raised the issue of Shutterstock using its own credential to cover Third Party Events instead of the PMC credential and "there was an ongoing back and forth." (Walter Jan. 18, 2022 Tr. 218:13-14; *see also id*. at 220:6-10 ("We certainly had any number of conversations about this topic related to both third-party events and PMC events.")); Email from K. Walter to C. Murray, dated Jan. 31, 2020, SSTK024480 ("Candice, an agenda point for our meeting. The pattern has definitely been that team SSTK isn't interested in our credentials from major events, like the Globes and Oscars.")).

31.    PMC had between two and five staff photographers from 2015 to 2020. (*See* Walter Tr., dated Jan. 18, 2022, 83:3).

32.    At times PMC covered multiple events in one night. *E.g.*, Walter Decl. ¶__; Deposition of Michael Buckner (Buckner Tr.) 98:4-9 (describing Princess and the Frog and Paleyfest occurring at the same time).

33.    When SSTK declined to cover an event, PMC could send one of its photographers, but then that photographer was not available to shoot other events.  Walter Decl. ¶__; Email from K. Walter to J. Lavet, Fx Networks, dated Aug. 6, 2019, PMC_0009310-11, at

0009310 ("Unfortunately we are limited in our staffing right now so have to use pickup from our partners").

34.     When Shutterstock covered an event using its own credential instead of a PMC credential, PMC lost ownership of photographs that Shutterstock took at the events; a percentage of licensing revenue earned from Shutterstock's exploitation of such works during the contract term; and the ability to exploit those images after the contract term ended. Agreement. §§ 3(c), 6; Walter Tr. 597:7-19 ("When Shutterstock refused our credentials to attend events, third party events, while securing coverage from other groups which denied us IP and long-term revenues opportunities as well as potentially credentials in the future.").

Dated: New York, New York          SHAPIRO ARATO BACH LLP
      March 28, 2022

                                   By: __/s/ Cynthia S. Arato_____
                                      Cynthia S. Arato

                                   500 Fifth Avenue, 40th Floor
                                   New York, NY 10110
                                   Telephone: (212) 257-4882
                                   Facsimile: (212) 202-6417
                                   carato@shapiroarato.com

                                   *Attorneys for Plaintiff Penske Media Corporation*