**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
PENSKE MEDIA CORPORATION,          :
                                        :
                                        :     No. 20 Civ. 4583 (MKV)
                      Plaintiff,     :
                                        :
                                        :
                     v.             :
                                        :
SHUTTERSTOCK, INC.,                :
                                        :
                    Defendant.   :
-------------------------------------------------------------x

## **PLAINTIFF PENSKE MEDIA CORPORATION'S**
## **MOTION FOR SUMMARY ADJUDICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

    The Agreement .............................................................................................................. 4

    Shutterstock obtains incalculable benefits from the Agreement .................................. 5

    Shutterstock sours on the Agreement .......................................................................... 6

    Shutterstock cynically invokes the pandemic to end the Agreement .......................... 6

ARGUMENT ..................................................................................................................... 10

    I.    SHUTTERSTOCK WRONGFULLY TERMINATED THE AGREEMENT ................. 10

        A. Shutterstock Cannot Prevail on Its Frustration of Purpose Defense ............................... 10

            1.    Shutterstock continued to benefit from the Agreement which, at most, was only "partially" frustrated ......................................................................................... 10

            2.    Shutterstock would have entered into the Agreement even if it had known in 2015 that the pandemic and its consequences would occur. .................................. 14

            3.    Shutterstock foresaw the possibility of a precipitous drop in revenue and assumed the risk of that occurrence ......................................................................... 15

        B. Shutterstock Cannot Prevail on Its Failure of Consideration Defense ............................. 15

        C. PMC Did Not Breach the Agreement by "Failing" to Provide Shutterstock with Access to Live Events Prohibited by Government Mandates ......................................... 16

    II.    PMC IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABLITY ON ITS COPYRIGHT CLAIM ................................................................................................. 21

    III.    THE COURT SHOULD GRANT JUDGMENT TO PMC ON SHUTTERSTOCK'S COUNTERCLAIMS .................................................................................................... 22

        A. Shutterstock's Claims for Rescission and Restitution Fail as a Matter of Law .............. 22

        B.    Shutterstock's Claim for Breach of Contract Fails as a Matter of Law ........................ 23

C.  Shutterstock's Claims for Violations of the Computer Fraud Abuse Act and Breach of  Shutterstock Website's Terms of Use Fail as a Matter of Law ................................. 23

CONCLUSION..................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*1140 Broadway LLC v. Bold Food, LLC*,
No. 652674/2020, 2020 WL 7137817 (N.Y. Sup. Ct. Dec. 3, 2020) ...................................... 12

*35 E. 7th St. Corp. v. Christian Louboutin L.L.C.*,
No. 154883/2020, 2020 WL 7315470 (N.Y. Sup. Ct. Dec. 9, 2020) ...................................... 11

*3Com Corp. v. Banco do Brasil, S.A.*,
171 F.3d 739 (2d Cir. 1999)................................................................................................... 17

*605 Fifth Property Owner, LLC v. Abasic, S.A.*,
No. 21cv811 (DLC), 2022 WL 683746 (S.D.N.Y. Mar. 8, 2022).......................................... 16

*Abrams v. N.Y.C. Dep't of Educ.*,
No. 20-CV-5085 (JPO), 2022 WL 523455 (S.D.N.Y. Feb. 22, 2022) ................................... 11

*Arista Recs., LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)................................................................................................... 22

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)................................................................................................... 22

*CAI Rail, Inc. v. Badger Mining Corp.*,
No. 20 Civ. 4644 (JPC), 2021 WL 705880 (S.D.N.Y. Feb. 22, 2021) ................................... 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................................... 12

*City of New York v. Long Island Airports Limousine Serv. Corp.*,
96 A.D.2d 998 (3d Dep't 1983)............................................................................................. 15

*City of New York v. N.Y. Pizzeria Delicatessen, Inc.*,
No. 05 CV2754 (KMK), 2006 WL 2850237 (S.D.N.Y. Sept. 29, 2006) ............................... 23

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.*, 232 F.3d 153 (2d Cir. 2000) ..................................................... 17

*Crown IT Servs., Inc. v. Koval-Olsen*,
11 A.D.3d 263 (1st Dep't 2004) ............................................................................................ 10

*Dr. Smood N.Y. LLC v. Orchard Houston, LLC*,
No. 652812/2020, 2020 WL 6526996 (N.Y. Sup. Ct. Nov. 2, 2020)................................ 11, 12

*Est. of John Lennon v. Leggoons, Inc.*,
   Nos. 95 Civ. 8872 (HB), 96 Civ 0020(HB), 1997 WL 346733 (S.D.N.Y. June 23, 1997) ...... 23

*Framework MI, Inc. v. CVS Health Corp.*,
   No. 20 Civ. 907 (NRB), 2021 WL 2403365 (S.D.N.Y. June 11, 2021) .................................. 25

*Gap Inc. v. Ponte Gadea N.Y., LLC*,
   524 F. Supp. 3d 224 (S.D.N.Y. 2021) ............................................................................ 11, 15

*In re Kolinsky*,
   110 B.R. 128 (S.D.N.Y. Bankr. 1990) .................................................................................. 23

*In re: Ampal-Am. Israel Corp.*,
   No. 15-CV-7949 (JSR), 2016 WL 859352 (S.D.N.Y. Feb. 28, 2016) ..................................... 14

*Jobim v. Songs of Universal, Inc.*,
   732 F. Supp. 2d 407 (S.D.N.Y. 2010) ................................................................................... 17

*Jorgensen v. Epic/Sony Recs.*,
   351 F.3d 46 (2d Cir. 2003) .................................................................................................... 22

*Leibowitz v. Cornell Univ.*,
   584 F.3d 487 (2d Cir. 2009) .................................................................................................. 25

*Mayweather Promotions, LLC v. PAC Ent. Worldwide LLC*,
   No. 21-CV-4378, 2022 WL 3997014 (S.D.N.Y. Sept. 1, 2022) ............................................. 10

*ML Genius Holdings LLC v. Google LLC*,
   No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022) ....................................................... 25

*Newman v. Comm'r*,
   902 F.2d 159 (2d Cir. 1990) .................................................................................................. 16

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ............................................................................................... 25

*Noland v. Janssen*,
   No. 17-CV-5452 (JPO), 2020 WL 2836464 (S.D.N.Y. June 1, 2020) .................................... 22

*Omni Quartz, Ltd. v. CVS Corp.*,
   287 F.3d 61 (2d Cir. 2002) .................................................................................................... 13

*R. Dwight Harris v. Royal Chrysler/Oneonta Inc.*,
   240 A.D.2d 804 (3d Dep't 1997) ........................................................................................... 17

*Realty Corp. v. Jugobanka, D.D.*,
  No. 95 CIV. 0323 RJW, 1998 WL 702272 (S.D.N.Y. Oct. 8, 1998) ........................................ 15

*Rebecca Broadway Ltd. P'ship v. Hotton*,
  143 A.D.3d 71 (1st Dep't 2016) ................................................................. 23

*Reed v. Luxury Vacation Home LLC*,
  No. 20 Civ. 4243 (PGG), 2022 WL 4624839 (S.D.N.Y. Sept. 30, 2022) ............................... 20

*Rekor Sys., Inc. v. Loughlin*,
  No. 19-CV-7767 (LJL), 2022 WL 789157 (S.D.N.Y. Mar. 14, 2022) ..................................... 24

*Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am.*,
  677 F. Supp. 721 (S.D.N.Y. 1987) ............................................................. 11

*Rosen v. eBay, Inc.*,
  No. CV 13–6801 MWF (Ex), 2015 WL 1600081 (C.D. Cal. Jan. 16, 2015) ........................... 22

*Rudman v. Cowles Commc'ns, Inc.*,
  30 N.Y.2d 1 (1972) ......................................................................... 17

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ................................................................. 25

*Shepley v. New Coleman Holdings Inc.*,
  174 F.3d 65 (2d Cir. 1999) .................................................................. 17

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
  467 F.3d 107 (2d Cir. 2006) ................................................................. 17

*United States v. Gen. Douglas MacArthur Senior Vill., Inc.*,
  508 F.2d 377 (2d Cir. 1974) ................................................................. 11

*Valentino U.S.A., Inc. v. 693 Fifth Owner LLC*,
  203 A.D.3d 480 (1st Dep't 2022) ............................................................. 15

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ...................................................................... 24

**Statutes**

18 U.S.C. § 1030(a)(2) ........................................................................ 24

18 U.S.C. § 1030(e)(8), (11) ................................................................... 24

## INTRODUCTION

This action concerns Shutterstock Inc.'s cynical invocation of the COVID-19 pandemic to wrongfully terminate the parties' Archive & Event Image Hosting and Licensing Agreement to avoid paying Penske Media Corporation ("PMC") millions of dollars under the Agreement.

PMC is a digital media and publishing company that covers the entertainment and fashion industries through iconic and well-known brands such as *Women's Wear Daily* and *Variety*. (¶ 1).[1] Through these publications, PMC obtains access to photograph various events hosted by third parties and holds its own events which photographers attend and cover. PMC also owns and controls a photography collection related to its iconic brands. (¶ 2).

Shutterstock owns and operates a website that historically licensed commercial digital imagery—a.k.a. "stock" photographs—to third parties. (¶¶ 4-5). Shutterstock entered into the Archive & Event Agreement in 2015, for a six-year term, as part of a plan to gain "credibility in the market for editorial content" and transform itself from a provider of low value "stock" photographs to a purveyor of prestigious news and editorial content. (¶¶ 14, 17). On the "Archive" side of the Agreement, PMC granted Shutterstock exclusive rights to license images from PMC's photography collection, including PMC's pre-existing historic archive as well as new images. On the "Event" side, PMC agreed to (1) provide Shutterstock with its access to photograph various events hosted by others, (2) have Shutterstock photograph PMC-hosted events, and (3) grant Shutterstock exclusive rights to license the resulting images to third parties. In exchange for its entrée into this coveted world of editorial imagery, Shutterstock agreed to pay PMC lucrative sums over a six-year period. Shutterstock also agreed to pay for photographers to cover events and to credit PMC $1 million annually toward licensing Shutterstock-owned

---

[1] Citations to "¶__" refer to PMC's 56.1 statement.

images.

Before this dispute arose, Shutterstock publicly acknowledged PMC's credibility, influence, and access with helping it to successfully launch its editorial business. However, by early 2020, Shutterstock already had leveraged its relationship with PMC to achieve its broader goals, and it resented the financial and other terms to which it had agreed to gain its foothold in the editorial marketplace. In particular, Shutterstock had lost millions of dollars on the deal prior to the pandemic and was poised to lose millions more, all irrespective of the pandemic.

Accordingly, just days after the pandemic hit, Shutterstock decided to exploit the crisis to get out of the deal. The Chief of Shutterstock's Editorial Division immediately concluded that the pandemic "is an opportunity to do a good deal with them [PMC]" because "this is not a good contract"; Shutterstock's outgoing CEO stated "insane how that contract is all them," "this time tables have to turn," and "we have to be hard on them and not give in"; and Shutterstock's incoming CEO declared that the company was "not going to pay anything" to PMC under the Agreement so it could amass "another huge savings." Relying on the pandemic, Shutterstock demanded that PMC strike a new deal under which Shutterstock would retain all its rights under the Agreement—including the *exclusive* right to license PMC-related images through the final year of the Agreement's term and beyond—while drastically reducing or eliminating its own obligations and thus saving millions of dollars. In other words, Shutterstock sought to benefit from a continued contractual relationship with PMC while avoiding all the accompanying, *non-pandemic related* losses.

After PMC declined Shutterstock's overreach, Shutterstock formally invoked the pandemic as a pretext to wrongfully terminate the deal. Shutterstock thereby breached its remaining obligations, including by failing to pay PMC $3.5 million due under the Agreement

and to provide PMC the $1 million credit to license non-PMC images from Shutterstock.

PMC does not dispute that COVID-19 caused the suspension of a significant number of live events that both parties expected to photograph under the Agreement, but those suspensions do not, as a matter of law, justify Shutterstock's unilateral termination.

Shutterstock cannot justify its termination based on any "frustration of purpose" defense. To prevail on that defense, Shutterstock must prove that COVID-19 caused a *complete destruction* of the Agreement, yet the most Shutterstock can prove is a *partial* impairment given that it received significant benefits under the Agreement between 2015 and when the pandemic hit, and continued to receive benefits even after that which the pandemic did not curtail. Further, Shutterstock cannot demonstrate that the pandemic meaningfully increased, or would have meaningfully increased, the losses it would have suffered under the Agreement had the pandemic not occurred. Those circumstances do not constitute a frustration of purpose.

Shutterstock also cannot justify its termination by claiming that PMC "breached" the Agreement by "failing" to ensure that live events were held during the pandemic for Shutterstock to photograph. The Agreement obligated PMC to provide Shutterstock with the access that PMC actually had to attend events which third parties actually held; the Agreement did *not* obligate PMC to ensure that such events did, in fact, occur; a task Shutterstock knew was beyond PMC's control when Shutterstock entered into the Agreement. The Agreement also obligated PMC to invite Shutterstock to attend public events that PMC hosted. PMC did not "breach" these obligations when government orders prohibited in-person events.

This Court should grant summary judgment to PMC on its First Claim for Relief for Breach of Contract and on Shutterstock's mirror-image First, Second, and Third Counterclaims for rescission, restitution, and breach. This Court also should grant summary judgment to PMC

on the liability portion of PMC's Fourth Claim for Relief for Copyright Infringement and

Shutterstock's Fourth and Fifth Counterclaims for violation of the Computer Fraud and Abuse

Act and Breach of Shutterstock's Website's Terms of Use.

## FACTUAL BACKGROUND

<u>The Agreement</u>

Shutterstock and PMC entered into the Archive & Event Image Hosting and Licensing

Agreement effective July 1, 2015, for a six-year term ending June 30, 2021. (¶¶ 6-7).

On the "Archive" side, PMC granted Shutterstock exclusive rights to license images from

PMC's photography collection, including PMC's pre-existing historic archive. (¶¶ 8-11). On the

"Event" side, PMC agreed to provide Shutterstock with certain access to photograph live events

hosted by others ("Third Party Events") and by PMC ("PMC Events"). (¶¶ 12-13).

For Third Party Events, the Agreement states that PMC will provide Shutterstock with

"defined credentials, passes, and VIP access to significant events around the world to which

PMC has access as defined herein." (¶ 13). The Agreement further provides that "[t]hese Third

Party Events shall initially include, but not be limited to, those events listed on Schedule D."

(*Id*.). Schedule D, in turn, lists 12 well-known "red carpet" entertainment events, such as The

Grammy Awards, The Venice Film Festival, and the Emmy Awards. (*Id*.). For PMC Events,

PMC agreed to provide Shutterstock with "access to [PMC's] event functions to which third

parties are invited generally." (¶ 12).

The parties agreed that PMC would be the copyright owner of the images captured at

these events, even if they were shot by Shutterstock photographers, and PMC gave Shutterstock

exclusive rights to license those images to third parties. (¶ 26).

In exchange, Shutterstock agreed to pay PMC royalties from Shutterstock's licensing of

PMC's images and annual, recoupable, but not refundable, advances against those royalties. (¶¶ 22, 23). The advances started at $1.5 million and escalated to $3.5 million, and PMC was entitled to retain 100% of the advances even if they exceeded PMC's royalty earnings for any given period. (¶¶ 23, 24.). During the contract negotiations, Shutterstock asked for the right to terminate the Agreement if the royalty earnings fell significantly below the advances, but PMC rejected that term, and Shutterstock entered into the Agreement without that protection. (¶¶ 29-31). (Shutterstock referred to the advance payments internally and with PMC as a "Minimum Revenue Guarantees" or "MRGs." (¶ 23A)). Shutterstock also agreed to (1) give PMC an annual $1 million credit toward licensing non-PMC images from Shutterstock (¶ 25); (2) help fund PMC's digitization of its historic archive (¶ 25A); and (3) supply photographers, at Shutterstock's expense, to photograph PMC Events, and to bear the costs of covering any Third Party Events it covered. (¶ 26).

<u>Shutterstock obtains incalculable benefits from the Agreement</u>

Shutterstock benefitted immensely from the Agreement. As Shutterstock's lead negotiator explained, in 2015, Shutterstock "was known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, [or] anyone in the entertainment and fashion world." (¶ 16). Shutterstock thus viewed the Agreement as "an investment in the long-term growth of Shutterstock" with an "intangible," "meaningful, business impact," which would "add to Shutterstock's reputation in the editorial space," "open up new business opportunities," and "improve the overall relationship between Shutterstock and its customers." (¶¶ 33-34)

Before this dispute arose, Shutterstock publicly boasted of those benefits. In mid-2015, Shutterstock's CEO stated that the deal would "accelerate [Shutterstock's] progress in editorial imagery." (¶ 19). In 2016, Shutterstock reported in SEC filings that the deal gave it "credibility

in the market for editorial content that will allow us to further grow our product offerings." (¶ 20). In a 2017 Company Overview presented to underwriters, Shutterstock identified its "partner[ship] with PMC" as one of two future "growth drivers" in the "editorial" space. (¶ 21). Internally, Shutterstock shared that "PMC was instrumental in gaining access to events for SSTK in the early years of the deal." (¶ 36).

<u>Shutterstock sours on the Agreement</u>

Despite the above benefits, Shutterstock soured on the deal well before the pandemic hit. Although Shutterstock had been willing to run its new businesses "at a loss" (¶ 32) and accepted the Agreement's payment terms to gain a foothold in the editorial marketplace (¶¶ 33-34), Shutterstock began to resent the deal's economics once it had accomplished its goals. By 2019, Shutterstock believed it had "established its brand in the market" and was "increasingly securing [its] own editorial credentials to events," which "resulted in less of a need for leaning on PMC." (¶ 36). Shutterstock also viewed its event coverage obligations under the Agreement as an "enormous distraction for our production teams," which "results in us spending more money to produce lots of content that they wind up owning." (¶¶ 83-84). Additionally, Shutterstock labeled the Minimum Revenue Guarantee a "value proposition loser for Shutterstock." (¶ 86).

Because of these perceived burdens, Shutterstock twice tried to renegotiate the Agreement in 2019, but PMC declined to amend the agreed-upon terms. (¶¶ 81, 87, 88). Thus, when the pandemic hit in 2020, Shutterstock pounced at the chance to exploit the crisis to revise the terms.

<u>Shutterstock cynically invokes the pandemic to end the Agreement</u>

On March 24, 2020, just *one week* after the pandemic first meaningfully impacted the United States, Candace Murray, Chief of Shutterstock's Editorial Division, wrote to Jon Oringer,

Shutterstock's founder and then-CEO who had spearheaded the Agreement, that the pandemic "is an opportunity to do a good deal with them" because "it is not a good contract." (¶¶ 90, 92). Oringer agreed, responding that it is "insane how that contract is all them," "this time tables have to turn," and "we have to be hard on them and not give in." (*Id.*). Murray and Oringer identified these goals even after Oringer asked Murray "do we have any legal recourse" because "they can't be providing us anything," and Murray answered, "no legal recourse." (¶ 91). Oringer probed this point a second time, asking "legally will we be able to [get some relief on the MRG]? or they have to agree?" and Murray responded, "they have to agree." (*Id.*).

Stan Pavlovsky, Shutterstock's then COO, replaced Oringer as CEO on April 1. (¶ 94). On March 31, he learned the Editorial Division's 2020 was forecast to lose millions of dollars and questioned Murray about the shortfall. (¶ 96). Murray responded that Shutterstock "need[s] the relief from PMC to get back to what the P&L looked like in December from a margin standpoint." (*Id.*). Murray later explained: "a WIN would be to waive the upcoming MRG and start a new deal on July 1st that is agreeable from an MRG and production standpoint." (¶ 99).

Shutterstock quickly set out to accomplish this goal. On March 31—the very same day that Pavlovsky raised his budgetary concern—Shutterstock sent PMC a "proposal" for a renegotiated deal that allowed all the Agreement's benefits to continue to flow to Shutterstock but cut by at least 50% Shutterstock's upcoming MRG payment obligation and drastically reduced its coverage obligations and related expenses. (¶¶ 97, 100). Although Shutterstock professed to seek this relief *because of the pandemic* (¶¶ 90, 100), Shutterstock made no effort to analyze *the pandemic's impact* on the deal. (¶ 106). Rather, in the proposal, Shutterstock calculated that it had lost $7.2 million on the deal between 2015 and 2019 (*i.e.*, *before the pandemic*) and projecting that, *absent the pandemic*, it was on track to lose another $4.3 million

through the end of Agreement's term, its highest annualized losses since inception. (¶ 93).

Shutterstock presented two alternatives to stem these losses, each of which assumed the pandemic would last six months. (¶¶ 98, 100). Under the first, the $3.5 million MRG due July 1 would be cut by 50%; Shutterstock's production costs would be capped at $60,000 for Q4 2020; and a renewal discussion would commence in Q1 2021. Under the second, Shutterstock would terminate the Agreement for a $1 million kill fee and the parties would negotiate a new three-year agreement effective July 1, 2020, in which the annual MRGs would be slashed to $500,000 and Shutterstock's production costs would be cut by 50% to no more than $150,000 per year. PMC would retain its $1 million credit under both alternatives. (*Id.*). By extinguishing or drastically reducing its payment and event coverage obligations, Shutterstock sought to secure a better deal *because* of the pandemic than it would have had *absent* the pandemic.

Shutterstock's internal communications indicated that it had little intention of negotiating. On April 8, before PMC even responded, Murray was "basically told we're going to walk away from PMC all together", a move she shared internally would be a breach of the Agreement. (¶ 100B). By April 13, Murray was investigating how quickly Shutterstock could shut down PMC's user accounts and remove PMC content from its website. (¶ 100C). Pavlovsky told Oringer on April 14 that Shutterstock was "not going to pay anything" to PMC, which, he crowed the next day, would result in "another huge savings for [the Company]." (¶ 102).

Pavlovsky thus sent PMC an updated proposal on April 29 offering even worse terms. (¶ 103). Under that proposal, Shutterstock would still receive the same benefits as under the existing Agreement *and those rights would be extended for another two years*, but Shutterstock would no longer pay *any* portion of the MRG; would no longer provide the $1 million credit towards PMC's licensing of Shutterstock images (and PMC would be barred from licensing

images from any other source); and would stop providing event coverage at its own expense. (*Id.*). When PMC asked for clarification regarding Shutterstock's drastic change of position, Pavlovsky confirmed: "we are not committing to any part of the minimum guarantee." (¶ 104).

Shutterstock, moreover, brushed off PMC's offer to extend the existing Agreement's term for no additional payment from Shutterstock (to allow time for live events to return and compensate for the suspension of live events) and to defer half of the upcoming $3.5 million MRG payment until the following year. (¶¶ 101-02).

Shutterstock sent PMC termination notices on May 18 and July 2, 2020 (¶ 105) contending that the pandemic had frustrated the purposes of the Agreement or, in the alternative, that PMC had failed to perform by not providing Shutterstock with access to new live events and, thus, the resulting photographs, during the pandemic shutdown. (*Id.*).

In these notices, Shutterstock claimed that COVID-19 had frustrated the purpose of the Agreement, even though (1) Shutterstock made no effort to analyze the pandemic's impact on the deal either in March, when it sent its initial demand to PMC, or in July, when it terminated the Agreement (¶ 106); and (2) Shutterstock continued to benefit from the Agreement during the pandemic in a variety of ways. For instance, when Shutterstock sent its first termination notice, Shutterstock already had received 2.5 million premium fashion and entertainment images from PMC, including 1.4 million digitized images from PMC's historic archive (*see* ¶¶ 27, 41, 149) and, during the pandemic, Shutterstock kept all those images on its website "readily available" for its customers to license. (¶¶ 42, 59). Between March and July 2020, while the pandemic was in effect and before Shutterstock terminated the Agreement, Shutterstock accepted additional images from PMC. (¶ 52; *see e.g., ¶* 120). Shutterstock's website continued to tout PMC content as "world class content" from "industry leaders." (¶ 43; *see also id.* (highlighting "PMC

collections" in a May 18, 2020 business pitch)). And Shutterstock continued to license that content to third parties, earning "just under a hundred thousand dollars" from four months' worth of "licensing activity during the pandemic period" (¶¶27, 60), while simultaneously no longer having to incur production costs of $300,000 per year to cover live events. (¶¶ 64, 66).

## ARGUMENT

### I.   SHUTTERSTOCK WRONGFULLY TERMINATED THE AGREEMENT

It is undisputed that Shutterstock prematurely terminated the Agreement as of July 17, 2020. As a result, Shutterstock withheld payment of the final $3.5 million MRG due to PMC by July 1, 2020 and deprived PMC of $1 million dollars' worth of licensing credits. Shutterstock had no valid basis to terminate the Agreement; consequently, its termination was wrongful and constitutes a breach. *Mayweather Promotions, LLC v. PAC Ent. Worldwide LLC*, No. 21-CV-4378, 2022 WL 3997014, at *8 (S.D.N.Y. Sept. 1, 2022). Shutterstock's affirmative defenses—frustration of purpose, failure of consideration, and breach—fail as a matter of law.

### A. Shutterstock Cannot Prevail on Its Frustration of Purpose Defense

Shutterstock cannot prevail on its frustration of purpose defense because it (1) cannot demonstrate that COVID-19 "completely destroyed" the Agreement's purposes; (2) admitted that it would have entered into the Agreement in 2015 had it known that a pandemic would occur in 2020; and (3) foresaw the risk that its earnings could precipitously decline and agreed to forego any right to terminate the Agreement based on that occurrence.

    1.   Shutterstock continued to benefit from the Agreement which, at most, was only "partially" frustrated.

The frustration of purpose "doctrine is a narrow one" (*Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263, 265 (1st Dep't 2004)) that cannot be invoked unless "there [is a] complete destruction of the basis of the underlying contract" (*Dr. Smood N.Y. LLC v. Orchard Houston,*

*LLC*, No. 652812/2020, 2020 WL 6526996, at *2 (N.Y. Sup. Ct. Nov. 2, 2020). "Discharge

under this doctrine has been limited to instances where a[n] . . . event renders the contract

*valueless* to one party." *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d

377, 381 (2d Cir. 1974) (emphasis added); *see also CAI Rail, Inc. v. Badger Mining Corp.*, No.

20 Civ. 4644 (JPC), 2021 WL 705880, at *9 (S.D.N.Y. Feb. 22, 2021) ("foundation of the

contract" must be "destroy[ed]"); *Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am.*, 677 F.

Supp. 721, 728-29 (S.D.N.Y. 1987) ("the circumstance that has ceased to exist" must be "the

foundation of the *entire* contract" (emphasis added)). "[P]artial frustration . . . is insufficient to

establish the defense." *Dr. Smood N.Y. LLC*, 2020 WL 6526996, at *2.

    Given this exceedingly high bar, New York courts have consistently rejected attempts by

defendants to rely on the pandemic to evade their contractual obligations, even where the

pandemic inflicted significant economic harm. *See, e.g.*, *Abrams v. N.Y.C. Dep't of Educ.*, No.

20-CV-5085 (JPO), 2022 WL 523455, at *3 (S.D.N.Y. Feb. 22, 2022) ("[T]emporary and

evolving restrictions . . . wrought by the public health emergency do not warrant recission or

other relief based on frustration of purpose." (citation omitted)); *Gap Inc. v. Ponte Gadea N.Y.,

LLC*, 524 F. Supp. 3d 224, at *235-36 (S.D.N.Y. 2021) (no frustration even where store location

suffered "particularly adverse financial consequences" from pandemic due to "precipitous

decline in foot traffic and office workers"); *35 E. 7th St. Corp. v. Christian Louboutin L.L.C.*,

No. 154883/2020, 2020 WL 7315470, at *2 (N.Y. Sup. Ct. Dec. 9, 2020) ("[U]nforeseen

economic forces, even the horrendous effects of a deadly virus, do not automatically permit the

Court to simply rip up a contract signed between two sophisticated parties."); *1140 Broadway

LLC v. Bold Food, LLC*, No. 652674/2020, 2020 WL 7137817, at *2 (N.Y. Sup. Ct. Dec. 3,

2020) (no frustration of lease even where "tenant's business was devastated by [the] pandemic");

*Dr. Smood N.Y. LLC*, 2020 WL 6526996, at *2 (no frustration where leased space was "wholly inaccessible" from March through July 2020 and "partially inaccessible" thereafter).

Here, while the pandemic prevented Shutterstock from obtaining new images from new live events for a period, nothing about the pandemic impaired Shutterstock's ability to exploit the other images it already had received, and would continue to receive, from PMC. To the contrary, (1) Shutterstock kept 2.5 million pre-existing PMC images on its website "readily available" for Shutterstock's customers to license; (2) accepted delivery of new images from PMC; (3) touted PMC content on its website; (4) licensed pre-existing PMC images to paying customers; and (5) earned "just under a hundred thousand dollars" of gross revenue from that licensing activity while saving on production costs. (*See supra* pp. 9-10). In these circumstances, Shutterstock also cannot show that the pandemic meaningfully increased, or would have meaningfully increased, the losses it would have suffered under the Agreement had the pandemic not occurred.  *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (summary judgment proper on "issue on which nonmoving party bears the burden of proof" in the "absence of evidence to support the nonmoving party's case").

Shutterstock tries to push all these points aside by claiming that the Agreement had only *one* purpose—the generation of new images at new live events—which supposedly was entirely frustrated. But the Agreement's express terms (indeed, its very title) make clear that the Agreement had *two purposes*, one related to securing photos taken at new "events" and the other to the ongoing licensing of PMC's other images, including its existing and growing "archive." (¶¶ 9-14). Consequently, this Court previously recognized that "even a quick review of the Agreement reveals that the royalty advances are consideration not only for Shutterstock's production of new photographs but also for Shutterstock's efforts to market and license images

12

already in the Penske archive." (Dkt. 71 at 10). Shutterstock conceded this point in its May 18 termination letter, which described PMC's obligations under the Agreement to include "licensing rights to PMC archival content," and contended that "Shutterstock agreed to pay PMC . . . based on the value of *the entire package of PMC's above-listed obligations*." (¶ 105A (emphasis added)). In any event, Shutterstock cannot claim otherwise, given the Agreement's plain terms. *See Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("A party is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing." (cleaned up)).

Nothing about the pandemic diminished Shutterstock's rights or expectations related to this Archive side of the Agreement, regardless of (1) how much Shutterstock did or didn't "value" that body of work;[2] (2) how much revenue that archive did or didn't generate for Shutterstock over the life of the deal; or (3) how much of that archive PMC had or hadn't yet digitized or delivered to Shutterstock. Nor did the pandemic impair Shutterstock's right or ability to continue to license images previously captured at PMC Events and Third Party Events.

Furthermore, had Shutterstock not prematurely terminated the Agreement, it would have obtained images from about 100 live events through June 30, 2021 (the natural end of the Agreement's term) once live events resumed. These events would have yielded Shutterstock

---

[2] Shutterstock's lead negotiator admitted that Shutterstock entered into the Agreement because it viewed PMC as its "solution for U.S. entertainment and fashion access and archive content." (¶¶ 16, 18). After conducting "typical" diligence, Shutterstock deemed the archive "impressive" (¶¶ 47-48) and agreed to pay hundreds of thousands of dollars to help digitize that body of work (¶ 25A). Oringer testified that he was "hopeful" and "optimistic" about generating revenues from the archive. (¶ 49A). Both pre- and post-pandemic, Shutterstock identified the *WWD* and *Variety* archives on its website, along with just three other brands, as comprising "world class content" from "industry leaders." (¶ 43). When Murray learned that Shutterstock was going to terminate the Agreement, she expressed "concern" over the "loss" of the WWD archives. (¶ 51). Even Pavlovsky described the archive as a "valuable asset" in his April 29, 2020 proposal to PMC. (¶ 109).

approximately 12,000 new images. (¶ 58; *see also id.* (Arato Decl. ¶ 5)).

Finally, Shutterstock's contention that the suspension of live events destroyed the deal's purpose also ignores that it entered into the Agreement to help obtain the "credibility" it needed to successfully launch its new Editorial Division and the Agreement achieved this objective for Shutterstock, irrespective of the pandemic. For this, and all the foregoing reasons, Shutterstock's "frustration" defense fails as a matter of law.

2.  <u>Shutterstock would have entered into the Agreement even if it had known in 2015 that the pandemic and its consequences would occur.</u>

Shutterstock's frustration of purpose defense also fails because Shutterstock cannot demonstrate, as it must, that it "would have made little sense" for the Company to enter the Agreement, considering the pandemic. *Crown IT Servs.*, 11 A.D.3d at 265 ("In order to invoke this defense, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense."); *accord In re: Ampal-Am. Israel Corp.*, No. 15-CV-7949 (JSR), 2016 WL 859352, at *3 (S.D.N.Y. Feb. 28, 2016). Here, Shutterstock has admitted that it *would* have entered into the Agreement even if it had known in 2015 that live events would be suspended in 2020 due to the pandemic. When asked at his deposition if Shutterstock would have "walked away from [the] deal" in 2015 had it known it "wouldn't be getting live images from PMC during the period of time that the pandemic lasted," Oringer, Shutterstock's former CEO, said "No." (¶ 113).

Oringer continued, "I would have expected that…Jay [PMC's CEO] would have been a better person and worked with us through that period of time to help us figure out a way to generate value for both sides through the pandemic." (¶ 113). That additional testimony does not diminish Oringer's "No." To the contrary, it *confirms* that in 2015 Shutterstock was willing to

14

accept any number of risks related to the Agreement, including the referenced pandemic or pandemic-like situation, and to rely instead on a possible extra-contractual business solution.

        3.  <u>Shutterstock foresaw the possibility of a precipitous drop in revenue and assumed the risk of that occurrence.</u>

Shutterstock also cannot rely on the frustration of purpose defense because Shutterstock foresaw the possibility of significant annual losses under the Agreement and knowingly assumed the risk of that occurrence. *Sage Realty Corp. v. Jugobanka, D.D.*, No. 95 CIV. 0323 RJW, 1998 WL 702272, at *3 (S.D.N.Y. Oct. 8, 1998) ("If a contingency is reasonably foreseeable and the agreement nonetheless fails to provide protection in the event of its occurrence, the defense of commercial frustration is not available."). Here, during the negotiation of the Agreement, Shutterstock asked PMC for the right to terminate the Agreement if its revenues dropped below 50% of the MRG; PMC declined to afford Shutterstock that protection, and Shutterstock entered into the Agreement anyway. (¶¶ 28-31). That foreseeable loss, which Shutterstock anticipated sustaining *irrespective of the pandemic*, is not frustration of purpose.

**B. Shutterstock Cannot Prevail on Its Failure of Consideration Defense**

The doctrine of "failure of consideration" is closely related to "frustration of purpose," and Shutterstock's reliance on the doctrine fails for similar reasons. *See Valentino U.S.A., Inc. v. 693 Fifth Owner LLC*, 203 A.D.3d 480, 859 (1st Dep't 2022). In particular, "failure of consideration" cannot apply unless (1) the failure is complete, not "partial," *Gap Inc.*, 524 F. Supp. 3d at 238-39; (2) the contingency causing the failure was unforeseen, *City of New York v. Long Island Airports Limousine Serv. Corp.*, 96 A.D.2d 998, 999 (3d Dep't 1983); and (3) "it is clear that reasonable men would not have made the subject contract" had they understood the contingency would occur, *id*. Moreover, "failure of consideration" applies only where a promise

15

goes unfulfilled. *605 Fifth Property Owner, LLC v. Abasic, S.A.*, No. 21cv811 (DLC), 2022 WL 683746, at *5 (S.D.N.Y. Mar. 8, 2022). As set forth below, PMC fulfilled its promises.

### C. PMC Did Not Breach the Agreement by "Failing" to Provide Shutterstock with Access to Live Events Prohibited by Government Mandates

As a matter of law, this Court should find that the Agreement obligated PMC to provide Shutterstock with access only to those live events that actually were held and to which PMC actually had access. *See*, *e.g.*, *Newman v. Comm'r*, 902 F.2d 159, 162 (2d Cir. 1990) ("[T]he construction of written contracts is a question of law for the court." (cleaned up)). PMC satisfied that obligation, and, accordingly, Shutterstock had no valid basis to terminate the Agreement for PMC's supposed "breach" based on the pandemic-related suspension of live events.

For events that PMC hosted, PMC agreed to "provide Shutterstock access to its events, galas, conferences, summits, and other event functions *to which third parties are invited generally*." (¶ 12). For events hosted by others, PMC agreed to "provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world *to which PMC has access*." (¶ 13 (emphasis added)). There is only one way to read these qualifying "to which" phrases: PMC had to give Shutterstock access to (1) PMC Events that were, in fact, held and *to which* PMC invited others; and (2) Third Party Events *to which* PMC had access.

Shutterstock nevertheless contends that PMC promised that the events listed on Schedule D of the Agreement would always be held and that PMC always would have access to them because the Agreement provides that "Third Party Events shall initially include, but not be limited to, those events listed on Schedule D." (¶ 13). That language cannot reasonably be understood as a guarantee that PMC would have access to all these events for the entirety of the Agreement's six-year term, much less that the events would always take place, given that, by definition, Third Party Events are put on by other entities which PMC does not control. Rather,

16

the language recognizes that the Third Party Events to which PMC has access will evolve over time, which is why it states that Third Party Events shall "initially include" those listed on Schedule and not that the Third Party Events will "always include" those listed events.

Moreover, even if the Court finds the provision ambiguous, the Court should "resolve the ambiguity in the contractual language as a matter of law" in PMC's favor because "there is no extrinsic evidence to support [Shutterstock's] interpretation" and all such evidence—the drafting history, Shutterstock's admissions, and Shutterstock's pre-dispute interpretation—supports PMC's interpretation. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000); *accord Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (summary judgment is appropriate "when the language is ambiguous . . . but the extrinsic evidence creates no genuine issue of material fact" (citation omitted)); *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) (similar); *see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 126 (2d Cir. 2006) ("when a contract is ambiguous, the court may and should look to the prior negotiations of the parties to determine what was intended" (cleaned up) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972))); *R. Dwight Harris v. Royal Chrysler/Oneonta Inc.*, 240 A.D.2d 804, 806 (3d Dep't 1997) (evidence "of the negotiations leading up to [a contract's] execution may serve to resolve any ambiguities"); *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416-18 (S.D.N.Y. 2010) (relying on course of performance and other extrinsic evidence in finding no fact dispute over interpretation of ambiguous contract).

Both the drafting history and the admissions by Pfeiffer, Shutterstock's lead negotiator, demonstrate that the above "to which" clauses are "qualifications" that do not impose on PMC any absolute obligation to deliver events to Shutterstock for Shutterstock to photograph.

17

Shutterstock initially drafted the Third Party and PMC Event provisions without the qualifying "to which" clauses (¶ 109A); PMC added the qualifying language, which Shutterstock accepted (¶110); and Pfeiffer agrees that the language qualified PMC's obligations (¶¶ 110, 111).

For Third-Party Events, Pfeiffer conceded that "I understand that the [added] language 'to which PMC has access' is a qualification." (¶ 111). As he explained, while "we [Shutterstock] expected [PMC] to be able to get into any event of significance[,] I understand [the phrase] to be creating wiggle room in the event that they're blocked out of an event because some third-party, say Getty, causing a problem for Variety getting access to an event." (¶ 110). Shutterstock, moreover, knowingly accepted the risk this qualification entailed, as Pfeiffer stated:

> Q: Did you understand this addition to be providing some qualification that existed in the term sheet that Shutterstock proposed to PMC?
>
> A: I understand that the language… is a qualification, but I would add that we did not perceive this as business risk at the time.

(¶ 110; *see also id.* (we "didn't contemplate that as high risk")).

Because certain Third-Party Events were suspended and/or canceled during various points of the pandemic, and PMC was therefore "blocked out" of accessing such functions, PMC did not breach its obligations by not delivering Shutterstock access to those events. It is irrelevant that Pfeiffer identified a shut-out by Getty, and not a world-wide pandemic, as an example of PMC not having access to an event. Either way, Shutterstock understood that PMC was not guaranteeing Shutterstock access, without qualification, to events hosted by others, much less that third parties would hold these events for the next six years. PMC, instead, promised Shutterstock the access that PMC had, to events that actually took place.

Similarly, for the PMC Events, Pfeifer testified that the phrase "to which third parties are invited generally" is a qualifying phrase, pursuant to which PMC was not absolutely obligated to

hold PMC Events and was, instead, only to operate in good faith: "again, I understand 'to which third parties are invited generally' is a qualification," and "it's my understanding, if [PMC is] acting in good faith, we would be at every event where photographers are welcome…as determined by PMC themselves." (¶ 111). Because government orders barred PMC from holding events during the pandemic to which photographers would have been invited, and PMC acted in good faith in not welcoming photographers to events that could not be held, PMC did not breach any obligations to Shutterstock with respect to these types of events either.

In addition, pre-dispute, Shutterstock acknowledged that the Agreement did not require PMC to ensure that Third Party events took place which Shutterstock could attend. To the contrary, the parties maintained a joint scheduling document for Third Party Events that included specific color-coded categories for "PMC cancelled credential. Such did not obtain" and "Event cancelled." (¶ 111A). Thus, far from viewing a lack of access or canceled events as "breaches," the parties recognized and documented such occurrences as normal events that could happen in the ordinary course. Similarly, on numerous occasions over the course of the deal, PMC did not possess and was thus unable to provide access to Shutterstock for various Schedule D events, and Shutterstock did not contend PMC was in breach. (¶ 111B).

Moreover, in March and April 2020, Murray explained multiple times to her Shutterstock colleagues that PMC's inability to deliver new live events under the Agreement was *not* a breach of the Agreement and would not allow Shutterstock to obtain relief from its contractual obligations without PMC's consent. On March 24, Murray advised Oringer that Shutterstock had "no legal recourse" for PMC "not providing us anything" and PMC "ha[s] to agree" for Shutterstock to get any relief. (¶ 91). In response, Oringer (one of the deal's final decision makers) did not take issue with that conclusion, and instead complained that it is "insane how the

19

contract is all them." (¶ 91; *see also id.* ("we know this contract is pretty one-sided towards PMC"). On April 8, Murray reiterated that Shutterstock would breach the Agreement if it walked away from the PMC relationship. (¶ 100B).

The above statements, admissions, and course of performance under the Agreement support only one interpretation: PMC had no obligation to ensure that events were, in fact, held so that Shutterstock could attend and photograph them. PMC was, instead, obligated to provide Shutterstock with the access to Third Party Events that actually were held and to which PMC had access and to invite Shutterstock to those PMC Events to which third parties were invited. PMC did not breach either of those obligations.

Finally, even if PMC had made an absolute promise to deliver access to specific live events operated by third parties, PMC cannot be liable for any breach of such promise because (1) Shutterstock concedes that COVID-19-related restrictions would have made the performance of such promise impossible (¶ 112), and (2) where a performance is "objectively impossible," the breaching party cannot be liable as a matter of law, *e.g.*, *Reed v. Luxury Vacation Home LLC*, No. 20 Civ. 4243 (PGG), 2022 WL 4624839, at *16 (S.D.N.Y. Sept. 30, 2022) (citation omitted).

*     *     *

Shutterstock also complains that PMC did not negotiate with Shutterstock on "curing" the suspension of live events after Shutterstock sent its May 2020 termination notice, as provided for in Paragraph 8 of the Agreement. However, because that provision simply bars a party from terminating the Agreement for cause unless that party first gives written notice and a 45-day period to cure—and thus does not provide any independent basis to terminate where no such basis otherwise exists—Shutterstock's pleading does not seek to justify its termination on that provision, and it has no application here.

In any event, PMC made a good faith proposal to resolve Shutterstock's stated concerns: PMC offered to extend the existing Agreement's term for another year with no additional payment due from Shutterstock and to defer half of the upcoming $3.5 million payment until the following year. (¶ 101). But Shutterstock already had decided that it was "not going to pay anything" to PMC, even while continuing to receive benefits under the Agreement. (¶ 102). Shutterstock repeatedly told PMC it would not waiver from this position and rendered further dialogue futile. (*E.g.*, ¶ 104). Shutterstock also twice preemptively warned PMC that it should not bother to offer Shutterstock any other, additional photos as these would not be sufficient to "remedy" the purported breach. (¶ 108). Soon after that, Shutterstock terminated the Agreement. If anyone was not acting in good faith it was Shutterstock, not PMC.

For all these reasons, judgment should be granted in PMC's favor and PMC should be awarded $4.5 million in damages for Shutterstock's breach, along with pre-judgment interest.

## II.   PMC IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABLITY ON ITS COPYRIGHT CLAIM

PMC is entitled to summary judgment that Shutterstock infringed PMC's copyrights to images from the 92nd Annual Academy Awards and Los Angeles school closures because there is no dispute that (1) PMC owns a valid copyright in these works (¶¶ 116-19); and (2) Shutterstock continued to use and/or license these images without PMC's authorization between its premature termination of the Agreement on July 17, 2020 and September 16 or 17, 2020 (¶¶ 114, 120-22). *See Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003).

As the Court already has held, "[t]he law is clear that '[a] licensee acts outside the scope of a license, and hence may be held liable for copyright infringement, where it continues to use copyrighted material after the license expires.'" (Dkt. 71 at 13 (citation omitted)). Moreover, Shutterstock fails all fair use factors: (1) displaying PMC's photos on its website constitutes a

commercial and non-transformative use; (2) the images are original, creative photographs; (3) Shutterstock displayed the images in their entirety; and (4) Shutterstock's use usurps the licensing market for those works. *See Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 124 (2d Cir. 2010) (applying factors); *Blanch v. Koons*, 467 F.3d 244, 251-58 (2d Cir. 2006) (same). In addition, because Shutterstock had no authority to license PMC's content after July 17, 2020, Shutterstock cannot rely on cases finding "fair" the use of an image to facilitate a parties' "*legitimate*" sale of a copy of such work. *Rosen v. eBay, Inc*., No. CV 13–6801 MWF (Ex), 2015 WL 1600081, at *15-17 (C.D. Cal. Jan. 16, 2015) (emphasis added); *accord Noland v. Janssen*, No. 17-CV-5452 (JPO), 2020 WL 2836464, at *4 (S.D.N.Y. June 1, 2020).

## III.   THE COURT SHOULD GRANT JUDGMENT TO PMC ON SHUTTERSTOCK'S COUNTERCLAIMS

### A.   Shutterstock's Claims for Rescission and Restitution Fail as a Matter of Law

Shutterstock's counterclaims for rescission and "partial" rescission based on "frustration of purpose" or "failure of consideration" are essentially mirror images of PMC's affirmative breach claim and fail for the same reasons set forth above. (*See supra*, § I.A)

In any event, because Shutterstock continued with, and accepted benefits under, the Agreement through mid-July 2020 (*see supra* pp. 9-10), Shutterstock may not obtain retroactive "restitution" of one-third of the $3 million MRG Shutterstock paid PMC in 2019 (Dkt. 77 ¶ 58). *See, e.g*., ; *City of New York v. N.Y. Pizzeria Delicatessen, Inc.,* No. 05 CV2754 (KMK), 2006 WL 2850237, at *7 (S.D.N.Y. Sept. 29, 2006) ("When the non-breaching party elects to continue the contract, it is not freed from its obligations under the contract, despite the other party's breach." (cleaned up)); *Est. of John Lennon v. Leggoons, Inc*., Nos. 95 Civ. 8872 (HB), 96 Civ 0020(HB), 1997 WL 346733, at *1 (S.D.N.Y. June 23, 1997) (similar); *Rebecca Broadway Ltd. P'ship v. Hotton*, 143 A.D.3d 71, 81 (1st Dep't 2016) (After a breach, "the injured party must

make an election (between terminating and affirming the contract) and cannot at the same time

treat the contract as broken and as subsisting, for one course of action excludes the other."

(cleaned up)). Shutterstock is similarly barred from seeking restitution because it affirmed the

Agreement by suing PMC for its alleged breach. (Dkt. 77 ¶¶ 59-63). *In re Kolinsky*, 110 B.R.

128, 135 (S.D.N.Y. Bankr. 1990) ("A party who elects to rescind a contract cannot avoid the

contract for purposes of restitution and invoke it for purposes of recovering damages.").

**B.  Shutterstock's Claim for Breach of Contract Fails as a Matter of Law**

PMC has explained above (*see supra*, § I.C) why PMC did not breach the Agreement by

"failing" to deliver access to Shutterstock for live events during the pandemic.

Nor could any reasonable trier of fact conclude that PMC breached the Agreement by

failing in good faith to deliver sufficient images from its historic archive in the first four months

of 2020. (Dkt. 77 ¶¶ 59-63). The Agreement does not require PMC to deliver any specific or

minimum number of archive images in any single calendar year, much less during the first four

months of such a year. (*See* ¶¶ 10, 11, 144). Indeed, although the parties "never set up a regular

cadence of delivery" for such works (¶ 144), PMC had previously typically delivered archive

images in large tranches toward the end of each year (¶¶ 145-49). Consequently, Shutterstock

was not expecting a delivery of such works between January and April 2020. (¶ 144).

Shutterstock, moreover, claims no damages regarding this claim. (¶ 150).

**C.  Shutterstock's Claims for Violations of the Computer Fraud Abuse Act and Breach of Shutterstock Website's Terms of Use Fail as a Matter of Law**

Shutterstock cannot prevail on its claims that PMC violated the Computer Fraud Abuse

Act ("CFAA") and breached the Shutterstock website terms of use simply because, after

Shutterstock terminated the Agreement, an employee with *Rolling Stone* (a PMC brand)

downloaded a small number of images from Shutterstock's website using pre-termination login credentials that Shutterstock mistakenly failed to disable. (Dkt. 77 ¶¶ 64-76, ¶¶ 124-25).

Shutterstock's CFAA claim fails because Shutterstock has not suffered any cognizable "damage" or "loss" in the form of "technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 141 S. Ct. 1648, 1659-60 (2021) (citing 18 U.S.C. § 1030(e)(8), (11)); *Rekor Sys., Inc. v. Loughlin*, No. 19-CV-7767 (LJL), 2022 WL 789157, at *11 (S.D.N.Y. Mar. 14, 2022) (CFAA requires "'loss' related to damage or impairment of the target computer itself"). Shutterstock asserts no such "technological harm"; instead, it seeks to recover royalties it allegedly paid to contributors who supplied the downloaded images. (¶ 136).

Shutterstock's CFAA claim also fails because Shutterstock has no evidence that PMC "intentionally access[ed] a computer without authorization or exceed[ed] authorized access." 18 U.S.C. § 1030(a)(2). Rather, the downloading was a product of Shutterstock's own error and done with innocent intent. When Shutterstock disabled PMC's accounts upon its premature termination of the Agreement, it mistakenly failed to disable one account used by *Rolling Stone*. (¶¶ 125-27). At the same time, an employee of *Rolling Stone* missed reading an email labeled "URGENT. MUST READ" which the publication sent to applicable employees advising them of the impending termination and to use images from sources other than Shutterstock. (¶ 130). The employee mistakenly did not read the email, and therefore continued to download images from the Shutterstock website through the still open *Rolling Stone* account, in what she thought was the ordinary course. (¶¶ 128-29, 132-35). There was no "intentional" unauthorized access.

Shutterstock's related claim for breach of its website's Terms of Use prohibiting unauthorized use of its content also fails. First, Shutterstock's claim is preempted by the United

24

States Copyright Act. *See, e.g.*, *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022) (summary order) (breach of contract claim involving terms of service prohibiting various unauthorized uses "not qualitatively different from a copyright claim and is therefore preempted"); *Framework MI, Inc. v. CVS Health Corp.*, No. 20 Civ. 907 (NRB), 2021 WL 2403365, at *4 (S.D.N.Y. June 11, 2021) (contract claim premised on "improperly accessing and improperly copying" is "qualitatively indistinct from copyright infringement and is preempted"). Regardless, the only Terms of Use that Shutterstock produced are dated November 29, 2021 (¶ 139), so PMC could not have agreed to them when the *Rolling Stone* employee downloaded images in 2020. Shutterstock also has no evidence that the Terms of Use reflect a contract between Shutterstock and PMC. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound," *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (citation omitted), and there can be no mutual assent here because Shutterstock admits that when PMC employees logged onto Shutterstock's website, the Terms of Use did not appear. (¶ 140; *cf. Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 129 n.18 (2d Cir. 2012) (terms of use that a website user would not encounter until he or she "scrolled down multiple screens" are not enforceable); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (similar).[3]

## CONCLUSION

This Court should grant judgment for PMC on the Claims and Counterclaims described herein, and PMC should be awarded $4.5 million in damages, along with pre-judgment interest.

---

[3] Shutterstock's 30(b)(6) witness on damages could not substantiate Shutterstock's claimed damages from the alleged breach; he explained only that members of Shutterstock's legal department had told him the damages were at least $5,000. (¶ 136) Shutterstock also produced no documents evidencing any monetary loss. (¶ 138).

Dated:  New York, New York
        March 17, 2023

                              By:  */s/ Cynthia S. Arato*
                                   Cynthia S. Arato
                                   Shapiro Arato Bach LLP
                                   500 Fifth Avenue, 40th Floor
                                   New York, NY 10110
                                   (212) 257-4882
                                   carato@shapiroarato.com

                                   *Counsel for Penske Media Corporation*