UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PENSKE MEDIA CORPORATION,      :
         :
         :     No. 20 Civ. 4583 (MKV)
       Plaintiff,  :
         :
         :
     v.     :
         :
SHUTTERSTOCK, INC.,       :
         :
      Defendant.  :
----------------------------------------------------------------x

**PLAINTIFF PENSKE MEDIA CORPORATION'S
STATEMENT PURSUANT TO LOCAL CIV. R. 56.1**

Plaintiff Penske Media Corporation ("PMC"), by its attorneys, submits the following statement pursuant to Local Civil Rule 56.1:

**A. The Parties**

1. Plaintiff PMC is a digital media, publishing, and information services company. It publishes more than 20 digital and print brands covering the entertainment and fashion industries, including Women's Wear Daily ("WWD"), Variety, Deadline Hollywood, and others. (Ex. 73, Declaration of Karl Walter ("Walter Decl.") ¶ 2; Ex.1, Defendant Shutterstock Inc.'s Counterclaims, Dkt. No. 77 ("Counterclaims") ¶ 13 (second sentence)).

2. PMC owns a large and ever-growing photographic collection with millions of images related to its publications. (Ex. 73, Walter Decl. ¶ 3).

3. PMC's photographic collection includes historic fashion, celebrity, and event images, created over the last 100+ years, from the various PMC-owned

publications. (Ex. 2, Expert Report of Eric Rachlis, dated Dec. 16, 2021 ("Rachlis Report") ¶¶ 10-12, 27, 29, 30)).[1]

4.      Defendant Shutterstock, Inc. ("Shutterstock") described itself in 2016, and in this action, as a company that, among other things, owns and operates website platforms that license photographs to third parties for use on third party websites, publications, marketing materials, and corporate communications. (*See* Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218-345 at 22220; *see also* Ex.1, Counterclaims ¶¶ 11-12).

5.      Until 2015, Shutterstock was known primarily for its "stock" photographs, but it desired to enter the more prestigious realm of offering an editorial imagery product, including fashion and entertainment photography. (Ex. 69, Deposition Transcript of Ben Pfeifer ("Pfeifer Tr.") 54:20-25, 162:16-18, 164:15-23; Ex. 4, Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Ex. 67, Deposition Transcript of Stan Pavlovsky ("Pavlovsky Tr.") 59:11-60:20; *see also* Ex.1, Counterclaims ¶ 12).

**B. The Archive & Event Agreement**

6.      PMC and Shutterstock entered into an agreement, named the Archive & Event Image Hosting and Licensing Agreement (the "Archive & Event Agreement" or "Agreement"), as of July 1, 2015. (Ex. 5, Archive & Event Agreement, SSTK092808-29).

7.      The Archive & Event Agreement provided for an initial six-year term that was to expire on June 30, 2021. (Ex. 5, Archive & Event Agreement § 1).

---

[1] The cited Exhibits are attached to the Declaration of Cynthia S. Arato ("Arato Decl."), filed concurrently with this statement.

8.      The Archive & Event Agreement provided Shutterstock with exclusive rights to license PMC's photographic collection, subject to limited exceptions. (Ex. 1, Counterclaims ¶ 13 (third sentence); Ex. 5, Archive & Event Agreement §§ 3(a), 3(a)(i)).

9.      As explained by Shutterstock in its Counterclaims, the Agreement "provide[d] to Shutterstock [exclusive] licensing rights to, *inter alia*, PMC's archival content (the "Archive Content"), as well as opportunities for Shutterstock to create new content at events."  (Ex. 5, Archive & Event Agreement § 3; Ex.1, Counterclaims ¶ 13 (second sentence)).

10.     With respect to Archive Content, Shutterstock received exclusive rights to license images "(i) currently owned or created by PMC;" (ii) "to which PMC has the contractual right to syndicate and/or license, as of the date of this Agreement; and (iii) created by PMC, or to which PMC acquires the contractual right to syndicate and/or license, during the License Period," subject to a limited exception. (Ex. 1, Counterclaims ¶ 13; Ex. 5, Archive & Event Agreement §§ 3(a)(i) and (iv), 4; Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).

11.     PMC's Archive Content included images from its historic archive collections in addition to more recently captured images. (Ex. 1, Counterclaims ¶ 13; Ex. 5, Archive & Event Agreement § 3(a)(i)).

12.     With respect to new content at events PMC hosted, the Agreement states that "PMC will provide Shutterstock with access to [PMC's] event functions to which third parties are invited generally" ('PMC Events')." (Ex. 5, Archive & Event Agreement § 3(a)(ii)).

13.     With respect to new content at events hosted by others, the Agreement states that PMC will "provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . Subject to the Getty Agreement Restrictions, PMC hereby grants to Shutterstock the right to be the sole third party to leverage and utilize PMC's credentials and access to capture Third Party Event Content at Third Party Event. These Third Party Events shall initially include, but not be limited to, those events listed on Schedule D. PMC shall work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content." (Ex. 5, Archive & Event Agreement § 3(a)(iii)). Schedule D, in turn, lists 12 well-known "red carpet" entertainment events, such as The Grammy Awards, The Venice Film Festival, and the Emmy Awards.

14.     Shutterstock entered into the Archive & Event Agreement as part of a strategic effort to expand its licensing business and to launch a news and editorial division. (Ex. 69, Pfeifer Tr. 17:4-18; 19:20-22; 25:11-17; 33:17-23; 54:20-25, 182:16-183:5; Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418; Ex. 3, Shutterstock Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23; Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-537, at 0022535; Ex. 1, Counterclaims ¶ 13 (first sentence); Ex. 69, Pfeifer Tr. 12:12-17 (the images that Shutterstock obtained under the Agreement were considered "editorial" and not commercial "stock" images)).

4

15.     As part of its efforts to launch this new Shutterstock editorial division, Shutterstock hired four staff photographers in 2015 (Ex. 8, Shutterstock Press Release, dated Sept. 9, 2015, PMC_0022538-39).

16.     Shutterstock's lead negotiator for the Agreement in 2015 and a vice-president of Shutterstock's business development in 2015 (Ex. 69, Pfeifer Tr. 10:15-22, 11:3-9, 21:24, 29:20-30:1) testified that prior to 2015, "Shutterstock's issue is that it was known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, [or] anyone in the entertainment and fashion world." (Ex. 69, Pfeifer Tr. 54:20-25).

17.     Accordingly, in 2015, Shutterstock embarked on a business plan to move beyond the stock photography business and into the editorial market. Initially, in January 2015, Shutterstock acquired Rex Features, Europe's largest independent photo press agency, an event which "mark[ed] Shutterstock's substantive entry in editorial imagery." (Ex. 69, Pfeifer Tr. 164:17-23; Ex. 4, Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Ex. 67, Pavlovsky Tr. 59:3-60:10).

18.     In early 2015, Shutterstock identified PMC as its "solution for U.S. entertainment and fashion access and archive content." (Ex. 69, Pfeifer Tr. 162:16-18; 170:9-23; Ex. 70, Deposition Transcript of Jon Oringer ("Oringer Tr.") 212:23-213:10).

19.     In June 2015, Shutterstock and PMC announced that they had reached a deal. In announcing the deal, Shutterstock characterized PMC as "another trailblazing company" whose "strategic alliance" with Shutterstock would "accelerate [Shutterstock's] progress in editorial imagery." (Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535; Ex. 70, Oringer Tr. 212:23-213:20).

20. Shutterstock explained in securities filings that the Agreement with PMC gave Shutterstock "credibility in the market for editorial content that will allow us to further grow our product offerings." (Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218, at 0022222-23; Ex. 70, Oringer Tr. 222:21-224:23).

21. In a 2017 Company Overview presented to underwriters, Shutterstock identified its "partner[ship] with PMC" as one of two future "growth driver[s]" in the "editorial" space. (Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418).

22. Shutterstock agreed to provide PMC with significant compensation. (Ex. 5, Archive & Event Agreement §§ 2, 3, 6).

23. First, Shutterstock agreed to pay PMC "an annual fully recoupable advance against royalties (the 'Royalty Advances')" otherwise due and payable to PMC for Shutterstock's licensing of PMC content. (Ex. 5, Archive & Event Agreement § 6).[2]

23A. Shutterstock contemporaneously referred to the Royalty Advances as "Minimum Revenue Guarantees" or "MRGs." (Ex. 66, Deposition Transcript of Candice Murray ("Murray Tr.") 84:21-85:17; Ex. 69, Pfeifer Tr. 68:15-69:17 ("minimum revenue guarantee is an accepted, common—common term"); Ex. 12, PMC Content Performance June 2018, SSTK025937-43, at SSTK025940 (chart comparing "Total Sales USD" and "MRG USD"); Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327-28 ("Shutterstock Loss on MRG"); Ex. 11, Chat from C. Murray to A. Chung and D. Marquis, dated March 23, 2020, SSTK100551-72, at SSTK100558 ("I flat out

---

[2] The Agreement provides that Shutterstock will retain 70% of the fees it earns for licensing PMC content to Shutterstock's customers and that Shutterstock will remit 30% of those fees as a royalty to PMC (subject to Shutterstock recouping the minimum revenue guarantees). (Ex. 5, Archive & Event Agreement § 6).

said, we need some relieve [sic] on the MRG with all that[']s going on"); *id*. at

SSTK100559 ("a WIN would be to waive the upcoming MRG and start a new deal on

July 1st that is agreeable from an MRG and production standpoint."); Ex. 9, E-mail from

D. Granato to J. Oringer et al., dated Sept. 28, 2019, SSTK053461-63, at SSTK053461

("This would contemplate an early payment…for the MRG that is due on July 1, 2020.").

24.     Shutterstock agreed to pay PMC annual Royalty Advances/MRGs as

follows:

| CONTRACT YEAR | PAYMENT DEADLINE | AMOUNT |
|---|---|---|
| Year 1 | 9/1/2015 | $1.5 million |
| Year 2 | 7/1/2016 | $1.5 million |
| Year 3 | 7/1/2017 | $2 million |
| Year 4 | 7/1/2018 | $2.5 million |
| Year 5 | 7/1/2019 | $3 million |
| Year 6 | 7/1/2020 | $3.5 million |

(Ex. 5, Archive & Event Agreement § 6).

25.     Shutterstock also granted PMC a license to use images from

Shutterstock's own image library, in exchange for specified fees, except that Shutterstock

annually "waiv[ed] the first US $1,000,000 of fees payable." (Ex. 5, Archive & Event

Agreement § 2(a)). This provided PMC with $1 million credits for PMC to use to license

Shutterstock images. (*Id*.).

25A.   Shutterstock also agreed to contribute funding for PMC's digitization of

its historic archive.  (Ex. 5, Archive & Event Agreement § 4).

26.     Shutterstock also agreed to provide editorial photographic event coverage

at PMC Events at its expense, to attend and shoot images at PMC Events; to bear the

expense of any such coverage it provided at Third Party Events; and that PMC would

own the copyrights to images shot at those events and at Third Party Events for which

7

Shutterstock used PMC's access. (Ex. 5, Archive & Event Agreement §§ 3(a)(ii)-(iii) and 3(c); Ex.1, Counterclaims ¶ 16).

27.     The Archive & Event Agreement ultimately allowed Shutterstock to obtain and post millions of editorial images on Shutterstock's websites for Shutterstock's customers to license for a fee. (*See, e.g.*, Ex. 13, Tabulation of PMC Images Delivered to SSTK, SSTK161815; Ex. 66, Murray Tr. 177:7-78:20).

**C. Shutterstock Accepted The Risk of A Revenue Shortfall When It Entered The Deal**

28.     Prior to signing the Archive & Event Agreement, the parties negotiated a term sheet. (Ex. 14, Signed Term Sheet, May 6, 2015, PMC_0019609).

29.     During that negotiation, Shutterstock proposed a provision that it titled "Shutterstock Opt-Out," which provided that, starting in 2018, Shutterstock would "have the right to terminate the Agreement if in the immediately preceding year PMC Royalties equal less than 50% of the Royalty Advance paid for such year." (Ex. 15, Draft Term Sheet, Apr. 28, 2015, PMC_0021292-301, at 0021297; Ex. 69, Pfeifer Tr. 112:23-113:11, 117:4-16, 126:22-127:6; Ex. 70, Oringer Tr. 170:22-171:2, 172:21-24, 174:6-11).

30.     Both Shutterstock's 30(b)(6) witness on the negotiation of the Agreement and Shutterstock's lead negotiator conceded that the "Shutterstock Opt-Out" proposed giving "Shutterstock the right to terminate the deal if there's a drop in the royalties that Shutterstock earns under the deal." (Ex. 70, Oringer Tr. 172:21-24; *accord* Ex. 70, Oringer Tr. 174:10-11 (under the draft provisions "Shutterstock would be able to cancel the agreement" if revenues fell); Ex. 69, Pfeifer Tr. 112:23-113:11 (describing provision as "a clause in Shutterstock's favor that gives Shutterstock an option to pull out of or

terminate the agreement if revenue generated from the licensing of this content doesn't meet minimum levels.").

31.     PMC rejected Shutterstock's proposed Opt-Out provision and Shutterstock still entered into the deal. (Ex. 61, Draft Term Sheet, May 4, 2015, PMC_0021840, at 0022605 (redline of redline showing Shutterstock accepting PMC's striking of the proposed "Opt-Out" provision), *id*. at p.*16 (print out of redline changes showing that Todd Greene, then General Counsel of PMC (Ex. 63, Deposition Transcript of Todd Greene ("Greene Tr.") 64:4-5; 65:12-13), deleted "Opt-Out" provision); Ex. 14, Signed Term Sheet, May 6, 2015, PMC_0019607-09 (final Term Sheet containing no "Opt-Out" provision); Ex. 5, Archive & Event Agreement, SSTK092808-28 (final Archive & Event Agreement containing no "Opt-Out provision); Ex. 69, Pfeifer Tr. 126:22-127:6 and 128:24-129:14 ("I think I agree with what you are saying. The conditional opt-out was stricken . . . Shutterstock signed the final term sheet.").

32.     Shutterstock was willing to run its new businesses "at a loss." (Ex. 69, Pfeifer Tr. 109:22-110:9).

33.     Shutterstock viewed its Agreement with PMC as "an investment in the long-term growth of Shutterstock" with an "intangible," "meaningful, business impact." (Ex. 69, Pfeifer Tr. 182:16-183:21; 234:23-235:17).

34.     Shutterstock believed its deal with PMC would "add to Shutterstock's reputation in the editorial space," "open up new business opportunities," and "improve the overall relationship between Shutterstock and its customers." (Ex. 69, Pfeifer Tr. 182:16-183:21).

**D. Shutterstock Reaps Benefits Under The Deal Both Pre and Post Pandemic**

*Shutterstock Benefitted From PMC's Reputation And Relationships In The World Of Fashion And Entertainment*

35.    Shutterstock benefited from PMC's cachet in the fashion and entertainment world, which helped propel Shutterstock from a supplier of ordinary stock photos to an influential name in editorial imagery. (Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23 ("exclusive distribution agreement with…PMC…provides us with…credibility in the market for editorial content…"); Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418).

36.    Internally in 2019, Shutterstock observed that "PMC was instrumental in gaining access to events for SSTK in the early years of the deal. As SSTK has established its brand in the market, we are increasingly securing our own editorial credentials to events." This "resulted in less of a need for leaning on PMC to provide." (Ex. 16, Email from Granato to Oringer, dated Mar. 18, 2019, SSTK161819-21, at 161821).

37.    [INTENTIONALLY OMITTED]

38.    By early 2020, Shutterstock was able to obtain access to various premier events, like the Oscars, Grammys, Golden Globes and Emmys, without PMC, and sometimes rejected the access PMC offered to Shutterstock. (Ex. 19, Email from Walter dated Jan. 31, 2020, SSTK108869-71, at 108869 ("The pattern has definitely been that team SSTK isn't interested in [PMC] credentials from major events, like the Globes and Oscars, even though these credentials are increasingly rare."); Ex. 17, Email from Granato dated Aug. 13, 2018, SSTK052379-81, at 052379 ("we are getting a lot of the same credentials that they are now"); Ex. 66, Murray Tr. 66:22-67:7, 69:2-7 (agreeing with statement in 2018 that Shutterstock is "getting a lot of the same credentials that [PMC is] now"); Ex. 18, 2019 Shutterstock Spreadsheet of Editorial Event Coverage

SSTK168725; Ex. 66, Murray Tr. 683:23-686:8 (By 2019, Shutterstock had its own

access to each of the events listed on Schedule D to the Agreement)).

39.    Shutterstock, on its own, received "near-perfect placement" for its

photographers "for every single event this [early 2020 awards] season," based upon "the

relationships Shutterstock ha[d] built with all the event organi[z]ers" during the PMC

partnership. (Ex. 20, Email from Barrett, dated Feb. 5, 2020, SSTK109975-77, at

109976).

40.    [INTENTIONALLY OMITTED].

*PMC Images Remained Featured Content on Shutterstock's Website During The
Pandemic Where They Retained Their Value*

41.    As of March 2020, Shutterstock had received approximately 2.5 million

images under the Archive & Event Agreement, all of which were PMC Content under the

Agreement. (Ex. 13, Tabulation of PMC Images Delivered to SSTK, SSTK161815; Ex.

66, Murray Tr. 262:2-5, 681:9-13; Ex. 21, Google Sheets comment from Marquis to

Murray, dated May 11, 2020, SSTK100528 ("we have 2.5m PMC images on our site

today.").

42.    These images remained "up on Shutterstock's website through at least July

16, 2020" (when Shutterstock purported to terminate the Agreement (Ex. 66, Murray Tr.

681:14-682:7)), where they were "readily available" to Shutterstock's customers (*Id.* at

262:2-8; Ex. 71, Deposition Transcript of Steve Sammut ("Sammut Tr.") 95:23-96:2).

43.    Between March and July 2020, Shutterstock identified two of PMC's

brands on its websites, along with just three other brands, as comprising "world class

content" from "industry leaders", and identified Shutterstock's "Archival Collections", as

a "[h]ighlight…of our editorial collection." (Ex. 22, Shutterstock Webpage, Main

Editorial Page, dated as of Apr. 29, 2020, PMC_0022838-41, at 0022839; Ex. 66, Murray

Tr. 267:2-10 and 272:15-21; Sammut Tr. 102:22-103:7; Ex. 23, Email from Sammut,

dated May 18, 2020, SSTK107719-22, at 107719 (touting "PMC collections" in a May

18, 2020 business pitch)).

     44.    [INTENTIONALLY OMITTED]

     45.    [INTENTIONALLY OMITTED]

     46.    [INTENTIONALLY OMITTED]

     47.    Prior to entering the deal, Shutterstock did "internal light diligence" on

PMC's photography archive and concluded that it was "impressive." (Ex. 69, Pfeifer Tr.

39:18-41:14).

     48.    This review was a "typical step for [Shutterstock] for any content deal" to

determine if the archive material "aligned with [Shutterstock's] expectations." (Ex. 69,

Pfeifer Tr. 39:13-22).

     49.    In announcing the deal with PMC, Shutterstock characterized "PMC's

archive," including the "100-year old publications Variety and WWD," as "legendary."

(Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).

     49A.    Shutterstock's former CEO and Chairman, Jon Oringer, testified that he

was "hopeful" and "optimistic" about generating revenues from the archive. (Ex. 70,

Oringer Tr. 104:12-106:7-11).

     50.    [INTENTIONALLY OMITTED]

     51.    After the pandemic's onset, Shutterstock's editorial chief stated internally

that I honestly don't want to lose" the PMC relationship, and one of her two "biggest

concern[s]" was "loss" of the "WWD . . . archivw[sic]." (Ex. 24, Chat, dated Apr. 28, 2020, SSTK114607-10, at 114608-09).

> *PMC Continued to Supply Content to Shutterstock During the Pandemic and Would Have Supplied More Content to Shutterstock Had Shutterstock Not Terminated The Deal*

52.    During the pandemic and before Shutterstock terminated the Agreement, PMC created and delivered new photographs to Shutterstock (Ex. 30, Images delivered to Shutterstock, SSTK0006), and coordinated with Shutterstock. (Ex. 25, Email from Melvin, dated May 15, 2020, PMC_0016319 ("Rob is going to head to Santa Monica to try to find a decent position."); Ex. 26, Email from Buckner, dated June 12, 2020, PMC_0016848 ("There should be some good names coming today."); Ex. 27, Email from Buckner, dated June 14, 2020, PMC_0016857; Ex. 28, Email from Buckner, dated June 18, 2020, PMC_0016860-62, at 0016860; Ex. 29, Email from Melvin, dated June 24, 2020, PMC_0001353-55, at 0001355).

53.    For example, after PMC invited Shutterstock to a "Garth Brooks Drive Thru Concert," Shutterstock responded, "I am all in for this content" and "I will also be in attendance." (Ex. 31, Email chain, dated June 26, 2020, PMC_0016885).

54.    Shutterstock terminated the Agreement as of July 17, 2020. (Ex.1, Counterclaims ¶¶ 31, 38).

55.    Between mid-March and Shutterstock's July 16 2020 termination date, PMC delivered 2,238 images to Shutterstock. (Ex. 30, Images delivered to Shutterstock, SSTK00006; Ex. 66, Murray Tr. 567:3-569:25 (2,238 images delivered between March 10 and July 2020)).

56.    [INTENTIONALLY OMITTED]

57.     Vaccines became widely available in March 2021. *See, e.g.,* NY Times, *See How Vaccinations Are Going in Your County and State* (updated Mar. 21, 2022), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (noting "vaccine rollout began in December 2020, with a focus on some of the most vulnerable populations" and "every state had made all adults eligible for the shots by April 2021").

58.     Had Shutterstock not terminated the Agreement, it would have benefitted from obtaining images under the Agreement through June 2021, including from Academy Award preparations, arrivals and backstage at the 21st BET Awards, and numerous film and television premieres and fashion shows. (Ex. 73, Walter Decl. ¶ 4; Ex. 66, Murray Tr. 586:10-595:5 (identifying examples of PMC images taken at live events prior to June 30, 2021 and admitting that Shutterstock would have put those images on its website if the Archive & Event Agreement had not been terminated)).

58A.     Specifically, Shutterstock would have obtained at least approximately 12,000 images from approximately 100 live fashion and entertainment events similar to the Third Party Events under the Agreement. (Ex. 73, Walter Decl. ¶ 4; *see also* Arato Decl. ¶ 5).

*Shutterstock Continued To License PMC Content During The Pandemic*

59.     After the onset of the pandemic in March 2020, Shutterstock continued to license thousands of PMC images to its customers, yielding thousands of dollars in gross monthly revenues to Shutterstock. (Ex. 66, Murray Tr. 378:22-79:6; Ex. 32, Spreadsheet of Licensing Revenue, SSTK168954).

60.     Shutterstock's corporate designee and chief of its Editorial division, Candice Murray, testified that "the dollar value of the revenues that Shutterstock earned

for licensing activity during the pandemic period…was just under a hundred thousand

dollars." (Ex. 66, Murray Tr. at 378:22-379:5).

61.    [INTENTIONALLY OMITTED]

62.    [INTENTIONALLY OMITTED]

63.    [INTENTIONALLY OMITTED]

64.    Ms. Murray calculated that, starting in 2016, Shutterstock spent between

approximately $200,000 and $300,000 per year under the Agreement on production costs

to capture content from live events for PMC, including to supply photographers and

photo editors, and that such expenses would have totaled $300,000 for 2020. (Ex. 66,

Murray Tr. at 183:10-184:20; 185:11-15; Ex. 10, Murray Proposal, dated Mar. 31, 2020,

SSTK025324-025333, at 025327).

65.    [INTENTIONALLY OMITTED]

66.    Shutterstock did not incur any production-related expenses while it

exploited PMC content between mid-March 2020 through the July 2020 termination date,

because, in the absence of live events, Shutterstock was not sending photographers and

editors to live events during that time. (Ex. 66, Murray Tr. 185:11-186:7; 186:11-22;

193:23-194:23).

67.    [INTENTIONALLY OMITTED]

68.    [INTENTIONALLY OMITTED]

69.    [INTENTIONALLY OMITTED]

70.    [INTENTIONALLY OMITTED]

71.    [INTENTIONALLY OMITTED]

72.    [INTENTIONALLY OMITTED]

73.    [INTENTIONALLY OMITTED]

74.     [INTENTIONALLY OMITTED]

75.    [INTENTIONALLY OMITTED]

76.    [INTENTIONALLY OMITTED]

77.    [INTENTIONALLY OMITTED]

78.    [INTENTIONALLY OMITTED]

79.    [INTENTIONALLY OMITTED]

80.    [INTENTIONALLY OMITTED]

**E. Displeased with Its Obligations Under the Agreement, Shutterstock Tried to Renegotiate the Agreement Before The Pandemic Hit**

81.    Starting at least as early as January of 2019, Shutterstock sought to renegotiate or terminate the Agreement. (Ex. 66, Murray Tr. 105:4-7).

82.    [INTENTIONALLY OMITTED]

83.    As of 2019, Shutterstock viewed its event coverage obligations under the Agreement as an "enormous distraction for our production teams" which "results in us spending more money to produce lots of content that they wind up owning" (Ex. 66, Murray Tr. 112:25-113:19 (agreeing with statement and explaining that it referred to "both third-party and PMC events"); *see also id.* at 113:20-115:21; Ex. 33, Email from Granato, dated Sept. 28, 2019, SSTK052537-40, at 052537).

84.    Shutterstock also believed that "[f]or the 'PMC' sponsored events we are basically their outsourced production house getting paid below market fees or no fees when there is no distribution value for us" (Ex. 66, Murray Tr. 69:8-19; Ex. 17, Email from Granato, dated Aug. 13, 2018, SSTK052379-81, at 052380).

85.    [INTENTIONALLY OMITTED]

16

86.     Shutterstock believed that its minimum revenue guarantee payment obligation was a "value proposition loser for Shutterstock." (Ex. 66, Murray Tr. 116:18-117:8; Ex. 33, Email from Conte, dated Sept. 28, 2019, SSTK052537-40, at 052537).

87.     In late January 2019, Shutterstock proposed revising the Agreement to relieve Shutterstock of its obligation to provide photographers and editors at its expense to cover any PMC Events. (Ex. 34, Email from D. Granato, dated Jan. 25, 2019, SSTK024498-500).

88.     In late September 2019, Shutterstock sought to renegotiate the deal (in the form of an early termination of the Agreement and a new deal with lower costs) because of the above perceived burdens. (Ex. 35, Email from D. Granato, dated Sept. 28, 2019, SSTK052739-41 (Shutterstock emailing proposal to PMC); Ex. 66, Murray Tr. 105:4-7; 106:18-24 (Shutterstock was "looking to lower" "costs we were spending to produce the content"); 112:25-113:19 (explaining that the costs related to "both third-party and PMC events")).

**F. Just Days After The Pandemic Hit The United States, Shutterstock Latched Onto The Pandemic As A Pretext to Terminate The Agreement**

89.     [INTENTIONALLY OMITTED]

90.     On March 24, 2020, just days after the pandemic hit, Ms. Murray told Shutterstock's then current CEO and Chairman, Jon Oringer that "this [the pandemic] is a good opportunity to do a good deal with them," and Mr. Oringer responded: "they will drag their feet through the [June]/july [sic] payment[.] [W]e have to be hard on them and not give in." (Ex. 70, Oringer Tr. 14:20-15:21; Ex. 36, Chat, dated Mar. 24, 2020, SSTK100705-08, at 100705-06; Ex. 66, Murray Tr. 140:24-141:23).

91.     During this same chat, Oringer asked Murray "do we have any legal recourse" because "they can't be providing us anything." Ms. Murray reported to Mr. Oringer that Shutterstock had "no legal recourse" to exit the Agreement and that PMC "ha[s] to agree" for Shutterstock to get any relief. Oringer asked again, "legally will we be able to [get some relief on the MRG]? or they have to agree?" Murray responded, "they have to agree." (Ex. 36, Chat, dated Mar. 24, 2020, SSTK 100705-08, at 100705, 08).

92.      Also during this same chat, Mr. Oringer stated "insane how that contract is all them" and "this time the tables have to turn" and Ms. Murray stated the Agreement "is not a good contract," (Ex. 36, Chat, dated Mar. 24, 2020, SSTK100705-708, at 100705, 100707). Ex. 66, Murray Tr. 139:14-16; 146:14-147:5; Ex. 70, Oringer Tr. 238:25-240:1; 278:13-15); *see also* Ex. 70, Oringer Tr. 20:6-8, 239:1-2 ("we know this contract is pretty one-sided towards PMC")).

93.     At or around that time, Shutterstock calculated that, before the pandemic, it had lost approximately $7.3 million dollars under the deal between 2015-2019 and projected further losses of $4.3 million under the deal absent the pandemic. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025327; Ex. 66, Murray Tr. 181:7-182:19; 185:4-6;188:25-189:20; 189:5-190:7).

94.     Stan Pavlovsky, previously COO of Shutterstock, took over as CEO on April 1, 2020 (Ex. 67, Pavlovsky Tr. 49:10-15).

95.     [INTENTIONALLY OMITTED]

96.     On or around March 31, 2020, Mr. Pavlosky learned that Shutterstock's editorial department was estimating that it would miss its earnings forecast for 2020 by

millions of dollars and questioned Ms. Murray about the newly projected shortfall. (Ex. 38, Chat, dated Mar. 31, 2020, SSTK100683 ("forecast for Editorial" was "7M off plan")). Ms. Murray told Mr. Pavlosky that Shutterstock "need[s] the relief from PMC to get back to what the P&L looked like in December from a margin standpoint." (*Id.*; *see also* Ex. 37, Chat, dated Mar. 31, 2020, SSTK114740 at 114743; Ex. 66, Murray Tr. 201:15-202:19, 203:10-15) (explaining the need for relief from PMC "to help salvage the revenue numbers.").

97.     The same day of her chat with Mr. Pavlovsky, Ms. Murray sent PMC a proposal for a revised deal which sought to maintain the relationship with PMC through June 30, 2021 (the end of the initial contractual term) and also proposed "renew[ing] the agreement through Dec [20]22," albeit on renegotiated financial terms.... (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).

98.     The proposal projected that live events would resume in six months from the end of March. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025328).

99.     Shutterstock's goals in making this proposal were to "waive the upcoming" minimum revenue guarantee payment that was due on July 1, 2020 and start a new deal on July 1 with more favorable payment and production terms. (Ex. 11, Chat from C. Murray to A. Chung and D. Marquis, dated March 23, 2020, SSTK100551-72, at SSTK100559 ("a WIN would be to waive the upcoming MRG and start a new deal on July 1st that is agreeable from an MRG and production standpoint."); Ex. 66, Murray Tr. 159:21-161:6, 163:19-24).

100.    Shutterstock presented two options to PMC in Shutterstock's March 31, 2020 proposal, each of which allowed Shutterstock to maintain its existing rights under the Agreement through the end of the contractual term, including during the six month period Shutterstock projected that live events would be cancelled because of the pandemic, but which reduced Shutterstock's MRG payment obligations and Shutterstock's obligation to provide event coverage for PMC at Shutterstock's expense. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).

100A.  Under the first, the $3.5 million MRG due July 1 would be cut by 50%; Shutterstock's production costs would be capped at $60,000 for Q4 2020; and a renewal discussion would commence in Q1 2021. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at SSTK025329). Under the second, Shutterstock would terminate the Agreement for a $1 million kill fee and the parties would negotiate a new three-year agreement effective July 1, 2020, in which the annual MRGs would be slashed to $500,000 and Shutterstock's historic annual production costs (Ex. 66, Murray Tr. 183:10-184:19) would be cut by 50% to no more than $150,000 per year. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at SSTK025330). PMC would retain its $1 million credit under both alternatives. (*Id.* at SSTK025329-30).

100B.  On April 8, Murray was "basically told we're going to walk away from PMC all together", a move she shared internally would be a breach of the Agreement (Ex. 39, Chat from C. Murray to D. Marquis and A. Chung, dated Apr. 8, 2020, SSTK115200).

100C.  By April 13, Murray was investigating how quickly Shutterstock could shut down all of PMC's user accounts and remove PMC content from its website. (Ex. 66, Murray Tr. 238:4-239:11).

101.    PMC offered in response to extend the term of Archive & Event Agreement for no additional payment by Shutterstock and to defer half of the upcoming $3.5 million payment (which was otherwise due to PMC in full on July 1, 2020) until the following year. (Ex. 40, Email from Penske, dated May 9, 2020, PMC_0016287-88, at 0016287; *see also* Ex. 68, Deposition Transcript of Jay Penske ("J. Penske Tr."), 327:18-328:2, 330:2-9; Ex. 67, Pavlovsky Tr. 177:8-178:19).

102.    While this dialogue ensued, Mr. Pavlosky advised Mr. Oringer that he was going to tell PMC that "we're not going to pay anything" (Ex. 41, Chat, dated Apr. 14, SSTK160949; Ex. 67, Pavlovsky Tr. 196:25-197:7) and anticipated that a new deal with PMC "would result in another huge savings for us" (Ex. 42, Chat, dated Apr. 15, 2020, SSTK106659-60, at 106659).

103.    On April 29, 2020, Mr. Pavlovsky sent PMC an updated proposal for a renegotiated deal that would commence on July 1, 2020. Under that proposal, Shutterstock would continue to receive the same benefits that it held under the Archive & Event Agreement (the right to license PMC content, including archive content and new images taken at available live events), except that Shutterstock would no longer have to pay PMC any minimum revenue guarantee; PMC would no longer get the $1 million credit towards its licensing of Shutterstock images; and PMC would have to bear the expenses for Shutterstock to provide event coverage. (Ex. 43, Email from Pavlovsky, dated Apr. 29, 2020, SSTK161699-703 at 161701-02).

104.    On April 29, 2020, Mr. Pavlovsky confirmed to PMC that "we are not committing to any part of the minimum guarantee." (Ex. 43, Email from Pavlovsky, dated Apr. 29, 2020, SSTK161699-703 at 161699).

105.    Shutterstock sent PMC notices of termination dated May 18 and July 2, 2020, contending that the pandemic had frustrated the purposes of the Agreement or, in the alternative, that PMC had failed to perform by not providing Shutterstock with access to new live events and, thus, the resulting photographs, during the pandemic shutdown. On this basis, Shutterstock withheld both payment of the final $3.5 million annual guaranteed payment and the $1 million credit for use of Shutterstock's imagery during the final contract year. (Ex. 44, May 18, 2020 Letter, PMC_0020980-83; Ex. 45, July 2, 2020 Letter, PMC_0020986-89).

105A.   Shutterstock's May 18, 2020 termination letter described PMC's obligations under the Agreement to include "licensing rights to PMC archival content," and contended that "Shutterstock agreed to pay PMC . . . based on the value of the entire package of PMC's above-listed obligations." (Ex. 44, May 18, 2020 Letter, PMC_0020980-83, at 20981).

106.    Before taking any of the above-noted actions and terminating the Agreement based on the pandemic's purported impact on the deal, Shutterstock did not take any steps to analyze the pandemic's actual financial impact on Shutterstock under the Agreement (factoring in Shutterstock's actual revenues and actual cost savings). (Ex. 66, Murray Tr. 284:24-285:8, 286:25-287:13; 288:12-18; Ex. 67, Pavlovsky Tr. 247:15-18; *see also* Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at SSTK025327).

107.    During that same time-period, Shutterstock did that financial analysis for
its entire Editorial business as a whole (Ex. 66, Murray Tr. 286:25-287), and Shutterstock
determined that its Editorial business did "better in 2020 versus 2019" on a net revenue
basis (*i.e.* that "during the pandemic period, the cost savings that Shutterstock
experienced were sufficient to have the net revenue number be a little better than in a
comparable prepandemic period.") (Ex. 66, Murray Tr. 287:14-288:11).

108.    In the May 18 letter, as well as in a May 8 email that Mr. Pavlovsky sent
to PMC, Shutterstock told PMC that "the piecemeal submission of Archival Content or
outdated Event content does not remedy PMC's inability to fulfill the lion's share of its
obligations." (Ex. 44, May 18, 2020 Letter, PMC_0020980-83 at 0020982-83; Ex. 46,
Pavlovsky Email, May 8, 2020, SSTK103646-47 ("PMC's submission of archival
content or outdated event content does not remedy failure by PMC to fulfill the entirety
of its obligations.")).

109.    Shutterstock told this to PMC even though Mr. Pavlovsky recognized the
value of PMC's Archive Content in his April 29, 2020 proposal, stating "Shutterstock
and PMC to establish archive cadence and strategy on go to market for this valuable
asset." (Ex. 43, Pavlovsky Email, Apr. 29, 2020, SSTK161699-703 at 161702).

109A.   During the negotiation of the deal, PMC proposed additions to the
language in the term sheet regarding PMC Events and Third Party Events, which
Shutterstock accepted. (Ex. 69, Pfeifer Tr. 95:23-96:7, 97:14-25; Ex. 72, Email from
Woodnough, dated April 23, 2015, PMC_0007268-7275, at 7273).

110.    Ben Pfeifer, Shutterstock's lead negotiator for the Agreement in 2015, Ex.
69, Pfeifer Tr. 27:4-30:2, admitted at his deposition that the Archive & Event Agreement

did not impose an absolute obligation on PMC to provide access to events to which PMC did not, in fact, have access. After being directed to PMC's addition of the phrase "to which PMC has access as defined herein," Ex. 69, Pfeifer Tr. 97:22-25, Pfeifer was asked "Q. Did you have an understanding of any difference between the provision as proposed by Shutterstock and – or as it existed in Shutterstock's term sheet and as against the provision as proposed by PMC? A. I don't know what their specific intent was. Reading this today, I understand it to be creating wiggle room in the event that they're blocked out of an event because some third-party, say Getty, causing a problem for Variety getting access to an event." (*Id.* 98:5-100:9).  In response to the following question:  "Did you understand this addition to be providing some qualification that existed in the term sheet that Shutterstock proposed to PMC?", Pfeifer responded:  "I understand that the language . . . is a qualification, but I would add that we did not perceive this as business risk at the time." (Ex. 69, Pfeifer Tr. 99:19-22, 100:5-102:9; *see also id.* 99:6-7 ("we didn't contemplate that as high risk"); *id.* 98:14-17 ("our motivation to get into this deal had a lot to do with the fact that we expected Variety to be able to get into any event of significance.").

111.    Shutterstock's lead negotiator also admitted that the Archive & Event Agreement did not impose an absolute obligation on PMC to hold PMC Events to which the public was invited generally. Mr. Pfeifer was asked the following question and he gave the following answer: "Q. …[A]t the time you received this term sheet, did you understand that the phrase 'to which third parties are invited generally' provided a qualification to the language that immediately precedes it?…A. So I think that, again, I understand 'to which third parties are invited generally' is a qualification, but in this case

24

PMC controls who's invited because they own the event, so it's different in my head."
(Ex. 69, Pfeifer Tr. 101:2-20). Mr. Pfeifer later further explained: "I understood that
while negotiating this agreement that PMC controls PMC events and determines who can
be there and who can't, including whether photographers would be allowed, and that
would be their call. So it's my understanding, if [PMC is] acting in good faith, we would
be at every event where photographers are welcome…as determined by PMC
themselves." (Ex. 69, Pfeifer Tr., 102:1223).

      111A.  PMC and Shutterstock maintained a joint scheduling document for Third
Party Events that included specific color-coded categories for "PMC cancelled credential.
Such did not obtain" and "Event cancelled." (Ex. 65, Deposition Transcript of Benjamin
Melvin ("Melvin Tr."), 24:16-25:1).

      111B.  On numerous occasions over the course of the deal, PMC did not possess
and was thus unable to provide access to Shutterstock for various Schedule D events, and
Shutterstock did not contend PMC was in breach. (Ex. 73, Walter Decl. ¶ 7)

      112.    Shutterstock has alleged in its Counterclaims that, to the extent PMC did
not provide access to PMC Events or Third Party Events, it was because those events had
to be cancelled "as a direct result of the pandemic" and Covid-19 related "restrictions."
(Ex.1, Counterclaims ¶¶ 1, 3, 20-24). Shutterstock has also alleged that it was because of
the pandemic that "these events ceased to exist in any meaningful way" (*id*. ¶ 3) because
"without a red carpet," Shutterstock could not create new, licensable images (*id.* ¶ 1).

      113.    Shutterstock's Founder and Executive Chairman, Jon Oringer, testified
that Shutterstock would *not* have "walked away from…deal" in "2015" even if it had
known Shutterstock "wouldn't be getting live images from PMC during the period of

time that the pandemic lasted." (Ex. 70, Oringer Tr. 234:22-235:11). Mr. Oringer was asked the following question and he gave the following answer: "Q. Based on the expectations that you had for the deal when you entered into it in 2015, would you have walked away from the entire deal if you had known in 2015 that … you would get -- you wouldn't be getting live images from PMC during the period of time that the pandemic lasted?" "A. No. I would have expected that -- actually, I thought Jay would have been a better person and worked with us through that period of time to help us figure out a way to generate value for both sides through the pandemic." Ex. 70, Oringer Tr. 234:22-235:11. In 2015, Oringer had final decision-making authority regarding whether to enter the Agreement with PMC. (Ex. 69, Pfeifer Tr. 22:12-23:2).

**G. Shutterstock Wrongfully Displayed PMC Content Post-Termination**

114.     Shutterstock purported to terminate the parties' relationship as of July 17, 2020. (Ex.1, Counterclaims ¶¶ 31, 38).

115.     [INTENTIONALLY OMITTED]

116.     Michael Buckner shot the images from the LA USD School Closure on December 15, 2015. (Exs. 47-49, Image Metadata Screen Shots, PMC_0024915-17). At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Ex. 62, Buckner Tr. 13:6-16).

117.     Michael Buckner shot the images from the 92nd Academy Awards on February 29, 2020. At the time he shot those images, he was employed as Chief Photographer of PMC and his duties included shooting images for PMC. (Ex. 62, Buckner Tr. 13:6-16).

118.    PMC owns and has a copyright registration for the LA USD School Closure images. (Ex. 50, PMC Copyright Registration Collection 9, PMC_0024911-12 (VA2-215-216); Ex. 52, Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 3 of the images listed in the registration.")).

119.    PMC owns and has a copyright registration for the images shot at the 92nd Annual Academy Awards. (Ex. 51, PMC Copyright Registration Collection 4, PMC_0024889-90 (VA2-213-153); Ex. 52, Email from Shutterstock's Counsel, dated June 28, 2021 ("No dispute; both parties agree that PMC owns all 66 of the images listed in the registration.")).

120.    The images from the LA USD School Closure were displayed on Shutterstock's website until September 18, 2020. (Ex. 53, Shutterstock Website Screen Shots, PMC_0004424-27; Ex. 54, Shutterstock's Image Removal Date Spreadsheet, SSTK168956).

121.    The images from the 92nd Academy Awards were displayed on Shutterstock's website until September 17, 2020. (Ex. 55, Shutterstock Website Screen Shots, PMC_0004379-82; Ex. 54, Shutterstock's Image Removal Date Spreadsheet, SSTK168956).

122.    Shutterstock's counsel has represented that, after the Agreement was terminated, Shutterstock also granted so-called "renewal" licenses to exploit certain of the above noted images shot by Michael Buckner. (Arato Decl. ¶ 3).

**H.  One PMC Employee Innocently Accesses The Shutterstock Website After Shutterstock Mistakenly Failed to Disable Access**

123.    The Archive & Event Agreement granted PMC access to Shutterstock's image library and awarded PMC an annual $1 million credit toward the use of these images. (Ex. 5, Archive & Event Agreement § 2(a)).

124.    Each PMC brand (like Variety or Rolling Stone) had its own Shutterstock accounts and used those accounts to access the Shutterstock images during the Agreement's term. (Ex. 71, Sammut Tr. 110:3-111:25, 141:2-12).

125.    Shutterstock represented to PMC in its July 2, 2020 termination letter that "Shutterstock content will no longer be available to PMC as of [July 17, 2020,] beyond how any third party might access such content in the marketplace."  (Ex. 45, July 2, 2020 Letter, PMC_0020986-89, at 0020989).

125A.  Shutterstock endeavored to disable the PMC accounts. (Ex. 71, Sammut Tr. 107:6-14).

126.    Shutterstock did not disable one of the accounts used by the Rolling Stone brand, titled "M.Penske," and that account remained active past the purported termination date. (Ex. 71, Sammut Tr. 120:7-121, 132:6-22).

127.    Shutterstock concedes that it made a mistake in leaving the M.Penske account open. (Ex. 71, Sammut Tr. 107:6-14; 119:24-120:21; Ex. 66, Murray Tr. 358:22-359:14 ("It was missed. Mistakes happen."); Ex. 56, Email chain dated Nov. 3, 2020, SSTK161784-89, at 161784).

128.    Had Shutterstock disabled the "MPenske" account, PMC would not have been able to use the account to access Shutterstock's website. (Ex. 71, Sammut Tr. 118:13-22).

129.    In September and October 2020, a Rolling Stone employee (Kimberly McDonald) mistakenly downloaded select images from the Shutterstock website using this account. (Ex. 71, Sammut Tr. 155:9-156:13; Ex. 57, Image List, SSTK11637-638; Ex. 64, Deposition Transcript of Kimberly McDonald ("McDonald Tr.") 11:16-12:16; 38:8-12).

130.    On July 14, 2020, Ms. McDonald received an email addressed to "ALL RS Edit Staff," labeled "URGENT, MUST READ." (Ex. 58, Email from Lotz, dated July 14, 2020, PMC_0020002-05; Ex. 64, McDonald Tr. 19:6-20:7).

131.    At the time, Ms. McDonald was a member of the "RS Edit Staff" listserv. (Ex. 64, McDonald Tr. 19:21-20:2).

132.    The email advised the RS Edit Staff to discontinue use of Shutterstock accounts but Ms. McDonald did not review the email. (Ex. 64, McDonald Tr. 20:8-12).

133.    Ms. McDonald did not read the email because it would have been sent "when we were doing remote production during the pandemic, meaning that I would have been responsible for between 10 to 15 videos within a week. It's very easy to have emails get buried when you're working at that frequency." (Ex. 64, McDonald Tr. 20:12-18, 45:24-46:3).

134.    From her standpoint, the Shutterstock website Ms. McDonald accessed using the M.Penske account looked the same after July 16, 2020 as it had beforehand. (Ex. 71, Sammut Tr. 144:15-25, 148:5-20).

135.    Had Ms. McDonald reviewed the email, she would not have downloaded the images. (Ex. 64, McDonald Tr. 48:8-18).

136.     Shutterstock has no evidence of a technological injury arising from McDonald's downloading of the 20 images. Its 30(b)(6) witness instead claimed that Shutterstock owed licensing royalties to third parties based upon these downloads, and that these royalties exceeded the statutory minimum $5,000 damages, but he failed to substantiate this claim with any concrete proof. (Ex. 67, Pavlovsky Tr. 22:10-14; 290:12-24; 291:20-292:6; 329:10-331:2).

137.     [INTENTIONALLY OMITTED]

138.     Shutterstock has produced no documentary evidence demonstrated that it suffered at least $5,000 in damages as a result of these activities. (Arato Decl. ¶ 4).

139.     The only terms of use that Shutterstock produced are dated November 29, 2021. (Ex. 59, Terms of Use, SSTK111629-35).

140.     When a PMC employee like Ms. McDonald logged onto the Shutterstock website using the PMC accounts that Shutterstock set up for PMC under the Agreement, the Shutterstock Terms of Use did not pop up on the screen. (Ex. 71, Sammut Tr. 158:19-160:20).

**I.  PMC Did Not Withhold Archive Images In Bad Faith**

141.     Shutterstock contends that PMC breached the Agreement by delivering far fewer Archive Content images between January and April 2020 than the average monthly number of Archive Content images PMC had delivered over the course of 2019. (Ex.1, Counterclaims ¶ 28).

142.     Shutterstock alleges that "in 2019, Shutterstock received, on average, 437 archival submissions *per month*," whereas "Shutterstock received just 119 archival images for the four-month period from January through April 2020." (Ex.1, Counterclaims ¶ 28 (emphasis added)).

143.    [INTENTIONALLY OMITTED]

144.    Shutterstock admits that the parties "never set up a regular cadence of delivery" (Ex. 66, Murray Tr. 421:5-13) and, for this reason, Shutterstock never complained about the pace of delivery or archival images or asserted that PMC had breached the Agreement based on the pace of its delivery. (Ex. 69, Pfeifer Tr. 224:8-17; Ex. 66, Murray Tr. 350:21-352:14). Based on PMC's historic delivery cadence, Shutterstock was not expecting a delivery of additional historic archive images between January and April 2020. (Ex. 66, Murray Tr. 423:15-424:6).

145.    Shutterstock produced a spreadsheet in this action documenting the timing of PMC's delivery of archival images. (Ex. 60, Asset Intake, SSTK168721).

146.    Shutterstock tracked the delivery of archival images under the labels PMCAR and PMCEL. (Ex. 66, Murray Tr. 304:21-23).

147.    According to Shutterstock's tracking, PMC delivered archival images under the code PMCAR on the following schedule:

|     | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|-----|------|------|------|------|------|------|
| Jan |      | 0 | 0 | 1 | 0 | 0 |
| Feb |      | 0 | 0 | 0 | 0 | 0 |
| Mar |      | 0 | 0 | 0 | 0 | 0 |
| Apr |      | 0 | 0 | 0 | 511 | 0 |
| May |      | 0 | 0 | 0 | 0 | 0 |
| Jun |      | 0 | 0 | 36 | 0 | 0 |
| Jul | 0 | 0 | 0 | 2,778 | 0 | |
| Aug | 0 | 0 | 0 | 128,920 | 0 | |
| Sep | 0 | 150,094 | 2 | 8 | 73,717 | |
| Oct | 0 | 580,650 | 4 | 0 | 366,310 | |
| Nov | 0 | 1 | 3 | 0 | 136,002 | |
| Dec | 0 | 0 | 1 | 2 | 0 | |

(Ex. 60, Asset Intake, SSTK168721).

148.    According to Shutterstock's tracking, PMC delivered archival images under the code PMCEL on the following schedule:

|      | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|
| Jan  |      | 0    | 0    | 0    | 112  | 0    |
| Feb  |      | 0    | 0    | 515  | 1,904 | 6   |
| Mar  |      | 0    | 0    | 0    | 2,119 | 0   |
| Apr  |      | 0    | 2    | 0    | 602  | 113  |
| May  |      | 0    | 0    | 6,718 | 146 | 1    |
| Jun  |      | 0    | 0    | 9,658 | 598 | 0    |
| Jul  | 0    | 0    | 0    | 6,797 | 93  |      |
| Aug  | 0    | 0    | 0    | 114  | 0    |      |
| Sep  | 0    | 0    | 0    | 101  | 0    |      |
| Oct  | 0    | 0    | 2    | 250  | 165  |      |
| Nov  | 0    | 34,891 | 0  | 440  | 55   |      |
| Dec  | 0    | 0    | 0    | 219  | 0    |      |

(Ex. 60, Asset Intake, SSTK168721).

149.    Based on Shutterstock's tracking, PMC delivered the following number of images with the codes PMCAR and PMCEL between January and April: none in 2016, 2 in 2017, 516 in 2018, 5,248 in 2019, and 119 in 2020, and the following number of images delivered between August and December: none in 2015, 765,636 in 2016, 12 in 2017, 130,054 in 2018, and 576,249 in 2019. (Ex. 60, Asset Intake, SSTK168721).

150.    Shutterstock never articulated any injury resulting from the purported withholding of archival images between January and April 2020, and, through its 30(b)(6) witness on damages, it does not claim to have suffered any. (Ex. 67, Pavlovsky Tr. 288:5-289:4).

 Dated: New York, New York                        SHAPIRO ARATO BACH LLP
             March 17, 2023

                                                   By:  _/s/ Cynthia S. Arato_____
                                                       Cynthia S. Arato

                                                   500 Fifth Avenue, 40th Floor
                                                   New York, NY 10110
                                                   Telephone: (212) 257-4882

Facsimile: (212) 202-6417
carato@shapiroarato.com

*Attorneys for Plaintiff Penske Media*
*Corporation*