UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

        Plaintiff-Counterclaim Defendant,

        -against-

SHUTTERSTOCK, INC.,

        Defendant-Counterclaim Plaintiff.

CASE NO. 20-cv-04583 (MKV)

**ORAL ARGUMENT REQUESTED**

<u>**MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF PENSKE MEDIA CORPORATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

MITCHELL SILBERBERG & KNUPP LLP

Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Defendant-Counterclaim Plaintiff
Shutterstock, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF RELEVANT FACTUAL BACKGROUND ...................................................... 2

     A.    PMC and Shutterstock Enter Into The Agreement in 2015. ...................................... 2

     B.    Consistent With Shutterstock's Principal Purpose for Entering Into the Agreement, PMC Agrees to Provide Access to Third Party Events............................................... 4

     C.    Shutterstock Agrees to Pay Multi-Million Dollar Advances, Plus More. ................. 5

     D.    For Years, PMC Provides Access to Third Party Events and Shutterstock Pays the Advances, Notwithstanding PMC's Late Provision of Archive Content and Other Violations of the Agreement. ....................................................................................... 6

     E.    In Mid-March 2020, the COVID-19 Pandemic Unexpectedly Causes Cancellation of Third Party Events and PMC Provides No Access to Shutterstock. .................... 7

     F.    PMC Refuses to Negotiate in Good Faith and Instead Files This Lawsuit. .............. 7

     G.    PMC Moves for Partial Summary Judgment. ........................................................... 9

ARGUMENT ................................................................................................................. 9

I.      LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT ............................ 9

II.     PMC MATERIALLY BREACHED THE AGREEMENT PRIOR TO THE TIME SHUTTERSTOCK WAS REQUIRED TO PAY THE $3.5M ADVANCE .................. 10

     A.    PMC Breached Section 3(a)(ii) & (iii) of the Agreement, by Failing to Provide Access to Live Events. ............................................................................................. 11

            1.    The Agreement Either Unambiguously Obligates PMC to Provide Access to  Live Events or is Ambiguous. ................................................................ 11

            2.    PMC Waived Any Impossibility Defense................................................. 15

     B.    PMC Breached Section 8 of the Agreement, by Inexplicably Refusing to Even Attempt to Resolve the Cause for Termination Alleged in the Cure Notice. .......... 15

     C.    PMC Breached Multiple Other Provisions of the Agreement. ............................... 18

III.    THE PANDEMIC SUBSTANTIALLY FRUSTRATED SHUTTERSTOCK'S PRINCIPAL PURPOSE FOR ENTERING INTO THE AGREEMENT........................ 19

     A.    Shutterstock's Principal Purpose For Entering The Agreement Was to Obtain Access to Attend and Photograph Third Party Events............................................ 20

     B.    The Pandemic Wholly Destroyed the Ability to Access to Third Party Events. ..... 22

     C.    The Pandemic Was Not Foreseeable At The Time of the Agreement.................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................9

*Arrow Commc'n Labs. Inc. v. Pico Prods. Inc.*,
   615 N.Y.S.2d 187 (4th Dept. 1994) .............................................................13, 14

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*,
   361 F. Supp. 2d 210 (S.D.N.Y. 2005)....................................................................13

*Aviation Dev. Co. v. C&S Acquisition Corp.*,
   No. 97 Civ. 9302 (AJP), 1999 WL 123718 (S.D.N.Y. Mar. 8, 1999),
   *aff'd sub nom. Aviation Dev. Co. PLC v. C & S Acquisition Corp.*,
   201 F.3d 430 (2d Cir. 1999).....................................................................................9

*Bank of Am. Nat. Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*,
   740 F. Supp. 260 (S.D.N.Y.), *aff'd sub nom.*,
   *First Nat. Bank Md. v. Envases Venezolanos,* 923 F.2d 843 (2d Cir. 1990) ..........19

*Bush v. Protravel Int'l, Inc.*,
   192 Misc. 2d 743 (N.Y. Civ. Ct. 2002)..................................................................24

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.*,
   232 F.3d 153 (2d Cir. 2000)...................................................................................14

*Consarc Corp. v. Marine Midland Bank, N.A.*,
   996 F.2d 568 (2d Cir. 1993)...................................................................................14

*Consumers Power Co. v. Nuclear Fuel Servs., Inc.*,
   509 F. Supp. 201 (W.D.N.Y. 1981) ..................................................................20, 22

*County of Jefferson v. Onondaga Dev., LLC*,
   59 N.Y.3d 203 (4th Dep't 2017).............................................................................10

*DiFolco v. MSNBC Cable LLC*,
   831 F. Supp. 2d 634 (S.D.N.Y. 2011)....................................................................17

*Dreni v. PrinterOn Am. Corp.*,
   486 F. Supp. 3d 712 (S.D.N.Y. 2020) (Vyskocil, J.).............................................11

*Dreni v. PrinterOn Am. Corp.*,
   No. 18 Civ. 12017 (MKV), 2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) .............13

*Eurocredit Bank v. Citibank, N.A.*,
   No. 95 Civ. 7713 (PKL), 1996 WL 556990 (S.D.N.Y. Oct. 1, 1996) ....................10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Greater N.Y. Auto. Dealers Assn, Inc. v. City Spec, LLC*,
    136 N.Y.S.3d 695 (N.Y. Civ. Ct. 2020)................................................................19

*Greenwood v. Daily News, L.P.*,
    8 Misc. 3d 1002(A) (N.Y. Sup. Ct. 2005)............................................................16

*HWA 1290 III LLC v. Gkny1 Inc.*,
    No. 158142/2020, 2021 WL 1943198 (N.Y. Sup. Ct. May 12, 2021)....................24

*In re Best Film & Video Corp.*,
    46 B.R. 861 (Bankr. E.D.N.Y. 1985)..............................................................17, 18

*In re Condado Plaza Acquisition LLC*,
    620 B.R. 820 (Bankr. S.D.N.Y. 2020)................................................................22

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2007 WL 130865 (Bankr. S.D.N.Y. Jan. 16, 2007) ............10

*Independent Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996).....................................................................19

*International Plaza Assocs. L.P. v. Amorepacific US, Inc.*,
    No. 155158/2020, 2020 WL 7416598 (N.Y. Sup. Ct. Dec. 14, 2020) ..................24

*Jack Kelly Partners LLC v. Zegelstein*,
    33 N.Y.S.3d 7 (1st Dep't 2016) ..........................................................................24

*Jobim v. Songs of Universal, Inc.*,
    732 F. Supp. 2d 407 (S.D.N.Y. 2010)..................................................................19

*Karamarios v. Bernstein Mgmt. Corp.*,
    612 N.Y.S.2d 12 (1st Dep't 1994) ......................................................................25

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)................................................................................11

*Mycak v. Honeywell, Inc.*,
    953 F.2d 798 (2d Cir. 1992).................................................................................12

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006).................................................................................14

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,
    315 F.3d 171 (2d Cir. 2003)..................................................................................9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Norfolk S. Ry. Co. v. Flexi-Van Leasing, Inc.*,
    No. 99 Civ. 0055 (WHP), 2000 WL 1855112 (S.D.N.Y. Dec. 18, 2000) .............................12

*Nowak v. Ironworkers Local 6 Pension Fund*,
    81 F.3d 1182 (2d Cir. 1996)....................................................................................................12

*Onex Food Servs., Inc. v. Grieser*,
    No. 93 Civ. 0278 (DC), 1996 WL 103975 (S.D.N.Y. Mar. 11, 1996) ..................................10

*Reed v. Luxury Vacation Home LLC*,
    No. 20 Civ. 4243 (PGG), 2022 WL 4624839 (S.D.N.Y. Sept. 30, 2022) ..............................25

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
    380 F.3d 704 (2d Cir. 2004)....................................................................................................11

*Ross v. Nat'l Urb. League*,
    141 S. Ct. 18 (2020)................................................................................................................24

*Rothberg v. Bernstein*,
    No. 87 Civ. 2053 (KMW), 1990 WL 58902 (S.D.N.Y. Apr. 30, 1990)...........................20, 22

*Sea Tow Servs. Int'l., Inc. v. Pontin*,
    607 F. Supp. 2d 378 (E.D.N.Y. 2009) ...................................................................................17

*Structure Tone, Inc. v. Universal Servs. Grp., Ltd.*,
    929 N.Y.S.2d 242 (1st Dep't 2011) .......................................................................................22

*T.E.A.M. Ent., Inc. v. Douglas*,
    361 F. Supp. 2d 362 (S.D.N.Y. 2005).....................................................................................15

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994)....................................................................................................15

*United States v. General Douglas MacArthur Senior Village, Inc.*,
    508 F.2d 377 (2d Cir. 1974)........................................................................................22, 23, 25

*United States v. Martin*,
    No. 18-CR-834-7 (PAE), 2020 WL 1819961 (S.D.N.Y. Apr. 10, 2020) ..........................24, 25

*Wechsler v. Hunt Health Sys., Ltd.*,
    330 F. Supp. 2d 383 (S.D.N.Y. 2004).....................................................................................11

### OTHER AUTHORITIES

11 Williston on Contracts (4th ed.)................................................................................................18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Bryan A. Garner, A Dictionary of Modern Legal Usage 941-942
   (2d ed., Oxford U. Press 1995) .............................................................................12

Fed. R. Civ. P. 56(a) ...............................................................................................9

Restatement (Second) of Contracts (1981) ...................................................19, 23, 24

## PRELIMINARY STATEMENT

Plaintiff-counterclaim defendant Penske Media Corporation ("PMC") launched and perpetuated this lawsuit under the misguided theory that it is entitled to millions dollars for delivering none of the services in exchange for which defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock") agreed to pay large advances for a set period of years.  Within the crucible of litigation, PMC's ploy to get something for nothing has fallen apart as it should: PMC was in breach when it reduced its delivery of hundreds of events to none, and multiple events that expressly were to be delivered under the parties' Agreement (defined below) were cancelled. PMC committed further breaches in an effort to thwart the intentions of the Agreement.  PMC even breached the obligation to make a good faith effort to resolve Shutterstock's concerns as the Agreement expressly required; indeed, the evidence suggests PMC eschewed its obligations because PMC believed it could get the last Advance (defined below) and then go to market, in bad faith, without any further performance as soon as Shutterstock's last advance check cleared.  And despite being in breach since March 2020, PMC now brazenly comes to court with an outstretched hand, seeking a second windfall in exchange for offering no services.

Whether under law or equity, PMC is not entitled to its demanded $4.5 million in consideration for taking advantage of perceived technicalities that PMC has never been able to support carry the day.  When put to the test under summary judgment, PMC is able to muster legally only a failed attempt to string together two words from unrelated parts of the parties' agreement.  PMC's resorting to mischaracterized snippets of internal discussions purporting to show factually some sort of "intent," forgets that intent is irrelevant to the claim.  This credibility challenge backfires: the context shows Shutterstock's good faith efforts, in the midst of a devastating and evolving global pandemic, to try to maintain some relationship despite PMC's

failure to deliver, and in the face of PMC's misguided hostility. PMC also implies disingenuously that because it uploaded a token amount of old images to Shutterstock's platform in a four-month period (a period corresponding to $1.33 million of consideration Shutterstock paid) and otherwise delivered none of what generated the relationship in the first place, it has checked all boxes to prevail.  PMC even reaches with a novel and mathematically unsound theory that turns entirely on the notion that the services PMC provided over the prior years were of *no value at all* at any time.

None of this is consistent with the spirit or the letter of the parties' relationship, and none of it establishes entitlement to judgment as a matter of law, at least not for PMC. PMC's CEO admitted the company was in breach of its obligations to provide valuable content creation opportunities yet failed to plead any defense excusing the breach. PMC admitted it never complied with the 45-day window in the agreement. All it did was confirm it would not perform. Discovery has revealed PMC set out to get its money and run to the market immediately. Further, PMC acknowledged it had never received advances without providing events; it cannot dispute the large advances were paid to secure event access for Shutterstock's purposes of building and maintaining advantages of exclusive access for the *entire* period of the parties' agreement, not a shortened period PMC proposes.  Therefore, PMC's claim is meritless *ab initio*.  At best for PMC, there exist disputed issues of fact in its voluminous papers, and PMC's motion should be denied accordingly.

## SUMMARY OF RELEVANT FACTUAL BACKGROUND

### A.    PMC and Shutterstock Enter Into The Agreement in 2015.

PMC is a digital media company and owner of multiple leading entertainment and fashion industry publications, including *Women's Wear Daily (WWD)*, *Variety*, *Deadline Hollywood*, *Rolling Stone*, *Billboard*, and *The Hollywood Reporter*.  *See* Counterstatement to PMC's Rule 56.1 Statement of Facts ("CSUF") ¶ 1.   For decades, PMC and its brands have consistently enjoyed

exclusive, behind-the-scenes access to attend and photograph the entertainment and fashion industry events featured in their publications, including high-profile, star-studded awards shows, movie premieres, and fashion shows. *Id.* ¶ 159. PMC also hosts its own events. *Id.* ¶ 12.

Shutterstock is a leading global provider of high-quality photographs and other content. *Id.* ¶ 151. Founded in 2003, Shutterstock initially primarily offered "stock" photography. *Id.* ¶ 5. Over the years, the demand for "editorial" photography—especially photographs documenting entertainment, fashion, sports, and other current events—increased exponentially due to the internet, social media, and ever-increasing pace of the news cycle. *Id.* ¶ 153. In order to capitalize on this demand, and to gain market share from its biggest competitor, Getty Images, Shutterstock decided in late 2014 to launch a comprehensive "Editorial" photography product. *Id.* ¶¶ 5, 154.

In the editorial photography business, "access is everything." Declaration of Eleanor M. Lackman dated April 19, 2023 ("Lackman Decl."), Ex. FF; *see also* CSUF ¶ 172. Shutterstock knew the success of its Editorial photography product depended on its ability to access and capture content at high-profile entertainment and fashion industry events around the world. *Id.* ¶ 155. In early 2015, having already acquired Rex Features, one of the largest photographic press agencies in Europe, Shutterstock identified PMC as its solution for obtaining access to entertainment and fashion industry events in the United States. *Id.* ¶¶ 18, 158-159.

On or about June 20, 2015, PMC and Shutterstock entered into the "Archive & Event Image Hosting and License Agreement" ("Agreement"), effective July 1, 2015. *Id.* ¶ 160; Dkt. No. 176-5 ("Agmt."). In the words of PMC's COO, the entire Agreement "was built on the concept [that Shutterstock] could leverage [PMC's] access to [entertainment and fashion industry] events." CSUF ¶ 161. During negotiations, PMC knew Shutterstock was in the midst of building its Editorial product to compete with Getty Images, and was mainly interested in a deal to obtain

3

PMC's access to entertainment and fashion industry events to add to Shutterstock's overall Editorial offering (to include news, politics, sports, entertainment, and fashion).  *Id.* ¶ 165.  PMC touted its "insider access"—the same access it previously granted to Getty Images—to induce Shutterstock to sign the Agreement.  *Id.* ¶¶ 165-168.  Upon execution, PMC's "insider access and event exclusivity" was front-and-center in the parties' internal and external messaging about the Agreement.  *Id.* ¶ 170.

For PMC, the Agreement was about what it believed to be guaranteed money.  *Id.* ¶ 187.  When the terms were finalized, PMC's CEO, Jay Penske, announced to his team:  "CASHFLOW MY BOYS!!! $15million in 48months!"  Lackman Decl., Ex. II.  Mr. Penske also has indicated he wanted a deal with Shutterstock to "destroy" Getty Images (*id.*, Ex. BB), because PMC's relationship with Getty Images, as with the sellers of *Variety*, ended in a dispute.  CSUF ¶ 214.

B.   Consistent With Shutterstock's Principal Purpose for Entering Into the Agreement, PMC Agrees to Provide Access to Third Party Events.

Consistent with Shutterstock's principal purpose for seeking a deal with PMC and the parties' negotiations, PMC agreed to provide Shutterstock with access to "significant events around the world to which PMC has access," which are referred to in the Agreement as "Third Party Events" and "defined [t]herein . . . [to] initially include, but not be limited to, [the] events listed on Schedule 'D'."  Agmt. § 3(a) & Schedule D (listing twelve marquee events).  Relatedly, PMC agreed "to work with Shutterstock in good faith to create additional access to third party events" and "to maximize revenue opportunities for coverage of Third Party Events within the fashion industry" (Agmt. §§ 3(a)(iii) & (e)); and to "engage in exclusive good faith discussions [with Shutterstock] . . . with the intent of amending to the Agreement" any "content, events[,] or rights to cover third party events acquired by PMC" during the Agreement (*id.* § 3(a)(iv)).

In addition, PMC agreed to "provide Shutterstock access to [PMC's] events . . . to which

4

third parties are invited generally ('PMC Events')." *Id.* § 3(a)(ii).  At its suggestion, PMC also agreed to provide Shutterstock with certain archival imagery ("Archive Content").  *Id.* § 3(a)(i).  PMC granted Shutterstock "an exclusive worldwide right and license" to exploit all of the content under the Agreement, including content captured at Third Party Events and PMC Events ("Third Party Event Content" and "PMC Event Content") and the Archive Content.  *Id.* § 3(a).

   C. <u>Shutterstock Agrees to Pay Multi-Million Dollar Advances, Plus More.</u>

   Shutterstock and PMC agreed to share in the revenue generated from the license of Third Party Event Content, PMC Event Content, and Archive Content.  *See* Agmt. § 6; CSUF ¶ 188. Specifically, Shutterstock agreed to pay royalties to PMC equal to 30% of the revenue.  *Id.* Shutterstock also agreed to pay PMC a large, up-front annual advance against such royalties (each, a "Advance") at the start of each of the Agreement's six successive, one-year license periods (each, a "License Period").  *Id.* ¶ 189.  Each Advance was "fully recoupable" by Shutterstock, but "solely" from the royalties generated and due to PMC during the applicable License Period.  *Id.*  The Advances started at $1.5M and went up to $3.5M (*id.*), based on the parties' expectation that revenues would increase as PMC provided more access and Shutterstock gained recognition as a go-to source for content from entertainment and fashion industry events.  *Id.* ¶ 190.  Shutterstock also agreed to provide PMC a $1M credit per License Period for licensing images on its website (Agmt. § 2(a)), and to host PMC's content (*id.* § 3(a)(i)).

   The parties anticipated, correctly, that PMC's provision of access to Third Party Events— thereby enabling Shutterstock to capture and exclusively offer entertainment and fashion-focused content for license—would be, by far, the most valuable component of the consideration due to Shutterstock.  *See* CSUF ¶¶ 184, 186.  The parties did not expect the Archive Content to generate significant revenue.  *Id.* ¶¶ 47, 184.  Most of the Archive Content had never been monetized,

existed solely in physical form, and was to be scanned with funding from Shutterstock; PMC wanted this because it had recently received a large group of physical photographs in the *Variety* files from PMC's recent purchase of it. *Id.* ¶¶ 179-180. Absent the promised access to Third Party Events, Shutterstock would not have entered into the Agreement with PMC. *Id.* ¶ 199.

        D.     <u>For Years, PMC Provides Access to Third Party Events and Shutterstock Pays the Advances, Notwithstanding PMC's Late Provision of Archive Content and Other Violations of the Agreement.</u>

Shortly after execution of the Agreement, PMC began providing Shutterstock with access to attend and photograph Third Party Events. *Id.* ¶¶ 174-175. In each of the first four License Periods of the Agreement, Shutterstock used PMC's credentials to attend **hundreds** of Third Party Events, resulting in many thousands of images and significant licensing revenues. *Id.* ¶ 175.

There is no dispute that Shutterstock timely paid the first four Advances, totaling $7.5M (*id.* ¶ 189), even though PMC refused to negotiate in good faith regarding content and credentials acquired from *Rolling Stone* (*id.* ¶¶ 1, 88), failed to provide all of its Archive Content (*id.* ¶ 184), and unbeknownst to Shutterstock at the time, had been offering its credentials to other parties (*id.* ¶ 13), in violation of the Agreement. Shutterstock also paid the fifth Advance for $3M in or around July 2019, which was recoupable against royalties due to PMC from revenue generated between July 1, 2019 and June 30, 2020 ("License Period 5"). *Id.* ¶ 24, 193. That revenue was expected to come from the license of Third Party Event Content, which together with PMC Event Content had accounted for approximately 90% (or more) of the revenue in the prior License Periods. *Id.* ¶ 185. The Archive Content accounted for approximately 10% (or less), and in fact, was so insignificant that Shutterstock paid two Advances before receiving any. *Id.* ¶¶ 185, 186.

E.      In Mid-March 2020, the COVID-19 Pandemic Unexpectedly Causes Cancellation
        of Third Party Events and PMC Provides No Access to Shutterstock.

In mid-March 2020, with a third of License Period 5 remaining, virtually all live events were cancelled due to the COVID-19 pandemic.  *See* CSUF ¶ 195.  In the following months, PMC provided **no access** to Shutterstock to any Live Events, including specific Third Party Events listed in Schedule D such as the 2020 Cannes Film Festival (scheduled for May 12-13, 2020) and the 2020 Tony Awards (scheduled for June 7, 2020).  *Id.* ¶ 197.  Shutterstock's revenue from licensing content under the Agreement dropped to **almost nothing**, totaling a mere fraction of the amount Shutterstock had paid to PMC for the corresponding period (*i.e.*, March through June 2020).  *Id.* ¶¶ 196, 225.  The parties never anticipated that PMC would not be able to deliver access to Live Events, let alone for a prolonged, indefinite period due to a global pandemic.  *Id.* ¶¶ 196-197.

F.      PMC Refuses to Negotiate in Good Faith and Instead Files This Lawsuit.

On March 31, 2020, Shutterstock approached PMC in a good-faith effort to keep the Agreement alive during the pandemic.  *Id.* ¶ 97.  Shutterstock had no intention of terminating the Agreement at this point (or at any point before then despite PMC's insinuations otherwise),[1] but in order for the relationship to continue in the absence of Live Events, it was critical that the terms be fair.  *Id.* ¶ 99.  To that end, Shutterstock proposed an adjusted Advance and offered to pay PMC a higher percentage of the licensing revenue.  *Id.* ¶ 103.  Contrary to PMC's assertion, Shutterstock's offer did not amount to a "better deal" (Mot., p. 8); absent access to the Live Events that it specifically contracted for, Shutterstock was worse off under any scenario.  CSUF ¶ 164.

PMC made only one counteroffer, which despite PMC having no ability to deliver the very

---

[1]  PMC's assertion that Shutterstock had been trying to terminate since 2019 is a sideshow.  The 2019 discussions arose from production costs at *sponsored* PMC events, which PMC admitted fell outside the scope of the Agreement, and the parties resolved before the pandemic.  *Id.*¶¶ 83-84.

consideration that led to the Agreement, left PMC better off and provided no additional consideration to Shutterstock in return.  PMC effectively proposed that Shutterstock give up $1M in consideration in exchange for the opportunity to pay $1.75M a year later.  *Id.* ¶ 101.  No rational person would accept this offer, and PMC refused to negotiate in good faith.  *Id.*  PMC's characteristic hostile, uncooperative approach was on full display:  Mr. Penske shouted at and then hung up on Shutterstock's newly-named CEO, Mr. Pavlovsky, when he indicated that Shutterstock could not accept PMC's proposal for more advance money when it had already overpaid PMC.  *Id.* ¶¶ 101, 218.  Indeed, the pre-paid $3M Advance covered through June 30, 2020 (*id.* ¶ 190), but PMC effectively stopped performing in March 2020 and showed no signs of coming to a reasonable resolution to address its breach.  *Id.* ¶ 198, 205-225.[2]  Apparently in retaliation, PMC also stopped supplying Archive Content, except for a token number of images with little licensing value, which should not have been negatively affected by the pandemic in any way.  *Id.* ¶ 204.

Following the call between Mr. Penske and Mr. Pavlovsky, the matter was turned over to counsel.  PMC's counsel was aloof, unfamiliar with the Agreement, and failed to respond to Shutterstock's counsel.  *Id.* ¶ 219.  With negotiations at a standstill and its primary purpose for entering into the Agreement eliminated, Shutterstock availed itself of the formal provisions of the Agreement.  On May 18, 2020, Shutterstock sent a "Cure Notice" to PMC under Section 8 of the Agreement, which triggered PMC's obligation to "correct, cure, or otherwise resolve the alleged cause for termination" within forty-five days.  *Id.* ¶¶ 220-221.  Shutterstock expected this to initiate negotiations and result in a reasonable resolution.  Instead, PMC went silent (*id.* ¶¶ 223-224), and on June 15, 2020, PMC prematurely filed this lawsuit without warning seeking, *inter alia*, the

---

[2] Despite all other facts, PMC places heavy reliance on a text message from a non-lawyer reflecting her misunderstanding of what would result in a breach, including PMC's prior breach. In concealing the context, PMC forgets that the *factfinder* determines whether breach occurred.

$3.5M Advance for July 1, 2020 and June 30, 2021 ("License Period 6"). Dkt. No. 1. PMC never provided any assurances it could and would perform at any time in the future. CSUF ¶ 221. Thus, upon expiration of the cure period on July 2, 2020, Shutterstock sent a "Termination Notice" to PMC, indicating the Agreement would be terminated as of July 17, 2020. *Id.* ¶ 225.

G.     <u>PMC Moves for Partial Summary Judgment.</u>

This case has been streamlined to remove the three claims against which Shutterstock moved to dismiss in 2020, and Shutterstock's three related counterclaims. Dkt. No. 159. At issue in this motion is part of PMC's first claim[3] and Shutterstock's first three counterclaims. *See* Dkt. No. 57. In essence, PMC proposes that despite its lengthy Statement of Facts, there is *no* dispute it is entitled to retain a pro rata share of License Period 5, receive $3.5M for License Period 6 which did not occur, and receive $1M in cash corresponding to the photo use credit without any crediting obligations to Shutterstock. PMC does not identify any other obligations or deductions.

<u>**ARGUMENT**</u>

**I.     LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT**

PMC must show "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). A court also may grant summary judgment

---

[3] PMC also alleged Shutterstock breached the Agreement by refusing to attend PMC Events, but failed to proffer any evidence of this and does not even mention it in its Motion. Count I therefore cannot be fully resolved on the Motion for that reason alone.

to the nonmoving party if the record establishes it is entitled to such relief.  *Aviation Dev. Co. v. C&S Acquisition Corp.*, No. 97 Civ. 9302 (AJP), 1999 WL 123718, at *2 (S.D.N.Y. Mar. 8, 1999), *aff'd sub nom. Aviation Dev. Co. PLC v. C & S Acquisition Corp.*, 201 F.3d 430 (2d Cir. 1999).

PMC cannot prevail on its motion in any respect, and judgment as a matter of law should be entered in Shutterstock's favor.  In addition to the myriad reasons discussed below, PMC is not entitled to summary judgment on its breach of contract claim because it ignored multiple of Shutterstock's affirmative defenses, including, most notably, unjust enrichment, which is properly pleaded and supported by evidence.  *See* Dkt. No. 76, p. 10; *see also In re Enron Corp.*, No. 01-16034 (AJG), 2007 WL 130865, at *1 (Bankr. S.D.N.Y. Jan. 16, 2007) (affirming denial of summary judgment where plaintiff "did not at any point discuss or even mention the [ ] affirmative defenses asserted in [defendant's] [a]nswer"); *Eurocredit Bank v. Citibank, N.A.*, No. 95 Civ. 7713 (PKL), 1996 WL 556990, at *2 (S.D.N.Y. Oct. 1, 1996).  It would be inequitable to permit PMC to recover $4.5M for License Period 6, which undisputedly did not occur.  *See* CSUF ¶¶ 24, 189-190.

## II.    PMC MATERIALLY BREACHED THE AGREEMENT PRIOR TO THE TIME SHUTTERSTOCK WAS REQUIRED TO PAY THE $3.5M ADVANCE

For summary judgment on its breach of contract claim, PMC must show, *inter alia*, it performed its own obligations under the Agreement.  "It is well settled that a party who seeks to recover damages from the other party to the contract for its breach must show that he himself is free from fault in respect of performance." *County of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.3d 203, 206 (4th Dep't 2017) (an "essential element[]" of a breach of contract claim is "performance of its obligations by the party asserting . . . breach") (citations omitted); *accord Onex Food Servs., Inc. v. Grieser*, No. 93 Civ. 0278 (DC), 1996 WL 103975, at *5 (S.D.N.Y. Mar. 11, 1996) ("It is clear that one who breaches a contract may not seek to enforce other provisions of that contract to

his or her benefit.") (citations omitted).  It is equally settled that "a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citations omitted); *see also Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004) ("When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations.").

PMC is not entitled to summary judgment on either party's claim for breach of contract because, as discussed below, the evidence in the record establishes (or at least reveals questions of fact from which a jury may find) that PMC materially breached the Agreement in multiple ways, thereby excusing Shutterstock's obligation to perform its side of the last year of the Agreement.

A.     PMC Breached Section 3(a)(ii) & (iii) of the Agreement, by Failing to Provide Access to Live Events.

As PMC concedes, "both parties expected to photograph" "a significant number of live events" under the Agreement.  Mot., p. 3.  PMC does not dispute it provided ***no access*** to Live Events from mid-March 2020 onward, including specific Third Party Events listed in Schedule D.  *See* CSUF ¶ 198.  Instead, PMC disingenuously contends it had no obligation to do so based on a strained reading of the Agreement, and a belated (and now waived) impossibility defense.

1.     The Agreement Either Unambiguously Obligates PMC to Provide Access to Live Events or is Ambiguous.

In interpreting a disputed contract term, a court's "primary task . . . is to determine intentions of the parties . . . as objectively manifested by the language of the contract in light of the background against which the contract was written."  *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 710 (2d Cir. 2004).  The threshold question is "whether the contractual terms at issue are ambiguous," which "is a question for law for the court to decide."  *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 723 (S.D.N.Y. 2020) (Vyskocil, J.) (citations omitted).

Contract language is unambiguous if it has a "definite and precise meaning" and "there is no reasonable basis for a difference of opinion." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996) (citation omitted).   On the other hand, contract language is ambiguous if it is "susceptible of at least two fairly reasonable meanings." *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir. 1992).  "In most instances, the existence of an ambiguous provision is fatal to resolution of a contractual dispute at the summary judgment stage." *Norfolk S. Ry. Co. v. Flexi-Van Leasing, Inc.*, No. 99 Civ. 0055 (WHP), 2000 WL 1855112, at *6 (S.D.N.Y. Dec. 18, 2000); *accord Nowak*, 81 F.3d at 1192 ("We have repeatedly held that, in a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous.").

PMC plainly breached Section 3(a)(iii) of the Agreement, which  unambiguously obligated PMC to provide Shutterstock with at least some access to Third Party Events, including those listed in Schedule D.  The language of the Agreement permits no other interpretation:

> Third Party Event Access and Third Party Event Content.  ***PMC will provide*** to Shutterstock defined credentials, passes, and VIP access to significant events around the world ***to which PMC has access as defined herein*** ("Third Party Events"). . . . These Third Party Events ***shall initially include, but not be limited to***, those events listed on Schedule "D".  PMC shall work with Shutterstock in good faith to create ***additional access*** to third party events that will enable the Parties to ***further monetize*** the Third Party Event Content.

Agmt. § 3(a)(iii) (emphases added).  The word "will" indicates a promise that "PMC ***will*** provide . . . access;" the phrase "to which PMC ***has*** access" indicates possession in the present tense (*i.e.*, the access possessed by PMC at the time the Agreement was executed); and the phrases "***initially include, but not be limited to***, [the Third Party Events] in Schedule 'D'" and "create ***additional*** access" indicates a minimum amount of access that may expand.   *Cf.* Bryan A. Garner, A Dictionary of Modern Legal Usage 941-942 (2d ed., Oxford U. Press 1995) ("will" creates a

contractual obligation); *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F. Supp. 2d 210, 215 (S.D.N.Y. 2005) (construing agreement to cover rights possessed by party at execution based on present tense verb "is").   Taken together, the foregoing language unambiguously conveys that PMC was at very least obligated to provide access to the Third Party Events to which it had access at the time the Agreement was executed, including, at a minimum, the specific Third Party Events in Schedule D.   This is consistent with the context and circumstances surrounding the execution of the Agreement, which show the parties intended that PMC would be obligated to provide access to Third Party Events, and Shutterstock would not have done the deal without it.   *See* CSUF ¶¶ 186, 198; *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017 (MKV), 2021 WL 4066635, at *4 (S.D.N.Y. Sept. 3, 2021) (in determining ambiguity, court is not strictly confined to contract language, and should consider "the context and circumstances surrounding the execution") (collecting cases).

Likewise, Section 3(a)(ii) unambiguously requires PMC to provide access to PMC Events; the phrase "which third parties are invited generally" merely qualifies that PMC need not provide access to those events that are not open to the public.  Agmt. § 3(a)(iii).[4]

PMC urges a different interpretation, one that relies on rewriting the Agreement.  It argues "the Agreement obligated PMC to provide Shutterstock with access only to those live events that actually were held and to which PMC actually had access."  Mot., p. 16.  The Agreement cannot reasonably be read to support PMC's interpretation, let alone ***only*** PMC's interpretation.  *See Arrow Commc'n Labs. Inc. v. Pico Prods. Inc.*, 615 N.Y.S.2d 187, 188 (4th Dept. 1994) ("A party

---

[4] PMC conflates its obligation to provide access to Third Party Events and PMC Events, which are subject to different contractual language.  Shutterstock's argument primarily focuses on Third Party Events, which far outnumbered PMC Event during each year of the Agreement and are relatively insignificant in the context of the overall Agreement.

seeking summary judgment has the burden of establishing that the construction it favors is the only construction which can fairly be placed thereon.") (citations omitted).  According to PMC, the phrase "to which PMC has access" accounted for the expectation that PMC's access would "evolve over time." Mot., p. 17.  Not only is this inconsistent with the word "has," but the parties accounted for the fact that PMC's access may evolve elsewhere—*i.e.*, by indicating that "Third Party Events" "shall initially include, but ***not be limited to***," the events listed in Schedule D, and by requiring PMC to work in good faith to "create ***additional access at third party events***" (using the undefined term to reflect other events). Agmt. § 3(a)(iii) (emphasis add).  PMC points out that the Agreement does not use the language "always include," but that is exactly what "shall" communicates.

If the Court finds PMC's interpretation plausible, then the parties' conflicting interpretations creates an ambiguity that cannot be resolved at this stage.  "This Court may resolve the ambiguity in the contractual language as a matter of law" ***only*** "if there is no extrinsic evidence to support [Shutterstock's] interpretation." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000); *see also New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) (if "extrinsic evidence as to [] meaning [of ambiguous term] is available, its interpretation is a question of fact"); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993) (reversing summary judgment, "some extrinsic evidence" supported nonmovant's interpretation).

Here, there is more than enough extrinsic evidence to merit denial of PMC's motion.  The context in which the Agreement was signed makes clear that Shutterstock would not have entered into the Agreement if this were not the case.  *Id.* ¶¶ 186, 198.  Moreover, Mr. Pfeifer, who negotiated the Agreement, and Mr. Melvin, who was involved in the day-to-day performance, have each submitted sworn declarations indicating that they understood that PMC was obligated to at

least provide credentials, passes, and VIP access to the Third Party Events listed in Schedule D. *See* CSUF ¶ 173.  And up until 2020, PMC consistently provided access to those events, except in rare instances, which was an obligation that Shutterstock was free to waive without consequence. *See id.* ¶ 174; Agmt. § 17 ("no waiver shall be construed as a waiver of any succeeding breach").

The extrinsic evidence PMC cites does not warrant any other result.  While Mr. Pfeifer testified he understood the phrase "to which PMC has access" as a qualification, his testimony does not establish that it qualified PMC's contractual obligation to such an extent as to render it wholly illusory.  *See* Mot., p. 18 (quoting Mr. Pfeifer's deposition transcript, including that he understood the phrase as "creating wiggle room" for the rare situation in which PMC may be "blocked out of ***an event***," not necessarily an event in Schedule D, and not that the phrase somehow meant PMC was not obligated to provide access to any events at all).  The witness referred only to a scenario that was foreshadowed elsewhere in the Agreement.  *See* Agmt. § 18.

### 2.  PMC Waived Any Impossibility Defense.

In a last-ditch attempt to avoid a finding of material breach, PMC argues "impossibility." Mot., p. 20.  This defense cannot be reconciled with PMC's vigorous objections to Shutterstock's claimed frustration of purpose, which presumably is why PMC has raised it for the first time in its motion.  Because PMC "did not raise impossibility in [its] answer" to Shutterstock's counterclaim, "it is waived."  *T.E.A.M. Ent., Inc. v. Douglas*, 361 F. Supp. 2d 362, 367 (S.D.N.Y. 2005); *accord Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994).

### B.  PMC Breached Section 8 of the Agreement, by Inexplicably Refusing to Even Attempt to Resolve the Cause for Termination Alleged in the Cure Notice.

With the impression that PMC did not want to resolve the matter but instead sought to follow through on its unfounded plan to reap millions of dollars in consideration in exchange for doing nothing, Shutterstock issued a Cure Notice under Section 8 of the Agreement.  Described

15

by Mr. Penske as "fairly boilerplate" (CSUF ¶ 220), this provision provides as follows:

> Termination:  Either Party may terminate the Agreement at any time
> for cause by giving the other Party written notice and providing a
> forty-five (45) day period ("Cure Period") during which the other
> must ***correct, cure, or otherwise resolve*** the alleged cause for
> termination. If at the conclusion of the Cure Period the cause for
> termination has not been corrected, cured or otherwise resolved then
> the non-breaching Party shall give written notice of termination to
> the other of not less than ten (10) business days.

Agmt. § 8 (emphasis added).  PMC, however, did none of this:  it offered no correction, no cure,

and no resolution.  CSUF ¶ 223.  Rather, it characteristically went looking for a fight, claiming

falsely that the Agreement terminated by virtue of the notice alone.  *Id.* ¶¶ 213, 225; Dkt. No. 1.

PMC provides no explanation for its utter failure to come back to the table to try to resolve

the matter in good faith.  Instead, it seems to suggest in two authority-bereft paragraphs that

Shutterstock somehow prevented PMC from cooperating because Shutterstock rejected PMC's

demand that Shutterstock commit to paying at least $1.75M on July 1 and $1.75M within the

following year, and also forgive one third of the prior year's Advance—***before even discussing***

***any other terms at all***.  CSUF ¶¶ 209-212.  While Shutterstock understandably was not interested

in paying more up-front money to a party already in breach,  it made its position that it wanted to

look at the situation holistically very clear to PMC.  *Id.* ¶ 81.  Indeed, when Penske reacted hotly

to the Cure Notice in a text message to Oringer, he responded: "We are happy to come to an

agreement. The notice was based on the 45-day window in the contract."  *Id.* ¶ 222.  Shutterstock's

then-General Counsel concurrently reached out to PMC's counsel.  *Id.* ¶ 219.  No response.

By citing a few out-of-context instant messages, PMC also seems to imply Shutterstock

invented the pandemic as an excuse to terminate an agreement Shutterstock saw as unfair.  Apart

from being absurd, this concocted theory fails.  A party's mental state has nothing to do with

whether an agreement was breached.  *See Greenwood v. Daily News, L.P.*, 8 Misc. 3d 1002(A)

(N.Y. Sup. Ct. 2005) ("[I]ntent is not relevant to a cause of action for breach of contract.") (citation omitted); *DiFolco v. MSNBC Cable LLC*, 831 F. Supp. 2d 634, 642 (S.D.N.Y. 2011) (same).

By not responding, it was *PMC* that made its own bed.  PMC admits it did not respond to the Cure Notice because it was upset that Shutterstock refused to commit as a condition for negotiating to yet *another* payment when PMC was already in breach, and was not going to agree to PMC's objectively unreasonable "delayed payment" terms offered as an ultimatum and as to which PMC evidently had no intention of performing on in good faith.  Regardless, PMC's disappointment in not getting its way is no excuse for not only failing even to *attempt* to resolve the matter during the window, but for running to court scorched-earth style in the middle of the Cure Period, despite this being PMC's trademark.  *See* CSUF ¶¶ 215, 223.  At no time did PMC say a word about why it did not respond to an admitted breach (*id.*); its belatedly raised excuse of "impossibility" is no explanation as to why PMC failed to seek a solution or resolution as required. The question of whether it could have cured or resolved Shutterstock's alleged cause in any manner under the broad provision in the Agreement raises an issue of fact, if not a hypothetical. *See Sea Tow Servs. Int'l., Inc. v. Pontin*, 607 F. Supp. 2d 378, 390-91 (E.D.N.Y. 2009) (citing cases).

Nonetheless, the most likely reason PMC did not respond ***at all*** is not because it was angry about its invented conditions for discussion, but because PMC knew it had no answer to Shutterstock's notice apart from having to concede it either was in breach or would have to seek a resolution in good faith rather than execute on its unfounded plan to get money and then go straight to the market without further cooperation.  CSUF ¶ 212.  In any event, whether it read Section 8 of the Agreement, by suing and otherwise failing to respond, PMC made a choice about the matter and chose to accept that the Agreement would terminate.  Indeed, Shutterstock could have terminated the Agreement immediately where the cure was unfeasible, *see In re Best Film & Video*

*Corp.*, 46 B.R. 861, 874 (Bankr. E.D.N.Y. 1985), but Shutterstock remained optimistic PMC might

cool off and engage in discussions that did not require Shutterstock to pre-commit to a set sum of

money for a new, short term that would not start for roughly three months.

      C.      <u>PMC Breached Multiple Other Provisions of the Agreement.</u>

Over the course of the Agreement, PMC did not hold up its end of the bargain and

materially breached various other contract terms, apparently believing it had to do little more than

sit back and collect the Advances.  For example, PMC hired only one photographer after

representing it had more on staff to help create more content for license through Shutterstock's

platform and agreed to supply the photographers (CSUF ¶ 177; Agmt. § 3(e)); refused to engage

in required negotiations with Shutterstock when PMC acquired the rights to *Rolling Stone* in 2017,

which included premium credentials and passes to highly valuable events (CSUF ¶ 1; Agmt. §

3(a)(iv)); and gave credentials (including those expressly required by Section 3(e) of the

Agreement) to other parties (CSUF ¶ 13; Agmt. § 3(a)).  These issues existed well before the

pandemic arose, although Shutterstock did not know the extent until this lawsuit.

Further, in or around March 2020, PMC effectively stopped supplying Archive Content to

Shutterstock, in violation of Section 3(a)(i) of the Agreement.  *See* CSUF ¶ 202.  Despite granting

Shutterstock rights to "all" of its Archive Content (Agmt. § 3(a)(i)), and indicating that it possessed

"***more than a million*** digital files of Archive Content" to transfer to Shutterstock (CSUF ¶ 203),

PMC delivered ***only 114*** archival images in total over the next four months.  *Id.* ¶¶ 147-148, 204.

While the Agreement does not expressly require delivery of a specific number of images, PMC

had delivered an average of ***more than 60,000*** images per month in the two years prior.  *Id.* ¶ 201;

11 Williston on Contracts § 32:14 (4th ed.) ("[T]he parties' own practical interpretation of the

contract—how they actually acted, thereby giving meaning to their contract during the course of

performing it—can be an important aid to the court."); *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) (considering "the contracting parties' course of performance" in interpreting an ambiguous term). In any event, PMC's provision of a token number of low-value archival images—particularly when it possessed "more than a million" and in the absence of Live Events—shows a lack of the requisite "good faith," particularly after Shutterstock had paid to digitize the images at PMC's request. Agmt. § 3(a)(i) (obligating PMC to "work [with Shutterstock] in good faith in the creation . . . [and] distribution" of Archive Content).

## III. THE PANDEMIC SUBSTANTIALLY FRUSTRATED SHUTTERSTOCK'S PRINCIPAL PURPOSE FOR ENTERING INTO THE AGREEMENT

Whether or not PMC breached, which it did, the pandemic wholly frustrated Shutterstock's principal purpose for entering into the Agreement and resulted in a failure of consideration. The doctrine of frustration of purpose excuses a party's obligation to perform when an unforeseeable intervening event substantially frustrates that party's principal purpose for entering into the contract. *See* Restatement (Second) of Contracts § 265 (1981) (cited herein as "Restatement"); *Bank of Am. Nat. Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 266 (S.D.N.Y.), *aff'd sub nom.*, *First Nat. Bank Md. v. Envases Venezolanos,* 923 F.2d 843 (2d Cir. 1990). The elements of the doctrine are: "(1) The purpose was the principal purpose in making the contract; (2) the frustration must be substantial; and (3) the frustrating event must be unforeseen, so that its non-occurrence was a basic assumption underlying the contract." *Greater N.Y. Auto. Dealers Assn, Inc. v. City Spec, LLC*, 136 N.Y.S.3d 695 (N.Y. Civ. Ct. 2020) (citations omitted). Similarly, "wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance[,]" the "[f]ailure of consideration [defense] gives the disappointed party the right to rescind the contract." *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1199 (S.D.N.Y. 1996) (citation omitted).

The parties agree they could not have reasonably foreseen a global pandemic would cause a complete shutdown of entertainment and fashion industry events, as it did beginning in mid-March 2020, thereby depriving Shutterstock of the very benefit it bargained for under the Agreement.  For this additional reason, PMC is not entitled to summary judgment on its breach of contract claim and Shutterstock's related affirmative defenses for frustration of purpose and failure of consideration, nor on Shutterstock's first and second counterclaims for rescission and restitution.  Indeed, summary judgment should be granted in Shutterstock's favor, thereby excusing Shutterstock from paying the $3.5M Advance for License Period 6, and as a matter of equity, compelling the return of the *pro rata* share of money that PMC kept while not performing.

A.   Shutterstock's Principal Purpose For Entering The Agreement Was to Obtain Access to Attend and Photograph Third Party Events.

In order for a party's performance to be excused under the frustration of purpose doctrine, "the purpose which is frustrated" must have been that party's "***principal purpose*** for entering the contract." *Rothberg v. Bernstein*, No. 87 Civ. 2053 (KMW), 1990 WL 58902, at *5 (S.D.N.Y. Apr. 30, 1990) (citing *Consumers Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 208 (W.D.N.Y. 1981)) (emphasis added).  In determining the party's principal purpose, a court may consider the agreement itself as well as extrinsic evidence and the surrounding circumstances. *See, e.g.*, *Consumers Power*, 509 F. Supp. at 208 (considering agreement and "affidavits from the pens of the contract negotiators" to determine whether purpose was frustrated).

Shutterstock's principal purpose for entering into the Agreement was to obtain access to Third Party Events—per the article cited by PMC, it was "***everything***."  Lackman Decl., Ex. FF; CSUF ¶¶ 164, 172.  PMC's "insider access" was exactly what Shutterstock needed and sought out in 2015 to build its comprehensive editorial photography product. *Id.* ¶ 9.  This is exactly why agencies pay large amounts to secure arrangements.  PMC knew this and touted its access to induce

Shutterstock to sign.  *Id.* ¶ 167.  Without access to Third Party Events, the entire Agreement would have made little sense.  Indeed, no one has *ever* paid PMC an advance against royalties for Archive Content alone.  *Id.* ¶ 199.  Certainly, Shutterstock would not have agreed to pay multi-million dollar Advances (plus other valuable consideration) for Archive Content alone, which had very little value in conjunction with Third Party Content and even less value without it.  *Id.* ¶¶ 185-186, 198.  Contrary to PMC's assertions through selective quoting to disguise a messy question that was met with a form objection, Mr. Oringer did not testify otherwise.  *Id.* ¶ 113.[5]

PMC now contends "the Agreement had **two purposes**, one relating to securing photos taken at new 'events' and the other to the ongoing licensing of PMC's other images, including its existing and growing 'archive.'"  Mot., p. 12.  The only support PMC musters for this secondary purpose is a portion of the Agreement's title and terms related to Archive Content (*id.*), which is not dispositive.  *Cf. Consumer Power*, 509 F. Supp. at 201 (finding issue of fact on principal purpose of the agreement, despite reference to same in the agreement's title).  As between the two, there can be no legitimate dispute that real-time access to Live Events was the "principal" purpose.  In fact, the Archive Content was so insignificant relative to the overall Agreement that it was rarely (if ever) discussed during the negotiation of the Agreement (CSUF ¶ 48); PMC did not deliver any Archive Content to Shutterstock until fourteen months into the Agreement, by which point,

---

[5] Below is PMC's question and Mr. Oringer's full answer (omitting the intervening objection):

> Q. Based on the expectations that you had for the deal when you entered into it in 2015, would you have walked away from the entire deal if you had known in 2015 that revenue generated during the pandemic – or strike that. That you would get -- you wouldn't be getting live images from PMC during the period of time that the pandemic lasted?

> A. No. I would have expected that -- actually, I thought Jay would have been a better person and worked with us through that period of time to help us figure out a way to generate value for both sides through the pandemic.

Shutterstock had already paid two Advances (*id.* ¶ 9); and even just looking at relative revenue, it accounted for only around 10% (or less) generated under the Agreement (*id.* ¶ 185. This Court's observation in the context of PMC's dismissed breach-of-the-implied-covenant claim that "the royalty advances are consideration not only for Shutterstock's production for new photographs but also for Shutterstock's efforts to market and license images already in the Penske archive" (Mot., p. 13 (quoting Dkt. No. 71, p. 10)), does not lead to a different result.

At a minimum, the principal purpose is a question of fact. *See Rothberg*, 1990 WL 58902, at *5 (denying summary judgment on frustration of purpose due to "issue of material fact as to [defendant's] principal purpose for entering the agreement"); *Consumers Power*, 509 F. Supp. at 208 (same, where the "essence of the contract" was "substantially controverted" and "the contract negotiators [ ] differ[ed] sharply as to their respective understandings of the [relevant] clause").

B.   The Pandemic Wholly Destroyed the Ability to Access to Third Party Events.

The pandemic and consequent moratorium on live events wholly destroyed Shutterstock's principal purpose for entering into the Agreement.  As of mid-March 2020, the very thing that induced Shutterstock to enter into the Agreement in the first place—namely, access to attend and photograph Third Party Events—ceased to exist indefinitely.  CSUF ¶¶ 195-196; *see also United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir. 1974) (frustration of purpose applies where "performance by party X would no longer give party Y what induced him to make the bargain in the first place" due to "unforeseeable events"); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 840 (Bankr. S.D.N.Y. 2020) (same, where "a circumstance that induced [and was the foundation of] the contract no longer exists" due to an unforeseeable event); *Structure Tone, Inc. v. Universal Servs. Grp., Ltd.*, 929 N.Y.S.2d 242, 246 (1st Dep't 2011) (same, where "reasons for performing the contract cease to exist due to an unforeseeable event").

22

As discussed *supra*, PMC does not dispute that it provided **no access** to Third Party Events for months due to the pandemic.  It coyly claims this only "partially frustrated" the purpose of the Agreement because Shutterstock "continued to benefit" in other ways.  Mot., pp. 10-11.  This legally and factually unsupported argument by no means forecloses the frustration of purpose doctrine.  As an initial matter, PMC overstates what Shutterstock "continue[d] to receive" during the pandemic before the termination.  Images from the most immediate Third Party Events are what sells and what induced Shutterstock to pay multi-million dollar Advances, not images from prior events, and certainly not the Archive Content, which never generated any significant revenue and would never merit an advance.  *See* CSUF ¶¶ 47, 183.  And, the very small amount of revenue that Shutterstock received was largely attributable to pre-pandemic licenses.  *Id.* ¶ 226.  In any event, as a matter of law, it is irrelevant whether Shutterstock continued to derive some limited, nominal value under the Agreement during the pandemic.  The question is whether this unforeseen, cataclysmic event "**substantially** frustrated" Shutterstock's "**principal** purpose" in entering the Agreement, Restatement § 265 (emphasis added), or in other words, "**materially affect[ed]** the consideration [that it] received," *General Douglas*, 508 F.2d at 381 (emphasis added).  With no access to Third Party Events, this question must be answered in the affirmative.

PMC also claims Shutterstock "would have obtained images from about 100 live events . . . once live events resumed." Mot., p. 13.  This is hypothetical. *See* CSUF ¶ 58.  Further, the events that PMC is referring to include "events" occurring toward the very end of the natural term such as the "MAGA Rally in Beverly Hills" and "Juneteenth 2021," which are not the types of credential-required entertainment and fashion events contemplated by the Agreement. *Id.* ¶ 58.  PMC does not identify *any* live event of *any* kind that it photographed between mid-March and July 16, 2020. *Id.* ¶ 58. *See* Restatement § 269 (frustration need not be permanent to have legal

effect); *see also Bush v. Protravel Int'l, Inc.*, 192 Misc. 2d 743, 752 (N.Y. Civ. Ct. 2002).

At a minimum, there is an issue of fact as to whether the pandemic's impact on the basis of Shutterstock's bargain was substantial enough to excuse its performance. *Cf. International Plaza Assocs. L.P. v. Amorepacific US, Inc.*, No. 155158/2020, 2020 WL 7416598, at *1 (N.Y. Sup. Ct. Dec. 14, 2020) (denying plaintiff's motion for summary judgment and finding issue of fact on frustration of purpose, where "the shutdown of the defendant's shop from March, 2020 to June, 2020 and the continuing [COVID-19] restrictions made it ***almost impossible*** for defendant to fulfill its function for which it signed a lease with plaintiff") (emphasis added); *Jack Kelly Partners LLC v. Zegelstein*, 33 N.Y.S.3d 7, 10 (1st Dep't 2016) (same, where defendant had possession of leased premises during pandemic); *HWA 1290 III LLC v. Gkny1 Inc.*, No. 158142/2020, 2021 WL 1943198, at *2 (N.Y. Sup. Ct. May 12, 2021) (denying plaintiff's motion for payment of past rent and finding issue of fact on frustration of purpose, even though defendant continued to occupy and/or operate its business at the leased premises during the pandemic).[6]

C.     The Pandemic Was Not Foreseeable At The Time of the Agreement.

Finally, as a matter of law, no one—and certainly not Shutterstock—could have foreseen or guarded against the pandemic and its effects at the time that the parties entered into the Agreement in 2015.  Courts have repeatedly recognized the "unanticipated," "unprecedented," and "extraordinary" nature of the pandemic.  *See, e.g.*, *Ross v. Nat'l Urb. League*, 141 S. Ct. 18, 20 (2020) (noting the "unanticipated impact of the COVID-19 pandemic"); *United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 WL 1819961, at *3 (S.D.N.Y. Apr. 10, 2020) ("The COVID-19

---

[6] As these cases alone make clear, New York courts have not "consistently rejected" the frustration of purpose doctrine in the context of the pandemic, as PMC contends, and the cases it cites are distinguishable.  Mot., pp. 11-12 (collecting distinguishable cases, primarily involving commercial lease disputes where, unlike here, the defendant tenant still obtained what it bargained for, namely, tenant was able to access and use the leased premises).

pandemic is extraordinary and unprecedented in modern times in this nation.").

PMC does not dispute the pandemic was unforeseeable.  In fact, the unforeseeability of the pandemic is inherent in PMC's belated "impossibility" defense.  *See* Mot., p. 20 (citing *Reed v. Luxury Vacation Home LLC*, No. 20 Civ. 4243 (PGG), 2022 WL 4624839, at *16 (S.D.N.Y. Sept. 30, 2022) ("impossibility" is premised on "an unanticipated event that could not have been foreseen")).  PMC argues that Shutterstock "foresaw the possibility" of "significant annual losses" (Mot., p. 15), but not with respect to the pandemic; further, "[f]rustration of purpose focuses on events," not the allocation of risk of loss.  *See General Douglas*, 508 F.2d at 381.  Plainly, Shutterstock did not foresee a ***complete shutdown*** of the bargained-for Live Events, causing its revenues to ***almost nothing***.  *See* CSUF ¶¶ 110, 196-197.  At the very least, this is another fact issue precluding summary judgment.  *See Karamarios v. Bernstein Mgmt. Corp.*, 612 N.Y.S.2d 12, 13 (1st Dep't 1994) ("Foreseeability is generally a question of fact for the jury.").

## CONCLUSION

For the foregoing reasons, PMC is not entitled, under law or in equity, to retain the portion of the $3M Advance attributable to the four-month period in which PMC was in material breach and the pandemic eliminated consideration, nor to receive an additional $4.5M in consideration for a License Period which never occurred.  The Court should deny PMC's Motion for Partial Summary Judgment in its entirety, and grant summary judgment in Shutterstock's favor on PMC's breach of contract claim and Shutterstock's first, second, and third counterclaims.

Respectfully submitted,

Dated: New York, New York          MITCHELL SILBERBERG & KNUPP LLP
        April 19, 2023


By:   /s/ Eleanor M. Lackman
        Eleanor M. Lackman (eml@msk.com)
        Marissa B. Lewis (mbl@msk.com)
        437 Madison Avenue, 25th Floor
        New York, New York 10022
        Tel.: (212) 509-3900
        Fax: (212) 509-7239
        eml@msk.com
        mbl@msk.com

        *Attorneys for Defendant Shutterstock, Inc.*