UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

     Plaintiff-Counterclaim Defendant,

     -against-

SHUTTERSTOCK, INC.,

     Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)


## SHUTTERSTOCK, INC.'S COUNTERSTATEMENT TO PENSKE MEDIA CORPORATION'S RULE 56.1 STATEMENT OF FACTS


MITCHELL SILBERBERG & KNUPP LLP

Eleanor M. Lackman (eml@msk.com)
Marissa B. Lewis (mbl@msk.com)
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Defendant-Counterclaim Plaintiff Shutterstock, Inc.*

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York and Paragraph 4(A)(i) of this Court's Individual Rules of Practice in Civil Cases, defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock"), by and through its undersigned counsel, respectfully submits the following counterstatement to plaintiff-counterclaim defendant Penske Media Corporation's ("PMC") Rule 56.1 statement of facts (Dkt. No. 168-1) and statement of additional facts:

1. **Plaintiff PMC is a digital media, publishing, and information services company. It publishes more than 20 digital and print brands covering the entertainment and fashion industries, including Women's Wear Daily ("WWD"), Variety, Deadline Hollywood, and others. (Ex. 73, Declaration of Karl Walter ("Walter Decl.") ¶ 2; Ex.1, Defendant Shutterstock Inc.'s Counterclaims, Dkt. No. 77 ("Counterclaims") ¶ 13 (second sentence)).**

**<u>Shutterstock's Response</u>:** Undisputed, but misleading insofar as this statement omits live events, which are part of PMC's core business. *See* Declaration of Eleanor M. Lackman dated April 19, 2023 ("Lackman Decl."), Ex. A (Deposition Transcript of Jay Penske ("Penske Tr.")), p. 21:18-20 (PMC is a "[p]ublishing digital media company" with "an element of live events and some information services or data."); *id.*, p. 37:13-16 ("Q. Are live events core to the business? A. Certainly. Certainly part of the core business."); *id.*, p. 68:6-10 (PMC is "a digital media business that has live events, that has an information services business as, as well as some data licensing. That's our current business."); *see also id.*, p. 68:19-21 (PMC is "not in the business of selling stock photography or editorial photography."); *id.*, p. 66:13-20 ("[T]he selling of photographs, either stock or editorial, is not a business that PMC has been in or is currently in."). Notably, this statement also omits a particularly relevant brand, namely, Rolling Stone, which PMC acquired in 2017 and refused to negotiate with Shutterstock about in good

faith, in violation of the parties' agreement at issue in this case, namely, the "Archive & Event Image Hosting and Licensing Agreement" (the "Agreement").  *See* Agmt. § 3(a)(iv) addressing "Acquisition Content and Acquisition Events"); Declaration of Candice Murray dated April 19, 2023 ("Murray Decl.") ¶ 13; *see also* Penske Tr., pp. 451:7-18, 452:6-10 (acknowledging that Rolling Stone was acquired in "late 2017" and "it would be[PMC's] intention to bring Rolling Stone into the contract, but it wasn't contemplated and neither were the fees for an acquisition of Rolling Stone's size").

2.    **PMC owns a large and ever-growing photographic collection with millions of images related to its publications. (Ex. 73, Walter Decl. ¶ 3).**

**<u>Shutterstock's Response:</u>**  Disputed, immaterial, and misleading insofar as this statement suggests that PMC's "photographic collection" was made available for license via Shutterstock's platform.  Although the parties' Agreement required PMC to deliver ***all*** Archive Content images from all of their publications (except *Rolling Stone*, which PMC refused to negotiate), the vast majority of PMC's archival photographic collection—including photographs that PMC received as part of its then-recent purchases of Fairchild Fashion Media, Variety, and others—existed primarily in physical form, and was never digitized or otherwise provided to Shutterstock for license.  *See* Declaration of Benjamin Pfeifer dated April 19, 2023 ("Pfeifer Decl.") ¶¶ 18-19; Murray Decl. ¶¶ 24-25; *see* Lackman Decl., Ex. B (Deposition Transcript of Karl Walter ("Walter Tr.")), pp. 385:23-386:13, 387:9-388:19, 391:9-392:6.  In addition, many of the photographs could not be licensed due to copyright rights and/or ownership issues.  *See* Lackman Decl., Ex. C (Deposition Transcript of Judy Margolin ("Margolin Tr.")), p. 192:2-13; Lackman Decl., Ex. D (Ex. 18 to Margolin Tr.) (SSTK030767-74) (third-party infringement claim against over 950 images from PMC's Fairchild Fashion Media archival collection); Penske Tr., p.

138:20-22 (describing the "complications of actually getting archives material approvals from the photographers" and the use of some of the money from the Shutterstock deal to work on the "extremely complex and laborious challenge" of understanding the rights and permissions of the archives); *id.*, p. 162:5-6 ("there were some challenges with rights and permissions"); *see also* Declaration of Cynthia Arato dated March 17, 2023 ("Arato Decl."), Ex. 2 (Expert Report of Eric Rachlis ("Rachlis Report")), ¶¶ 20, 25, 30, 33.

3.    **PMC's photographic collection includes historic fashion, celebrity, and event images, created over the last 100+ years, from the various PMC-owned publications. (Ex. 2, Expert Report of Eric Rachlis, dated Dec. 16, 2021 ("Rachlis Report") ¶¶ 10-12, 27, 29, 30)).[1]**

**Shutterstock's Response:**  Disputed, immaterial, and misleading for the same reasons and based upon the same evidence set forth in response to Paragraph 2 above.

4.    **Defendant Shutterstock, Inc. ("Shutterstock") described itself in 2016, and in this action, as a company that, among other things, owns and operates website platforms that license photographs to third parties for use on third party websites, publications, marketing materials, and corporate communications. (*See* Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218-345 at 22220; *see also* Ex.1, Counterclaims ¶¶ 11-12).**

**Shutterstock's Response:**  Undisputed that the information cited is from a Form 10-K from seven years ago.  *See* Arato Decl., Ex. 3.  Shutterstock is a leading global creative platform offering full-service solutions, high-quality content, and creative workflow solutions for brands, businesses and media companies.  *See* Murray Decl. ¶ 2. Its platform brings together content creators and a vast network of contributors by providing readily-searchable content that Shutterstock's customers pay to license and by compensating contributors as their content is licensed.  *Id.*  Shutterstock's offerings include over 433 million images, as well as footage, music, and more, which has enabled

---

[1] The cited Exhibits are attached to the Declaration of Cynthia S. Arato ("Arato Decl."), filed as Dkt. No. 176.

Shutterstock to attract a global and diverse base, representing businesses of all sizes and from all major industries, including global and local media and broadcast companies that are reliant on fresh, newsworthy images to attract their own customers. *Id.*

5.     **Until 2015, Shutterstock was known primarily for its "stock" photographs, but it desired to enter the more prestigious realm of offering an editorial imagery product, including fashion and entertainment photography. (Ex. 69, Deposition Transcript of Ben Pfeifer ("Pfeifer Tr.") 54:20-25, 162:16-18, 164:15-23; Ex. 4, Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Ex. 67, Deposition Transcript of Stan Pavlovsky ("Pavlovsky Tr.") 59:11-60:20; *see also* Ex.1, Counterclaims ¶ 12).**

**Shutterstock's Response:**  Undisputed that Shutterstock, which was founded in 2003, initially primarily offered and was known for "stock" photography, but otherwise disputed.  Shutterstock always offered "editorial" photographs. *See* Lackman Decl., Ex. F (Deposition Transcript of Jon Oringer ("Oringer Tr.")), p. 63:15-24 ("[W]e've been selling editorial images since about 2006").  However, in around late 2014, in order to capitalize on the increasing demand for editorial photography and to gain market share from its biggest competitor in stock content, Getty Images, Shutterstock decided to launch an editorial photography product (called "Shutterstock Editorial," now also encompassed in the product called Shutterstock Premier, and sometimes referred to herein as "Editorial") that would include images documenting fashion, entertainment, sports, and other current events around the world.  *See* Pfeifer Decl. ¶¶ 3-4; Lackman Decl., Ex. G (Deposition Transcript of Benjamin Pfeifer ("Pfeifer Tr.")), pp. 167:17-168:4; 170:9-15; 207:15-21; Oringer Tr., pp. 97:21-98:12; 100:24-101:2; 301:22-302:12 (Penske and Oringer agreed on the goal to help Shutterstock get a competitive advantage over Getty Images).

6.     **PMC and Shutterstock entered into an agreement, named the Archive & Event Image Hosting and Licensing Agreement (the "Archive & Event Agreement" or "Agreement"), as of July 1, 2015. (Ex. 5, Archive & Event Agreement, SSTK092808-29).**

**Shutterstock's Response:**  Undisputed, but misleading as to the defined term "Archive & Event Agreement."  As noted *supra* CSUF ¶ 1, Shutterstock uses the defined term "Agreement" herein to refer to the parties' "Archive & Event Image Hosting and Licensing Agreement."

7.    **The Archive & Event Agreement provided for an initial six-year term that was to expire on June 30, 2021. (Ex. 5, Archive & Event Agreement § 1).**

**Shutterstock's Response:**  Disputed, and misleading as to the defined term "Archive & Event Agreement."  Section 1 of the Agreement states, in relevant part:  "The Agreement is effective on July 1, 2015 (the 'Effective Date') and will expire on June 30, 2021, *or earlier if terminated pursuant to Section 8* (the 'Initial License Period')."  Agmt. § 1 (emphasis added).  The Initial License Period was divided into six successive, one-year license periods (each, a "License Period"), with each License Period standing on its own. *See* Agmt. § 6; *see also* Pfeifer Decl. ¶ 20; Lackman Decl., Ex. H (Deposition Transcript of Todd Greene ("Greene Tr.")), pp. 160:3-164:3, 178:4-24, 230:23-232:3.  Relatedly, the Agreement does not include any provision for early escalation of payment if Shutterstock achieves certain goals or successes relating to its Editorial product.  Rather, so long as the parties were performing, were not in breach, and were otherwise operating in good faith, the contract would persist for six single-year terms.

8.    **The Archive & Event Agreement provided Shutterstock with exclusive rights to license PMC's photographic collection, subject to limited exceptions. (Ex. 1, Counterclaims ¶ 13 (third sentence); Ex. 5, Archive & Event Agreement §§ 3(a), 3(a)(i)).**

**Shutterstock's Response:**  Undisputed, but misleading as to the defined term "Archive & Event Agreement."  The relevant provisions of the Agreement speak for themselves.  Shutterstock further states that it did not obtain the full scope of "exclusive rights" to which it was entitled under the Agreement because, as discussed *supra* CSUF ¶

2, PMC failed to deliver the vast majority of its archival photographic collection to Shutterstock for license.

9.    **As explained by Shutterstock in its Counterclaims, the Agreement "provide[d] to Shutterstock [exclusive] licensing rights to, *inter alia*, PMC's archival content (the "Archive Content"), as well as opportunities for Shutterstock to create new content at events."  (Ex. 5, Archive & Event Agreement § 3; Ex.1, Counterclaims ¶ 13 (second sentence)).**

**Shutterstock's Response:**  Undisputed that Shutterstock's Counterclaim contains the quoted language, but misleading because the relevant provisions of the Agreement speak for themselves.  Shutterstock further states that its principal purpose for entering into the Agreement was to obtain insider access to attend and photograph live entertainment and fashion industry events (such as the Academy Awards and the Sundance Film Festival), so that it could offer such content as part of its comprehensive editorial photography product.  *See* Greene Tr., pp. 97:18-99:13 ("it was important to [Shutterstock] that they enter into an agreement with somebody like PMC that could give them access to images to be captured for use in [ ] their editorial products"); *id.*, pp. 104:11-24; 114:25-115:20; Lackman Decl., Ex. I (Deposition Transcript of George Grobar ("Grobar Tr.")), pp. 44:23-45:14 (access to events "was a significant part of the partnership"); *id.*, pp. 134:8-135:4 (the Agreement "was built on the concept of they could leverage the access to these events"); Lackman Decl., Ex. J (Grobar Depo. Ex. 4; PMC_0002137-42) (PMC and Shutterstock "Talking Points" document noting in the "Overview" that "this alliance will alter the existing model of editorial access to entertainment and fashion photography" and that the Agreement leverages "PMC's insider access and event exclusivity").  While the Agreement also provided Shutterstock with licensing rights to Archive Content, this was a minor component of the Agreement, as evidenced by the fact that PMC did not deliver ***any*** Archive Content at all until September 2016 (*i.e.*, fourteen months into the Agreement), by

which point, Shutterstock had already paid two Royalty Advances. Murray Decl. ¶¶ 5-8; *see also* Arato Decl., Ex. 60 (SSTK168721).

10.    **With respect to Archive Content, Shutterstock received exclusive rights to license images "(i) currently owned or created by PMC;" (ii) "to which PMC has the contractual right to syndicate and/or license, as of the date of this Agreement; and (iii) created by PMC, or to which PMC acquires the contractual right to syndicate and/or license, during the License Period," subject to a limited exception. (Ex. 1, Counterclaims ¶ 13; Ex. 5, Archive & Event Agreement §§ 3(a)(i) and (iv), 4; Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535).**

**Shutterstock's Response:** Disputed, as to PMC's incomplete characterization of the Agreement and recitation of the definition of "Archive Content." The cited portions of the Agreement do not merely grant Shutterstock a license; they require PMC to "work together" with Shutterstock "in good faith in the creation, management, hosting, distribution and syndication of image, footage and/or audio content (i) currently owned or created by PMC, (ii) to which PMC has the contractual right to syndicate and/or license, as of the date of this Agreement, and (iii) created by PMC, or to which PMC acquires the contractual right to syndicate and/or license, during the License Period (collectively, the 'Archive Content')." Agmt. § 3(a)(i). Moreover, PMC omits that Shutterstock's rights are "[s]ubject to the Getty Agreement Restrictions." *Id.* Section 4 of the Agreement merely reflects that Shutterstock gave PMC a requested budget to help PMC achieve its goal of trying to monetize the old physical copies of photographs that were in the storage files of Fairchild Fashion Media and the owner of Variety, which PMC had acquired in 2014 and 2012, and that PMC was obligated to deliver all such images in "SSTK Compliant" format with specific metadata. *Id.* § 4. Accordingly, it does not support the statement. *Id.*

11.    **PMC's Archive Content included images from its historic archive collections in addition to more recently captured images. (Ex. 1, Counterclaims ¶ 13; Ex. 5, Archive & Event Agreement § 3(a)(i)).**

**Shutterstock's Response:** Disputed, and misleading, because the Agreement does not refer to "historic archive collections" and the phrase "recently captured images" is ambiguous. *See* Agmt. § 3(a)(1); *see also* Penske Tr., pp. 175:13-176:18 ("Q. Looking at this definition [of "Archive Content"], does this…include content that is created at third-party events? […] A. Yeah, it says third-party event access and third-party event content […] so my, my instinct would be it doesn't. It's just a sub-bullet of PMC content, archive content.").

12. **With respect to new content at events PMC hosted, the Agreement states that "PMC will provide Shutterstock with access to [PMC's] event functions to which third parties are invited generally" ('PMC Events')." (Ex. 5, Archive & Event Agreement § 3(a)(ii)).**

**Shutterstock's Response:** Disputed and misleading, insofar as this statement contains an incomplete quote (without an ellipsis) from a sentence in the Agreement that pertains to "access to," not "new content at," PMC Events. The complete sentence in Section 3(a)(ii) of the Agreement states: "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')." Agmt. § 3(a)(ii).

13. **With respect to new content at events hosted by others, the Agreement states that PMC will "provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . Subject to the Getty Agreement Restrictions, PMC hereby grants to Shutterstock the right to be the sole third party to leverage and utilize PMC's credentials and access to capture Third Party Event Content at Third Party Event. These Third Party Events shall initially include, but not be limited to, those events listed on Schedule D. PMC shall work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content." (Ex. 5, Archive & Event Agreement § 3(a)(iii)). Schedule D, in turn, lists 12 well-known "red carpet" entertainment events, such as The Grammy Awards, The Venice Film Festival, and the Emmy Awards.**

**Shutterstock's Response:** Undisputed that Section 3(a)(iii) of the Agreement contains the quoted language and that Schedule "D" lists twelve third-party entertainment

9

events, but otherwise disputed and misleading, including insofar as the statement omits "The Tony Awards" and "The Cannes Film Festival" (among others) from the events listed in Schedule D. Notably, Shutterstock's contractual "right to be the **sole third party** to leverage and utilize PMC's credentials" to Third Party Events (Agmt. § 3(a)(iii)), PMC admittedly offered and gave its credentials to other parties to other parties. *See* Walter Tr., pp. 198:25-201:21.

14.    **Shutterstock entered into the Archive & Event Agreement as part of a strategic effort to expand its licensing business and to launch a news and editorial division. (Ex. 69, Pfeifer Tr. 17:4-18; 19:20-22; 25:11-17; 33:17-23; 54:20-25, 182:16-183:5; Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418; Ex. 3, Shutterstock Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23; Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-537, at 0022535; Ex. 1, Counterclaims ¶ 13 (first sentence); Ex. 69, Pfeifer Tr. 12:12-17 (the images that Shutterstock obtained under the Agreement were considered "editorial" and not commercial "stock" images)).**

**Shutterstock's Response:** Disputed, and misleading insofar as this statement suggests, incorrectly, that Shutterstock did not offer editorial photography at the time that it entered into the Agreement in 2015. As discussed *supra* CSUF ¶ 5, Shutterstock had always offered editorial photographs, but in late 2014, decided to launch a comprehensive editorial photography product that would include images documenting fashion, entertainment, sports, and other current events around the world. Undisputed that Shutterstock entered the Agreement for strategic reasons that included receipt of credentials, passes, and VIP access that would give Shutterstock an advantage over competitors in marketing its Editorial product to major news media licensees of entertainment and fashion imagery. *See* Pfeifer Decl. ¶¶ 3-6.

15.    **As part of its efforts to launch this new Shutterstock editorial division, Shutterstock hired four staff photographers in 2015 (Ex. 8, Shutterstock Press Release, dated Sept. 9, 2015, PMC_0022538-39).**

**Shutterstock's Response:**  Undisputed, but misleading insofar as this statement suggests, incorrectly, that editorial photography was "new" for Shutterstock in 2015.  *See supra* CSUF ¶ 5.  Shutterstock further states that it hired four staff photographers in 2015, in part, to ensure that it had sufficient photographs to assign to the credentials provided by PMC pursuant to the Agreement, and because PMC did not have as many on its staff as it had suggested to Shutterstock during the negotiation of the Agreement and as agreed in Section 3(e) of the Agreement. *See* Declaration of Benjamin Melvin dated April 19, 2023 ("Melvin Decl.")), ¶ 8; Murray Decl. ¶ 11; Pfeifer Decl. ¶¶ 8, 15, 18.

16. **Shutterstock's lead negotiator for the Agreement in 2015 and a vice-president of Shutterstock's business development in 2015 (Ex. 69, Pfeifer Tr. 10:15-22, 11:3-9, 21:24, 29:20-30:1) testified that prior to 2015, "Shutterstock's issue is that it was known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, [or] anyone in the entertainment and fashion world." (Ex. 69, Pfeifer Tr. 54:20-25).**

**Shutterstock's Response:**  Disputed, as this is an incomplete and inaccurately contextualized recitation of the cited testimony.   PMC's counsel inquired whether Shutterstock was interested in the access provided by the Agreement "because it helped it compete with Getty," to which Mr. Pfeifer responded: "[W]e talked about competing with Getty every day, but Shutterstock's issue is that it was known for stock imagery, and it wasn't taken seriously by photo editors, publicists, brands, anyone in the entertainment and fashion world.  So having a Variety credential helped get access."  Pfeifer Tr., pp. 53:9-54:25; *see also* Pfeifer Decl. ¶¶ 5, 9; *see also supra* CSUF ¶ 7.

17. **Accordingly, in 2015, Shutterstock embarked on a business plan to move beyond the stock photography business and into the editorial market. Initially, in January 2015, Shutterstock acquired Rex Features, Europe's largest independent photo press agency, an event which "mark[ed] Shutterstock's substantive entry in editorial imagery." (Ex. 69, Pfeifer Tr. 164:17-23; Ex. 4, Shutterstock Q4 2020 Earnings Call Transcript, PMC_0019419-41 at 19425; Ex. 67, Pavlovsky Tr. 59:3-60:10).**

**Shutterstock's Response:**  Undisputed, but misleading insofar as this statement suggests, incorrectly, that Shutterstock did not offer editorial photography in 2015.  As discussed *supra* CSUF ¶ 5, Shutterstock had always offered editorial photographs, but in late 2014, decided to launch a comprehensive editorial photography product geared toward licensees for valuable, newsworthy images.  Shutterstock's acquisition of Rex Features in 2015 was just one foundational step toward building that product.  *See* Pfeifer Decl. ¶¶ 3-4.

18.    **In early 2015, Shutterstock identified PMC as its "solution for U.S. entertainment and fashion access and archive content." (Ex. 69, Pfeifer Tr. 162:16-18; 170:9-23; Ex. 70, Deposition Transcript of Jon Oringer ("Oringer Tr.") 212:23-213:10).**

**Shutterstock's Response:**  Undisputed except incomplete. Mr. Pfeifer testified that PMC was Shutterstock's "solution for U.S. entertainment and fashion access and archive content." (Pfeifer Tr., 162:16-18). Shutterstock further states that it acquired Rex Features—through which it obtained access to significant entertainment and fashion industry events around the world, but primarily in the U.K. and Europe—prior to engaging in contract negotiations with PMC, and PMC knew this during such negotiations.  *See* Melvin Decl ¶¶ 3-6, Ex. A (PMC_0022533) (January 15, 2015 press release, "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery"); Penske Tr., pp. 60:11-61:5 (Shutterstock "had just acquired Rex" during Mr. Penske's initial discussions with Shutterstock's CEO, Jon Oringer, regarding the potential agreement); *id.*, pp. 63:2-64:14 (same); Greene Tr., pp. 26:8-19, 114:25-115:20, 223:2-224:9.

19.    **In June 2015, Shutterstock and PMC announced that they had reached a deal. In announcing the deal, Shutterstock characterized PMC as "another trailblazing company" whose "strategic alliance" with Shutterstock would "accelerate [Shutterstock's] progress in editorial imagery." (Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-37, at 0022535; Ex. 70, Oringer Tr. 212:23-213:20).**

**Shutterstock's Response:** Undisputed that the parties publicly announced their agreement in June 2015 and that the cited press release contains the quoted language and that the six-year deal would be expected to deliver value every year as part of Shutterstock's progress in its "Editorial" product offering, but otherwise inaccurate and therefore disputed, and in any event, immaterial. The press release was issued by both parties following drafting by their press departments (Pfeifer Decl. ¶ 12), and pursuant to Shutterstock's contractual obligation to identify PMC as a "launch partner" for its comprehensive editorial photography product (Agmt. § 7). Notably, the press release refers to PMC as "*another* trailblazing company" that Shutterstock was "team[ing] up with" to build its comprehensive editorial photography product. *See* Arato Decl., Ex. 6 (PMC_022535-37), at PMC_0022535 ("We are thrilled to team up with another trailblazing company . . . .").

20.    **Shutterstock explained in securities filings that the Agreement with PMC gave Shutterstock "credibility in the market for editorial content that will allow us to further grow our product offerings." (Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218, at 0022222-23; Ex. 70, Oringer Tr. 222:21-224:23).**

**Shutterstock's Response:** Undisputed that Shutterstock's 2016 Form 10-K contains the quoted language and that Shutterstock had expected a six-year deal to help build market penetration over each year, but misleading insofar as it suggests, incorrectly, that Shutterstock's "credibility in the market for editorial content" arose solely and immediately from its Agreement with PMC.

21.    **In a 2017 Company Overview presented to underwriters, Shutterstock identified its "partner[ship] with PMC" as one of two future "growth driver[s]" in the "editorial" space. (Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418).**

**Shutterstock's Response:** Disputed. This statement misquotes and wholly mischaracterizes the cited document. *Cf.* Arato Decl. Ex. 7 (SSTK092400-41) at

SSTK092418.  The page of the document that PMC cites from early in the editorial build period is entitled "Investments in Additional Future Growth Drivers" and contains a chart identifying five "Opportunit[ies]" and Shutterstock's "Focus" and the "Status" of each.  *Id.* "Editorial" is identified among the five "Opportunit[ies]" and, with respect to its "Status," the document states: "Acquired Rex Features and partnered with Penske Media."  *Id.*  To the extent document may be characterized as identifying the "partner[ship] with Penske Media" as a "Growth Driver[]" (which Shutterstock disputes), then PMC is one of seven. *Id.* (identifying a total of ***seven*** companies in the "Status" column, including "Building Offset," "Rex Features," "Penske Media," "PremiumBeat," "Facebook," "Wix," "WebDAM," "and others").  *Id.*

22.    **Shutterstock agreed to provide PMC with significant compensation. (Ex. 5, Archive & Event Agreement §§ 2, 3, 6).**

**Shutterstock's Response:**  Undisputed that Shutterstock agreed to provide PMC with significant compensation, including seven-figure Royalty Advances and a $1M licensing credit each License Period, provided, however, that PMC was in compliance with the terms and the letter and spirit of the Agreement.

23.    **First, Shutterstock agreed to pay PMC "an annual fully recoupable advance against royalties (the 'Royalty Advances')" otherwise due and payable to PMC for Shutterstock's licensing of PMC content. (Ex. 5, Archive & Event Agreement § 6).[2]**

**Shutterstock's Response:**    Disputed, including the footnote, as PMC has mischaracterized the plain terms of the Agreement.  While Section 6 of the Agreement contains the quoted language—in particular, "Shutterstock shall pay to PMC ***an annual***

---

[2] The Agreement provides that Shutterstock will retain 70% of the fees it earns for licensing PMC content to Shutterstock's customers and that Shutterstock will remit 30% of those fees as a royalty to PMC (subject to Shutterstock recouping the minimum revenue guarantees). (Ex. 5, Archive & Event Agreement § 6).

*fully recoupable advance against royalties (the 'Royalty Advances')*"—it thereafter

clarifies that such "Royalty Advances shall be recoupable by Shutterstock **solely** from . . .

[the royalties] otherwise payable to PMC **during the twelve month period of the License**

**Period to which such Royalty Advance relates** (i.e., the July 1 to June 30 period following

payment)." Agmt. § 6 (emphasis added). In addition, the footnote is misleading insofar

as it refers to the term "minimum revenue guarantees," which is not used in the Agreement

and conflicts with the Agreement's payment structure. *Cf.* Agmt. § 6 (referring to "fully

recoupable" "Royalty Advances").

**23A.    Shutterstock contemporaneously referred to the Royalty Advances as "Minimum Revenue Guarantees" or "MRGs." (Ex. 66, Deposition Transcript of Candice Murray ("Murray Tr.") 84:21-85:17; Ex. 69, Pfeifer Tr. 68:15-69:17 ("minimum revenue guarantee is an accepted, common—common term"); Ex. 12, PMC Content Performance June 2018, SSTK025937-43, at SSTK025940 (chart comparing "Total Sales USD" and "MRG USD"); Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327-28 ("Shutterstock Loss on MRG"); Ex. 11, Chat from C. Murray to A. Chung and D. Marquis, dated March 23, 2020, SSTK100551-72, at SSTK100558 ("I flat out said, we need some relieve [sic] on the MRG with all that['s going on"); *id.* at SSTK100559 ("a WIN would be to waive the upcoming MRG and start a new deal on July 1st that is agreeable from an MRG and production standpoint."); Ex. 9, E-mail from D. Granato to J. Oringer et al., dated Sept. 28, 2019, SSTK053461-63, at SSTK053461 ("This would contemplate an early payment…for the MRG that is due on July 1, 2020.").**

<u>**Shutterstock's Response:**</u>  Undisputed that Shutterstock's employees sometimes

used the incorrect term "minimum revenue guarantee" or "MRG" to refer to the "Royalty

Advances" in the Agreement in informal communications and/or non-legal documents, but

otherwise disputed and misleading. Apart from a single reference that appears to be a typo,

especially because it is capitalized and not defined (Agmt. § 1), the term "minimum

revenue guarantees" and the related acronym "MRG" are not used in conjunction with

references to the payment here, namely, payment of "fully recoupable" "Royalty

Advances." Agmt. § 6. The inadvertent use of a shorthand term in informal

communications and/or non-legal documents does not somehow change the plain language of the Agreement, and how it was understood by the parties involved. *See* Murray Decl. ¶ 18, n.1; Pfeifer Tr., pp. 68:15-69:3 ("I wouldn't call it a guarantee. I would call it an advance of royalty income."); *id.*, p. 72:2-22 ("This agreement talks about 'royalty advances,' . . . not a 'revenue guarantee'"); Penske Tr., pp. 182:23-183:5 (acknowledging the Agreement refers to "royalty advances," not "minimum guarantee").

24. **Shutterstock agreed to pay PMC annual Royalty Advances/MRGs as follows:**

| Contract Year | Payment Deadline | Amount |
|---|---|---|
| Year 1 | 9/1/2015 | $1.5 million |
| Year 2 | 7/1/2016 | $1.5 million |
| Year 3 | 7/1/2017 | $2 million |
| Year 4 | 7/1/2018 | $2.5 million |
| Year 5 | 7/1/2019 | $3 million |
| Year 6 | 7/1/2020 | $3.5 million |

**(Ex. 5, Archive & Event Agreement § 6).**

**Shutterstock's Response:** Disputed and misleading with respect to the acronym "MRGs" (which stands for "minimum revenue guarantees"), but otherwise undisputed. The term "minimum revenue guarantees" and related acronym "MRGs" are not used in conjunction with the payment terms set forth in the Agreement. *See supra* CSUF ¶ 23A. Notably, Shutterstock timely paid the full Royalty Advances in Year 1, Year 2, Year 3, Year 4, and Year 5 (one third of which was impacted by the COVID-19 pandemic), despite PMC's deficiencies in cooperation through the years, and had no obligation to do so in Year 6 because, *inter alia*, the Agreement had been properly terminated pursuant to Section 8. *See* Declaration of Stan Pavlovsky dated April 18, 2023 ("Pavlovsky Decl.") ¶ 16.

25. **Shutterstock also granted PMC a license to use images from Shutterstock's own image library, in exchange for specified fees, except that**

Shutterstock annually "waiv[ed] the first US $1,000,000 of fees payable." (Ex. 5, Archive & Event Agreement § 2(a)). This provided PMC with $1 million credits for PMC to use to license Shutterstock images. (*Id.*).

**Shutterstock's Response:**  Undisputed, but incomplete and misleading in that referenced "license to use images from Shutterstock's own image library" and "$1 million credit" applied only "throughout the License Period," as defined in the Agreement.  *See* Agmt. § 2(a); *see also id.* § 1 (defining "License Period").  Notably, PMC used up the $1M licensing credit almost to the exact dollar every year.  *See* Murray Decl. ¶ 13.

**25A.    Shutterstock also agreed to contribute funding for PMC's digitization of its historic archive.  (Ex. 5, Archive & Event Agreement § 4).**

**Shutterstock's Response:**    Disputed to the extent that PMC characterizes Shutterstock's partial reimbursements of PMC's expenses for making the Archive Content and PMC Event Content compliant with Shutterstock's metadata practices as interchangeable with "funding," which it was not. The Agreement provided that "Shutterstock shall partially reimburse PMC's expenses arising from PMC's obligation to make the Archive Content and PMC Event Content SSTK compliant, in accordance with the following schedule. Such payments will be made following PMC's delivery of documentary evidence of the incurrence of such expenses, including payment of third party consultants or contractors who are engaged in the process of creating, identifying, curating or managing Archive Content, PMC Event Content and/or Third Party Event Content." Agmt. § 4.  Immaterial in that this was a term that the parties included in order to speed up the digitization (and consequently, monetization) of the archive, which was admittedly "similar or worse than [that of] Rex Features."  Pfeifer Tr., pp 79:10-80:13. *See also* Pfeifer Decl. ¶ 18 (PMC was interested in getting Shutterstock to help contribute toward PMC

digitizing its physical archives from its various recently purchased publications because PMC wanted to find a way to exploit the archive that was sitting in physical storage).

26.    **Shutterstock also agreed to provide editorial photographic event coverage at PMC Events at its expense, to attend and shoot images at PMC Events; to bear the expense of any such coverage it provided at Third Party Events; and that PMC would own the copyrights to images shot at those events and at Third Party Events for which Shutterstock used PMC's access. (Ex. 5, Archive & Event Agreement §§ 3(a)(ii)-(iii) and 3(c); Ex.1, Counterclaims ¶ 16).**

**Shutterstock's Response:** Undisputed, but misleading, insofar as this statement paraphrases the Agreement.

27.    **The Archive & Event Agreement ultimately allowed Shutterstock to obtain and post millions of editorial images on Shutterstock's websites for Shutterstock's customers to license for a fee. (*See, e.g.*, Ex. 13, Tabulation of PMC Images Delivered to SSTK, SSTK161815; Ex. 66, Murray Tr. 177:7-178:20).**

**Shutterstock's Response:** Undisputed, but misleading as to the defined term "Archive & Event Agreement" as well as the term "editorial images," which can encompass any images not designed for commercial use.    Over the course of the Agreement, the revenue generated from the licensing of images taken at live events (*i.e.*, what the Agreement defines as "Third Party Event Content" and "PMC Event Content") accounted for approximately 90% of the overall revenue generated pursuant to the Agreement.  *See* Murray Decl. ¶ 11. Given the fast pace of the news cycle, the demand for and value of such images generally plummets after the first few hours or days of being taken and made available for license.  *See id.* ¶ 5; *see also* Rachlis Report ¶¶ 12-13.  Further, PMC admittedly did not provide all content that it had and was anticipated to provide under the Agreement and its refusal to discuss new acquired content and credentials (*e.g.*, from *Rolling Stone*) deprived Shutterstock of opportunities to create more content.  *See* Murray Decl. ¶¶ 13, 25; Pfeifer Decl. ¶¶ 15, 18-19.

28.    **Prior to signing the Archive & Event Agreement, the parties negotiated a term sheet. (Ex. 14, Signed Term Sheet, May 6, 2015, PMC_0019609).**

**Shutterstock's Response:**    Undisputed, but misleading as to the defined term "Archive & Event Agreement."

29.    **During that negotiation, Shutterstock proposed a provision that it titled "Shutterstock Opt-Out," which provided that, starting in 2018, Shutterstock would "have the right to terminate the Agreement if in the immediately preceding year PMC Royalties equal less than 50% of the Royalty Advance paid for such year." (Ex. 15, Draft Term Sheet, Apr. 28, 2015, PMC_0021292-301, at 0021297; Ex. 69, Pfeifer Tr. 112:23-113:11, 117:4-16, 126:22-127:6; Ex. 70, Oringer Tr. 170:22-171:2, 172:21-24, 174:6-11).**

**Shutterstock's Response:**    Undisputed, but immaterial. Further, misleading insofar as the "Opt-Out" term was merely one term proposed during the parties' multiple rounds of negotiations, during which each party proposed multiple sets of terms, and immaterial because such "Opt-Out" term is not in the final Agreement, which contains an integration clause. *See* Pfeifer Decl. ¶ 16; Pfeifer Tr., pp. 113:4-116:13; Agmt. § 16 ("This Agreement . . . supersedes all prior or simultaneous agreements, discussions, negotiations[,] and statements . . . "). Upon removal of the "Opt-Out" term from the pre-Agreement term sheet, Shutterstock added other terms that would benefit Shutterstock and help shore up the Agreement to be financially and commercially successful. *See* Pfeifer Decl. ¶ 16. Shutterstock was prepared to not recoup 100% every year because the access alone had non-monetary but commercial value. *Id.*

30.    **Both Shutterstock's 30(b)(6) witness on the negotiation of the Agreement and Shutterstock's lead negotiator conceded that the "Shutterstock Opt-Out" proposed giving "Shutterstock the right to terminate the deal if there's a drop in the royalties that Shutterstock earns under the deal." (Ex. 70, Oringer Tr. 172:21-24; *accord* Ex. 70, Oringer Tr. 174:10-11 (under the draft provisions "Shutterstock would be able to cancel the agreement" if revenues fell); Ex. 69, Pfeifer Tr. 112:23-113:11 (describing provision as "a clause in Shutterstock's favor that gives Shutterstock an option to pull out of or terminate the agreement if revenue generated from the licensing of this content doesn't meet minimum levels.").**

**Shutterstock's Response:**  Disputed, as PMC has mischaracterized the terms of the proposed clause, which did not refer to a "drop" or consequence "if revenues fell," But immaterial.  The proposed term—which was among many that were not ultimately incorporated into the Agreement—included a right to terminate "if in the immediately preceding year PMC Royalties equal less than 50% of the Royalty Advance paid for such year."  Lackman Decl., Ex. K (PMC_0021292-301; April 28, 2015 iteration of Term Sheet) at PMC_21297; *see also* Pfeifer Decl. ¶ 16 (referring to overall negotiation context and Shutterstock's comfort in the goal of mutual success, along with added provisions to help ensure that the Agreement would be financially and commercially successful for both parties; such components supplanted the opt-out proposed term).  Undisputed that Shutterstock paid the Royalty Advance in full in 2015, 2016, 2017, 2018, and 2019 despite PMC's deficiencies in cooperation through the years.  *See supra* CSUF ¶ 29; *see also* Walter Tr., p. 202:7-20, and CSUF ¶ 29.

31.  **PMC rejected Shutterstock's proposed Opt-Out provision and Shutterstock still entered into the deal. (Ex. 61, Draft Term Sheet, May 4, 2015, PMC_0021840, at 0022605 (redline of redline showing Shutterstock accepting PMC's striking of the proposed "Opt-Out" provision), *id*. at p.\*16 (print out of redline changes showing that Todd Greene, then General Counsel of PMC (Ex. 63, Deposition Transcript of Todd Greene ("Greene Tr.") 64:4-5; 65:12-13), deleted "Opt-Out" provision); Ex. 14, Signed Term Sheet, May 6, 2015, PMC_0019607-09 (final Term Sheet containing no "Opt-Out" provision); Ex. 5, Archive & Event Agreement, SSTK092808-28 (final Archive & Event Agreement containing no "Opt-Out provision); Ex. 69, Pfeifer Tr. 126:22-127:6 and 128:24-129:14 ("I think I agree with what you are saying. The conditional opt-out was stricken . . . Shutterstock signed the final term sheet.").**

**Shutterstock's Response:**  Disputed as incomplete, including as noted in the preceding response, but immaterial.  As Mr. Pfeifer testified, this proposal was part of the overall "give-and-take" inherent in all contract negotiations, and thus cannot be analyzed in isolation.  *See* Pfeifer Tr., pp. 113:4-116:13; Pfeifer Decl. ¶ 16 (discussed *supra* at CSUF

Case 1:20-cv-04583-MKV-VF    Document 180    Filed 04/19/23    Page 21 of 91

¶¶ 29-30).  Indeed, it was one of many on both sides that were not ultimately incorporated into the Agreement, and the final Agreement did include other provisions designed to maximize Shutterstock's ability to recoup the Royalty Advances, including, without limitation, the requirement that PMC provide Shutterstock with access to the specific high-profile third party events listed on Schedule D of the Agreement, and that PMC "work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content," as well as PMC's language regarding the ability to terminate for failure to correct, cure, or otherwise resolve any claimed breach in 45 days.  Agmt. §§ 3(a)(iii), 8.  Such additional provisions and assurances gave Shutterstock comfort that it did not have to worry about any shortfalls. Notably, despite negotiating for a cure provision in the Agreement, Mr. Penske appeared to believe the cure provision was useless when asked about it during his deposition.  *See* Penske Tr., pp. 361:7-363:13 ("[Y]ou're saying in 45 days I could create – start creating live events in order to remove our company from a breach?").

   32.    **Shutterstock was willing to run its new businesses "at a loss." (Ex. 69, Pfeifer Tr. 109:22-110:9).**

   **Shutterstock's Response:**  Disputed, to the extent that PMC has mischaracterized Mr. Pfeifer's testimony.  In response to the question "would you have proposed [royalty advance] amounts . . . based on projections that could show a loss to the extent there were other benefits that were important to obtain under the deal," Mr. Pfeifer testified: "Potentially, yes.  I mean, all new businesses, at least at Shutterstock, we typically ran businesses or were willing to run businesses at a loss for some period of time."  Pfeifer Tr., pp. 109:22-110:9.  Undisputed that Shutterstock was paying a vendor for a service and was amenable to not recouping the value of that service off of royalties given the primary

purpose and benefit of the Agreement of giving Shutterstock an edge in the building and marketing of its editorial product.  Pfeifer Decl. ¶ 16 ("Shutterstock was prepared to not recoup 100% every year because the access alone had non-monetary but commercial value. Just like spending money on advertising is not a "loss" from an economic perspective, we saw the royalty advance as an investment that provided us a marketing benefit each year of the Agreement.").

33.    **Shutterstock viewed its Agreement with PMC as "an investment in the long-term growth of Shutterstock" with an "intangible," "meaningful, business impact." (Ex. 69, Pfeifer Tr. 182:16-183:21; 234:23-235:17).**

**Shutterstock's Response:**  Undisputed.  Shutterstock entered into the Agreement in order to obtain intangible benefits, including six full years of competitive advantage that would grow in value over time, so long as PMC was supplying meaningful access in accordance with the Agreement, and PMC was aware of this goal as noted throughout. PMC's suggestion that Shutterstock was not entitled to retain and was somehow supposed to give up these intangible benefits upon termination of the Agreement is unsupported.

34.    **Shutterstock believed its deal with PMC would "add to Shutterstock's reputation in the editorial space," "open up new business opportunities," and "improve the overall relationship between Shutterstock and its customers." (Ex. 69, Pfeifer Tr. 182:16-183:21).**

**Shutterstock's Response:**  Undisputed that these are some of the benefits that Shutterstock expected to receive under the Agreement, but misleading insofar as it is an incomplete characterization of Shutterstock's purpose for entering into the Agreement.  For example, PMC's statement omits that Shutterstock believed having exclusive access to entertainment and fashion industry live events would help it to jump ahead of competitors and therefore increase its market share of the editorial space, particularly in combination with its offerings from Rex Features and other major news and lifestyle content providers.

*See* Pfeifer Decl. ¶¶ 4-7, 9; Pfeifer Tr., p. 183:15-21 ("We had conversations about how [the Agreement] would open doors with different kinds of customers […] [W]e felt there was meaningful business impact to having access to [live and archival] content we wouldn't otherwise have."); Lackman Decl., Ex. L (Deposition Transcript of Stan Pavlovsky ("Pavlovsky Tr.")), pp. 93:19-94:7 ("[W]e have lots of images already. The difference with the live events is that allowed us to have exclusive content that competitors like Getty could not have, so there's value to that content that doesn't exist with other forms of con[tent] at the present time."); Greene Tr., p. 115:13-15 ("[Shutterstock] wanted to enter into the editorial imagery business and to specifically take on Getty in the market.").

35.    **Shutterstock benefited from PMC's cachet in the fashion and entertainment world, which helped propel Shutterstock from a supplier of ordinary stock photos to an influential name in editorial imagery. (Ex. 3, Form 10-K, dated Feb. 24, 2016, PMC_0022218-345, at 0022222-23 ("exclusive distribution agreement with…PMC…provides us with…credibility in the market for editorial content…"); Ex. 7, SSTK Company Overview, dated Sept. 2017, SSTK092400-41, at 092418).**

<u>**Shutterstock's Response:**</u>  Disputed in part.  The cited documents do not support the statement.  The collection of acquisitions and partnerships as part of the overall editorial offering (including news, sports, and more) helped build Shutterstock's customer base for Editorial imagery.  Pfeifer Decl. ¶ 6.  Shutterstock's acquisition of Rex Features built its ability to offer high-demand, current entertainment and fashion content, such as from awards events such as BAFTA.  *See* Melvin Decl. ¶¶ 5-6.  The niche that PMC filled was live event and other fresh content from the worlds of entertainment and fashion in the United States.  *Id.* ¶¶ 6-7.  Undisputed that PMC's cachet in the fashion and entertainment industry was a benefit that Shutterstock expected and which Shutterstock bargained for but did not receive during a substantial portion of the Agreement, including over a year of competitive and strategic marketing value along with the high-value content that comes

with the deal. *See* Pfeifer Decl. ¶ 20; Pavlovsky Decl. ¶¶ 3-4, 26; Penske Tr., p. 37:13-16

("Q. Are live events core to the business? A. Certainly. Certainly part of the core

business."); *id.*, p. 384:13-19 ("And it's one of those things like, yeah, you've got an

obligation. You've –you've certainly received what you bargained for, but there's the

contract—you know, live events have been stymied. And so okay, what are we going to

do?").

36.    **Internally in 2019, Shutterstock observed that "PMC was instrumental in gaining access to events for SSTK in the early years of the deal. As SSTK has established its brand in the market, we are increasingly securing our own editorial credentials to events." This "resulted in less of a need for leaning on PMC to provide." (Ex. 16, Email from Granato to Oringer, dated Mar. 18, 2019, SSTK161819-21, at 161821).**

**Shutterstock's Response:** Immaterial but disputed in part. Undisputed that PMC

was instrumental in giving access as contemplated by the significant up-front payment

under the Agreement. Disputed as to credentials generally. *See* Arato Decl., Ex. 16 at

SSTK161821 (referring to PMC events growing in number). Disputed that reputation in

industry was due solely to PMC. *See* Melvin Decl. ¶¶ 3-6 (discussing importance and

impact of Rex acquisition). In September 2019, after the cited email, Shutterstock

identified that the fashion access and credentials and entertainment events were still

important. *See* Lackman Decl., Ex. M (Deposition Transcript of Candice Murray ("Murray

Tr.")), pp. 107:15-108:23 (describing importance of fashion weeks around the world. "Q.

I asked you if there was anything else other than the access and live events that you valued

in September of 2019? [Objection] A. Again, it was really the live events. Q. So nothing

else? [Objection] A. No."); *see also* Melvin Decl. ¶ 12 (indicating Shutterstock used PMC's

credentials for numerous Third Party Events in 2019 and 2020); *see also id.*, ¶ 9, Ex. E

(2019 shared production showing Shutterstock used numerous PMC credentials).

37.     [INTENTIONALLY OMITTED]

38.     **By early 2020, Shutterstock was able to obtain access to various premier events, like the Oscars, Grammys, Golden Globes and Emmys, without PMC, and sometimes rejected the access PMC offered to Shutterstock. (Ex. 19, Email from Walter dated Jan. 31, 2020, SSTK108869-71, at 108869 ("The pattern has definitely been that team SSTK isn't interested in [PMC] credentials from major events, like the Globes and Oscars, even though these credentials are increasingly rare."); Ex. 17, Email from Granato dated Aug. 13, 2018, SSTK052379-81, at 052379 ("we are getting a lot of the same credentials that they are now"); Ex. 66, Murray Tr. 66:22-67:7, 69:2-7 (agreeing with statement in 2018 that Shutterstock is "getting alot of the same credentials that [PMC is] now"); Ex. 18, 2019 Shutterstock Spreadsheet of Editorial Event Coverage SSTK168725; Ex. 66, Murray Tr. 683:23-686:8 (By 2019, Shutterstock had its own access to each of the events listed on Schedule D to the Agreement)).**

   **<u>Shutterstock's Response:</u>** Disputed but immaterial. Mr. Melvin—Shutterstock's Rule 30(b)(6) designee on "Shutterstock's obtaining and/or use of its own credentials to shoot images at Third Party Events for which it could have obtained credentials from PMC"—testified that while Shutterstock had some non-premium ("behind the line") credentials to some of the prominent events, Shutterstock "[a]bsolutely" needed PMC's help to obtain certain access to premier entertainment events. *See* Lackman Decl., Ex. N (Deposition Transcript of Benjamin Melvin ("Melvin Tr.")), p. 63:9-21 ("[T]he majority of the access that [Shutterstock] received was arrivals. So one of the things that PMC . . . afforded us, was access, outside of behind the line . . . ."); *id.*, pp. 46:14-23, 63:24-66:9 ( "there might be different credentials to shoot  different aspects of the event" and "Shutterstock could not obtain [certain credentials] on its own" and relied on PMC, including, for example, "[e]xecutive arrivals" credentials to the Oscars and the Golden Globes). Moreover, Shutterstock used PMC's credentials at many of these events in 2019 and 2020. *See, e.g.*, Melvin Decl. ¶ 9, Ex. E (PMC_0019418) (showing Shutterstock used multiple PMC credentials (i.e., "VAR" and "WWD") for the Oscars and Golden Globes in 2019); *accord* Murray Tr., pp. 683:23-684:13 ("[Shutterstock] worked with PMC [ ] to use

their credentials" in 2019 for the events listed on Schedule D because they "are all giant events, where you would take all the credentials you could and put as many photographers there as you could.").

39.    **Shutterstock, on its own, received "near-perfect placement" for its photographers "for every single event this [early 2020 awards] season," based upon "the relationships Shutterstock ha[d] built with all the event organi[z]ers" during the PMC partnership. (Ex. 20, Email from Barrett, dated Feb. 5, 2020, SSTK109975-77, at 109976).**

**Shutterstock's Response:** Disputed.  Shutterstock's relationships with the event organizers predated the so-called "PMC partnership" through its acquisition of Rex Features.  *See* Melvin Decl. ¶¶ 3-7, Ex. A; Melvin Tr., pp. 9:4-13, 59:17-25 ("going back to the early 2000s, I received credentials, invites, tipsheets, to almost every event in Los Angeles," including while employed by Rex Features prior to the acquisition); *id.*, p. 74:4-22 ("Again, with the Oscars, we had a pre-existing relationship that dates back to the early mid-2000s, where we had covered the Academy Awards every year since then.  So, again, this wasn't a new relationship. . . . [Rex Features] had photographers based in LA that were shooting under the Rex credential [at] the Academy Awards, the Golden Globes, and almost every other event that took place in LA, prior to 2009, going back to May 2000 – early 2000s.").  Shutterstock also used many PMC credentials for the early 2020 awards season events.  *See* Melvin Decl., ¶ 12.  Further, this is immaterial given that PMC did not negotiate for restrictions on Shutterstock using its own credentials or leveraging its relationships from Rex despite being aware of these relationships.  *See* Greene Tr. 174:3-20.

40.    [INTENTIONALLY OMITTED].

41.    **As of March 2020, Shutterstock had received approximately 2.5 million images under the Archive & Event Agreement, all of which were PMC Content under the Agreement. (Ex. 13, Tabulation of PMC Images Delivered to SSTK, SSTK161815;**

**Ex. 66, Murray Tr. 262:2-5, 681:9-13; Ex. 21, Google Sheets comment from Marquis to Murray, dated May 11, 2020, SSTK100528 ("we have 2.5m PMC images on our site today.").**

      **Shutterstock's Response:** Undisputed as to the approximate number of images that Shutterstock had received from PMC as of March 2020, but disputed that all such images constituted "PMC Content" because PMC did not own them (such as certain Shutterstock live event images) and/or have the necessary rights to license some of them. *See* Rachlis Report ¶¶ 25, 31; *see also* Lackman Decl., Ex. D (Ex. 18 to Margolin Tr. at SSTK030768) (November 18, 2018 email chain regarding copyright infringement claim); *id.*, Ex. E (Ex. 19 to Margolin Tr. at PMC_0021693) (February 4, 2020 email chain regarding copyright infringement claim). Shutterstock further states PMC's "approximately 2.5 million images" were a mere fraction of the ***over 315 million*** images available for license on Shutterstock's website at such time. *See* Murray Decl. ¶ 2.

      42.    **These images remained "up on Shutterstock's website through at least July 16, 2020" (when Shutterstock purported to terminate the Agreement (Ex. 66, Murray Tr. 681:14-682:7)), where they were "readily available" to Shutterstock's customers (*Id.* at 262:2-8; Ex. 71, Deposition Transcript of Steve Sammut ("Sammut Tr.") 95:23-96:2).**

      **Shutterstock's Response:** Immaterial, as this statement relates to PMC's copyright claim, which it has voluntarily dismissed. *See* Dkt. No. 159. Otherwise disputed, to the extent that this statement implies that any PMC-coded images "remained up on Shutterstock's website" and/or "were ready available to Shutterstock's customers" after the termination of the Agreement on July 17, 2020. That is false. Shutterstock permanently removed all PMC-coded images from its website on the date that the Agreement effectively terminated (July 17, 2020). *See* Murray Tr., p. 450:18-20 ("Q. Was all PMC content taken down as of July 17, 2020? A. Yes."). Moreover, PMC has admitted that Shutterstock—

not PMC—owned hundreds of the images that purportedly "remained up" on Shutterstock's website.  *See* Dkt. No. 159.

43.    **Between March and July 2020, Shutterstock identified two of PMC's brands on its websites, along with just three other brands, as comprising "world class content" from "industry leaders", and identified Shutterstock's "Archival Collections", as a "[h]ighlight…of our editorial collection." (Ex. 22, Shutterstock Webpage, Main Editorial Page, dated as of Apr. 29, 2020, PMC_0022838-41, at 0022839; Ex. 66, Murray Tr. 267:2-10 and 272:15-21; Sammut Tr. 102:22-103:7; Ex. 23, Email from Sammut, dated May 18, 2020, SSTK107719-22, at 107719 (touting "PMC collections" in a May 18, 2020 business pitch)).**

**Shutterstock's Response:**    Disputed, as this statement misquotes and mischaracterizes the cited page of Shutterstock's website, which speaks for itself, and is not supported by any of the other cited evidence.  Shutterstock included multiple brands' logos—only two of which were PMC's—at the bottom of the editorial page of its website as illustrative examples of the "industry leaders" whose content is among the "[w]orld-class content" in "[Shutterstock's] editorial collection."    Arato Decl., Ex. 22 (PMC_0022838-41) at PMC_0022839 (logos for Rex, European Press Photo Agency, APA, Variety, WWD); *see also* Lackman Decl., Ex. O (Deposition Transcript of Steve Sammut ("Sammut Tr.")), pp. 39:20-41:11.  Even in the purported "business pitch" that PMC cites, the reference to "PMC collections" is merely an example of content included in Shutterstock's editorial offering.  *See* Arato Decl., Ex. 23 (SSTK107719-22) at SSTK107719 (Shutterstock's editorial offerings include "the Rex collection, Shutterstock Editorial's staff photographers['] content, other wholly owned content, as well as collections that are available globally whether exclusive or otherwise that are not wholly owned, e.g. PMC collections like WWD or Variety").  Moreover, Shutterstock's website identified Shutterstock's "Archival Collections"—not "PMC's archive"—as a "[h]ighlight[] of [Shutterstock's] editorial collection," among eight other categories of

images (e.g., "Coronavirus Outbreak Coverage" and "Editors' Picks").  Lackman Decl.,

Ex. P (PMC_0022834-37 at PMC_0022835; *see also* Sammut Tr., pp. 39:10-19, 102:8-21

(explaining the reference to "Archival Collections" on Shutterstock's website refers to "any

asset [in Shutterstock's collection] pre the year 2000").  Nonetheless, undisputed that an

affiliation with PMC had commercial value to Shutterstock and Shutterstock lost that value

when PMC subverted the objects of the Agreement and ultimately stopped performing

under the Agreement.

      44.     [INTENTIONALLY OMITTED]

      45.     [INTENTIONALLY OMITTED]

      46.     [INTENTIONALLY OMITTED]

      **47.     Prior to entering the deal, Shutterstock did "internal light diligence" on PMC's photography archive and concluded that it was "impressive." (Ex. 69, Pfeifer Tr. 39:18-41:14).**

      <u>**Shutterstock's Response:**</u>  Undisputed that Shutterstock did "light" diligence, but

disputed as to the remainder.  The cited deposition testimony is inadmissible hearsay and,

at most, establishes that Keren Sachs—a former Shutterstock employee whose duties did

not include managing or acquiring archival content (Pfeifer Tr., p. 36:2-16)—stated in an

email to Mr. Pfeifer that she "review[ed] [PMC's] archive" and "[i]t's impressive."  *Id.*;

*see also* Pfeifer Decl. ¶ 18.  To the extent this can even be characterized as "diligence," it

is the only diligence that Shutterstock did on the Archive Content prior to entering into the

Agreement (Pfeifer Tr., p. 39:7-22; Pfeifer Decl. ¶ 18), and it has since become clear that

PMC's Archive Content is not impressive.  *See* Rachlis Report ¶¶ 22-27; Murray Decl. ¶

9; Walter Tr., p. 392:8-12 ("Q: . . . did the licensing of archived content bring in significant

revenue?  A:  No.").

48.     **This review was a "typical step for [Shutterstock] for any content deal"
to determine if the archive material "aligned with [Shutterstock's] expectations." (Ex.
69, Pfeifer Tr. 39:13-22).**

    **Shutterstock's Response:**  Disputed, and misleading to the extent this statement

suggests that Shutterstock did "internal diligence" on PMC's Archive Content (*see supra*

CSUF ¶ 47).  Mr. Pfeifer merely testified that "looking at some of the content," as it did in

the case of PMC's Archive Content, "would be a typical step for [Shutterstock] for any

content deal . . . to determine if [the content] aligned with [Shutterstock's] expectation."

Pfeifer Tr., p. 39:18-22.  The fact that Shutterstock took a "light" look at a handful of

photographs and no additional steps to examine PMC's Archive Content prior to entering

into the Agreement is commensurate with its value vis-à-vis the other benefits that

Shutterstock stood to gain.  *See* Pfeifer Decl. ¶ 18.  Simply put, the Archive Content was

not important to Shutterstock or PMC under the deal.  *Id.*; *see also* Murray Decl. ¶¶ 6-9.

49.     **In announcing the deal with PMC, Shutterstock characterized "PMC's
archive," including the "100-year old publications Variety and WWD," as
"legendary." (Ex. 6, Shutterstock Press Release, dated June 22, 2015, PMC_0022535-
37, at 0022535).**

    **Shutterstock's Response:**  Disputed.  The cited press release was jointly drafted

and issued by PMC and Shutterstock and was designed to promote PMC's interest in

marketing its recent acquisitions.  *See* Pfeifer Decl. ¶ 12; Lackman Decl., Ex. Q (Deposition

Transcript of Lauren Gullion ("Gullion Tr.")), pp. 30:23-32:12 (agreeing that "[she was]

responsible for drafting this press release [ ] with respect to PMC's side" and describing

the "very collaborative process with Shutterstock").  Moreover, PMC used the exact same

language in a document that it prepared and shared with Shutterstock before the press

release was issued.  *See* Lackman Decl., Ex. J (Ex. 4 to Grobar Tr.) (PMC_0002137-42)

(June 18, 2015 Gullion to various PMC employees attaching "our finalized talking points,

reviewed and approved by SSTK," which refer to "PMC's archive" as "including images from its legendary 100-year-old publications Variety and WWD").

**49A.    Shutterstock's former CEO and Chairman, Jon Oringer, testified that he was "hopeful" and "optimistic" about generating revenues from the archive. (Ex. 70, Oringer Tr. 104:12-106:7-11).**

<u>**Shutterstock's Response:**</u>  Disputed, and misleading.  This statement takes Mr. Oringer's testimony out of context.  In the same excerpt from which PMC quotes, Mr. Oringer stated that Shutterstock was "skeptical," and "w[as not] able to fully diligence the archive" and therefore "tried to make the best decision based on" "whatever information [that PMC] provided." Oringer Tr., pp. 104:20-105:17, 105:16-24.  Moreover, Mr. Rachlis opined that eleven out of twelve of the archives identified in the Agreement as comprising PMC's Archive Content contain no materially viable content.  *See* Agmt. § 3(a)(i) (defining PMC's "Archive Content" as "including, but not [being] limited to," twelve content libraries); Rachlis Report ¶ 27 (with one exception, the "archives listed in the Agreement . . . do not have known viable imagery").  According to Mr. Rachlis, the one exception is the WWD archive, which, despite having "some nice material" (Lackman Decl., Ex. R (Deposition Transcript of Eric Rachlis ("Rachlis Tr.")), p. 79:21-25; *see also* Rachlis Report ¶¶ 28-29), has "limited [ ] licensing viability" because it is a "very niche subject matter archive" and its event and celebrity images are "not unique or exclusive" (*id.*, ¶ 32; *see also id.* ¶¶ 30-31).  *Accord* Rachlis Tr., p. 80:10-12 (agreeing that "WWD is the only PMC brand that has viable archival content"); *see also* Murray Decl. ¶ 7 (only value in WWD archive is as a complement to its live content, and trade archival content like PMC's has very little value in general, particularly as compared to consumer-focused archival content); Pfeifer Decl. ¶¶ 13, 18 (noting that Shutterstock had low expectations for the PMC archive, did not receive any suitable amount until well into the second year of the

Agreement, and was not in need of archive content in light of the vast amount of competitive archives it had and therefore received no strategic advantage from it; further identifying level of diligence done on archive content as reflecting the value Shutterstock placed on it). *Compare id.* ¶ 19 ("considering the state of the archive content—very little of which was digitized, in addition to the issues noted just above—it is unlikely Shutterstock would have entered into *any* agreement with PMC at all if all Shutterstock was receiving was the archive content").

50.    [INTENTIONALLY OMITTED]

51.    **After the pandemic's onset, Shutterstock's editorial chief stated internally that I honestly don't want to lose" the PMC relationship, and one of her two "biggest concern[s]" was "loss" of the "WWD . . . archivw[sic]." (Ex. 24, Chat, dated Apr. 28, 2020, SSTK114607-10, at 114608-09).**

**Shutterstock's Response:**  Except as to the relationship (Murray Decl. ¶¶ 14-16, 22), disputed, and misleading, as it mischaracterizes Ms. Murray's statement in an internal message.  *See* Arato Decl., Ex. 24 (SSTK114607-10), at SSTK114608 (in a discussion about "the deal," Ms. Murray said, "I honestly don't want to lose it but we are so far away from establishing terms . . . "); Murray Tr., p. 253:18-25 ("Q: . . . [Y]ou did not want to lose the PMC relationship?  A:  Yeah, I said I honestly don't want to lose it[.]").  Further, in response to a question from Mr. Melvin asking if her "biggest concern [was] the loss of [PMC's] archive or the access to events moving forward," Ms. Murray responded "WWD *live and* archiv[e]" and "nothing else."  Arato Decl., Ex. 24 (SSTK114607-10), at SSTK114609 (emphasis added).  This reflects Ms. Murray's position that the WWD archival content had some value when offered in combination with new WWD content, but the archival content had no material value alone.  *See* Murray Tr., p. 254:2-9; Murray Decl. ¶ 7 (only value in WWD archive is as a complement to its live content).

52.    **During the pandemic and before Shutterstock terminated the Agreement, PMC created and delivered new photographs to Shutterstock (Ex. 30, Images delivered to Shutterstock, SSTK0006), and coordinated with Shutterstock. (Ex. 25, Email from Melvin, dated May 15, 2020, PMC_0016319 ("Rob is going to head to Santa Monica to try to find a decent position."); Ex. 26, Email from Buckner, dated June 12, 2020, PMC_0016848 ("There should be some good names coming today."); Ex. 27, Email from Buckner, dated June 14, 2020, PMC_0016857; Ex. 28, Email from Buckner, dated June 18, 2020, PMC_0016860-62, at 0016860; Ex. 29, Email from Melvin, dated June 24, 2020, PMC_0001353-55, at 0001355).**

     **Shutterstock's Response:**    Disputed, and misleading, insofar as this statement suggests, incorrectly, that PMC delivered "new photographs" of the same quality and number as it typically delivered under the Agreement.  In fact, these photographs were not entertainment or fashion (as is PMC's designated scope) and certainly not valuable: they consisted extensively of non-events such as shots of buildings from public places and images of protesters at outdoor marches, covering the same material we were receiving from the AP and other political news partners.  *See* Murray Decl. ¶ 28.  Moreover, the number of images delivered during this period (*i.e.*, between mid-March and July 16, 2020) pales in comparison to the number of images that PMC delivered to Shutterstock during the same period in prior years.  *Id.*  This statement is also misleading as to PMC's purported "coordinat[ion] with Shutterstock."  As shown in the evidence that PMC cites, PMC and Shutterstock were not coordinating photographers to use credentials; these were non-credentialed events (*e.g.*, a "BLM rally"), and in some instances, PMC was merely looking for "remote" editing.  *See, e.g.*, Arato Decl., Ex. 27 ("I wanted to know if you'll would be able to take some remote editing images?"); *id.*, Ex. 28 ("Any chance an editor can be available to take some remote shots?").

     53.    **For example, after PMC invited Shutterstock to a "Garth Brooks Drive Thru Concert," Shutterstock responded, "I am all in for this content" and "I will also be in attendance." (Ex. 31, Email chain, dated June 26, 2020, PMC_0016885).**

**Shutterstock's Response:**  Undisputed, but immaterial and misleading, because Shutterstock's jovial response was that "I am all for this content, *as it's the closest thing to a concert we get these days!*" Arato Decl., Ex. 31 (emphasis added).  Further, nothing in this email chain establishes that Shutterstock used PMC's credentials for the event or that credentials were otherwise needed for an outdoor concert.

54.    **Shutterstock terminated the Agreement as of July 17, 2020. (Ex.1, Counterclaims ¶¶ 31, 38).**

**Shutterstock's Response:**  Undisputed.

55.    **Between mid-March and Shutterstock's July 16 2020 termination date, PMC delivered 2,238 images to Shutterstock. (Ex. 30, Images delivered to Shutterstock, SSTK00006; Ex. 66, Murray Tr. 567:3-569:25 (2,238 images delivered between March 10 and July 2020)).**

**Shutterstock's Response:**  Undisputed, but immaterial and misleading.  Many of the images delivered during this period were taken prior to the pandemic, and as discussed *supra* CSUF ¶ 52, those taken during the pandemic were not of the same quality and number as it typically delivered under the Agreement.  *See, e.g.*, Murray Decl. ¶¶ 27-28.  Moreover, PMC's delivery of 2,238 images between mid-March and July 16, 2020 is a far cry from the "more than a million recently digital files of Archive Content" that PMC claimed to be "in the process of transferring" to Shutterstock on May 4, 2020 (Lackman Decl., Ex. S (Ex. 10 to Grobar Tr.) (PMC_0020975-76)), and also pales in comparison to the number of images that PMC delivered to Shutterstock during the same period in prior years.  *See* Murray Decl. ¶¶ 27-28; Arato Decl., Ex. 60 (SSTK168721).  This number is especially immaterial considering, for example, that another one of Shutterstock's partners, namely, the Associated Press ("AP"), had been delivering 3,000 images *per day* during the same period. Murray Decl. ¶ 28.

56.    [INTENTIONALLY OMITTED]

57.     **Vaccines became widely available in March 2021.** *See, e.g.,* **NY Times,** ***See How Vaccinations Are Going in Your County and State* (updated Mar. 21, 2022), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (noting "vaccine rollout began in December 2020, with a focus on some of the most vulnerable populations" and "every state had made all adults eligible for the shots by April 2021").**

        **Shutterstock's Response:**    Disputed, to the extent that it suggests that live events

resumed around March 2021 in the same nature and to the same extent as prior to the

pandemic.  In March 2021, only the first dose of the vaccine was available for all adults in

particular places, and the availability of vaccinations has nothing to do with whether

entertainment and fashion events returned, much less in a manner that would allow for

exclusive Shutterstock access via a PMC credential before the natural expiration date of

the    Agreement    on    June    30,    2021.    *See*    Lackman    Decl.,    Ex.    T

(https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/11/fact-sheet-

president-biden-to-announce-all-americans-to-be-eligible-for-vaccinations-by-may-1-

puts-the-nation-on-a-path-to-get-closer-to-normal-by-july-4th/).

        58.     **Had Shutterstock not terminated the Agreement, it would have benefitted from obtaining images under the Agreement through June 2021, including from Academy Award preparations, arrivals and backstage at the 21st BET Awards, and numerous film and television premieres and fashion shows. (Ex. 73, Walter Decl. ¶ 4; Ex. 66, Murray Tr. 586:10-595:5 (identifying examples of PMC images taken at live events prior to June 30, 2021 and admitting that Shutterstock would have put those images on its website if the Archive & Event Agreement had not been terminated)).**

        **Shutterstock's Response:**  Disputed.  Shutterstock did terminate the Agreement

and, therefore, this statement presents a hypothetical rather than a statement of fact.

Shutterstock cannot know whether it would have "obtained images under the Agreement"

had it remained in effect through June 2021, particularly given that PMC admittedly has

withheld credentials and content from Shutterstock before (Walter Tr., p. 202:7-20), and

even if it did, any "benefit[]" that Shutterstock received from such images would have been

nominal and substantially smaller than it received in prior years due to the pandemic's impact on live events. *See* Murray Decl. ¶¶ 27-28.[3]  Moreover, there is no support for the referenced "*numerous* film and television premieres and fashion shows" during this period, and the only two events that PMC specifically mentions—*i.e.*, The Academy Awards (April 25, 2021) and BET Awards (June 27, 2021)—occurred more than a year after PMC ceased providing access to events and toward the very end of the natural term. Indeed, the BET Awards (which, notably, was not listed on Schedule D) occurred just three days before Shutterstock likely would have been pulling content from its platform due to the termination of the Agreement. *See* Agmt. § 1 & Schedule D.  The so-called "Lightbox" referenced in the cited Declaration of Karl Walter (at ¶ 4) contains images from "events" that also occurred toward the very end of the natural term and/or are not the types of credential-required entertainment and fashion events contemplated by the Agreement, including, for example,  the "MAGA Rally in Beverly Hills" and "Juneteenth 2021." Lackman Decl., ¶50.

**58A. Specifically, Shutterstock would have obtained at least approximately 12,000 images from approximately 100 live fashion and entertainment events similar to the Third Party Events under the Agreement. (Ex. 73, Walter Decl. ¶ 4; *see also* Arato Decl. ¶ 5).**

**Shutterstock's Response:**  Disputed for the same reasons set forth *supra* CSUF . ¶ 58.  The referenced "events" are *not* "similar to the Third Party Events under the Agreement," and certainly were not remotely similar to the Third Party Events listed in Schedule D, all of which were cancelled during this period.  *Compare* Agmt., Schedule D

---

[3] Notably, other major events (including those listed in Schedule "D") were cancelled shortly after Shutterstock discussed internally about whether it would be able to photograph certain events. *See* Arato Decl., Ex. 11 at SSTK100561 (chat between Anh-Le Chung and Candice Murray on March 23, 2020 noting that there had been no announcements about the Cannes Film Festival).

*with* Lackman Decl. ¶ 50.  Moreover, "approximately 12,000 images" and "approximately 100 . . . events" over the course of nearly *fifteen months* (*i.e.*, mid-March 2020 through June 2021) pales in comparison to the content and access that PMC previously provided. *See* Arato Decl., Ex. 60 (showing Shutterstock received approximately ***200,000 images per year*** in 2016-2019); Melvin Decl. ¶ 9, Exs. B-E (shared production documents for 2016, 2017, 2018, and 2019, listing, on average, more than six hundred live events per year for which PMC had obtained and was offering its credentials to Shutterstock); *id.* ¶ 10 ("On average, Shutterstock sent its photographers to ***several hundred*** Third Party Events per year . . . using the access and credentials that PMC provided to Shutterstock pursuant to the Agreement."); *see also* Murray Decl. ¶¶ 27-28.

59.     **After the onset of the pandemic in March 2020, Shutterstock continued to license thousands of PMC images to its customers, yielding thousands of dollars in gross monthly revenues to Shutterstock. (Ex. 66, Murray Tr. 378:22-379:5; Ex. 32, Spreadsheet of Licensing Revenue, SSTK168954).**

**Shutterstock's Response:**  Undisputed, but immaterial and misleading because, by definition, such amount does not account for the expenses that Shutterstock incurred over the same period, including, for example, the amount of the royalty advance paid to PMC.  *See* Murray Decl. ¶ 29; Pavlovsky Decl. ¶¶ 22-25.

60.     **Shutterstock's corporate designee and chief of its Editorial division, Candice Murray, testified that "the dollar value of the revenues that Shutterstock earned for licensing activity during the pandemic period…was just under a hundred thousand dollars." (Ex. 66, Murray Tr. at 378:22-379:5).**

**Shutterstock's Response:**  Disputed, to the extent that this statement suggests that Shutterstock did not lose money under the Agreement during the pandemic period or that there was no other value in the Agreement.  It did lose money (and, in fact, it lost money throughout the entire term of the Agreement).  *See* Arato Decl., Ex. 10 (SSTK025324-025333), at SSTK025327.  Ms. Murray's testimony refers to gross revenues from the

license of PMC Content during the pandemic period, which, by definition, do not account for the costs and deductions that Shutterstock incurred over the same period, *e.g.*, the Royalty Advance paid to PMC. When the Royalty Advance that Shutterstock paid to PMC for the relevant period ($3M) is amortized over the roughly four-month pandemic period ($1M), and subtracted from the "just under a hundred thousand dollars" in gross revenues during this period, the result is a severe net loss to Shutterstock (*negative* $900K), not to mention the loss of value of being able to provide to Shutterstock's growing list of customers the type of content that they signed up with Shutterstock (as opposed to any competitor) to receive. *See* Pavlovsky Decl. ¶¶ 21-27; *see also* Murray Decl. ¶ 29; Arato Decl., Ex. 10 (SSTK025324-025333), at SSTK025327 (projecting a significant loss for the year 2020).

61.    [INTENTIONALLY OMITTED]

62.    [INTENTIONALLY OMITTED]

63.    [INTENTIONALLY OMITTED]

64.    **Ms. Murray calculated that, starting in 2016, Shutterstock spent between approximately $200,000 and $300,000 per year under the Agreement on production costs to capture content from live events for PMC, including to supply photographers and photo editors, and that such expenses would have totaled $300,000 for 2020. (Ex. 66, Murray Tr. at 183:10-184:20; 185:11-15; Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at 025327).**

**Shutterstock's Response:**    Disputed, and misleading, as these figures merely include the amount that Shutterstock spent to supply photographers and editors, and do not account for various other amounts that Shutterstock incurred under the Agreement during the relevant time period (*e.g.*, advertising expenses, content processing expenses). *See* Murray Decl. ¶¶ 10, 13; Arato Decl., Ex. 10 (SSTK025324-025333), at SSTK025327 (reporting "PMC Event Coverage (est.) – Freelance Fees" and "separately reporting, inter

alia, 'Ad Spend' and 'Content Processing Expense Reimbursement'").  Further disputed to

the extent it implies that Shutterstock saved on costs.

      65.     [INTENTIONALLY OMITTED]

      66.     **Shutterstock did not incur any production-related expenses while it exploited PMC content between mid-March 2020 through the July 2020 termination date, because, in the absence of live events, Shutterstock was not sending photographers and editors to live events during that time. (Ex. 66, Murray Tr. 185:11-186:7; 186:11-22; 193:23-194:23).**

    **<u>Shutterstock's Response:</u>**  Disputed.  Shutterstock still incurred production-

related expenses because it kept photographers on payroll during the pandemic.  *Cf.*

Pavlovsky Tr., pp. 69:14-70:9.  Moreover, disputed as misleading because the revenue

calculations cites relate to licenses that *pre-date* the pandemic and are therefore unreliable.

      67.     [INTENTIONALLY OMITTED]

      68.     [INTENTIONALLY OMITTED]

      69.     [INTENTIONALLY OMITTED]

      70.     [INTENTIONALLY OMITTED]

      71.     [INTENTIONALLY OMITTED]

      72.     [INTENTIONALLY OMITTED]

      73.     [INTENTIONALLY OMITTED]

      74.     [INTENTIONALLY OMITTED]

      75.     [INTENTIONALLY OMITTED]

      76.     [INTENTIONALLY OMITTED]

      77.     [INTENTIONALLY OMITTED]

      78.     [INTENTIONALLY OMITTED]

      79.     [INTENTIONALLY OMITTED]

      80.     [INTENTIONALLY OMITTED]

81.    **Starting at least as early as January of 2019, Shutterstock sought to renegotiate or terminate the Agreement. (Ex. 66, Murray Tr. 105:4-7).**

**Shutterstock's Response:**  Disputed, but immaterial.  During a very short period of time, Shutterstock and PMC discussed modifications (not termination) to the Agreement to address certain ambiguities and practical issues to "rejigger" the terms to give both sides more of what they wanted, but this discussions ended absolutely on November 6, 2019. *See* Lackman Decl., Ex. U (PMC_0020956-57) (November 2019 email chain between Karl Walter and George Grobar, indicating "[Ms. Murray] does NOT want to renegotiate our contract"); *see also* Murray Decl. ¶ 12.

82.    [INTENTIONALLY OMITTED]

83.    **As of 2019, Shutterstock viewed its event coverage obligations under the Agreement as an "enormous distraction for our production teams" which "results in us spending more money to produce lots of content that they wind up owning" (Ex. 66, Murray Tr. 112:25-113:19 (agreeing with statement and explaining that it referred to "both third-party and PMC events"); *see also id.* at 113:20-115:21; Ex. 33, Email from Granato, dated Sept. 28, 2019, SSTK052537-40, at 052537).**

**Shutterstock's Response:**  Disputed but immaterial.  As indicated in the other documents regarding PMC's theory that internal discussions that terminated well before the pandemic matter, in the context of pre-paying the 2020 Royalty Advance six months early with a modest 5.7% discount, Donna Granato was referring materially to the issue with sponsored PMC Events that had no editorial or licensing value on Shutterstock's platform.  Murray Decl. ¶ 10.  These events were resulting in disproportionate cost issues until a rate card was adopted for sponsored, non-editorial events.  *Id*; Murray Tr., pp. 113:20 -114:20 ("And at this point in time, were – was Shutterstock still providing photographers to shoot at PMC-sponsored events for free? Yes."); *id.*, p. 116:15-17 ("I wouldn't call those [third-party events] a distraction.  It was primarily the PMC [sponsored] events.").

84.     **Shutterstock also believed that "[f]or the 'PMC' sponsored events we are basically their outsourced production house getting paid below market fees or no fees when there is no distribution value for us" (Ex. 66, Murray Tr. 69:8-19; Ex. 17, Email from Granato, dated Aug. 13, 2018, SSTK052379-81, at 052380).**

**Shutterstock's Response:**  Undisputed but immaterial.  PMC ultimately agreed that PMC sponsored events were not covered under the Agreement and agreed to a rate card to cover the costs that Shutterstock would incur in photographing sponsor-supported PMC events that Shutterstock could not monetize due to restrictions or other low value (such as non-celebrities speaking on a panel about the film business).  *See* Murray Decl. ¶ 10.

85.     [INTENTIONALLY OMITTED]

86.     **Shutterstock believed that its minimum revenue guarantee payment obligation was a "value proposition loser for Shutterstock." (Ex. 66, Murray Tr. 116:18-117:8; Ex. 33, Email from Conte, dated Sept. 28, 2019, SSTK052537-40, at 052537).**

**Shutterstock's Response:**  Disputed but immaterial.  The testimony is that the head of tax would be looking at the accounting numbers only, and not the overall economic or business benefit to the business (*e.g.*, the competitive advantage, brand-building and marketing advantage, etc.), and therefore would describe it as a "value proposition loser" where Shutterstock itself would not.  *See* Pavlovsky Decl. ¶ 25; *see also* Murray Tr., pp. 116:25-117:8 (Responding to questions regarding an email from Shutterstock's former head of tax, Al Conte: "It lost money, which is how Al would have looked at it, so yes."). The Royalty Advance unquestionably corresponded to material value.  *See* Pfeifer Decl. ¶¶ 16, 20.

87.     **In late January 2019, Shutterstock proposed revising the Agreement to relieve Shutterstock of its obligation to provide photographers and editors at its expense to cover any PMC Events. (Ex. 34, Email from D. Granato, dated Jan. 25, 2019, SSTK024498-500).**

**Shutterstock's Response:**  Disputed but immaterial. The referenced proposals related to adding compensation for non-editorial/sponsored events that were not within the scope of the Agreement.  *See* Murray Decl. ¶ 10.  Specifically, the cited document shows that Shutterstock inquired whether PMC was complying with its promises to not provide non-sponsored PMC Event access or content to third parties, proposed a right of first refusal for non-editorial (*i.e.*, sponsored) PMC Events that did not result in the creation of content suitable for the editorial platform, and revised the Agreement to add *Rolling Stone* (which PMC refused to negotiate for as required under the Agreement).  *See id.* ¶ 13; Pfeifer Decl. ¶ 15; Arato Decl., Ex. 34 (SSTK024498-499) (January 25, 2019 email from Donna Granato to Karl Walter attaching "PMC Mark Up" of Agreement).

88.     **In late September 2019, Shutterstock sought to renegotiate the deal (in the form of an early termination of the Agreement and a new deal with lower costs) because of the above perceived burdens. (Ex. 35, Email from D. Granato, dated Sept. 28, 2019, SSTK052739-41 (Shutterstock emailing proposal to PMC); Ex. 66, Murray Tr. 105:4-7; 106:18-24 (Shutterstock was "looking to lower" "costs around what we were spending to produce the content"); 112:25-113:19 (explaining that the costs related to "both third-party and PMC events")).**

**Shutterstock's Response:** Disputed but immaterial.  The cited evidence refers to efforts to get PMC to comply with its obligation to renegotiate upon its acquisition of Rolling Stone credentials and/or content, and to set a rate card for PMC sponsored events that were outside of the Agreement and that PMC had demanded Shutterstock produce nonetheless.  Further, immaterial given that mental state or motivation has nothing to do with the legal tests at issue here, and in that after Donna Granato left Shutterstock and PMC had conceded it needed to provide a rate card to use Shutterstock photographers and other resources for sponsored events outside the Agreement, the new head of editorial indicated that she did not want to renegotiate the Agreement.  *See* Lackman Decl., Ex.. U (PMC_0020956) (November 2019 email chain between Karl Walter and George Grobar,

42

indicating "[Ms. Murray] does NOT want to renegotiate our contract"); Walter Tr., pp. 649:20-653:2. Undisputed that PMC had been pushing for coverage of events that did not provide editorial, licensable content, and Shutterstock was looking for a win-win solution that would address PMC's demands in the spirit of good faith.[4] Murray Decl. ¶¶ 10-12.

89.    [INTENTIONALLY OMITTED]

90.    **On March 24, 2020, just days after the pandemic hit, Ms. Murray told Shutterstock's then current CEO and Chairman, Jon Oringer that "this [the pandemic] is a good opportunity to do a good deal with them," and Mr. Oringer responded: "they will drag their feet through the [June]/july [sic] payment[.] [W]e have to be hard on them and not give in." (Ex. 70, Oringer Tr. 14:20-15:21; Ex. 36, Chat, dated Mar. 24, 2020, SSTK100705-08, at 100705-06; Ex. 66, Murray Tr. 140:24-141:23).**

**Shutterstock's Response:** Disputed but immaterial. Mental state or motivation, particularly less than two weeks into the pandemic-related shutdowns, has nothing to do with the question of whether Shutterstock is entitled to relief or recovery. Ms. Murray said the quoted words in the context of Ms. Murray's concern that a contract where Shutterstock paid millions of dollars to receive hundreds of events and got none was, indeed, not a good contract. Murray Decl. ¶¶ 13, 19-20. Further, PMC had taken the position that it did not have to negotiate with Shutterstock in good faith over new Acquisition Content (such as all of the credentials that would be available via the *Rolling Stone* acquisition) and had further taken the position that Shutterstock had to provide costly coverage for sponsored events when the language in the agreement plainly said "editorial." Murray Decl. ¶¶ 10, 13. In that sense, the contract was not good in that PMC took a deflective and adversarial,

---

[4] It is also worth noting that pursuant to the Agreement § 3(e), production costs were to be borne extensively by PMC. Ms. Granato's concerns about PMC's obligations under the Agreement were further justified by the fact that PMC had also promised there were more photographers on staff and were obligated to provide them. *See* Murray Decl. ¶ 11.

rather than a collaborative, "good faith" approach on issues because they had the leverage of live events. *See id.* ¶¶ 10-11.

91.    **During this same chat, Oringer asked Murray "do we have any legal recourse" because "they can't be providing us anything." Ms. Murray reported to Mr. Oringer that Shutterstock had "no legal recourse" to exit the Agreement and that PMC "ha[s] to agree" for Shutterstock to get any relief. Oringer asked again, "legally will we be able to [get some relief on the MRG]? or they have to agree?" Murray responded, "they have to agree." (Ex. 36, Chat, dated Mar. 24, 2020, SSTK 100705-08, at 100705, 08).**

<u>**Shutterstock's Response:**</u>    Disputed.    Despite being reflected in a casual chat format, the context makes clear that there was an opportunity to negotiate with PMC regarding the Agreement globally given that there were no live events and to develop a fair deal rather than simply end it.    As Ms. Murray stated in the referenced chat, "this is an opportunity to do a good deal with [PMC]."    Arato Decl., Ex. 36 (SSTK100705-08), at SSTK 100705 (March 24, 2020 chat between Jon Oringer and Candice Murray). Moreover, as Ms. Murray testified at her deposition, Mr. Oringer had asked her if there was a force majeure clause in the Agreement, and she was under the impression—before talking to counsel—that this clause was necessary in order for the Agreement to end.    *See* Murray Decl. ¶¶ 19-20; Murray Tr., pp. 134:22-136:5; 220:16-21; 223:24-224:3; 224:16-18.    Ms. Murray is not a lawyer and did not draft the Agreement; she stated Shutterstock had "no legal recourse" against PMC before consulting with inside and/or outside counsel, and has since learned she was wrong.    *See* Murray Decl. ¶¶ 19-20.    Further, at this very stressful and challenging time, none of the events in Schedule D of the Agreement had been cancelled, nor was it clear that PMC was not going to take steps to resolve the matter. Immaterial in that a non-lawyer's uncorrected view on the law, in the context of a global pandemic that put everyone under stress, is not binding on this Court, and motivation is irrelevant.    Shutterstock was legally entitled to "walk away" from the Agreement for

multiple reasons as explained in the accompanying Memorandum of Law.  Moreover, PMC mischaracterizes the chat because there was no reference to an "MRG" by either Mr. Oringer or Ms. Murray.

92.     **Also during this same chat, Mr. Oringer stated "insane how that contract is all them" and "this time the tables have to turn" and Ms. Murray stated the Agreement "is not a good contract," (Ex. 36, Chat, dated Mar. 24, 2020, SSTK100705-708, at 100705, 100707). Ex. 66, Murray Tr. 139:14-16; 146:14-147:5; Ex. 70, Oringer Tr. 238:25-240:1; 278:13-15);** *see also* **Ex. 70, Oringer Tr. 20:6-8, 239:1-2 ("we know this contract is pretty one-sided towards PMC")).**

**Shutterstock's Response:**  Undisputed but immaterial.  Despite being reflected in a friendly and casual chat format, the context makes clear that there was an opportunity to negotiate with PMC regarding the Agreement globally given that there were no live events ("they can't be providing us anything,"  Arato Decl., Ex. 36 (SSTK100705-708) at SSTK 100705 (March 24, 2020 chat between Jon Oringer and Candice Murray)) and to develop a fair deal rather than simply end it as Shutterstock was within its rights to do ("this is an opportunity to do a good deal with [PMC]." *id.*).  In the context of receiving no live event access and PMC declining to cooperate – failing to cover fashion events (*see* Agmt. § 3(e), "PMC shall […] provide its in-house staff photographers for such [fashion] events"), taking the position that Shutterstock had to take photographs that could not be syndicated, refusing to negotiate in good faith for additional access to high-profile events, refusing to engage in negotiations for new, high-profile event opportunities – it was certainly not a good contract. *See* CSUF ¶ 91.  Further, the statement reflects the belief of someone who did not negotiate the language of the Agreement.  The Agreement was not intended to be one-sided but in some ways had turned out to be that way due to PMC's non-compliance with the obligation to act in good faith at times, something Jay Penske was evidently aware of due to his avoidance of the issue.  *See* Murray Decl. ¶¶ 13-14; Arato Decl., Ex. 36 (SSTK100705-08)

at SSTK100706 ("[I] saw Jay the other week... he doesn't mention anything biz related ever[.] we avoid the topic").

93.    **At or around that time, Shutterstock calculated that, before the pandemic, it had lost approximately $7.3 million dollars under the deal between 2015-2019 and projected further losses of $4.3 million under the deal absent the pandemic. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025327; Ex. 66, Murray Tr. 181:7-182:19; 185:4-6;188:25-189:20; 189:5-190:7).**

**Shutterstock's Response:**  Disputed.  The cited document uses accounting terms (e.g., "gain" or "loss") but the document reflects the outlay for the services that PMC had delivered and was supposed to deliver as a springboard for offering an up-front payment under which Shutterstock would still "lose" money – i.e., continue to pay for the delivery of services it had contracted for, namely, receive event access and support the creation of content.  *See* Arato Decl., Ex. 10 (SSTK025324-33) (March 31, 2020 proposal from Candice Murray to Karl Walter), at SSTK025327-29; Murray Decl. ¶ 15.  Immaterial in that Shutterstock's payments have nothing to do with whether Shutterstock is excused from performance under the law or any other claim or counterclaim in this case. Shutterstock did not create a global pandemic that led to decisions to cancel nearly all events, nor did it decide not to engage in negotiations, just to get out of a contract that was supposed to be more of a win-win financially.  *See* Pavlovsky Decl. ¶ 19.

94.    **Stan Pavlovsky, previously COO of Shutterstock, took over as CEO on April 1, 2020 (Ex. 67, Pavlovsky Tr. 49:10-15).**

**Shutterstock's Response:**  Undisputed.

95.    [INTENTIONALLY OMITTED]

96.    **On or around March 31, 2020, Mr. Pavlosky learned that Shutterstock's editorial department was estimating that it would miss its earnings forecast for 2020 by millions of dollars and questioned Ms. Murray about the newly projected shortfall. (Ex. 38, Chat, dated Mar. 31, 2020, SSTK100683 ("forecast for Editorial" was "7M off plan")). Ms. Murray told Mr. Pavlosky that Shutterstock "need[s] the relief from PMC to get back to what the P&L looked like in December**

from a margin standpoint." (*Id.*; *see also* **Ex. 37, Chat, dated Mar. 31, 2020, SSTK114740 at 114743; Ex. 66, Murray Tr. 201:15-202:19, 203:10-15) (explaining the need for relief from PMC "to help salvage the revenue numbers.").**

**Shutterstock's Response:** Undisputed but immaterial legally (including for reasons stated *supra* CSUF ¶ 93) and in that PMC proposed some form of "relief," albeit a delayed payment at a cost of an extra $1 million in credit, given the undisputed fact that PMC could not deliver on the services Shutterstock had contracted for. *See* Penske Tr., p. 339:11-16; Pavlovsky Tr., pp. 177:5-178:12; Pavlovsky Decl. ¶ 10. Further inaccurate that "relief" from PMC would have been the only aspect to address the economics, but averred that other vendors in analogous situations were aware of the circumstances and their deals and worked out context-aware arrangements with Shutterstock. Murray Decl. ¶ 16.

97.     **The same day of her chat with Mr. Pavlovsky, Ms. Murray sent PMC a proposal for a revised deal which sought to maintain the relationship with PMC through June 30, 2021 (the end of the initial contractual term) and also proposed "renew[ing] the agreement through Dec [20]22," albeit on renegotiated financial terms.... (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).**

**Shutterstock's Response:** Undisputed, but immaterial because PMC rejected the offer and no new deal was agreed. Further, Shutterstock avers that in the same document cited by PMC, Ms. Murray states that no content of any type had been received for nearly two weeks (i.e., since the pandemic had started to affect events), but that "[Shutterstock] value[s] our partnership and are hopeful that [PMC is] open to this discussion considering all that is going on in the world that is affecting business today." Arato Decl., Ex. 10 (SSTK025324-33) (March 31, 2020 proposal from Candice Murray to Karl Walter), at SSTK02524. The renegotiated financial terms offered the same $1M credit to PMC for use of Shutterstock's photo library, and Proposal #1 (of 2) only cut the Royalty Advance by 50% (from $3.5M to $1.75M) to account for the six months where, at the time, events

were anticipated to not happen.  Immaterial as the terms of a proposed resolution two weeks into the pandemic have no legal relevance to whether Shutterstock is entitled to prevail on its claims or defenses pertaining to the Agreement. *Id.*

98.    **The proposal projected that live events would resume in six months from the end of March. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 025328).**

**Shutterstock's Response:**    Undisputed that a proposal made 18 days into the pandemic shut-down speculated that live events might resume in six months, but immaterial given that nobody disputes that virtually no award shows or major events with any sort of red carpet or after parties, which would be of interest to Editorial licensees, returned until around or after the natural termination of the Agreement in June 2021. *See* Murray Decl. ¶¶ 5, 14.

99.    **Shutterstock's goals in making this proposal were to "waive the upcoming" minimum revenue guarantee payment that was due on July 1, 2020 and start a new deal on July 1 with more favorable payment and production terms. (Ex. 11, Chat from C. Murray to A. Chung and D. Marquis, dated March 23, 2020, SSTK100551-72, at SSTK100559 ("a WIN would be to waive the upcoming MRG and start a new deal on July 1st that is agreeable from an MRG and production standpoint."); Ex. 66, Murray Tr. 159:21-161:6, 163:19-24).**

**Shutterstock's Response:**    Immaterial for the reasons stated above, and disputed. Ms. Murray's primary goal in making the initial proposal was to work out a temporary measure to deal as best as possible with a global pandemic that was wreaking havoc on the world and in the fifth year of the Agreement had eliminated the very reason for the Royalty Advances, and to do so in a way that would not allow the pandemic to end the relationship entirely.  Murray Decl. ¶18.  The quoted statement is taken from a Shutterstock employee who admittedly did not have a major say in the ultimate disposition of a potential new deal. *Id.*  In her own words, "[i]t's not ultimately my call." (Murray Tr., p. 161:4).  However, Shutterstock does not dispute that a lower Royalty Advance (not "MRG") was sensible for

a re-negotiation of the agreement's terms at that juncture (March 2020), when no events—the undisputed consideration for the deal—were happening.  When it became clear that the pandemic could potentially last more than six months, Shutterstock reasonably concluded that putting any timeframe on event content—and therefore any up-front payment for the services of providing access—made no sense.  Murray Decl. ¶ 18; Pavlovsky Decl. ¶¶ 10, 13; *see also* Pavlovsky Tr., pp. 180:6-181:5, 193:16-194:5.

100.    **Shutterstock presented two options to PMC in Shutterstock's March 31, 2020 proposal, each of which allowed Shutterstock to maintain its existing rights under the Agreement through the end of the contractual term, including during the six month period Shutterstock projected that live events would be cancelled because of the pandemic, but which reduced Shutterstock's MRG payment obligations and Shutterstock's obligation to provide event coverage for PMC at Shutterstock's expense. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at 02529-30).**

**<u>Shutterstock's Response:</u>**  Immaterial for the reasons stated above, but disputed.  Any proposal which projected that live events would be cancelled would not be a proposal that "allowed Shutterstock to maintain its existing rights under the Agreement," by nature, because its existing rights were premised on having access to live events.  Murray Decl. ¶ 31; *see also* Pfeifer Decl. ¶¶ 18, 20.  In that regard, reducing Shutterstock's royalty advance payment obligations by six months accounted for the lack of access to live events for an estimated (at the time) six months (further evidencing what the Royalty Advance was for: the events, not the archive, a point PMC did not dispute at the time).  *See* Pavlovsky ¶ 20.  Additionally, the proposal removed "Shutterstock's obligation to provide event coverage for PMC at Shutterstock's expense" only because no live events were happening and addressed production costs in part due to some PMC brands' resistance to accept that PMC sponsored events were not within the Agreement and should be paid for.  PMC never provided any response to this proposal, apart from offering one and only offer: delayed

one-half of the payment of the Royalty Advance in exchange for at least $1 million in additional credit, and no discussion whatsoever of anything that PMC would do for Shutterstock in return under this new agreement.  *See* Penske Tr., 342:12-343:8 ("the intention was to blend the deal and extend over two years […] we're not going to [let] them […] walk away from the payment, […] [we are] willing to spread it over two years").

**100A.  Under the first, the $3.5 million MRG due July 1 would be cut by 50%; Shutterstock's production costs would be capped at $60,000 for Q4 2020; and a renewal discussion would commence in Q1 2021. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at SSTK025329). Under the second, Shutterstock would terminate the Agreement for a $1 million kill fee and the parties would negotiate a new three-year agreement effective July 1, 2020, in which the annual MRGs would be slashed to $500,000 and Shutterstock's historic annual production costs (Ex. 66, Murray Tr. 183:10-184:20) would be cut by 50% to no more than $150,000 per year. (Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-33, at SSTK025330). PMC would retain its $1 million credit under both alternatives. (*Id.* at SSTK025329-30).**

**Shutterstock's Response:**  Disputed to the extent it omits the reasons behind the proposals but immaterial for the reasons stated above.  The referenced exhibit explicitly stated that Shutterstock would receive 50% relief on the Royalty Advance (not "MRG") "due to no events for 6 months; March-September 2020;" the cap on production costs was due to the fact that the level of events was expected to be lower in light of the pandemic. Arato Decl., Ex. 10 (SSTK025324-33) (March 31, 2020 proposal from Candice Murray to Karl Walter), at SSTK025329. The second proposal reduced the Royalty Advance and provided better licensing fees in light of the fact that PMC slashed its credentials, passes, and special access from hundreds to *zero* many months before the final year of the Agreement was to start.  *Id.* at SSTK025330.

**100B.  On April 8, Murray was "basically told we're going to walk away from PMC all together", a move she shared internally would be a breach of the Agreement (Ex. 39, Chat from C. Murray to D. Marquis and A. Chung, dated Apr. 8, 2020, SSTK115200).**

**Shutterstock's Response:**  Undisputed but immaterial, and highly misconstrued and out of order.  As the witness explained and as the overall communications plainly show, the referenced conversation was in a casual chat format, between two non-lawyers with an uncorrected view on the law, in the context of an evolving global pandemic that put everyone under stress.  Murray Decl. ¶¶ 19-22 (describing the misunderstanding that the only way to get out of an agreement was if there was a force majeure clause, and noting that the speaker was expressing frustration that PMC was not delivering even though it was voraciously using up every ounce of its $1,000,000 credit, was not interested in cooperating, and was so aloof that Shutterstock's CEO—who questioned why a vendor was not performing nor acting appropriately—ended up taking over the discussions).  A non-lawyer's misinterpretation and misunderstanding of the law is not binding on this Court.  Shutterstock was legally entitled to "walk away" from the Agreement for multiple reasons as explained in the accompanying Memorandum of Law.

**100C.  By April 13, Murray was investigating how quickly Shutterstock could shut down all of PMC's user accounts and remove PMC content from its website. (Ex. 66, Murray Tr., pp. 238:4-239:11).**

**Shutterstock's Response:**  Undisputed, but immaterial for the reasons stated *supra* CSUF 100B.  Further, PMC's single, objectively unacceptable approach made it clear that PMC was looking to get out of the relationship and Shutterstock rightly prepared for that.  Murray Decl. ¶ 23 (stating with respect to comment about removing content, "Mr. Pavlovsky asked me to assess factors relating to negotiating points, including what might happen if PMC went on the offense against us just like I understand they did with Getty Images under the *Variety* deal.  In my experience, there is nothing wrong with engaging in a risk assessment as part of developing a negotiation position.").  Further, on May 4, 2020, PMC said that it had conducted assessments on the situation with two outside law firms,

both of whom predicted above 95% chance of success, and had "readied counsel to litigate," so there was no other way to take PMC's position but as a threat. *See* Lackman Decl., Ex. 5 (Ex. 10 to Grobar Tr.) (PMC_0020975-20976) (May 4, 2020 email from Jay Penske to Jon Oringer).

101.    **PMC offered in response to extend the term of Archive & Event Agreement for no additional payment by Shutterstock and to defer half of the upcoming $3.5 million payment (which was otherwise due to PMC in full on July 1, 2020) until the following year. (Ex. 40, Email from Penske, dated May 9, 2020, PMC_0016287-88, at 0016287; *see also* Ex. 68, Deposition Transcript of Jay Penske ("J. Penske Tr."), 327:18-328:2, 330:2-9; Ex. 67, Pavlovsky Tr. 177:8-178:19).**

**Shutterstock's Response:**    Immaterial for reasons stated above, including that motivation is irrelevant, and disputed, including as incomplete.  While PMC agreed that the Agreement should be changed, PMC's objectively unreasonable, singular, fixed proposal was that Shutterstock absolutely pay the total amount of $3.5 million despite the fact that PMC admittedly was delivering no services, but that Shutterstock could wait to pay $1.75 million of it until some months later so long as Shutterstock gave PMC a generous extra $1 million in credit: $1,000,000 in credit is a significant "payment" on the books.  See Pavlovsky Tr., 180:6-181:5; *see also* Pavlovsky Decl. ¶¶ 9-10.  This proposal – essentially a short-term loan with an "interest rate" of over 50% in the form of credit for images for which Shutterstock had to pay suppliers – failed to take into account anything about the pandemic, the terms of the deal, the fact that PMC had provided no content for weeks, that PMC had retained the entire Royalty Advance from the entire year without performing from only eight months into the contract year, or the fact that PMC could not deliver on upcoming events of any type including pre-defined events in Schedule D.  *See* Lackman Decl., Ex. TT (SSTK024717) (April 10, 2020 email from Candice Murray to Karl Walter); Margolin Tr., 150:8-151:13.  Nor did it promise any performance by PMC;

rather, it reflected PMC's admission that PMC's leadership did not understand the stock photography business. *See* Penske Tr., 65:11-66:1; 66:13-20 ("[T]he selling of photographs, either stock or editorial, is not a business that PMC has been in or is currently in."). PMC's proposal never changed and in fact was so rigid that when Shutterstock's CEO questioned why it should discuss up-front money when PMC was already in the hole, PMC's CEO—frustrated that he was not going to be able to execute on the plan to get the money and immediately look for another partner—responded with profanities and then hung up on Shutterstock's CEO. Pavlovsky Tr., 249:12-250:14 ("Q. [W]hat did you and [Jay Penske] speak about? A. […] I just remember he threw a few profanities out and then that was pretty much the end of the conversation. […] I think he hung up on me."); Pavlovsky Decl. ¶ 13.

**102.    While this dialogue ensued, Mr. Pavlosky advised Mr. Oringer that he was going to tell PMC that "we're not going to pay anything" (Ex. 41, Chat, dated Apr. 14, SSTK160949; Ex. 67, Pavlovsky Tr. 196:25-197:7) and anticipated that a new deal with PMC "would result in another huge savings for us" (Ex. 42, Chat, dated Apr. 15, 2020, SSTK106659-60, at 106659).**

**Shutterstock's Response:**    Undisputed that not paying money for services not rendered would inherently result in savings of expense but loss of benefit. Disputed, to the extent this statement characterizes Shutterstock's motives during the pandemic renegotiation as unequivocally unwilling to pay "anything," and immaterial in that alleged motives in a negotiation are irrelevant to whether Shutterstock is excused or otherwise entitled to relief. Indeed, Mr. Pavlovsky testified to his intent at the time: "From my perspective, if PMC was not going to be able to rectify or help us, work with us, you know, tell us, you know, a solution, we were not going to pay the last advance." (Pavlovsky Tr., pp. 191:12-191:16). Moreover, Mr. Pavlovsky stated that unless there was some resolution, Shutterstock did not intend to pay $3.5 million for services it was not receiving.

(Pavlovsky Tr., pp. 194:15-195:23); *see also* Pavlovsky Decl. ¶ 10.  Shutterstock further avers that its reason for rejecting this proposal was clear given the uncertainty surrounding the pandemic, and issue which was not addressed by PMC's proposal: "The primary reason is that we would continue -- we would be paying for a period of time when we're not receiving any services, no live events, etc., and so just extending the remainder of the contract for another half or whatever it would be is not something that I felt comfortable. Q. Even if that extension covered a period of time when live events resumed? A. Correct. Q. Why was that not accepted? A. Because everything was so uncertain at the time, that there was no way for me to think about an extension of an agreement in the middle of a pandemic.  I had no idea how much longer this -- it could have been the case that this thing had gone on for another, you know, year and we would have been yet again in the same -- in the same position, we're getting no services, but paying." (Pavlovsky Tr., pp. 180:9-181:5).

103.    **On April 29, 2020, Mr. Pavlovsky sent PMC an updated proposal for a renegotiated deal that would commence on July 1, 2020. Under that proposal, Shutterstock would continue to receive the same benefits that it held under the Archive & Event Agreement (the right to license PMC content, including archive content and new images taken at available live events), except that Shutterstock would no longer have to pay PMC any minimum revenue guarantee; PMC would no longer get the $1 million credit towards its licensing of Shutterstock images; and PMC would have to bear the expenses for Shutterstock to provide event coverage. (Ex. 43, Email from Pavlovsky, dated Apr. 29, 2020, SSTK161699-703 at 161701-02).**

**Shutterstock's Response:**  Disputed and immaterial.  Shutterstock never had to pay any "minimum revenue guarantee" at any time. Under the proposal, Shutterstock would receive live events when they returned, but they did not exist at that time and were not expected to return until well after July 1, 2020, and for the reasons Mr. Pavlovsky explained, including the uncertainty and PMC had retained one-third of a year's Royalty Advance while performing no measurable services, Shutterstock was not comfortable with

setting an advance that the parties had always tied to live events that would generate instant content for Editorial licensees in the media.  Arato Decl., Ex. 43 at SSTK161701-02. Instead, PMC would enjoy a much higher royalty rate than under the Agreement (40% instead of 30%), calibrated against production costs for content that Shutterstock would create but which PMC would own outright in just three or fewer years, and the parties would meet quarterly to help ensure that they were acting in good faith as business partners as the Agreement contemplated.  *Id.*; *see also* Lackman Decl., Ex. V (SSTK161779-81; April 2020 email chain between Stan Pavlovsky and George Grobar) at SSTK161780. Undisputed that the proposal appears to omit a credit but PMC never responded to the proposal to ask for it, so it is an irrelevant point.

104.    **On April 29, 2020, Mr. Pavlovsky confirmed to PMC that "we are not committing to any part of the minimum guarantee." (Ex. 43, Email from Pavlovsky, dated Apr. 29, 2020, SSTK161699-703 at 161699).**

**Shutterstock's Response:**  Undisputed.  As Mr. Pavlovsky testified, committing to any sort of advance when the pandemic was so uncertain, although certainly suggested no live events for *months* after there had been no live events since mid-March (well before the next term and advance), and when PMC had already kept over $1,000,000 in value for no services relevant to the Editorial business, simply made no sense.  Pavlovsky Tr., 180:4-181:5.  Further, PMC never countered this proposal apart from reasserting its "blend and extend" proposal, which was objectively unacceptable.  *See* CSUF ¶ 101.

105.    **Shutterstock sent PMC notices of termination dated May 18 and July 2, 2020, contending that the pandemic had frustrated the purposes of the Agreement or, in the alternative, that PMC had failed to perform by not providing Shutterstock with access to new live events and, thus, the resulting photographs, during the pandemic shutdown. On this basis, Shutterstock withheld both payment of the final $3.5 million annual guaranteed payment and the $1 million credit for use of Shutterstock's imagery during the final contract year. (Ex. 44, May 18, 2020 Letter, PMC_0020980-83; Ex. 45, July 2, 2020 Letter, PMC_0020986-89).**

**Shutterstock's Response:**  Disputed to the extent mischaracterized. Shutterstock sent PMC a Notice to Cure per the Agreement's Section 8 on May 18, 2020 and indicated that the alleged cause for termination excused it from further performance.  Arato Decl., Ex. 44 at PMC_0020982 ("The fundamental change in circumstances resulting in the cancellation of PMC Events and Third Party Events has entirely frustrated Shutterstock's purpose for entering the agreement, rendering it worthless and thus excusing payment…"). In support of its position that Shutterstock was excused from performance, the letters mention various portions of the Agreement under which PMC was not performing.  *See* Arato Decl., Exs. 44, 45.  The July 2, 2020 letter further outlined steps Shutterstock would take for an acceptable wind-down, even though PMC by that point had retaliated with a lawsuit laden with false and disparaging allegations.  Arato Decl., Ex. 45 at PMC_0020989; Dkt. No. 1.

**105A. Shutterstock's May 18, 2020 termination letter described PMC's obligations under the Agreement to include "licensing rights to PMC archival content," and contended that "Shutterstock agreed to pay PMC . . . based on the value of the entire package of PMC's above-listed obligations." (Ex. 44, May 18, 2020 Letter, PMC_0020980-83, at 20981).**

**Shutterstock's Response:**  Disputed, and misleading, as this statement mischaracterizes the May 18, 2020 letter and takes quotes out of context.  Shutterstock's May 18, 2020 letter was a Notice to Cure per the Agreement's Section 8, and indicated that there had been a fundamental change in circumstances (the pandemic) which entirely frustrated Shutterstock's purpose for entering the agreement, rendering it worthless and thus excusing payment.  Arato Decl., Ex. 44 at PMC_0020982.  *See* Arato Decl., Ex. 44. To counter PMC's statement that it was entitled to payment of the Royalty Advance so long as it supplied some Archive Content to Shutterstock, Shutterstock made clear in the Notice to Cure that it agreed to pay "based on the value of ***the entire package***," not *just* the

"licensing rights to PMC archival content" as PMC baselessly contends, and PMC was not entitled to payment absent the provision of access to Live Events. *Id.*

106.    **Before taking any of the above-noted actions and terminating the Agreement based on the pandemic's purported impact on the deal, Shutterstock did not take any steps to analyze the pandemic's actual financial impact on Shutterstock under the Agreement (factoring in Shutterstock's actual revenues and actual cost savings). (Ex. 66, Murray Tr. 284:24-285:8, 286:25-287:13; 288:12-18; Ex. 67, Pavlovsky Tr. 247:15-18; *see also* Ex. 10, Murray Proposal, dated Mar. 31, 2020, SSTK025324-025333, at SSTK025327).**

**Shutterstock's Response:** Disputed but immaterial. PMC's referenced transcripts are mischaracterized. When Mr. Pavlovsky was asked whether in May 2020, Shutterstock had quantified the lost value of the deal, Mr. Pavlovsky did not recall, but noted that part of how Shutterstock determined the lost value was "[b]y virtue of the fact that we didn't have all the live event coverage within that period [one third of the prior year of the contract]." Pavlovsky Tr., pp. 247:21-248:3. When asked the same question, Ms. Murray also stated that "When I said 90 percent of the revenue we generated against PMC content was on live event content, we had however many years prior to 2020 to say this is what we saw from live event content." Murray Tr., p. 284:11-284:15. Further, PMC has not clarified what it means by "cost savings" or proposed what such "cost savings" were, especially as photographers stayed on payroll (Pavlovsky Decl. ¶¶ 19-20; 21-27) and vendor-by-vendor profitability analyses under contracts with fluctuating provisions are not done in the ordinary course of business. In any event, there is no need to look at the "financial impact" under counsel's novel suggestion because PMC was in breach and the services that Shutterstock was paying PMC to provide were not being delivered. Such a breach obviates the need for a detailed financial analysis, and attempts to eliminate the breach by looking at purported benefits not only are unsupported and disregard the

enormous value of having event access, but have nothing to do with liability or attributable

damages.

107. **During that same time-period, Shutterstock did that financial analysis for its entire Editorial business as a whole (Ex. 66, Murray Tr. 286:25-287), and Shutterstock determined that its Editorial business did "better in 2020 versus 2019" on a net revenue basis (*i.e.* that "during the pandemic period, the cost savings that Shutterstock experienced were sufficient to have the net revenue number be a little better than in a comparable prepandemic period.") (Ex. 66, Murray Tr. 287:14-288:11).**

**Shutterstock's Response:** Undisputed that a financial analysis was conducted, but

disputed that it was "that" analysis that counsel proposes in the paragraph above.

Shutterstock avers that it did its analysis for the "entire editorial business," (Murray Tr., p.

287:12-13), not just for PMC's contribution to its editorial business, and the editorial

business evolved in ways that PMC has failed to distinguish. Immaterial to the questions

at issue in the lawsuit.

108. **In the May 18 letter, as well as in a May 8 email that Mr. Pavlovsky sent to PMC, Shutterstock told PMC that "the piecemeal submission of Archival Content or outdated Event content does not remedy PMC's inability to fulfill the lion's share of its obligations." (Ex. 44, May 18, 2020 Letter, PMC_0020980-83 at 0020982-83; Ex. 46, Pavlovsky Email, May 8, 2020, SSTK103646-47 ("PMC's submission of archival content or outdated event content does not remedy failure by PMC to fulfill the entirety of its obligations.")).**

**Shutterstock's Response:** Undisputed. At the time, PMC had delivered, in the

prior two months, far less than the Associated Press delivered to Shutterstock each day.

Further undisputed that the point of the Agreement was to provide live, real-time, current

content of events to which the general public did not have access and as to which there was

a large editorial media demand for images. *See* Murray Decl. ¶¶ 4-8; Pfeifer Decl. ¶¶ 3,

12; Melvin Decl. ¶¶ 6-7. As noted throughout above, everyone agrees that the purpose of

the Agreement was for the value of live event access and the current live content itself.

109.    **Shutterstock told this to PMC even though Mr. Pavlovsky recognized the value of PMC's Archive Content in his April 29, 2020 proposal, stating "Shutterstock and PMC to establish archive cadence and strategy on go to market for this valuable asset." (Ex. 43, Pavlovsky Email, Apr. 29, 2020, SSTK161699-703 at 161702).**

**Shutterstock's Response:**  Disputed.  Mr. Pavlovsky's proposal contemplates a review and assessment of Archive Content – including the "millions" of images that Mr. Grobar had represented him (albeit falsely) were on their way to Shutterstock and which the Agreement obligated PMC to provide but did not—as part of a comprehensive look at a new deal, if any, given the absence of event content for several weeks and no sign of it returning for over a year.  *See* Pavlovsky Decl. ¶ 20, Lackman Decl., Ex. S (PMC_0020975-76) (May 4, 2020 email from Jay Penske forwarding George Grobar email to Jon Oringer).  Without any live event content, both the pricing and focus of a new agreement would have to take a fresh look at what, if anything, PMC could still offer.  Murray Decl. ¶¶ 13-15.  Immaterial to the issues in this dispute, which is about a 2015 Agreement, not a prospective 2020 agreement as to which PMC refused to engage.

109A.  **During the negotiation of the deal, PMC proposed additions to the language in the term sheet regarding PMC Events and Third Party Events, which Shutterstock accepted. (Ex. 69, Pfeifer Tr. 95:23-96:7, 97:14-25; Ex. 72, Email from Woodnough, dated April 23, 2015, PMC_0007268-7275, at 7273).**

**Shutterstock's Response:**  Undisputed but immaterial because the negotiations are irrelevant as to an unambiguous agreement, and the proposed additions to the language in the Term Sheet did not materially change the expectations of the parties or the essence of the Agreement, but was merely descriptive in nature (not conditional).  Specifically, as to PMC Events, PMC merely added the phrase "to which third parties are invited generally" to the end of the sentence "Furthermore[,] PMC shall provide access to its events, galas, conferences, summits, and other event functions[.]"    Pfeifer Tr., pp. 95:23-96:11.

Moreover, as to Third Party Events, PMC added the phrase "to which PMC has access as defined herein" to the sentence "PMC shall provide to Shutterstock defined credentials, passes, VIP access to significant events around the world[.]"  Pfeifer Tr., p. 97:14-21. Shutterstock understood this addition to provide further assurances to Shutterstock that PMC did have the access to the marquee events on Schedule D.  Pfeifer Decl. ¶ 10.

**110.   Ben Pfeifer, Shutterstock's lead negotiator for the Agreement in 2015, Ex. 69, Pfeifer Tr. 27:4-30:2, admitted at his deposition that the Archive & Event Agreement did not impose an absolute obligation on PMC to provide access to events to which PMC did not, in fact, have access. After being directed to PMC's addition of the phrase "to which PMC has access as defined herein," Ex. 69, Pfeifer Tr. 97:22-25, Pfeifer was asked "Q. Did you have an understanding of any difference between the provision as proposed by Shutterstock and – or as it existed in Shutterstock's term sheet and as against the provision as proposed by PMC? A. I don't know what their specific intent was. Reading  this today, I understand it to be creating wiggle room in the event that they're blocked out of an event because some third-party, say Getty, causing a problem for Variety getting access to an event." (*Id.* 98:5-100:9).   In response to the following question:  "Did you understand this addition to be providing some qualification that existed in the term sheet that Shutterstock proposed to PMC?", Pfeifer responded:   "I understand that the language . . . is a qualification, but I would add that we did not perceive this as business risk at the time." (Ex. 69, Pfeifer Tr. 99:19-22, 100:5-102:9; *see also id.* 99:6-7 ("we didn't contemplate that as high risk"); *id.* 98:14-17 ("our motivation to get into this deal had a lot to do with the fact that we expected Variety to be able to get into any event of significance.").**

**Shutterstock's Response:**  Disputed, as PMC has mischaracterized Mr. Pfeifer's testimony.  Mr. Pfeifer's full testimony conveys the true understanding of the parties at the time: "to which PMC has access" was a descriptive phrase, not a conditional one.  Pfeifer Decl. ¶ 10; Pfeifer Tr., pp. 100:5-9 ("I understand that the language 'to which PMC has access' is a qualification, but I would add that we did not perceive this as business risk at the time.").  It meant that PMC was obligated to provide Shutterstock access to the events that it had access to, i.e., those high-profile events identified on Schedule D to the Agreement (e.g., The Academy Awards, The Grammys, The Sundance Film Festival, etc.) and all others "to which PMC has access."  *Id.*; *see also* Pfeifer Decl. ¶ 9.  It certainly did

not memorialize any unspoken escape-hatch for PMC in the event it had no access whatsoever to any third party events, or shift onto Shutterstock the unforeseeable risk that a once-in-a-century global pandemic would wipe out all of the live events that PMC promised Shutterstock to induce it to enter into the Agreement in the first place. "PMC not having access to an event is like Ferrari not having access to Formula One. They are the industry, in my mind." Pfeifer Tr., p. 99:13-16. As George Grobar, PMC's Chief Operating Officer, put it, the Agreement was "built" on the concept that Shutterstock "could leverage the access to these events." Grobar Tr., pp. 134:8-135:4. Mr. Pfeifer's comment about "to which PMC has access" was in reference to a real and possible situation wherein Getty Images' relationship with *Variety* was winding down after a heated dispute, as expressly reflected in Section 18 of the Agreement that discusses Getty Images having access to certain unspecified events on *Variety* credentials. *See* Pfeifer Decl. ¶ 9. Particularly in light of the competitive threat that Shutterstock was to Getty Images in the field, Shutterstock expected that there might be a possibility that Getty Images—upon hearing about the deal—may use the *Variety* relationship to box Shutterstock out. *Id.* Thus, the "wiggle room" referred to by Pfeifer was the caveat contemplated by Section 18 of the Agreement. *Id.* Notably, Section 22 of the Agreement indicates PMC's representation and warranty that other than the Getty Images agreement, there was *nothing interfering with or preventing PMC from its performance of its obligations*, and PMC never identified anything to Shutterstock that would lead us to believe it might not be able to perform. *Id.*; *see also* Agmt. § 22.

111.    **Shutterstock's lead negotiator also admitted that the Archive & Event Agreement did not impose an absolute obligation on PMC to hold PMC Events to which the public was invited generally. Mr. Pfeifer was asked the following question and he gave the following answer: "Q. …[A]t the time you received this term sheet,**

**did you understand that the phrase 'to which third parties are invited generally' provided a qualification to the language that immediately precedes it?...A. So I think that, again, I understand 'to which third parties are invited generally' is a qualification, but in this case PMC controls who's invited because they own the event, so it's different in my head." (Ex. 69, Pfeifer Tr. 101:2-20). Mr. Pfeifer later further explained: "I understood that while negotiating this agreement that PMC controls PMC events and determines who can be there and who can't, including whether photographers would be allowed, and that would be their call. So it's my understanding, if [PMC is] acting in good faith, we would be at every event where photographers are welcome...as determined by PMC themselves." (Ex. 69, Pfeifer Tr., 102:1223).**

    **Shutterstock's Response:**  Undisputed as to Mr. Pfeifer's testimony, but disputed as to PMC's mischaracterization of this portion of it.  *See supra* CSUF ¶ 110.  When PMC's counsel pressed Mr. Pfeifer on his understanding of the Agreement's terms, in particular as to "PMC Events," Mr. Pfeifer testified that, based on his conversations with Jay Penske, he understood that some PMC Events "[were] private, like industry leader events" (Pfeifer Tr., pp. 101:21-102:2), but that since PMC controlled "who's invited because they own the event," the added term is "different" than a qualification.  Moreover, Mr. Pfeifer testified that to the extent PMC called a particular event "private," such that Shutterstock photographers would not be given access, he assumed PMC would be doing so in good faith.  *Id.*, 100:10-23.  Mr. Pfeifer's testimony is consistent with an obvious assumption of the contracting parties—that PMC could not simply elect not to hold any non-private PMC Events and remain in compliance with its obligation to provide live event access under the Agreement—be they PMC Events referenced in the testimony, or Third-Party Events, not referenced in the quoted testimony.  As Mr. Grobar testified, live events were "a significant part of the partnership" (Grobar Tr., pp. 44:23-45:3), and the Agreement was "built" on the concept that Shutterstock "could leverage the access to these events."  Grobar Tr., pp. 134:8-135:4.

**111A. PMC and Shutterstock maintained a joint scheduling document for Third Party Events that included specific color-coded categories for "PMC cancelled credential. Such did not obtain" and "Event cancelled." (Ex. 65, Deposition Transcript of Benjamin Melvin ("Melvin Tr."), 24:16-25:1).**

**Shutterstock's Response:**    Undisputed, but PMC misleading insofar as this statement omits other color-coded categories, including, for example, "Shutterstock will cover for PMC."  Melvin Decl., Ex. E (PMC_0019418, sheet titled "Color Code").

**111B. On numerous occasions over the course of the deal, PMC did not possess and was thus unable to provide access to Shutterstock for various Schedule D events, and Shutterstock did not contend PMC was in breach. (Ex. 73, Walter Decl. ¶ 7)**

**Shutterstock's Response:**  Disputed, and immaterial.  With a small handful of exceptions, from 2016 through 2019, PMC provided Shutterstock with credentials for every Third Party Event listed in Schedule D every year.  *See* Melvin Decl. ¶ 12.  For example, Shutterstock used PMC's credentials to attend and photograph The Academy Awards, the Tony Awards, The Emmy Awards, The Screen Actors Guild Awards, and The Independent Spirit Awards  in 2016, 2017, 2018, and 2019.  *Id.*  The only evidence that PMC cites in support of this statement is the Declaration of Karl Walter, whose statements made "[t]o the best of [his] knowledge" at least partially conflict with Mr. Melvin's knowledge based on his recollection and review of Shutterstock's records.  *Compare* Walter Decl. ¶ 7 *with* Melvin Decl. ¶ 12.

**112.    Shutterstock has alleged in its Counterclaims that, to the extent PMC did not provide access to PMC Events or Third Party Events, it was because those events had to be cancelled "as a direct result of the pandemic" and Covid-19 related "restrictions." (Ex.1, Counterclaims ¶¶ 1, 3, 20-24). Shutterstock has also alleged that it was because of the pandemic that "these events ceased to exist in any meaningful way" (*id.* ¶ 3) because "without a red carpet," Shutterstock could not create new, licensable images (*id.* ¶ 1).**

**Shutterstock's Response:**  Undisputed generally but Shutterstock avers that the Counterclaims themselves are more accurate than PMC's selective quotation of them.

Multiple PMC witnesses claimed that the reason they could not provide event access was due to the COVID-19 pandemic.  *See* Penske Tr., pp. 323:16-325:3 (discussing event cancellations due to the pandemic); Margolin Tr., pp. 73:17-74:8, 102:11-16 (similar). Further, immaterial to the extent PMC has waived its right to rely on event cancellations as an excuse for its breach of the Agreement.

**113.    Shutterstock's Founder and Executive Chairman, Jon Oringer, testified that Shutterstock would *not* have "walked away from…deal" in "2015" even if it had known Shutterstock "wouldn't be getting live images from PMC during the period of time that the pandemic lasted." (Ex. 70, Oringer Tr. 234:22-235:11). Mr. Oringer was asked the following question and he gave the following answer: "Q. Based on the expectations that you had for the deal when you entered into it in 2015, would you have walked away from the entire deal if you had known in 2015 that … you would get -- you wouldn't be getting live images from PMC during the period of time that the pandemic lasted?" "A. No. I would have expected that -- actually, I thought Jay would have been a better person and worked with us through that period of time to help us figure out a way to generate value for both sides through the pandemic." Ex. 70, Oringer Tr. 234:22-235:11. In 2015, Oringer had final decision-making authority regarding whether to enter the Agreement with PMC. (Ex. 69, Pfeifer Tr. 22:12-23:2).**

**Shutterstock's Response:**  Disputed.  The confusing, compound, and speculative question posed (but creatively shortened here) caused Mr. Oringer to answer a question of whether he expected whether he and Jay Penske could work out their issues during the pandemic that Mr. Oringer had already testified was unforeseeable and unforeseen at the time; he spoke to whether he thought in 2015 Jay Penske would be a collaborative partner if an issue came up.   PMC's counsel's full question and Mr. Oringer's full response (with Shutterstock's counsel's intervening objection) reads as follows:

> Q. Based on the expectations that you had for the deal when you entered into it in 2015, would you have walked away from the entire deal if you had known in 2015 that revenue generated during the pandemic -- or strike that. That you would get -- you wouldn't be getting live images from PMC during the period of time that the pandemic lasted?"

> MS. LACKMAN:    Objection; confusing.    Calls for
> speculation.
>
> A. No. I would have expected that—actually, I thought Jay
> would have been a better person and worked with us through
> that period of time to help us figure out a way to generate
> value for both sides through the pandemic.

Oringer Tr., pp. 234:22-235:11; *see also id.* at 21:1-9 ("I was not thinking about a pandemic

at the time of the agreement.").    Undisputed that Oringer had final decision-making

authority regarding whether to enter the Agreement with PMC.

114.    **Shutterstock purported to terminate the parties' relationship as of July 17, 2020. (Ex.1, Counterclaims ¶¶ 31, 38).**

**Shutterstock's Response:**    Undisputed, but misleading to the extent the word

"purported" suggests that the termination was ineffective.    Shutterstock effectively

terminated the Agreement as of July 17, 2020.  See *supra* CSUF ¶ 54.

115.    [INTENTIONALLY OMITTED]

116.    [WITHDRAWN BY AGREEMENT][5]

117.    [WITHDRAWN BY AGREEMENT]

118.    [WITHDRAWN BY AGREEMENT]

119.    [WITHDRAWN BY AGREEMENT]

120.    [WITHDRAWN BY AGREEMENT]

121.    [WITHDRAWN BY AGREEMENT]

122.    [WITHDRAWN BY AGREEMENT]

123.    [WITHDRAWN BY AGREEMENT]

124.    [WITHDRAWN BY AGREEMENT]

---

[5] By agreement of PMC and Shutterstock, PMC withdraws Undisputed Fact Nos. 116 through 140, and Shutterstock therefore does not submit a Counterstatement to these alleged facts herein.

125.    [WITHDRAWN BY AGREEMENT]

126.    [WITHDRAWN BY AGREEMENT]

127.    [WITHDRAWN BY AGREEMENT]

128.    [WITHDRAWN BY AGREEMENT]

129.    [WITHDRAWN BY AGREEMENT]

130.    [WITHDRAWN BY AGREEMENT]

131.    [WITHDRAWN BY AGREEMENT]

132.    [WITHDRAWN BY AGREEMENT]

133.    [WITHDRAWN BY AGREEMENT]

134.    [WITHDRAWN BY AGREEMENT]

135.    [WITHDRAWN BY AGREEMENT]

136.    [WITHDRAWN BY AGREEMENT]

137.    [WITHDRAWN BY AGREEMENT]

138.    [WITHDRAWN BY AGREEMENT]

139.    [WITHDRAWN BY AGREEMENT]

140.    [WITHDRAWN BY AGREEMENT]

141.    **Shutterstock contends that PMC breached the Agreement by delivering far fewer Archive Content images between January and April 2020 than the average monthly number of Archive Content images PMC had delivered over the course of 2019. (Ex.1, Counterclaims ¶ 28).**

**Shutterstock's Response:**    Undisputed, but incomplete and misleading. Shutterstock does not merely contend that PMC delivered "far fewer" Archive Content images between January and April 2020 than the monthly average in 2019, but that PMC delivered only a token number—119 Archive Content images *in total*—during this period, despite indicating on or about May 4, 2020 that PMC possessed "***more than a million*** digital files of Archive Content" to be transferred.  Lackman Decl., Ex. S (PMC_0020975-

76) (emphasis added); Murray Decl. ¶ 25. Moreover, the number of Archive Content images that PMC delivered between January and April 2020 not only pales in comparison to the monthly average in 2019, but also in 2018. In each year, PMC delivered, on average, ***thousands*** of Archive Content images per month. *See* Murray Decl. ¶ 27; Arato Decl., Ex. 60 (SSTK168721). PMC also breached in other, material ways, as noted throughout.

142. **Shutterstock alleges that "in 2019, Shutterstock received, on average, 437 archival submissions *per month*," whereas "Shutterstock received just 119 archival images for the four-month period from January through April 2020." (Ex.1, Counterclaims ¶ 28 (emphasis added)).**

**Shutterstock's Response:** Undisputed.

143. [INTENTIONALLY OMITTED]

144. **Shutterstock admits that the parties "never set up a regular cadence of delivery" (Ex. 66, Murray Tr. 421:5-13) and, for this reason, Shutterstock never complained about the pace of delivery or archival images or asserted that PMC had breached the Agreement based on the pace of its delivery. (Ex. 69, Pfeifer Tr. 224:8-17; Ex. 66, Murray Tr. 350:21-352:14). Based on PMC's historic delivery cadence, Shutterstock was not expecting a delivery of additional historic archive images between January and April 2020. (Ex. 66, Murray Tr. 423:15-424:6).**

**Shutterstock's Response:** Disputed. PMC granted Shutterstock "an exclusive worldwide right and license . . . in ***all*** right, title[,] and interest that PMC has in the Archive Content," and was contractually obligated to "work . . . in good faith" to deliver Archive Content to Shutterstock for distribution. Agmt. § 3(a)(i) (emphasis added). In 2018 and 2019, delivered, on average, ***thousands*** of Archive Content images per month. *See* Murray Decl. ¶ 27; Arato Decl., Ex. 60 (SSTK168721). Moreover, Shutterstock expected to receive additional Archive Content images given PMC's obligation to provide everything, and because PMC's delivery of live event content necessarily came to a halt due to the pandemic. Murray Decl. ¶¶ 24-26. Indeed, Mr. Walter testified in his capacity as PMC's Fed. R. Civ. P. 30(b)(6) designee on the "frequency and volume of delivery to Shutterstock

of . . . Archive Content" that PMC was expecting to digitize and deliver 1.9 million Archive

Content images to Shutterstock in 2020, but it never did. *See* Walter Tr., pp. 385:4-386:13;

Lackman Decl., Ex. W (Ex. 38 to Walter Tr.) (PMC_0014957-62, email chain between

Karl Walter and George Grobar).

145.    **Shutterstock produced a spreadsheet in this action documenting the timing of PMC's delivery of archival images. (Ex. 60, Asset Intake, SSTK168721).**

**Shutterstock's Response:** Undisputed, but misleading insofar as Shutterstock has

produced multiple spreadsheets documenting PMC's delivery of Archive Content images,

including, but not limited to, the spreadsheets Bates-numbered SSTK161815,

SSTK161816, SSTK161817, and SSTK168721.

146.    **Shutterstock tracked the delivery of archival images under the labels PMCAR and PMCEL. (Ex. 66, Murray Tr. 304:18-23).**

**Shutterstock's Response:** Undisputed.

147.    **According to Shutterstock's tracking, PMC delivered archival images under the code PMCAR on the following schedule:**

|       | 2015 | 2016    | 2017 | 2018    | 2019    | 2020 |
|-------|------|---------|------|---------|---------|------|
| Jan   |      | 0       | 0    | 1       | 0       | 0    |
| Feb   |      | 0       | 0    | 0       | 0       | 0    |
| Mar   |      | 0       | 0    | 0       | 0       | 0    |
| Apr   |      | 0       | 0    | 0       | 511     | 0    |
| May   |      | 0       | 0    | 0       | 0       | 0    |
| Jun   |      | 0       | 0    | 36      | 0       | 0    |
| Jul   | 0    | 0       | 0    | 2,778   | 0       |      |
| Aug   | 0    | 0       | 0    | 128,920 | 0       |      |
| Sep   | 0    | 150,094 | 2    | 8       | 73,717  |      |
| Oct   | 0    | 580,650 | 4    | 0       | 366,310 |      |
| Nov   | 0    | 1       | 3    | 0       | 136,002 |      |
| Dec   | 0    | 0       | 1    | 2       | 0       |      |

**(Ex. 60, Asset Intake, SSTK168721).**

**Shutterstock's Response:**  Undisputed that the chart above is consistent with the information in the spreadsheet Bates-numbered SSTK168721, but otherwise disputed and misleading because the words "tracking" and "schedule" are ambiguous.

148.    **According to Shutterstock's tracking, PMC delivered archival images under the code PMCEL on the following schedule:**

|       | 2015 | 2016   | 2017 | 2018  | 2019  | 2020 |
|-------|------|--------|------|-------|-------|------|
| Jan   |      | 0      | 0    | 0     | 112   | 0    |
| Feb   |      | 0      | 0    | 515   | 1,904 | 6    |
| Mar   |      | 0      | 0    | 0     | 2,119 | 0    |
| Apr   |      | 0      | 2    | 0     | 602   | 113  |
| May   |      | 0      | 0    | 6,718 | 146   | 1    |
| Jun   |      | 0      | 0    | 9,658 | 598   | 0    |
| Jul   | 0    | 0      | 0    | 6,797 | 93    |      |
| Aug   | 0    | 0      | 0    | 114   | 0     |      |
| Sep   | 0    | 0      | 0    | 101   | 0     |      |
| Oct   | 0    | 0      | 2    | 250   | 165   |      |
| Nov   | 0    | 34,891 | 0    | 440   | 55    |      |
| Dec   | 0    | 0      | 0    | 219   | 0     |      |

**(Ex. 60, Asset Intake, SSTK168721).**

**Shutterstock's Response:**  Undisputed that the chart above is consistent with the information in the spreadsheet Bates-numbered SSTK168721, but otherwise disputed and misleading, including insofar as the words "tracking" and "schedule" are ambiguous. Notably, the charts in SUF ¶¶ 147-148 collectively establish that PMC first delivered Archive Content to Shutterstock in September 2016—fourteen months into the Agreement—and delivered a total of merely seventeen images in 2017.  The fact that Shutterstock continued to pay the Royalty Advances notwithstanding the foregoing breaches—and, moreover, paid two Royalty Advances before having received *any* Archive Content at all—demonstrates the insignificance of the Archive Content to the parties' Agreement.

149.    **Based on Shutterstock's tracking, PMC delivered the following number of images with the codes PMCAR and PMCEL between January and April: none in 2016, 2 in 2017, 516 in 2018, 5,248 in 2019, and 119 in 2020, and the following number of images delivered between August and December: none in 2015, 765,636 in 2016, 12 in 2017, 130,054 in 2018, and 576,249 in 2019. (Ex. 60, Asset Intake, SSTK168721).**

**Shutterstock's Response:**  Undisputed that the numbers in this statement are consistent with the information in the spreadsheet Bates-numbered SSTK168721.  This statement is otherwise disputed and misleading in that it suggests, incorrectly, that PMC delivered images with the codes "PMCAR" and "PMCEL," and because the word "tracking" is ambiguous.

150.    **Shutterstock never articulated any injury resulting from the purported withholding of archival images between January and April 2020, and, through its 30(b)(6) witness on damages, it does not claim to have suffered any. (Ex. 67, Pavlovsky Tr. 288:5-289:4).**

**Shutterstock's Response:**    Disputed.  PMC's withholding of archival images between January and April 2020—and, in fact, through the end of June 2020—necessarily resulted in less Archive Content for Shutterstock to offer for license to third parties pursuant to the Agreement.  *Cf.* Agmt. § 3(a) (granting Shutterstock an "exclusive, worldwide right and license in all right, title[,] and interest that PMC has in the Archive Content").

## STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH IT IS CONTENDED THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED

### A.    In Late 2014, Shutterstock Decides to Build Comprehensive Editorial Product.

151.    Shutterstock is a leading global provider of high-quality photographs and other content.  *See* Murray Decl. ¶ 2.

152.    The "editorial" use of photographic imagery is the use of imagery as part of the timely editorial coverage of people, events, and other subjects.  *See* Murray Decl. ¶ 4;

*see also* Greene Tr., pp. 38:25-39:15; Lackman Decl., Ex. X (Ex. 2 to Greene Tr.) at PMC_0021282.

153.    The demand for "editorial" photographs—especially photographs documenting current entertainment, fashion, sports, and other live events (sometimes referred to herein as "live event imagery")—is consistently very high due to the public's interest in these subjects, and has increased exponentially over the past two decades due to the internet, social media, and ever-increasing pace of the news cycle.  *See* Murray Decl. ¶¶ 4-7; Rachlis Report ¶ 13.

154.    In order to capitalize on this demand, and to gain market share from its biggest competitor, Getty Images, Shutterstock decided in late 2014 to build a comprehensive "Editorial" photography product with a focus on providing live event imagery to media companies.  *See* Pfeifer Decl. ¶¶ 3-6; Pfeifer Tr., pp. 167:17-168:4, 170:9-15, 207:15-21; Oringer Tr., pp. 97:21-98:12, 100:24-101:2, 301:22-302:12.

155.    Shutterstock knew that the success of its Editorial product depended on its ability to access and photograph high-profile entertainment, fashion, and sports events around the world, and thus sought to acquire and/or partner with entities who could provide such access.  *See* Pfeifer Decl. ¶¶ 5-6; Greene Tr., p. 104:11-24.

156.    In January 2015, Shutterstock acquired Rex Features, the largest independently-owned photographic press agency in Europe, thereby gaining exclusive access to high-profile entertainment and fashion industry events primarily in the United Kingdom and Europe.  *See* Melvin Decl. ¶ 3, Ex. A (PMC_0022533) (January 15, 2015 press release).

157.    Over approximately the next two years, Shutterstock entered into exclusive, multi-year agreements with various other entities—including, for example, the Associated Press ("AP"), The Football Association (the governing body of English Football), european pressphoto agency, b.v. ("epa") (one of the leading news photography agencies in the world), the World Surf League, SilverHub Media (which owns one of the leading press photography agencies in Germany)—in order to gain additional access and content for its Editorial product.  *See* Pfeifer Decl. ¶¶ 3, 6; *see also* Murray Decl. ¶ 28 (pursuant to agreement with AP, Shutterstock received approximately 3,000 images daily, from breaking news to red carpet to live sporting events).

**B.    Shutterstock Enters Into Agreement with PMC for Event Access.**

158.    By early 2015, Shutterstock had already acquired Rex Features, but lacked the broad and exclusive access to entertainment and fashion industry events in the United States that it needed for its Editorial product.  *See* Melvin Decl. ¶¶ 3-6; Pfeifer Decl. ¶¶ 4-5; Pfeifer Tr., pp. 53:9-54:25, 98:11-99:7, 162:16-18.

159.    Shutterstock identified PMC as its solution to fill that gap; for decades, PMC and its brands have possessed exclusive access to high-profile entertainment and fashion industry events around the world, particularly in the United States.  *See* Pfeifer Decl. ¶ 5; Pfeifer Tr., 162:16-18; Melvin Decl. ¶¶ 6-7; Dkt. No. 149 ¶¶ 2, 17.  Through PMC's then-recent acquisition of legendary Hollywood trade magazine *Variety*, there seemed to be no red carpet, no after-party, and no exclusive entertainment event to which PMC could not get access.  *See* Dkt. No. 149 ¶¶ 2, 17.

160.    On or about June 20, 2015, PMC and Shutterstock entered into the "Archive & Event Image Hosting and License Agreement" (the "Agreement"), effective as of July 1, 2015.  *See* Agmt.

161.    The Agreement "was built on the concept [that Shutterstock] could leverage [PMC's] access to [entertainment and fashion industry] events."  Grobar Tr., pp. 134:8-135:4; *see also id.*, pp. 44:23-45:14 (access to events "was a significant part of the partnership"); Greene Tr., pp. 158:23-159:15, 173:24-174:22, 196:12-197:12, 235:7-20 (introducing Ex. 25, the press release); Lackman Decl., Ex. Y (Ex. 25 to Greene Tr. at PMC_0021387) ("Leveraging PMC's insider access, Shutterstock will document leading Hollywood events such as the Golden Globe Awards, the Grammy Awards, and the Academy Awards); Lackman Decl., Ex. J (PMC_0002137-42) ("Talking Points" document).  Under the Agreement, "both parties expected to photograph" "a significant number of live events[.]" Dkt. No. 168 at 3.

162.    Sections 3(a)(ii) and (iii) of the Agreement grant access to entertainment and fashion industry events—defined as "PMC Events" and "Third Party Events" (sometimes referred to collectively herein as "Live Events")—and provide, in relevant part:

> PMC Events and PMC Event Content:  PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events').  All image, footage and/or audio content recorded at such PMC Events are referred to herein as "PMC Event Content".
>
> Third Party Event Access and Third Party Event Content: PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein ('Third Party Events').  All image, footage and/or audio content created hereunder at the Third Party Events is referred to herein as

'Third Party Event Content'. Subject to the Getty Agreement Restrictions, PMC hereby grants to Shutterstock the right to be the sole third party to leverage and utilize PMC's credentials and access to capture Third Party Event Content at Third Party Events. These Third Party Events shall initially include, but not be limited to, those events listed on Schedule 'D'. PMC shall work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content.

Agmt. §§ 3(a)(ii) & (iii) .

163.    Schedule D to the Agreement listed twelve Third Party Events, including, in particular, "The Golden Globes Awards and Nominee Press Conference," "The Sundance Film Festival," "The Grammy Awards," "The Academy Awards," "The Tony Awards," The Emmy Awards," "The Cannes Film Festival," "The Screen Actors Guild Awards," "The Directors Guild of America Awards," "The Venice Film Festival," "The Independent Spirit Awards," "The Toronto Film Festival." *Id.*, Schedule D; *see also* Melvin Decl. ¶ 11.

164.    Shutterstock's principal purpose for entering into the Agreement was to gain access to entertainment and fashion industry events in the United States. *See* Pfeifer Decl. ¶¶ 7, 12-13, 20, 22; *see also* Melvin Decl. ¶¶ 6-7.

165.    At the time the Agreement was executed and all relevant times prior, PMC knew that Shutterstock was in the midst of building its Editorial product, and was primarily interested in a deal with PMC for its access to Live Events—especially the Third Party Events. *See* Pfeifer Decl. ¶¶ 4-5; Greene Tr., pp. 97:18-99:13 ("it was important to [Shutterstock] that they enter into an agreement with somebody like PMC that could give them access to images to be captured for use in [ ] their editorial products"); *id.*, pp. 104:11-24, 114:25-115:20, 158:23-159:15, 173:24-174:22, 196:12-197:12, 235:7-20 (introducing

Ex. 25, the press release); Grobar Tr., pp. 44:23-45:14, 134:8-135:4; Lackman Decl., Ex. J

(PMC_0002137-42) ("Talking Points" document); *id.*, Ex. Y (Ex. 25 to Greene Tr.)

(PMC_0021385-88) (June 3, 2015 email from PMC "attach[ing] [their] current DRAFT of

the SSTK press release," which emphasized PMC's "insider access," and quoted Mr.

Oringer as stating, "We are thrilled to team up with another trailblazing company to

accelerate our progress in editorial imagery").

166.    PMC also knew that Shutterstock was building its Editorial product was "to

specifically take on Getty Images," which had previously contracted with PMC for event

access.  *See* Pfeifer Decl. ¶¶ 3-5; Greene Tr., pp. 96:3-98:3, 115:6-20, 174:3-22; Penske

Tr., pp. 100:3-103:7 (emphasizing the importance to Getty Images, Shutterstock's

competitor, of live event coverage and noting that a majority of the events Getty Images

was promoting in its referenced marketing material were from PMC).

167.    PMC used its "insider access" to high-profile entertainment and fashion

industry events to induce Shutterstock to enter into the Agreement, including by offering

access to specific events such as The Academy Awards, The Grammy Awards, and The

Sundance Film Festival—which PMC's Fed. R. Civ. P. 30(b)(6) designee on the

negotiation of the Agreement, Todd Greene, did not deny.  *See* Pfeifer Decl. ¶¶ 7-8;

Lackman Decl. Ex. Z (PMC_022851-22859) (February 10, 2015 email from Jay Penske to

Ben Pfeifer and Todd Greene), *id.*, Ex. AA (PMC_0022535-37); Melvin Decl., Ex. A;

Pfeifer Tr., p. 183:15-21; *see also* Greene Tr., pp. 11:16-12:2, 14:12-19, 114:2-13, 115:22-

116:25, 117:8-23.

168.    During the negotiation of the Agreement, PMC's CEO, Jay Penske,

emphasized the competitive value of the potential deal vis-à-vis Getty Images, which

according to Mr. Penske, had become aware that Shutterstock may obtain event access from PMC and sought to obtain event access from the Hollywood Reporter (one of Variety's competitors at the time)[6] in response. *See* Penske Tr., pp. 258:4-259:10; *see also id.*, pp. 73:13-24, 74:15-75:18, 231:17-232:9 (Shutterstock paying a lot of money to help pursue the "800-pound gorilla in Getty"); 274:3-6, 430:18-431:3; Lackman Decl., Ex. BB (Ex. 20 to Penske Tr. at SSTK111587) (October 26, 2015 email from Mr. Penske, stating "Now I want to destroy Getty even more!"); *id.*, Ex. CC (Ex. 43 to Penske Tr. at PMC_0022929) (June 20, 2015 email from Mr. Penske stating, upon receiving Agreement for signature, "Looking forward to . . . watching getty [*sic*] squirm").

169.    PMC also recognized the enormous financial value that event access had. *See id.*, Ex. DD (Ex. 4 to Penske Tr. at SSTK111575-582) (February 6, 2015 email from Mr. Penske, stating "And this morning Paul [Woolnaugh] received a multi-million dollar minimum guarantee termsheet [*sic*] from Getty. Guess we got their attention….").

170.    After the Agreement was executed, the parties emphasized PMC's "insider access and event exclusivity" in contemporaneous press releases. *See* Lackman Decl., Ex. EE (SSTK111626-27) ("Shutterstock is teaming up with Penske Media Corporation to create and license images and videos ***of the biggest events in entertainment and fashion***, the companies will announce Monday. The alliance combines the technology of one of the biggest stock-image providers in the world ***with PMC's insider access and event exclusivity***, establishing an innovative way of offering editorial images to media, publishing and creative business.") (emphases added); *see also id.*, Ex. Y (Ex. 25 to Greene

---

[6] Several years later, PMC acquired the Hollywood Reporter.

Tr. at PMC_0021385-88) (June 3, 2015 email from PMC "attach[ing] [their] current DRAFT of the SSTK press release," which emphasized PMC's "insider access").

171.    PMC also emphasized "PMC's insider access and event exclusivity" in "talking points" regarding the Agreement, which PMC developed and distributed to employees to ensure accurate and consistent internal and external messaging. *See* Lackman Decl., Ex. J (PMC_0002137-42); Gullion Tr. pp. 69:12-70:7, 75:20-24.

172.    In an article commenting on the parties' Agreement, an "industry expert" recognized that the "access is everything" and referred to PMC's live event access as a "golden pass."  Lackman Decl., Ex. FF; Dkt. No. 149, ¶ 25 (PMC's Amended Complaint, citing article by "industry expert").

173.    Mr. Pfeifer, who negotiated the Agreement, and Mr. Melvin, who was involved in the day-to-day performance of the Agreement, understood that PMC was obligated under the Agreement to at least provide credentials, passes, and VIP access to the Third Party Events listed in Schedule D.  *See* Pfeifer Decl. ¶ 8; Melvin Decl. ¶¶ 11-12.

174.    From the start of the Agreement through early 2020, PMC offered its credentials, and Shutterstock sent its photographers, to ***several hundred live events per year***.  *See* Melvin Decl. ¶ 9, Exs. B-E (shared production documents for 2016, 2017, 2018, and 2019, listing, on average, more than six hundred live events per year for which PMC had obtained and was offering its credentials to Shutterstock); *id.* ¶ 10 ("On average, Shutterstock sent its photographers to ***several hundred*** Third Party Events per year . . . using the access and credentials that PMC provided to Shutterstock pursuant to the Agreement.").

175.    From 2016 through 2019, PMC provided Shutterstock with credentials for every Third Party Event listed in Schedule D every year, with a small handful of exceptions.  Melvin Decl. ¶ 12.

176.    Shutterstock hired four leading photographers in September 2015, in part, to ensure that it had sufficient coverage for PMC's credentials.  *See* Melvin Decl. ¶ 8.

177.    Section 3(e) of the Agreement stated in part that "[t]he in-house staff photographers currently employed by PMC shall produce images, footage and/or audio content that will be contribute to PMC Event Content and Third Party Event Content," and further required that for all fashion events, PMC shall "provide its in-house staff photographers," with Shutterstock providing additional freelance photographers for specific purposes.  Agmt. § 3(e).

178.    PMC did not have the necessary staff:  for at least part of the Agreement, it kept on staff only one photographer (Michael Buckner), who was only able to shoot for *Variety*.  *See* Murray Decl. ¶ 11; Walter Tr., pp. 82:18-84:4 ("Q. How many photographers did [PMC] have on staff when you joined PMC? A. PMC had no photographers on staff. […] Shortly after I was brought on in 2015, Penske Media hired Michael Buckner to be our chief photographer.").

C.    <u>**The Agreement Also Covers Archive Content, an Ancillary Point for Shutterstock.**</u>

179.    As of early 2015, PMC possessed a collection of archival photographic imagery, primarily in physical form, which it had not previously offered for license.  *See* Penske Tr., pp. 263:6-14, 275:5-7, 423:24-25, 429:2-6, 439:21-440:3.

180.    With the acquisition of *Variety* and *WWD*, PMC had come into possession of physical prints, product handouts, publicity stills, and other old entertainment- and

fashion-related images, and PMC was interested in monetizing this material. *See* Greene Tr., p. 96:12-13.

181.    Generally, the demand for archival imagery is significantly lower than for live event imagery, as it is older and used for different purposes. *See* Murray Decl. ¶¶ 5-7; Rachlis Report, ¶¶ 14-15. As a result, Shutterstock did not spend much time investigating it; its review consisted of sending a junior staffer to flip through some prints that PMC provided for review. Pfeifer Decl. ¶ 18.

182.    While it took some time for Shutterstock to start receiving any measurable amounts of archival content suitable for licensing, the portion of PMC's collection of archival imagery that was provided to Shutterstock was not particularly valuable and many of the photographs could not be licensed due to copyright rights and/or ownership issues. *See supra* CSUF ¶ 2; *see* Rachlis Report ¶¶ 19-25; Murray Decl. ¶ 7; Pfeifer Decl. ¶ 18.

183.    Pursuant to the Agreement, PMC was obligated to provide Shutterstock with all of the archival images, footage, and other content that it owned and/or had the right to license ("Archive Content"), and "work [with Shutterstock] in good faith in the creation . . . [and] distribution" of such Archive Content. Agmt. § 3(a)(i); *see also* Murray Decl. ¶ 24.

184.    The parties did not expect PMC's Archive Content to generate any significant revenue, especially given that Shutterstock agreed to reimburse PMC for the cost of digitizing its collection. *See* Pfeifer Decl. ¶ 13; Pfeifer Tr., pp. 53:9-54:8; *see also* Murray Decl. ¶¶ 7-9.

185.    The documents show that PMC did not submit for the editorial platform any Archive Content to Shutterstock until ***fourteen months*** into the Agreement, by which

point, Shutterstock had already paid *two* Royalty Advances to PMC.  *See* Murray Decl., ¶ 8; Arato Decl., Ex. 60 (SSTK168721); Pfeifer Decl. ¶ 13.

186.    Over the course of the Agreement, the Archive Content accounted for approximately 10% (or less) of the overall revenue generated from exploitation of content pursuant to the Agreement.  The Live Event Content (*i.e.*, Third Party Event Content and PMC Event Content) accounted for approximately 90% (or more).  *See* Murray Decl. ¶ 9.

187.    When combined with the competitive and brand value of having access that others did not have, as evidenced by the large advances that Shutterstock paid, Live Event Content was effectively 100% of the value of the Agreement.  *See* Pavlovsky Decl. ¶ 24.

**D.    Shutterstock Agrees to Pay Seven-Figure Royalty Advances, Plus More.**

188.    PMC's principal purpose for entering into the Agreement was "to make money."  Lackman Decl., Ex. GG (Deposition Transcript of Gerry Byrne ("Byrne Tr.")), pp. 52:17-19 ("[W]e're in business to make money."); Walter Tr., p. 45:2-5 ("Q:  Do you have any understanding at all as to any goal that PMC had in its relationship with Shutterstock?  A:  We wanted to make money."); Lackman Decl., Ex. II (PMC_0021285) (April 16, 2015 email from Mr. Penske to PMC's business team stating, "CASHFLOW MY BOYS!!! $15million in 48months!"); Penske Tr., pp. 409:22-410:2 (stating with respect to the foregoing April 16, 2015 email, "I'm not aware of another e-mail with all caps and exclamation points").

189.    Pursuant to the Agreement, Shutterstock and PMC shared in the revenue generated from the license of Third Party Event Content, PMC Event Content, and Archive Content.  Specifically, Shutterstock agreed to pay royalties to PMC equal to 30% of the revenue.  *See* Agmt. § 6.

190.    Shutterstock also agreed to pay PMC a large, up-front "annual fully recoupable advance" against such royalties (each, a "Royalty Advance") at the start of each of the Agreement's six successive, one-year license periods (each, a "License Period"), as follows:

- Year 1: $1,500,000 due on or before September 1, 2015
- Year 2: $1,500,000 due on or before July 1, 2016
- Year 3: $2,000,000 due on or before July 1, 2017
- Year 4: $2,500,000 due on or before July 1, 2018
- Year 5: $3,000,000 due on or before July 1, 2019
- Year 6: $3,500,000 due on or before July 1, 2020

*Id.*

191.    The Royalty Advances increased from $1.5M to $3.5M, based on the parties' expectation that revenues would increase as PMC provided more access and Shutterstock gained recognition as a reliable source for content from entertainment and fashion industry events.  *See* Pfeifer Decl. ¶¶ 14-15; *see also, e.g.*, Agmt. § 3(a)(iii) (requiring PMC "to work with Shutterstock in good faith to create additional access to third party events"); *id.*, § 3(e) (requiring PMC "to work [with Shutterstock] in good faith to maximize revenue opportunities for coverage of Third Party Events within the fashion industry").

192.    Shutterstock was not obligated to reimburse PMC for any accrued brand value at the conclusion of the term of the Agreement, whether early or at the end of Year 6.  *See* Agmt. § 6.

193.    Each Royalty Advance was "fully recoupable" by Shutterstock, but "solely" from the royalties generated and due to PMC "during the twelve month period of the License Period to which such Royalty Advance relates."  Agmt. § 6; *see also* Pfeifer Decl. ¶¶ 14-15, 20.

194. PMC drafted this language to make clear that each License Period stood on its own. *See* Greene Tr., pp. 160:3-164:3, 178:4-24, 230:23-232:3 ("the reason that we did this was to make sure that when Shutterstock was able to recoup royalties, it was only in relation to the 12-month period"); *see also* Pfeifer Decl. ¶ 20.

195. In addition to the Royalty Advances, Shutterstock agreed, *inter alia*, to provide PMC a $1M credit per License Period for licensing images on Shutterstock's website and to host PMC's content, in exchange for which PMC was required to credit Shutterstock as the source. *See* Agmt. §§ 2(a).

**E.    In March 2020, PMC Stops Providing Live Event Access Due to the Pandemic.**

196. Beginning in mid-March 2020, the unforeseen COVID-19 pandemic resulted in a ***complete shutdown*** of in-person entertainment and fashion industry events in the United States, causing Shutterstock's revenues under the Agreement to drop to ***almost nothing***. *See* Murray Decl. ¶ 29; Walter Tr., pp. 249:18-250:6 ("To my recollection, there were no events [between mid-March, 2020, and July 16, 2020] that happened in person.").

197. Neither party expected nor reasonably could have expected that a global pandemic would occur during the term of the Agreement that would cause nearly all live events to be cancelled. *See* Pfeifer Decl. ¶ 17; Greene Tr., p. 321:9-14; Penske Tr., pp. 315:20-316:16 ("the first time I recognized that there was an impact [on PMC's business]" was "[r]oughly the end of February, early March of 2020").

198. From early March 2020 onward, PMC did not offer credentials, passes, or VIP access to any significant entertainment and fashion industry events, including specific Third Party Events listed in Schedule D such as the 2020 Cannes Film Festival (scheduled for May 12-23, 2020) and/or the 2020 Tony Awards (scheduled for June 7, 2020). *See*

Murray Decl. ¶ 14; Melvin Decl. ¶ 12; *see also* Walter Tr., pp. 202:7-20, 253:25-254:15 ("there's not really credentials to be had for virtual events"); Margolin Tr., pp. 134:10-134:23.

199.    Shutterstock would not have agreed to pay the License Period 6 Royalty Advance, or any other Royalty Advance, if it knew that it would not have access to PMC Events or Third Party Events during that particular License Year, especially because Shutterstock could recoup against a Royalty Advance with ***only*** the revenues earned during that particular License Period.  *See* Pfeifer Decl. ¶ 20.

200.    PMC has never had anyone pay an advance against royalties for archive material alone.  *See* Penske Tr., p. 200:6-14.

**F.    PMC Also Inexplicably Stops Providing Archive Content.**

201.    In the two years prior to the pandemic (2018 and 2019), PMC delivered an average of ***more than 60,000*** Archive Content images per month.  *See* Arato Decl., Ex. 60 (SSTK168721).

202.    Shutterstock expected to receive additional Archive Content images during the early pandemic months, especially because PMC's delivery of live event content necessarily came to a halt due to the pandemic, which would free up PMC staff to focus on non-event-related tasks.  Murray Decl. ¶¶ 24-27.

203.    PMC possessed "more than a million digital files of Archive Content" that it could have transferred to Shutterstock, and because PMC's delivery of live event content necessarily came to a halt due to the pandemic, which would free up PMC staff to focus on non-event-related tasks.  Lackman Decl., Ex. S (PMC_0020975-76); Murray Decl., ¶¶ 24-27; *see also* Walter Tr., pp. 385:4-386:13 (testifying PMC was expecting to digitize and

deliver 1.9 million Archive Content images to Shutterstock in 2020, but it never did); Lackman Decl., Ex. W (Ex. 38 to Walter Tr. at PMC_0014957-62).

204.    In the last four months of the Agreement (*i.e.*, March 2020 through the end of June 2020), PMC delivered only a token amount of Archive Content—113 archival images in **total**.  *See* Murray Decl. ¶ 26; *see also* Arato Decl., Ex. 60.

**G.    PMC Refuses to Negotiate in Good Faith and Sets Up Artificial Conditions.**

205.    Recognizing that the pandemic eliminated the reason why Shutterstock entered into the agreement (namely, to obtain exclusive VIP access, credentials, and passes to entertainment and fashion events), PMC agreed that the contract should be amended in some way in response to the unforeseen pandemic, which had instantly obliterated the very services Shutterstock contracted for.  *See* Penske Tr., p. 214:14-18 ("I offered specifically to extend the agreement while there were challenges obviously with live events through the devastating effects of COVID"); *id.*, p. 215:2-5 ("I was very aware that these events were being impacted, and I offered to extend the agreement for a year and to bridge the payment."); *id.*, p. 339:13-16 ("Yeah, it means proffer them another, another year or extend the term so they can see some of the live events come back."); *id.*, pp. 316:9-12; 336:10-12 ("[L]ive event revenue was, was down most significantly."); *see also* Lackman Decl., Ex. JJ (Ex. 7 to Grobar Tr. at PMC_0015928-29).

206.    Nonetheless, as discussed below, PMC's cash-driven proposal—indeed its sole proposal and sole position—failed to appreciate the fact that it was unclear if or how live events would come back, as well as the fact that live events were cancelled only eight months into the prior term of the Agreement.  Further, after events specifically named in

the Agreement were cancelled, PMC indisputably was in breach.  *See* Agmt. § 3(a)(iii) &
Schedule D.

207.     As a result of the impact on live events, PMC was able to negotiate mutually
acceptable relief from venues and other vendors who allow PMC to put on its more than
100 annual summits, conferences, and talent-driven events.  *See* Penske Tr., 385:8-386:5
(describing agreements to postpone contracts for pre-pandemic booked space until PMC
had visibility on when live events would return).  PMC vigorously opposed providing
documentation regarding this relief, necessitating a motion to the Court.  *See* Dkt. No. 94.

208.     Indeed, PMC's Chief Operating Officer testified that he would expect
where live events were cancelled due to the pandemic, PMC or its subsidiary brands took
the position that they were owed money back from the venue slated to host the event (*e.g.*,
a refund of a security deposit), but Mr. Grobar claimed to not know "definitively."  Grobar
Tr., p. 93:3-17.

209.     Two weeks after the pandemic closed offices and shut the country down,
Shutterstock approached PMC regarding the issue, but even despite the matter escalating
to Shutterstock's CEO and PMC's COO in mid-April, the parties seemed to be talking past
each other: PMC demanding that Shutterstock commit to paying the $3.5 million advance
either on July 1 or split into an extended term, and Shutterstock asking to speak about the
overall picture, bearing in mind the possibility that live events requiring credentials, passes
or VIP access may not return for a year or more.  *See* Pavlovsky Tr., pp. 180:20-181:5.

210.     Shutterstock's CEO noted to PMC's COO on their phone call in mid-April
that Shutterstock had already paid a full year's advance-a sizeable amount of money-
through June 30, 2020 and was no longer receiving live event access as of March 2020.

Therefore, in Mr. Pavlovsky's view it did not make sense to open a dialog by talking about how much more money would be advanced to PMC-much less talking about a $3.5 million royalty advance for the coming year. *See* Pavlovsky Tr., pp. 193:16-194:5, 204:2-15, 247:15-248:3, 263:15-23.

211. Despite the fact that Shutterstock was open to starting the negotiation with forgiving the fact that PMC had received a full year's advance for performance in only 2/3 of the year and had used up 100% of its million-dollar credit, PMC demanded that Shutterstock commit to paying a portion of the July 1, 2020 royalty advance as a *condition* to even discussing the matter. Pavlovsky Decl. ¶¶ 10-12. After Shutterstock made it clear that it could not begin to discuss how much more it would pay out of pocket without assurances that PMC could deliver the live events that advances were for, PMC disregarded the obligations under the Agreement to discuss in good faith and otherwise refused to engage in a negotiated dialog. *Id.* ¶¶ 16-20.

212. PMC saw an opportunity to have its cake and eat it, too, as a result of the pandemic, working internally to get the royalty advance and then immediately go to market without any intention to deliver services against that royalty advance. Lackman Decl., Ex. KK (Ex. 27 to Penske Tr. at PMC_008848-50) ("final payment then out"); *id.*, Ex. LL (Ex. 28 to Penske Tr. at PMC_0010175); *id.*, Ex. MM (Ex. 9 to Grobar Tr. at PMC_0015971-72) ("Let's hold it to them to make the payment" and then "go to market").

213. On May 4, 2020, PMC indicated that it had already "readied counsel to litigate" and consulted with two law firms. *Id.*, Ex. S (PMC_0020975-76) (stating PMC's plan was to "hammer back in equal measure, and get paid, and then seek a [new] partner upon completion"); *see also* Grobar Tr., pp. 174:6-11, 183:24-184:24.

214.    From that time onward, PMC did not offer to create additional access at third party events for Shutterstock.  *See* Margolin Tr., p. 102:4-16.

215.    This preference for aggression and conflict with its partners is not uncommon for PMC and its CEO.  For example, the Agreement came about following PMC's dispute with Getty Images (to which PMC sent a demand letter), and prior to that time, PMC and Penske became involved in a lawsuit between them and the sellers of *Variety*.  *See* Lackman Decl., Ex. BB (Ex. 20 to Penske Tr. at SSTK111587) (October 26, 2015 email from Mr. Penske, stating "Now I want to destroy Getty even more!"); *id.*, Ex. UU (demand letter to Getty Images dated July 27, 2015); *see also* Alex Ben Block, *Variety Sues Former Owners for $10 Million*, The Hollywood Reporter (May 10, 2013 4:45 PM), https://www.hollywoodreporter.com/business/business-news/variety-sues-owners-10-million-520900/.

216.    Still, Shutterstock expected cooperation with the obligations in the Agreement and an appreciation of the undisputed facts that PMC had retained a full year's advance, pulled down the full year's worth of credit, had stopped performing, and was not showing signs of performing on any part of the Agreement; but in fact, PMC seemed to be growing icier. Pavlovsky Decl. ¶¶ 13-20.

217.    Four days later, on May 8, 2020, Shutterstock's CEO reached out to PMC's CEO with a cordial note and invited a discussion, with the goal of finding a good faith effort to see if there was a way to rectify the fact that Shutterstock was not receiving the contracted services.  *See* Lackman Decl., Ex. NN (Ex. 17 to Pavlovsky Tr. at PMC_0016288); *see also* Pavlovsky Tr., pp. 53:6-19, 110:19-111:2.  On the call, PMC's CEO was angry about Shutterstock's refusal to commit to a promise some fixed sum of

money as a condition to having an overall discussion about what to do regarding the uncertain pandemic that was causing the elimination of all events (not to mention the overall uncertainty and human casualties). Pavlovsky Tr., p. 249:14-23.

218.    When Mr. Pavlovsky declined to commit to any specific amount of money, as Mr. Penske demanded he do despite his failure to commit to providing events or similar value to replace the loss, Mr. Penske hung up on Mr. Pavlovsky after saying a few profanities.   Pavlovsky Tr., pp. 249:14-23, 250:14 ("I just remember he threw a few profanities out and then that was pretty much the end of the conversation.").

219.    Following the call, Shutterstock turned the matter over to its in-house legal counsel.  But apart from a single phone call, PMC's counsel did not respond to the efforts of Shutterstock's legal team.  *See* Pavlovsky Tr., p. 254:14-23; Garfield Tr., pp. 16:25-17:3, 34:2-5, 37:18-22, 45:3-11, 59:25-60:10; Lackman Decl., Ex. OO (Ex. 4 to Garfield Tr. at PMC_0022819-20).

220.    Section 8 of the Agreement provides: "Either Party may terminate the Agreement at any time for cause by giving the other Party written notice and providing for a forty-five (45) day period ("Cure Period") during which the other must correct, cure or otherwise resolve the alleged cause for termination."  If the alleged cause is not cured, the party was obligated to give notice of termination to the other.  Amgt. § 8; Penske Tr., 210:11-211:10 (Section 8 of the Agreement is a "fairly boilerplate termination agreement if someone could not cure the alleged cause for termination.").

221.    Given the radio silence from PMC coupled with the apparent lack of interest in addressing the matter, Shutterstock prepared a letter pursuant to Section 8 of the Agreement.  Garfield Tr., pp. 35:14-21, 54:18-55:8, 58:5-7, 59:25-60:10; Lackman Decl.,

Ex. PP (Ex. 6 to Garfield Tr. at PMC 0020980-83). In the letter, Shutterstock identified the fact that PMC had cancelled PMC Events, was unable to provide access to Third Party Events, including those in Schedule D, and offered no assurances that PMC could offer any access to any such events in the foreseeable future. *Id.*

222.    In response to the letter, Jay Penske sent a note to Jon Oringer saying: "Wow Jon, I guess you/Stan made the call to throw rocks instead, it's going to cost SSTK much more. Such a waste of time." Lackman Decl., Ex. QQ (Ex. 11 to Margolin Tr. at PMC_0021820). Mr. Oringer responded: "We are happy to come to an agreement. The notice was based on the 45 day window in the contract." *Id.* Shutterstock's GC also wrote to Ms. Margolin to invite PMC to discuss. Lackman Decl., Ex. RR (Ex. 7 to Garfield Tr. at PMC_0022822-23).

223.    Apart from the response from Mr. Penske on May 18, 2020, nobody from PMC responded to either communication in the 45-day window, much less took any steps to correct, cure or otherwise resolve the alleged cause for termination. Penske Tr., pp. 360:11-365:12; Margolin Tr., pp. 112:5-113:11; 128:12-19. The only thing Shutterstock heard from PMC came 30 days later: that PMC had filed an unnoticed lawsuit against Shutterstock, one that suggested PMC had not read the May 18 letter or the referenced Section 8 of the Agreement. Dkt. No. 1.

224.    Indeed, when asked at deposition, Jay Penske acknowledged the breach but confirmed that PMC did not take any steps to correct, cure, or otherwise resolve it. He took the misguided position that the pre-notice offer to "blend and extend" (*i.e.*, force Shutterstock into another year in an unpredictable time, and give PMC another $1 million in credit for the privilege of paying part of the advance later) was sufficient, and no effort

to do anything at all post-notice was required.  Penske Tr., pp. 360:11-365:12 ("Q. The alleged cause is the information provided in the letter, including the – A. You wanted us to start creating live events?  Is that what you're referring to? Q. How about – A. You're the one who was talking about this is such a global pandemic that we needed to all be so careful to changes – you're saying in 45 days I could create – start creating live events in order to remove our company from a breach?"); Margolin Tr., pp. 102:4-16; 112:5-25.   He identified no counter or any other proposal after Shutterstock indicated that preconditions to negotiation were not acceptable.  Pavlovsky Decl. ¶ 13.

225.    Given that filing a lawsuit was not a correction, cure, or otherwise a resolution of the alleged cause for termination, Shutterstock sent a written notice of termination on July 2, 2020, pursuant to the provisions of Section 8 of the Agreement. Lackman Decl., Ex. SS (Ex. 8 to Garfield Tr. at SSTK111589-111590).

226.    From the onset of the pandemic in mid-March 2020 through the termination of the Agreement in mid-July 2020, Shutterstock earned roughly $180,200 from the exploitation of all content under the Agreement, which was largely attributable to pre-pandemic licenses and content, and in any event, is a ***small fraction*** of the revenue that Shutterstock typically generated during similar periods of time, and an ***even smaller fraction*** of the corresponding portion of the $3M Royalty Advance and photo credit that Shutterstock had already provided.  *See* Murray Decl. ¶ 20.

Respectfully submitted,

Dated:  New York, New York          MITCHELL SILBERBERG & KNUPP LLP
       April 19, 2023

By:   /s/ Eleanor M. Lackman
        Eleanor M. Lackman (eml@msk.com)
        Marissa B. Lewis (mbl@msk.com)
        437 Madison Avenue, 25th Floor
        New York, New York 10022
        Tel.: (212) 509-3900
        Fax: (212) 509-7239
        eml@msk.com
        mbl@msk.com

*Attorneys for Defendant Shutterstock, Inc.*