UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENSKE MEDIA CORPORATION,<br><br>    Plaintiff-Counterclaim Defendant,<br><br>-against-<br><br>SHUTTERSTOCK, INC.,<br><br>    Defendant-Counterclaim Plaintiff. | Case No. 20-cv-04583 (MKV) |

## DECLARATION OF CANDICE MURRAY

CANDICE MURRAY declares as follows:

1. I am employed by defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock") as VP, Global Editorial Business Development. I submit this declaration in opposition to plaintiff-counterclaim defendant Penske Media Corporation's ("PMC") Motion for Partial Summary Judgment. The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as a result of my preparation to serve as a one of Shutterstock's corporate witnesses at a deposition in this case.

**A.    Performance of the Agreement Focused on Live Events.**

2. Shutterstock is a leading global creative platform offering full-service solutions, high-quality content, and creative workflow solutions for brands, businesses, and media companies. Shutterstock's platform brings together content creators and a vast network of contributors by providing readily-searchable content that Shutterstock's customers pay to license and by compensating contributors as their content is licensed. Today, Shutterstock's offerings include over 433 million images (in March 2020, the number of images was over 315 million), as well as footage, music, and more, which has enabled Shutterstock to attract a global and diverse

base, representing businesses of all sizes and from all major industries, including global and local media and broadcast companies that are reliant on fresh, newsworthy images to attract their own customers.

3. I was responsible for managing Shutterstock's relationship with PMC and oversaw the day-to-day performance of the parties' "Archive & Event Image Hosting and License Agreement" ("Agreement") during the last couple years of the term. I took on this role around November 2019, but have worked at Shutterstock since April 2016, and joined Shutterstock's editorial department in early 2018.

4. As detailed in the accompanying Declaration of Benjamin Pfeifer, at the time the Agreement was signed in 2015, Shutterstock was in the midst of building its comprehensive "Editorial" photography product. Generally, the "editorial" use of photographic imagery is the use of imagery as part of the timely editorial coverage of people, events, and other subject matter, but the product at issue here was designed to focus on current content that would be delivered to major, well-known and minor physical and digital media outlets, which are large consumers of timely and newsworthy images.

5. Therefore, while there are different types of imagery that may be used in an editorial context, customers most often want the newest, latest images—especially when it comes to coverage of celebrities, fashion, and live events. Given the public's interest in celebrities and fashion and the constantly updating 24-hour news cycle, "live event imagery"—*i.e.*, photography documenting current entertainment and fashion industry events such as movie premieres, award shows, and high-profile parties and fashion shows—is consistently in very high demand. Those types of events and locations that are not open to the general public tend to garner even greater demand, not only for their exclusivity and interest, but because very few photographers have the

opportunity to capture them. Live event imagery generally has a relatively short "shelf life," and while sometimes it has value for retrospectives on subjects or events, demand and royalties significantly tail off not long after the image is first available.

6. There also is "archival imagery," which generally is older and used for different purposes than live event imagery. For example, an archival image might be licensed for use in a CNN program on a historical event or a deceased celebrity, whereas a live event image might be licensed for use in an E! Entertainment article on current event or celebrity news. The number of consumers interested in current entertainment and fashion industry news is much greater than those interested in the editorial pieces that typically utilize archival imagery. As a result, the demand for live event imagery among producers of editorial content is significantly higher than that for archival imagery.

7. The parties' Agreement in this case involves both of these types of imagery: (1) "live event imagery," which includes what the Agreement defines as "Third Party Event Content" and "PMC Event Content," and is sometimes referred to collectively as "Live Event Content;" and (2) "archival imagery," which is defined in the Agreement as "Archive Content." Considering the relative demand among the consumer population, anyone in the business of creating, selling, or even just using editorial photography would recognize the Live Event Content component of the Agreement to be the most valuable by far. The value differential is compounded exponentially by the facts that PMC has some of the best access to obtain Live Event Content and largely unimpressive, unviable Archive Content. The only component of PMC's archive with some viable content in my view was *Women's Wear Daily* ("*WWD*"), which primarily derived value as a complement to the newer *WWD* event content. Unlike other archival collections offered on Shutterstock's platform—including, for example, the world-renowned *LIFE Picture Collection*,

which contains three centuries worth of monumental political, global, and social events of perennial appeal to the general consumer—the *WWD* archive did not have much value on its own, nor did other B2B "trade" material, which made up nearly all if not all of PMC's archive. For example, a photo of a designer's runway show in the 1980s is not comparable in terms of salability or marketability to an image of Dr. Martin Luther King, Jr. delivering his "I Have a Dream" speech.

8. For these reasons, and because I understood that the reason the Agreement came about was because of the unique opportunity the PMC relationship gave Shutterstock to get VIP credentials, special accesses, and other exclusive credentials that no other competitor could get to the most noteworthy entertainment and fashion events in the country, the Archive Content was never a priority in the day-to-day performance of the Agreement. It was all about the Live Events from the very beginning. Not only is it widely known that these sorts of live access agreements tend to involve large, up-front payments with little or no archive at all, but it was not until September 2016—*fourteen months* into the Agreement—that PMC first delivered any viable Archive Content to Shutterstock, by which point, Shutterstock had already paid the first two Royalty Advances. And in one year, after PMC went through its initial blast of scanning images until it ran out of the budget it asked Shutterstock for, PMC provided only *fourteen* archive images in the entire year. Even though I understood that PMC was obligated to provide us with all images in its possession under the terms of the Agreement, the fact that nobody even mentioned the absence of archive content demonstrated to me exactly what the Agreement was about: live, fresh, current images from the most important credentialed events.

9. As expected, PMC's Archive Content did not generate any significant revenue. Over the entire course of the Agreement, the Archive Content accounted for approximately 10% (or less) of the overall revenue generated from exploitation of content pursuant to the Agreement. The Live Event Content accounted for approximately 90% (or more). And this does not include the brand and marketing value that comes from being the agency with access to locations at events where nobody else can get access to shoot the most exclusive and newsworthy images. As a result, losing Live Event Content for any more than just a few days could not be called a "partial impairment" of the Agreement: it effectively would be a total destruction.

**B.**     **2019 Discussions Between Shutterstock and PMC.**

10. I understand PMC makes much of Shutterstock's attempts to "renegotiate or terminate the Agreement" in 2019. They have nothing to do with the pandemic, and PMC mischaracterizes these discussions and takes them out of context. Before I took over managing the relationship with PMC, my predecessor, Donna Granato, briefly engaged in discussions with PMC regarding modifying the Agreement to address certain ambiguities and practical issues. The discussions primarily stemmed from the fact that PMC had been pushing Shutterstock for photographic coverage of *sponsored* PMC events, which fell outside the parties' Agreement. The Agreement expressly refers to editorial coverage. The photos taken at these events had little to no editorial or licensing value (*e.g.*, photos of non-celebrities speaking on a panel about the film business) and, in many cases, could not even be offered for license on Shutterstock's platform because PMC promised them exclusively to the sponsor. In other words, Shutterstock was sending photographers to cover these events at PMC's request for free and then was unable to monetize the content. As I made clear at my deposition, it was primarily these sponsored PMC events that had been causing—as Ms. Granato put it in an internal email—an "enormous distraction."

However, the parties were able to resolve the issue; PMC had already agreed by this point that these events were outside the scope of the Agreement, and agreed to increase the rates on the rate card for these non-editorial/sponsored events to cover Shutterstock's production costs.

11. Further, we expected that PMC was going to provide more support than it did. For example, the Agreement referenced that PMC was to supply all photographers, with back-up from Shutterstock at fashion events. However, PMC did not have a staff of photographers; it had hired Michael Buckner, but he was just one person, and he was specifically tied to *Variety* and only able to cover events where *Variety* was credentialed. I understand PMC also had a photographer at *WWD* for a time, but she was gone by the time I became involved. In any event, often there were multiple events on the same day or multiple locations (such as arrivals and inside the event) that required multiple photographers, which led Shutterstock to have to secure support.

12. Because there appeared to be some confusion, as soon as I took over Ms. Granato's role, I connected with PMC's point-person on the day-to-day performance of the Agreement, Karl Walter, and made clear that Shutterstock did not want to renegotiate the Agreement, even though PMC's performance had been disappointing and uncooperative. As a former Getty Images employee, Mr. Walter seemed to me to want the relationship with Shutterstock to fail. In any case, Mr. Walter understood that we intended to proceed under the Agreement as-is. I understand from an email that PMC produced in this case that Mr. Walter reported back to PMC's Chief Operating Officer via email on November 6, 2019: "Candice and I connected briefly yesterday. Interestingly, she does NOT want to renegotiate our contract." (A copy of Mr. Walter's email, Bates-numbered PMC_0020956, is attached to Shutterstock's counsel's declaration as Exhibit U).

## C.     2020 Discussions Between Shutterstock and PMC.

13.     By early 2020, I had settled into my new role managing the relationship with PMC, and became aware of some ongoing issues. In many ways, the Agreement was not a good deal for Shutterstock. While the Agreement had the term "good faith" written throughout, I gathered pretty quickly that PMC wanted to do as little as possible. For example, in addition to having demanded for quite some time that Shutterstock provide costly photographic coverage for sponsored PMC events, I learned that PMC had refused to negotiate with Shutterstock in good faith over newly-acquired content and credentials. In particular, PMC had acquired a majority stake in the iconic music magazine *Rolling Stone* and its content and premium credentials and passes to major music events starting in 2017 and bought it fully just over a year later, and we wanted to get those under the "Acquisition Content and Acquisition Events" portion of the Agreement. However, I learned from Jon Oringer that when he asked about *Rolling Stone*, PMC refused to engage and avoided discussing the matter. Despite this and other transgressions that I later learned about, Shutterstock continued to pay the annual Royalty Advance on-time, and to give PMC a $1M licensing credit (which PMC used up almost to the dollar, and nothing more, each year), and without so much as a mention until PMC made it an issue in March 2020, when it was not due until July 2020.

14.     It seemed to me that PMC had been taking an adversarial rather than a collaborative, good-faith approach in its dealings with Shutterstock over the years because it knew that had all the leverage—specifically, that Shutterstock needed PMC for access to Live Events like the Academy Awards, the Emmy Awards, and other high-demand events. When the pandemic hit in March 2020, and all Live Events were cancelled, it leveled the playing field in a sense by bringing the parties together to talk about how to address a dramatically different situation that required a sensible approach to address. Considering that PMC had stopped delivering what Shutterstock

7

expected it to, it of course seemed to me like an opportune time for Shutterstock to approach PMC regarding the Agreement globally (including the preexisting issues and the new issues that arose in light of the pandemic) with the objective of developing a fair deal rather than simply ending it because we were not getting what Shutterstock was spending a lot of money to receive. I very much wanted to keep working with PMC. Even though the relationship was not ideal, we were in the middle of a cataclysmic event, and I felt that losing any relationship would be an issue for Shutterstock and in particular its relatively new Editorial product in which Shutterstock was investing so many resources to become a reliable source for the newest, freshest, and most appealing images in news, sports, entertainment, fashion, and other areas where speed and exclusivity matter competitively and generate the highest licensing revenue.

15. On March 31, 2020, I sent a proposal to PMC regarding the Agreement going forward. (A copy of this proposal is attached as Exhibit 10 to PMC's counsel's declaration.) The primary goal in making the proposal was to work out a temporary measure to deal as best as possible with a global pandemic that was wreaking havoc on the world, in a way that would not allow the pandemic to torpedo the relationship entirely. Of course, as we all learned, the pandemic was not temporary—and certainly not as compared to the fact that there was the one final year that would unquestionably overlap essentially fully with the hiatus in events.

16. Generally, like other companies, Shutterstock was concerned about the impact of the pandemic on the company financially and strategically. A major component of our business that was impacted was the Editorial business. Shutterstock had relationships with many suppliers and providers under which sporting events, fashion shows, red-carpet award events, and others could no longer be supplied. Under some of these agreements, Shutterstock had royalty advances coming due. Shutterstock took efforts to discuss the situation with their vendors, nearly all of

whom—PMC being a notable exception—worked with Shutterstock to reach a reasonable resolution that took into account the then-current circumstances and the uncertainty of the pandemic. Everyone's goal was to get through this global crisis with relationships intact and goodwill in place. As a result, Shutterstock received relief on advances and other forms of financial relief to help smooth out the fact that many of our vendors could not supply the live content for which we had contracted. PMC was the only party that did not cooperate.

17. I understand PMC claims that losing access to Live Events is merely a "partial impairment." This is an enormous misstatement: from being the official photographer for major sports events to getting an exclusive photograph of actors celebrating at an Oscars after-party, everyone knows that a photographic agency will provide major financial consideration to get live access to events that the public (and as a result, major licensees and other partners) cares about. The loss of even the status of the relationship represents a significant competitive loss, which is why in my experience the agreements tend to last for multiple years.

18. I understand that PMC is pointing to a casual chat conversation that I had with two of my colleagues, on March 23, 2020, regarding Shutterstock's anticipated proposal to PMC. (This chat is attached as Exhibit 11 to PMC's counsel's declaration.) PMC misconstrues this chat. To explain, when I stated at "a WIN would be to waive the upcoming [Royalty Advance] and start a new deal on July 1st that is agreeable from [a Royalty Advance] and production standpoint," I meant that it would be a "win" to right-size the Agreement and get into a new deal that would expand the content and extend the relationship for years to come. This is what Karl Walter at PMC said he wanted, too: a long-term relationship was the most important thing, and at the time I believed him. As I said at my deposition, however, it ultimately was not my call: I was there to start the discussions about the short term, but a new deal would need to involve the legal

department and other stakeholders. In any event, I do believe that a lower up-front payment was sensible for a re-negotiation of the Agreement's terms at that juncture (March 2020), when no events—the undisputed primary consideration for the deal—were happening and we had no sense of when they would return. When it became clear that the pandemic could potentially last more than six months, Shutterstock reasonably concluded that putting any timeframe on event content—and therefore any up-front payment for the services of providing access—made no sense.[1]

19. I understand that PMC is also pointing to a similar chat conversation that I had with Jon Oringer on March 24, 2020. (A copy of this chat is attached as Exhibit 36 to PMC's counsel's declaration.) PMC misconstrues this chat as well. The context makes clear that I stated "this is an opportunity to do a good deal with [PMC]" for the reasons above, not to somehow wrongfully take advantage of the pandemic. I also stated in this chat that Shutterstock had "no legal recourse" against PMC, which I now know—after Shutterstock consulted with inside and outside counsel in April—is wrong.

20. I explained this extensively in my deposition, and I am surprised that PMC ignores the context when I testified clearly about how I inadvertently came to a conclusion based on a mental leap. First, I am not a lawyer. Also, I did not draft the Agreement and, when I made that statement, I was not intimately familiar with the terms of the Agreement (as I am now, through my involvement in this case) and had not consulted legal counsel. When Mr. Oringer asked me off-the-cuff if there was a force majeure clause in the Agreement, I assumed from his question that this clause was necessary in order for the Agreement to end. For whatever reason, it did not occur

---

[1] Also, notably, in this chat I used the term "MRG," which stands for "minimum guarantee"—a term we have in a few of our other agreements and which is somewhat analogous in some ways to a royalty advance in that it is a payment up front. The correct term, as used in the Agreement, is "Royalty Advance."

to me at the time that Shutterstock had other options, so when he posed the question to me of "do we have any legal recourse," I assumed that the answer was no. At that time, I was focused on getting the partnership to work, although as PMC was refusing to provide us with any images and the marquee events started to disappear, it seemed to me that something was off. As I explained to Ms. Arato, I have since learned that my later instincts were correct and we had and have multiple types of legal recourse. Also, at the time, it was still very early in the pandemic; none of the events in Schedule D of the Agreement had been cancelled and no one knew how long the pandemic would last, nor was it clear that PMC was not going to take steps to resolve the matter.

21.   I understand that PMC also tries to suggest something nefarious was going on in early April. However, as PMC knows, the pandemic was an evolving situation, and with each passing day, it seemed less likely that PMC would perform anytime soon. Also, when PMC did not respond positively to either of our proposals, which would effectively forgive the period of time where PMC kept its advance but delivered no services and yet continued to pull images for free under its $1,000,000 annual credit, we wondered whether PMC did mean what it said about wanting to continue the relationship.

22.   By early April, as we grew concerned, the matter was turned over to our new CEO, Stan Pavlovsky, to handle. It was clear to me that he was troubled about the fact that PMC's actions did not seem to correspond to good faith. Also, with the news about the length of the pandemic becoming increasingly dire, Mr. Pavlovsky questioned the value of a relationship where Shutterstock made large payments to get coveted and exclusive access to live events that were showing no sign of returning. I interpreted his questions as indicating that Shutterstock did not perceive value in the relationship for archive content alone, which I had informed him we had not been receiving anyway. However, I wanted to keep the relationship alive and was not happy about

the possibility that it might end. I was invested in the relationship and wanted to maintain it if possible. My notes to my friend at work reflected my venting about the possibility of losing the relationship and the major changes going on daily in the world and at the company in general. However, I could not possibly have known the outcome because the matter was out of my hands; I was just blowing off some steam, which we all needed at that very stressful time in our history.

23. The comment about removing content also does not show anything. Mr. Pavlovsky asked me to assess factors relating to negotiating points, including what might happen if PMC went on the offense against us just like I understand they did with Getty Images under the *Variety* deal. In my experience, there is nothing wrong with engaging in a risk assessment as part of developing a negotiation position.

D.      **Delivery of Content After March 2020.**

24. PMC was obligated under the Agreement to supply *all* the images, footage, and other content it had ownership of or licensing rights to from all of its various publications and content libraries, but it never did this, even when Shutterstock gave PMC significant financial reimbursements to PMC for digitizing the material in 2016-2018.

25. By March 2020, Shutterstock had received approximately 1,504,547 archival images from PMC, and was expecting to receive millions more, especially as I understood that PMC wanted to, and was obligated to, give us everything they had any rights into from all of their publications (except *Rolling Stone* and others, which as noted, I learned that PMC would not add to the Agreement). I understand that PMC indicated in an email, on May 4, 2020, that it was "in

the process of transferring" "more than a million digital files of Archive Content" to Shutterstock. (A copy of this email, Bates-numbered PMC_0020975-76, is attached to Shutterstock's counsel's declaration as Exhibit S.)

26. These Archive Content files were never transferred. Instead, PMC inexplicably stopped providing meaningful Archive Content to Shutterstock. In the last four months of the Agreement (*i.e.*, March 2020 through the end of June 2020), PMC delivered only a token amount of Archive Content—**113** archival images *in total*, which I recall consisting primarily of "stock" or non-editorial images that were very unlikely to sell. For context, in the two years prior to the pandemic (*i.e.*, 2018 through the end of 2019), PMC provided Shutterstock with approximately **61,575** archival images *per month*. The spreadsheet Bates-numbered SSTK168721 (which is attached as Exhibit 60 to PMC's counsel's declaration) tracks the amount of Archive Content (and also Live Event Content) that PMC delivered to Shutterstock during each month of the Agreement. The codes "PMCAR" and "PMCEL" in the spreadsheet correspond to Archive Content.

27. It was apparent to me that PMC was intentionally withholding the promised Archive Content in retaliation to Shutterstock's proposal. At the very least, PMC was not fulfilling its obligation to work in good faith to distribute Archive Content and maximize licensing revenue under the Agreement. I understand that PMC has claimed that it normally did not deliver Archive Content during this time of year (March-June) because there were a lot of Live Events; in particular, the Golden Globes, Grammy Awards, Academy Awards, and others are all in January and February. PMC's logic does not hold up. As an initial matter, the number of archival images

that PMC delivered to Shutterstock from March-June 2020 (*i.e.*, **113** archival images) pales in comparison to the number of images that PMC delivered to Shutterstock during the same four-month period of the prior two years: **16,412** images (March-June 2018) and **3,976** images (March-June 2019). Also, due to the pandemic, there were no Live Events to distract PMC from March-June 2020. PMC's delivery of Archive Content did not depend on the occurrence of live events and should not have been affected by the pandemic in any way. If anything, I would have expected PMC's delivery of Archive Content to increase, given its live event content necessarily came to a halt.

28.     I understand PMC has pointed to the fact that it delivered **2,238 images** to Shutterstock between mid-March and July 16, 2020. These images were not entertainment or fashion (as is PMC's designated scope) and certainly not valuable: they consisted extensively of non-events such as shots of buildings from public places and images of protesters at outdoor marches, covering the same material we were receiving from the AP and other political news partners. Further, many of the images delivered during this period were taken prior to the pandemic and belatedly updated (and, as noted above, 113 of them were Archive Content). Again, this number pales in comparison to the number of images that PMC delivered to Shutterstock during the same period in prior years. As shown in the spreadsheet Bates-numbered SSTK168721 (attached as Exhibit 60 to PMC's counsel's declaration), during roughly the same period in the prior two years, PMC delivered **78,969** images (March-July 2018) and **65,772** images (March-July 2019), respectively. Plus, during the same period, AP had been delivering 3,000 images *per day*.

29. Not surprisingly, Shutterstock's revenue from the exploitation of content under the Agreement dropped dramatically—to *almost nothing*—from the onset of the pandemic in mid-March 2020 through the termination of the Agreement in mid-July 2020. It is difficult to determine the amount of revenue from licenses that were issued post-pandemic because payments on licenses are not made in real-time. So, for example, a license that was issued on March 1 may not result in payment receipt until at least a month or more after that date, and longer if the license goes through resellers or the licensee is slow to pay. During this period, Shutterstock earned roughly $180,200 from the exploitation of all content (*i.e.*, $124,850 from Live Event Content and $55,350 from Archive Content), much of which is likely from content supplied prior to the pandemic, and a large chunk of which related to a pre-pandemic photo shoot. Even disregarding the clear timing discrepancies that are involved, this amount is a *small fraction* of the revenue that Shutterstock typically generated during similar periods of time, and an *even smaller fraction* of the corresponding portion of the $3M Royalty Advance and photo credit that Shutterstock had already provided. Therefore, the pandemic had an even bigger impact on Shutterstock's revenues under the Agreement than the numbers show.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: London, United Kingdom
April 19, 2023

_____
CANDICE MURRAY

15