UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

    Plaintiff-Counterclaim Defendant,

-against-

SHUTTERSTOCK, INC.,

    Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

### DECLARATION OF BENJAMIN MELVIN

BENJAMIN MELVIN declares as follows:

1. I am employed by defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock") as Senior Manager of Strategic Partnerships. I submit this declaration in support of Shutterstock's Opposition to plaintiff-counterclaim defendant Penske Media Corporation's ("PMC") Motion for Partial Summary Judgment. The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as a result of my preparation to serve as a one of Shutterstock's corporate witnesses at a deposition in this case.

**A.**     **Shutterstock's Acquisition of Rex Features**

2. Shutterstock is a leading global provider of high-quality licensed photographs, vectors, illustrations, videos, and music to businesses, marketing agencies, and media organizations around the world. Working with its growing community of over two million contributors, Shutterstock adds hundreds of thousands of images each week, and currently has more than 424 million images on its platform, in addition to vectors, video, music, and other creative and editorial audiovisual content.

3. On or about January 15, 2015, Shutterstock entered into an agreement to acquire Rex Features, the largest independently-owned photographic press agency in Europe. Attached hereto as **Exhibit A** is a true and correct copy of a January 15, 2015 press release entitled "Shutterstock to Acquire Rex Features, Expands Focus on Editorial Imagery" (Bates No. PMC_0022533).

4. I was employed by Rex Features from 2009 through the time of the acquisition, and began working for Shutterstock immediately after in 2015. I was based in Rex Features' U.S. office in Los Angeles, California and was responsible for managing Rex Features' credentials and photographer assignments for live events in the U.S. (For context, a "credential" in this context is a pass that formally allows you to send photographers and bring photography equipment into a live event and take photos from a specially designated area.)

5. When Shutterstock acquired Rex Features, Shutterstock inherited Rex Features' credentials and well-established relationships with major studios, publicists, and event organizers. As a result of the acquisition, Shutterstock obtained credentials and access—and to this day continues to obtain credentials and access—to significant entertainment and fashion industry events around the world (*e.g.*, movie premieres, awards shows, fashion shows, and high-profile parties). This was instrumental to Shutterstock's ability to offer high-demand entertainment and fashion content on its platform and to establishing Shutterstock's reputation as a key player in the editorial photography industry.

**B.     Shutterstock's Agreement with PMC**

6. While Rex Features had access to almost every major entertainment and fashion industry event the U.S., as a U.K.-based company, Rex Features' access and relationships were primarily in the U.K. and Europe. Shutterstock's acquisition of Rex Features did not (and was

not expected to) fulfill Shutterstock's need for a wide range of exclusive access to entertainment and fashion industry events in the U.S.  In addition, much of Rex Features' access to some of the most premium U.S. events was "behind the line," meaning that Rex Features photographers would be located alongside banks of photographers, rather than wandering on the red carpet or receiving access to after-parties where some of the most commercially desirable images for the news media are made.  For certain events, only one official photographer was admitted in, and there were several occasions involving core events where that photographer was not Rex Features and often was Getty Images, Shutterstock's largest competitor for these sorts of photographs.

7.  In or around July 2015, Shutterstock entered into the subject "Archive & Event Image Hosting and License Agreement" (the "Agreement") with PMC.  PMC had exactly the type of access that Shutterstock needed in the U.S., including through its recent acquisition of the storied Hollywood entertainment industry bible, *Variety* magazine, which had a deal with Getty Images until the publication got into a dispute with PMC.  Under the Agreement, PMC agreed to provide Shutterstock with PMC's credentials to access and photograph significant third-party entertainment and fashion industry events around the world ("Third Party Events"), including, but not limited to, the twelve specific Third Party Events listed in Schedule D. These were the events that mattered most to any media company that would report on entertainment, and PMC's access was sometimes referred to as the "golden pass." To be able to create images at events like these was a massive difference-maker between your standard photo agency and a premium, go-to source for editorial content.

8.  Almost immediately after the Agreement was signed and over the next few years, Shutterstock employees (me included) worked closely with Karl Walter (a former Getty Images

director and PMC's point-person on the day-to-day performance of the Agreement) and other PMC employees to coordinate and assign photographers to shoot thousands of Third Party Events. The goal was to maximize monetizable content for both parties. Shutterstock even invested in technology to help support the influx of editorial imagery, and hired four new photographers early on in the parties' Agreement (in or around September 2015) to ensure that it had enough people available to assign to PMC's credentials.

9. Shutterstock and PMC jointly maintained and referred to annual "shared production documents" to keep track of the credentials for Third Party Events, including the event date, the type of access available to PMC (or one of its subsidiaries), and any assigned photographers and/or editors. Shutterstock and PMC both had access to and regularly updated the shared production documents, copies of which are attached in PDF format (converted from their original Excel spreadsheet format) hereto as follows:

**Exhibit B:**  2016 shared production document (Bates No. PMC_0019397)

**Exhibit C:**  2017 shared production document (Bates No. PMC_0019401)

**Exhibit D:**  2018 shared production document (Bates No. PMC_0019400)

**Exhibit E:**  2019 shared production document (Bates No. PMC_0019418)

10. On average, Shutterstock sent its photographers to *several hundred* Third Party Events per year—including the very first year of the Agreement (July 2015 through June 2016)—using the access and credentials that PMC provided to Shutterstock pursuant to the Agreement. As shown in the graphic below, Shutterstock used PMC's credentials to attend and photograph 527 events between January through May 2016 alone. Attached hereto as **Exhibit F** is a copy of relevant excerpts of a document entitled "PMC / SSTK Partnership" (Bates No.

PMC_0022088, PMC_0022103-106), which includes the graphic shown below (at PMC_0022103).



11.     As noted, Schedule D to the Agreement contained a list of twelve Third Party Events, including, in particular, "The Sundance Film Festival," "The Grammy Awards," "The Academy Awards," "The Tony Awards," "The Emmy Awards," "The Cannes Film Festival," "The Screen Actors Guild Awards," "The Directors Guild of America Awards," "The Venice Film Festival," "The Independent Spirit Awards," "The Toronto Film Festival."  I always understood this list to be, at a minimum, what PMC was obligated to provide to Shutterstock—in other words, that PMC would at the very least provide Shutterstock with credentials to the specific events in Schedule D, and would also work in good faith to provide additional access to other entertainment and fashion industry events.  It makes sense that the Agreement was structured this way; the events in Schedule D are longstanding, annual events and, at the time the Agreement was signed, anyone familiar with the entertainment industry would have safely assumed that PMC had and would continue to have access to these events year after year.  While

5

it was equally safe to assume at the time that PMC would have access to numerous other entertainment and fashion industry events, due to the nature of most of these events (*e.g.*, one-time events such as movie premieres), it would have been impossible to name them in the Agreement—leaving Shutterstock no choice but to rely on PMC's good faith over the course of the Agreement. In addition, as reflected our intention, the press releases reflected that PMC would be providing premium access to hundreds of entertainment and fashion events per year.

12. The people involved in the day-to-day performance of the Agreement seemed to have a mutual understanding that PMC was obligated to provide Shutterstock with access to the Third Party Events in Schedule D. With a small handful of exceptions, from 2016 through 2019, PMC provided Shutterstock with credentials for every event listed in Schedule D every year.[1] For example, Shutterstock used PMC's credentials to attend and photograph The Academy Awards, the Tony Awards, The Emmy Awards, The Screen Actors Guild Awards, and The Independent Spirit Awards, in 2016, 2017, 2018, and 2019. To the extent they were not cancelled due to the pandemic, PMC also offered Shutterstock its credentials to these Third Party Events (and others listed in Schedule D) in early 2020. I understand Mr. Walter has pointed to a handful of instances in which he concedes PMC did not fulfill its obligation to provide access to certain events listed in Schedule D. (These instances are listed in Paragraph 7 of Mr. Walter's declaration, which I understand was submitted as Exhibit 73 to PMC's counsel's declaration.) In several instances, Mr. Walter's recollection is inconsistent with Shutterstock's records. For example, to the best of my knowledge, PMC did obtain access official events at The Sundance Film Festival in 2019 and The Toronto Film Festival in 2016, 2017, 2018, and 2019. In fact,

---

[1] By the time the Agreement went into effect in July 2015, nearly all of the events listed in Schedule D had already taken place that year.

Shutterstock used PMC's credentials to attend The Toronto Film Festival in 2016, 2017, and 2018.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Hertfordshire, United Kingdom

April 19, 2023

_____
BENJAMIN MELVIN