UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

      Plaintiff-Counterclaim Defendant,

      -against-

SHUTTERSTOCK, INC.,

      Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

## DECLARATION OF STAN PAVLOVSKY

STAN PAVLOVSKY declares as follows:

1.      I was formerly employed by defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock") as Chief Executive Officer.  I submit this declaration in opposition to Penske Media Corporation's ("PMC") Motion for Partial Summary Adjudication.  The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as part of my involvement in the above-referenced lawsuit.

### Shutterstock's Efforts to Work with PMC Despite Its Breach, and PMC's Refusal to Negotiate in Good Faith

2.      PMC does not factually dispute it was not performing once the 2020 pandemic hit. Instead, much of PMC's complaints appear to relate to the fact that it did not like the proposal we formulated, which was expressly based on their inability to perform, and therefore decided that it would not negotiate or otherwise engage with Shutterstock.  As I will describe below, PMC's position was that it was entitled to a large sum of money as a condition to engaging in any discussion of how it would remedy a current breach—one that had deprived Shutterstock of significant value that Shutterstock had bargained for.  In particular, PMC refused to discuss anything until I committed to paying some portion of a royalty advance that would not

15321848.6

be due for several weeks, and despite our efforts, PMC refused to engage with us, preferring to engage in prematurely filed litigation.

3.      I joined Shutterstock in April 2019 as President and Chief Operating Officer.  I brought to the role a background in financial planning and analysis (FP&A). On April 1, 2020, I took over the role of Chief Executive Officer from Shutterstock's founder, Jon Oringer.  It was around this time, in the midst of an ever-evolving pandemic that impacted our global business and operations, that I became aware of the fact that one of our vendors, PMC, had ceased performing under its multi-year agreement—under which Shutterstock had invested a lot of money and resources—to provide live content from hundreds of major and minor entertainment and fashion events.

4.      I learned that Shutterstock had made several seven-figure payments at the start of each year of a six-year agreement (the "Agreement"), and each payment was tied to each year of the Agreement. Through the course of my learning about the Agreement, I also learned that these payments were styled as royalty advances but were so significant because of the commercial and brand value of receiving the best credentials, passes, and VIP access to marquee entertainment and fashion events. However, around this time, these events and others started to be cancelled in droves. I also learned that PMC had ceased uploading images of any type.  The way I understood the facts, PMC had ceased providing the events that Shutterstock was paying for (and had paid millions for on July 1, 2019), while continuing to use the $1,000,000 credit throughout and otherwise using up the benefits that PMC received under the Agreement without delivering what Shutterstock had bargained for.  Therefore, under any way of looking at the situation, PMC was not performing under the spirit or letter of the Agreement and in fact was in breach. Beyond that,

it was getting a material advantage from Shutterstock without any performance or material reciprocity.

5.     Initially, Shutterstock's lead of the Editorial division, Candice Murray, was involved in discussing how to address the situation. Ms. Murray wanted to maintain the relationship with PMC because at the time I took over the CEO role, there was a belief that perhaps the pandemic would not last as long as it did. However, but with marquee events being cancelled (including the Tony Awards, which were cancelled around a week before I became CEO) and PMC not taking steps to provide content, we realized that events might not come back for a very long time.

6.     I understood that other vendors in a comparable situation to PMC's appreciated that they were unable to perform, and that all of them that had advances or guarantees provided some adjustments to reach a fair result.  Considering how uniquely events-driven the Agreement was, not to mention that PMC had retained an advance designed to cover the period of July 1, 2019-June 30, 2020, we expected that PMC would follow similarly.

7.     We formulated our proposals based on our understanding that PMC agreed with Candice Murray that the parties' Agreement was no longer appropriate, and that PMC's primary goal was a long-term relationship with Shutterstock. Obviously, a long-term relationship would not be healthy if it involved Shutterstock paying a lot of money for nothing.  Accordingly, we understood that PMC was open to considering financial adjustments to help the parties' new agreement reflect current realities, such as PMC's ability to perform under the current Agreement, while being flexible and open to allow for growth as circumstances evolved. Further, we had prepaid a large royalty advance, and PMC was already in a deficit, so our proposal reflected the fact that what was contractually relevant to performance by PMC was not presently

3

happening. Notably, at no time did we receive any assurances that PMC could perform anytime in the near or even distant future, and we made it clear that we were taking that fact into account. We thought that by: (1) opening up the proposal with forgiving the several weeks of advance that correlated to the pandemic and being open to forgiving the entire four months based on the way the pandemic was looking, and (2) increasing the royalty percentages for content as well as getting PMC back on track with the photographer obligations it agreed to undertake to support events (obligations that PMC had pushed Shutterstock to pay for), PMC would find our proposal more than reasonable.

8.     However, it turned out that PMC did not want to negotiate with us. After the matter was taken out of Mr. Walter's hands, we got the sense that the goals inside PMC differed between the editorial team and the c-suite. PMC started showing signs that it was not going to be cooperative and would not ride out the storm with us, but was calculating to get a large payment and then get out based on some perceived technicality that the advances would be paid despite the corresponding services not being delivered, and despite no assurances that they ever would be delivered anytime soon or at all. This seemed odd considering that it was clear to everyone (except PMC) as the pandemic dragged on that PMC was indisputably in breach (for example, the Cannes Film Festival – another event listed in the Agreement – was cancelled on April 14, 2020).

9.     Apparently believing it was in a position of strength because of the Editorial team's willingness to discuss bringing back advances when events returned, PMC rejected Shutterstock's initial concepts. However, while we expected PMC to negotiate in its own interest to get to a mutually acceptable resolution, we never expected it to shut down discussions and sue us because we would not agree to pay it a lot of money—even more money than we were paying

when PMC was delivering the valuable event content that Shutterstock paid for—when PMC was in breach.

10.     But that is what PMC did.  While PMC agreed that the current Agreement should be modified in some way in light of non-delivery of the very benefits Shutterstock sought in the relationship, PMC countered with a single proposal from which it never varied: no relief on the past, no obligations to provide any other material, PMC would receive $1,750,000 on July 1, 2020 without any obligation to provide any events, and PMC would receive an extra $1,000,000 in photography use credit from Shutterstock in exchange for Shutterstock paying $1,750,000 on July 1, 2021 instead of July 1, 2020. However, Shutterstock was not looking for a payment plan—particularly not one with a $1,000,000 fee—especially not after PMC showed no sign of returning the pro rata share of the 2019-2020 advance that it retained. It was looking for an agreement that took into account the past breaches and the "new normal."

11.     Of course, we understandably were quite troubled by our perception that PMC misguidedly saw an opportunity to take advantage of us. Not only did they seem oblivious to the fact that they had been paid a $3 million allocable to the term July 1, 2019-June 30, 2020 yet were not delivering services, but they also seemed to not recognize that major events expressly named in the parties' Agreement were being cancelled.

12.     Much to Jay Penske's chagrin, Jon put the matter in my hands and stepped back— as was consistent with his transition. I agreed to do so and to even speak with Mr. Penske about the matter. One point that was clear to Jon and me, however, was that we could not agree to the commitment of any sort of money up front as a condition of a discussion. No other vendor had tried to demand commitment to an advance or guarantee as a baseline discussion of a conversation about the terms of a new agreement.  It would have been particularly inappropriate

to do so in the context present in this case:  by the end of the term PMC would already have retained the equivalent of $1,000,000 of prorated Royalty Advance from 2019-2020 and continued using up to the full cap its $1,000,000 annual photo credit.

13.    PMC misconstrues my communications with Jon on this point: Jon and I agreed that if PMC was looking for a new agreement as we were as well, then the discussion should not start with, much less be conditioned on, how much more Shutterstock would be paying PMC for hypothetical events that may never materialize in the short window that PMC had proposed (specifically, the extension of one year). When I spoke with Mr. Penske, however, this very sensible approach enraged PMC to such a point that he screamed at me and hung up the phone, leaving me to turn the matter over to our in-house counsel, who ultimately got outside counsel involved after Mr. Penske wrote to Jon and indicated that PMC had two law firms ready to litigate.

14.    PMC claims that Shutterstock never intended to offer PMC anything. That is not true. As noted in Shutterstock's April 29, 2020 proposal, made at a time after two major listed events on our baseline list were cancelled, the past period of non-delivery of events would be forgiven and the parties would enter into a straight licensing agreement until live events returned. Further, this was a negotiation, and as I properly stated, I was not going to commit to paying some amount of money as a condition to having a discussion. If PMC did believe in its archive (which it insisted was valuable despite the track record of the archive material Shutterstock already had), and if PMC had planned to finally deliver what it claimed to have and was obligated to provide years before, an agreement along the lines of our proposal would be consistent with our other agreements that do not involve current content.  Most importantly to PMC, it would keep the relationship alive. Indeed, a split of this nature might incentivize PMC to

6

use the time it might have used to get credentials, to take its purportedly valuable archive seriously and provide it to Shutterstock rather than what I understood it did: simply moved it across the country into another storage warehouse where it remained un-scanned and un-cleared for license.

15.     On the other hand, perhaps if events had returned quickly and PMC provided Shutterstock with all of the credentials it had from all of PMC's imprints (not just those in existence under PMC's umbrella in 2015), PMC theoretically could have earned more money than in the Advance under the Agreement. The bottom line was that the situation was just too variable to make it sensible to talk about an event-based advance, especially when PMC was already so far into the hole before the sixth year of the Agreement even started.

16.     Even though we confirmed that PMC was clearly in breach, we did not intend to terminate if and while the parties were still talking, but I understood that by mid-May, even PMC's counsel was not responding at all.  Nonetheless, despite the absence of cooperation from PMC, the Shutterstock team continued to follow the procedures and processes set out in the Agreement, including the obligations to cooperate in good faith, as well as to follow the provisions of Section 8 of the Agreement that relate to allegations by a party of breach.  PMC did not do the same.  Our lawyers sent out a notice on May 18, 2020 to identify the problem and trigger the formal negotiation period, but I never heard anything further except that Mr. Penske sent a text message to Jon, to which he responded.  The next thing I heard was that PMC had sued Shutterstock in court less than a month later and before the negotiation period had finished running.

17.     Knowing that both parties believed the current Agreement should change given the loss of the value Shutterstock had paid for, it was always Shutterstock's hope to work out an

7

acceptable, sensible resolution that took into account the facts and uncertainties of the pandemic and its impact on the entertainment and fashion content that was a key part of Shutterstock's Editorial offering. PMC never gave me the impression that it needed a seven-figure sum to survive the summer of 2020; in fact, I had an understanding that PMC had received a large influx of funds (in particular, a reported $200,000,000 from Saudi Arabia's Research and Media Group) around that time and was otherwise flush with cash. Therefore, it seemed strange to me that PMC's approach became increasingly acrimonious and unreasonable—until they stopped communicating with us entirely.

18.     In my experience, negotiations start at two distant points and move toward the middle, particularly in a circumstance where the parties are obligated to focus on the objectives of their agreement. In the case of the Agreement, the objective was to cooperate in good faith to maximize the overall benefit for both parties based on the context of the relationship. The communications I received indicated to me that all PMC wanted was cash for itself, and nothing else mattered.

19.     Through a set of short phrases, included in out-of-context fashion, from messages to various people, PMC's papers seem to suggest that Shutterstock invented the pandemic or otherwise torpedoed the very valuable access it had contracted to receive—and that Shutterstock did do in order to save money. To the contrary, the cost saving was simply a reflection of the fact that everyone agreed that there would be cost saving of some sort: it was a small silver lining in the cloud that PMC had retained a lot of money and Shutterstock's last year of negotiated opportunities went up in smoke, at great damage to Shutterstock's business goals and competitive advantage. Moreover, these quotes reflect my expectation at the time that PMC was

planning on following through with their expressed expectation that a longer-term relationship was more important than getting more money than it had already retained without performing.

20.     As noted above and stated expressly in my communications with Mr. Grobar, we could not commit to pay PMC more advance money when it could not guarantee us that we would get any of the kind of event access that was central to the Agreement.  Likewise, the fact that I commented to my chief financial officer that there would be an adjustment to the budgets does not imply anything except what the note shows: I was reporting my expectations in the context of budgeting during a very unpredictable time in most companies' financial history. What I expected at the time was that the parties would consider the offers, identify their positions, and come to the table to get to a resolution that would carry the parties through the absence of credential-required events.  I never expected PMC to shut down negotiations.  After all, not only did we expect PMC to negotiate in good faith, but the Agreement *obligated* PMC to do so.

**PMC's Theory that Shutterstock Financially Benefitted from PMC's Failure to Perform Does Not Reflect Shutterstock's Accounting or Records**

21.     I understand PMC claims in its summary judgment motion that because Shutterstock theoretically saved a few thousand dollars on production costs involved in producing images at the live events Shutterstock paid so much money to access, Shutterstock should have to forgo the lost portion of the 2019 Advance, pay $3,500,000 for the 2020 Advance, and give PMC $1,000,000 to equate to photographic use credit.

22.     I further understand that to support this conclusion, PMC alleges that Shutterstock made no efforts to analyze the impact of the pandemic on the deal and therefore Shutterstock cannot say it suffered an essentially total loss. This makes no sense logically, mathematically or otherwise. On a high level, we did easily identify the impact: the loss of events—with respect to

9

both marketing positioning and licensing—was devastating and destroyed the very purpose for the deal, so there is no point in running calculations on minute aspects. Certainly we did not engage in back-of-the-envelope balancing of various numbers that might be thrown into an Excel sheet. For example, looking at dollars received from licensing in various periods from old stock and past events is difficult to calibrate measure when payments for images come in with some lag from the time the images are licensed.  Licensing revenue often is received days, weeks, or even months after the license issues. Similarly, it is speculative to measure any payments against hypothetical savings for any kind of costs, especially when they were costs that were to be borne heavily by PMC under the Agreement and those costs were attributable to events that may or may not have occurred but were not articulated by number in the Agreement itself. Further, without new material arriving, gauging revenues would similarly be difficult: this content was attributable to at least 90% of licensing revenues annually, and PMC had dropped its delivery of old stock by over 90% as well. It was plain that no event images, 113 images of old events to be processed and delivered into a pool of millions of other available non-current images, and the delivery of no credentials much less the cachet that they carry, all equates effectively to an upside of zero dollars. And that is before taking the deduction of the four months of advance money from the July 1, 2019 payment of $3 million and the attributable portion of the $1 million credit to use other Shutterstock images for PMC's vast portfolio of publications.

23.     Rather, Shutterstock identified its losses in an economically-sound manner. In light of the seven-figure amounts at issue, the analysis was far more simple: the minimum value is what was set out in Section 6 of the Agreement, *i.e.*, the minimum Shutterstock would be paying for the event access. That is the economic value of the Agreement because it is the floor. A few dollars saved in the cost for editors for a four-month or even a year span is nothing

compared to the advance, and those amounts are rolled up into the other operational terms of the Agreement. They are not expressly mentioned in the Agreement, and as I understand it, PMC was supposed to be supplying photographers at its own cost for events, too.

24.     The bottom line is that Shutterstock made money on live events. That is the economic yardstick. Having the credentials was not only the source of nearly all of the revenue under the Agreement, but what Shutterstock was paying for was the competitive and brand value of being able to show access that a competitor does not have. The quantitative value of this package is the set of numbers in Section 6 of the Agreement.

25.     Therefore, while there is no dispute that from an *accounting* perspective (as would matter to a chief financial officer, to whom I spoke to report on financials in the message PMC references), the Royalty Advances were cash outflows, the Advances were not "losses" from an *economic* perspective because we received value in exchange for them. Further, my understanding was that PMC had agreed with Shutterstock that with hard work put in by both sides, the Royalty Advances would be fully recouped, but as PMC's comments reflect, the cash outflow earned other value in return.

26.     Without events, however, the economic value that Shutterstock was paying for would not be received. Accordingly, the payouts without the bargained-for benefits would be true losses minus recoupment. This is one reason why an arrangement that contemplated an advance in exchange for event access—but without any event access—did not make objective business sense. The advance equated to event access; in my experience in the industry and based on what I had heard from others, I was unaware of other agreements solely for archive content that included any royalty advances—much less sizeable ones.

15321848.6

27.     PMC also quotes short phrases in snippets of chats to suggest that an adjustment of a Royalty Advance by $1,750,000 would eliminate a shortfall of $7,000,000. While other vendors adjusted their agreements and other measures were taking place, the $5,250,000 delta in PMC's conclusory financial analyses shows how one cannot use selectively quoted chats to provide assessments of revenues, budgets, allocations, and margins in a business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: New York, New York
          April 18, 2023

STAN PAVLOVSKY