DocuSign Envelope ID: D6451584-7880-44EB-A877-5D3043CBCA16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSKE MEDIA CORPORATION,

    Plaintiff-Counterclaim Defendant,

-against-

SHUTTERSTOCK, INC.,

    Defendant-Counterclaim Plaintiff.

Case No. 20-cv-04583 (MKV)

## DECLARATION OF BENJAMIN PFEIFER

BENJAMIN PFEIFER declares as follows:

1. I was formerly employed by defendant-counterclaim plaintiff Shutterstock, Inc. ("Shutterstock") as VP of New Business. I submit this declaration in support of Shutterstock's Opposition to Motion for Partial Summary Judgment. The statements made below are true and accurate based on my own personal knowledge.

2. Founded by Jon Oringer in 2003, Shutterstock has been a rapidly expanding and successful company in the audiovisual content industry. At the time I joined Shutterstock, the company had been primarily known for "stock" imagery that was geared toward commercial use, such as use in advertising and corporate materials, as well as non-commercial publications and general public uses. When it came to photo editors, brands, or anyone in the news, entertainment, sports, or fashion world, Shutterstock wasn't seen as a serious contender.

3. Over the years, the demand for "editorial" photography—especially photographs documenting entertainment, fashion, sports, and other current events—increased exponentially due to the internet, social media, and ever-increasing pace of the news cycle. In around late 2014, Shutterstock set out to launch an "editorial" offering that would offer high-value, highly current

content that would attract large-scale subscribers with larger budgets—primarily news outlets that were going to Shutterstock's competitor Getty Images instead. While Shutterstock always had editorial content, including from Jon's very first uploads of thousands of editorial-style images to the Shutterstock platform, we believed that a branded "Editorial" service would attract large licensees around the world (such as major news outlets and entertainment and fashion magazines) who rely on highly current images from global news and events, politics, sports, entertainment, and fashion to support their reporting. The product became known as Shutterstock Editorial and also is now encompassed in the product called Shutterstock Premier.

4. Shutterstock started building out the Editorial product by acquiring Rex Features ("Rex"), Europe's largest independent photography press agency. Although Rex had staff in the United States—for example, in Los Angeles for entertainment events—most of its coverage, while premium, was based in Europe.

5. At the suggestion of Jay Penske, CEO of Penske Media Corporation ("PMC"), following a discussion between Jay and Jon at a business conference, Shutterstock considered a partnership with PMC to help bolster the U.S. entertainment and international fashion component of the Editorial product through PMC's entertainment trade publications such as *Variety* and fashion trades such as *Women's Wear Daily*. I understood that PMC had recently been in a dispute with its then-partner, Getty Images, so the timing and opportunity were right.

6. During the course of the next several months, Shutterstock continued to build out its Editorial product, spending large sums of money to secure partnerships for current, in-demand images from the Associated Press (AP), european pressphoto agency (epa), BFA, and The Football Association. It is universal knowledge among those who work in the image licensing business that those with access charge money for it, just like Fox pays the NFL millions of dollars to get football

DocuSign Envelope ID: D6451584-7880-44EB-A877-5D3043CBCA16
Case 1:20-cv-04583-MKV-VF   Document 188   Filed 04/20/23   Page 3 of 10

coverage or AP guarantees the NFL millions per year to be associated with NFL imagery, or Getty Images pays for exclusive access to NBA images. Shutterstock did so with respect to PMC, in the form of a "Royalty Advance" recoupable against money earned through PMC's contributions of special access, passes, and credentials that would allow the creation and immediate licensing of unique and high-demand images via Shutterstock's Editorial platform, in a 2015 "Archive & Event Image Hosting and Licensing Agreement" ("Agreement"), provided that PMC was not in breach. *See* Agreement, § 6.

7. While Rex had good access to some U.S. events, often the access was "behind the line" – basically, where a Rex photographer would be standing on bleachers next to a bank of dozens of photographers who were all capturing the same images. Through *Variety*, PMC had something special. As PMC's own complaint recognized, "access is everything." PMC had not just insider access, but the so-called "golden pass" to the most high-profile entertainment and fashion events in the industry, including exclusive passes like access to Oscar and Emmy Awards after-parties. This access was what induced us to do this deal at all, and it was so important to us that we spelled out the events by name in the parties' Agreement.

8. In particular, Section 3(a)(ii) of the Agreement states: "PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions to which third parties are invited generally ('PMC Events')." Section 3(a)(iii) of the Agreement states: "PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world to which PMC has access as defined herein (the 'Third Party Events')." The term Third Party Events expressly includes (but is not limited to) the events cataloged on Schedule D to the Agreement, such as the Academy Awards and the Sundance Film Festival. *See* Agreement, §§ 3(a)(ii), 3(a)(iii). These events were the baseline for the start of the Agreement and

3

were expected to include hundreds of lesser (but still editorially valuable) events. While I recall a couple of problems with access and issues with PMC failing to provide photographers that were required under Section 3(e) of the Agreement for third party events, I do not recall PMC failing to provide access to the Schedule D events every year.

9. I understand that PMC claims that the events on Schedule D were optional and that PMC never had to provide any of them. For support, PMC relies on a comment I made about Getty Images potentially boxing PMC out of an event and seems to imply that this gave PMC free reign to not deliver on the events that were the baseline events that Shutterstock was paying for. This comment cannot be extrapolated to apply to other scenarios, much less a scenario where no events would be provided. Rather, my comment was in reference to a real situation: Getty Images' relationship with *Variety* was winding down after a heated dispute, as expressly reflected in Section 18 of the Agreement that discusses Getty Images having access to certain unspecified events on *Variety* credentials. Particularly in light of the competitive threat that Shutterstock was to Getty Images in the field, we expected that there might be a possibility that Getty Images—upon hearing about the deal—may use the *Variety* relationship to box Shutterstock out. So of course there was some wiggle room: that's what I was referring to, in particular, the caveat contemplated by Section 18 of the Agreement. Notably, Section 22 of the Agreement indicates PMC's representation and warranty that other than the Getty Images agreement, there was nothing interfering with or preventing PMC from its performance of its obligations, and PMC never identified anything to us that would lead us to believe it might not be able to perform.

10. In fact, PMC represented and warranted to us that it had access to the events on Schedule D, along with hundreds of additional lower-tier events that may generate images of marketable value for the Editorial offering, and the Agreement so reflects that representation and

4

warranty. In particular, "to which PMC has access" is a description or statement of fact, not a condition, and was part of the definition of Third-Party Events themselves. Had we meant to say "if" or "to the extent that" in lieu of "to which," we would have said that.[1]

11.     PMC's phrase "available access" is not used in Section 3(a), or anywhere else in the Agreement. The Agreement does not say "if PMC has access" or "to the extent that PMC has access." The Agreement is not conditional or limiting at all, but instead is presumptive. The significant event access is what got Shutterstock to enter into the Agreement with PMC and assumes PMC already has access. Moreover, the language "to which PMC has access" refers to the list on Schedule D, at the very least, and reflects the array of significant annual events that the parties understood the events to be. In other words, the definition reflects the significant events that PMC has access to, as understood at the time of entry into the Agreement. *See* Agreement, § 3(a)(iii) ("PMC will provide to Shutterstock defined credentials, passes, VIP access to significant events around the world to which PMC has access as defined herein ("Third Party Events"). . . . These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D.").

12.     As I believe PMC agrees, the Agreement was a unique deal in that it was driven by event access, and third-party events in particular. Because Shutterstock had acquired Rex, there was no comparable deal at the time. Our jointly drafted press releases tout the event access and talk about all of the high-profile places where Shutterstock will be capturing the kinds of images that the world wants.

---

[1] This can be contrasted to "PMC Events," which contained a qualification that they be events "to which third parties are invited generally" (i.e., not private functions like a PMC company holiday party). Agreement, § 3(a)(ii). For Third-Party Events, PMC is still on the hook even if *nobody* is invited to the event. *Compare with id.*, § 3(a)(iii).

13. As the Agreement reflects, we included a component for licensing of content on a percentage basis, consistent with our adjusted royalty splits for other content. Our expectation was that the content involved would be third-party event content primarily if not fully. However, nobody expected that archive content would recoup the advance: after all, to my recollection, PMC did not provide us with any notable amount of archival content suitable for licensing until well into the second year of the Agreement. Simply put, Shutterstock was not making any money on archival content because it did not have any. Shutterstock also had other archives from other places as part of its dozens of millions of images, so having a cache of old photographs of questionable provenance wouldn't give us any notable strategic advantage beyond what we had. Indeed, as PMC's lawsuit indicated, "access [was] everything."

14. What Shutterstock wanted out of the Agreement was the cachet associated with being the official *Variety* photographer at the Oscars or the Tonys or the official *WWD* photographer at New York Fashion Week, along with the exclusive photographs that would garner the attention of big licensees, including Shutterstock's competitors' clients. This is consistent with one of the goals as stated in Section 3(a) of the Agreement, specifically, to maximize the revenue from the content, as well as stated in the subsection pertaining to third-party events, i.e., to "further monetize" the content. In fact, we believed that through our partnership, the Royalty Advance would be recouped and PMC would earn more revenue above the advances that Shutterstock paid.

15. In fact, at the time, PMC assured us that the arrangement would be so successful that Shutterstock would not only achieve its goal of building its brand in the editorial space—something it would need the full year of the Agreement and perhaps beyond to do—but the royalty advance would be paid off, particularly in later years. PMC promised to us that it had more photographers on staff than the one it ultimately offered for support, and that it would work to help

expand third-party-event opportunities. PMC (which now indirectly owns *The Hollywood Reporter* and *Billboard*) also was on an acquisition spree, which led to the addition of a specific provision that would give Shutterstock the right of first negotiation for added publications, such as the iconic music publication *Rolling Stone*, which carried with it its own highly valuable credentials and should have become part of the deal if PMC followed the provisions of the Agreement. *See* Agreement, § 3(a)(iv) ("PMC and Shutterstock shall engage in exclusive good faith discussions for a period of not less than 90 days after the date of such Acquisition [transaction] with the intent of amending the Agreement such Acquisition Content and/or Acquisition Events.").

16. The promising and collaborative discussions between the parties and the realities of the industry helped both parties feel comfortable increasing the amount of the advances over time, and why we felt comfortable that while there may not be recoupment on occasion, the relationship would be successful on an annual basis and shortfalls would not be severe—particularly after the initial few months as we ramped up. To help bolster the spirit of mutual success in the wake of the removal of the "opt-out" from the term sheet, we added in other provisions relating to pricing, good faith, and other terms that would benefit Shutterstock and help shore up the Agreement to be financially and commercially successful. The negotiation was a back-and-forth just like in the creation of any other deal. Of course, as even a 50% level implies, Shutterstock was prepared to not recoup 100% every year because the access alone had non-monetary but commercial value. Just like spending money on advertising is not a "loss" from an economic perspective, we saw the royalty advance as an investment that provided us a marketing benefit each year of the Agreement.

17. We had no reason to believe that PMC was just looking for cash payments in the deal. After all, the Agreement was set up for mutual success that would lead to payments above the Royalty Advance. We had drafted the Agreement to encourage good faith cooperation, but as Candice Murray can explain better, PMC resisted the goal of maximizing content and at one point demanded coverage that was not included in the Agreement. Obviously, it also never occurred to anyone at the time that a global pandemic would come along that would wipe out all live events for nearly two years. However, in our view, PMC bore that risk: it was obligated to provide at a minimum a set of events and work in good faith to create additional access at third party events, and PMC knew that this is what Shutterstock was paying for. If PMC did not provide the opportunities that those events brought, then in my view as the Shutterstock's primary drafter of the Agreement, PMC is in breach.

18. There can be no serious dispute that Shutterstock would not have entered into the Agreement – at least not one with significant advances – if the only content that was provided was archive content. The total level of our diligence into the archive was sending a junior staffer to take a look at some of the fashion photographs to get an idea of what PMC had and confirm that PMC did have some photographs in the entertainment and fashion category. While we did agree that some of the images were quite striking and might be a useful compliment to current day coverage in fashion in particular and PMC seemed very interested in having Shutterstock throw in some money to help PMC do something with its archive that was sitting in physical storage as part of the various financial back-and-forth, we never conducted an assessment of the value of the archive. We also had doubts about the rights in the images considering that it was unclear if the photographers were employees or mere independent contractors of the publications, and many appeared to be publicity shots created by studios and fashion brands. There was little to no

negotiation or discussion regarding the archive images; the overwhelming majority of the time in the negotiation and subsequent meetings was spent on matters pertaining to live events. And, as noted above, to my recollection, Shutterstock never even ingested any material amount of the archive until after Shutterstock had paid its second royalty advance.

19.     In fact, considering the state of the archive content—very little of which was digitized, in addition to the issues noted just above—it is unlikely Shutterstock would have entered into *any* agreement with PMC at all if all Shutterstock was receiving was the archive content.

20.     Annual access to live entertainment and fashion industry events was the reason Shutterstock entered into the Agreement, and the reason for the annual advances. PMC knew and understood this at the time of the Agreement's execution. Shutterstock would not have agreed to pay the License Period 6 Royalty Advance, or any other Royalty Advance, if it knew that it would not have access to PMC Events or Third Party Events during that particular License Year, especially because Shutterstock could recoup against a Royalty Advance with *only* the revenues earned during that particular License Period. The Royalty Advance amount increased after the second license period, with the largest amount in the last license period, because the parties anticipated that revenues would increase over time as more consumers of editorial photography recognized Shutterstock as a reliable source for current entertainment and fashion photography, and higher revenues in the later license periods would justify larger corresponding recoupable Royalty Advances. Every year was valuable to us, and we expected to receive every year of access with a growing pace of events.

21.     There was no scenario where an Advance would be paid in exchange for no third-party event content. Not only was this understood for all the reasons stated above, but the

Agreement also was drafted in such a way to tie the Royalty Advance calculations to the provision of Third Party Event Content. Agreement, at § 6 ("*and* Third Party Event Content").

22. Accordingly, as the primary drafter of the Agreement, I find PMC's current position that it is entitled to $3.5 million plus $1 million of paid credit for a shortened period of service to be irreconcilable with the history, facts, industry practice, and common sense. PMC's failure or inability to provide events would completely destroy the purpose of the Agreement, and Shutterstock never would have entered into the Agreement if it could not get access to premium events—much less any events.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Brooklyn, New York
April 19, 2023

_Ben Pfeifer_
BENJAMIN PFEIFER